UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JANE DOES 1-9, *et al.*,

        Plaintiffs,

      v.

KASHYAP P. PATEL,
Director, Federal Bureau of Investigation,
*et al.*,

        Defendants.

Civil Action No. 25-4258 (TNM)

**MOTION TO DISMISS AND**
**<u>MEMORANDUM IN SUPPORT THEREOF</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 4

        A.    Factual Background ................................................................................ 4

        B.    Procedural History ............................................................................... 6

LEGAL STANDARD ................................................................................................ 7

ARGUMENT ........................................................................................................... 7

    I.    Plaintiffs Fail To State A Claim Under The First Amendment .............................. 7

    II.    Plaintiffs Fail To State Procedural Due Process Claims ..................................... 10

        A.    Plaintiffs Were Not Deprived Of Any Property Interest ......................... 10

        B.    Plaintiffs Were Not Deprived Of Any Liberty Interest ........................... 12

        C.    Plaintiffs Received Adequate Process ....................................................... 14

    III.    Plaintiffs Fail To State A Substantive Due Process Claim ................................. 15

    IV.    Plaintiffs' Removals Were Lawful Under The Article II Removal Power ........... 16

    V.    Jane Doe 5 Fails To State A Claim .................................................................. 17

        A.    The Purported Statutory Removal Protections For SES Agents Are Unconstitutional As Applied In This Context ........................................... 17

        B.    Even If The Removal Protections Apply, Jane Doe 5's Claims Fail ........ 20

    VI.    Plaintiffs' Derivative Claims Should Be Dismissed ........................................... 24

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albright v. Oliver,*
    510 U.S. 266 (1994) ...................................................................................15

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
    526 U.S. 40 (1999) .....................................................................................10

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .....................................................................................7

*Bd. of Regents of State Colls. v. Roth,*
    408 U.S. 564 (1972) .............................................................................10, 11

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .....................................................................................7

*Bessent v. Dellinger,*
    145 S. Ct. 515 (2025) .................................................................................24

*Bishop v. Wood,*
    426 U.S. 341 (1976) ...................................................................................21

*Breiterman v. United States Capitol Police,*
    15 F.4th 1166 (D.C. Cir. 2021) ..............................................................9, 16

*Buckley v. Valeo,*
    424 U.S. 1 (1976) .......................................................................................18

*Changji Esquel Textile Co. v. Raimondo,*
    40 F.4th 716 (D.C. Cir. 2022) ........................................................3, 22, 23

*Cleveland Bd. of Educ. v. Loudermill,*
    470 U.S. 532 (1985) ...................................................................................14

*Cnty. of Sacramento v. Lewis,*
    523 U.S. 833 (1998) ...................................................................................15

*Collins v. Yellen,*
    594 U.S. 220 (2021) ...................................................................................20

*Connick v. Myers,*
    461 U.S. 138 (1983) .....................................................................................7

*Crooks v. Mabus,*
    845 F.3d 412 (D.C. Cir. 2016) ...................................................................11

*Dep't of State v. Munoz,*
    602 U.S. 899 (2024) ...................................................................................15

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012) .......................................................................................23

*Esparraguera v. Dep't of the Army,*
    101 F.4th 28 (D.C. Cir. 2024) ..............................................................14, 21

*Farah v. Esquire Mag.,*
    736 F.3d 528 (D.C. Cir. 2013) ..............................................................13, 14

*Fornaro v. James,*
    416 F.3d 63 (D.C. Cir. 2005) .....................................................................23

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ........................................................................ 17, 18, 20
*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) ................................................................................ *passim*
*Gilbert v. Homan*,
  520 U.S. 924 (1997) .................................................................................. 14, 21
*Graham v. Ashcroft*,
  358 F.3d 931 (D.C. Cir. 2004) ................................................................... 3, 23
*Griffith v. FLRA*,
  842 F.2d 487 (D.C. Cir. 1988) .................................................................. 20, 22
*Grosdidier v. Chairman, Broad. Bd. of Governors*,
  560 F.3d 495 (D.C. Cir. 2009) ........................................................................ 23
*Grupo Mexicano de Desarrolo, S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999) ........................................................................................ 24
*Hall v. Ford*,
  856 F.2d 255 (D.C. Cir. 1988) ....................................................................... 11
*Ex Parte Hennen*,
  13 Pet. 230 (1839) .......................................................................................... 16
*Hettinga v. United States*,
  677 F.3d 471 (D.C. Cir. 2012) ......................................................................... 7
*Hurd v. District of Columbia*,
  147 F.4th 1036 (D.C. Cir. 2025) ........................................................... 3, 15, 16
*In re Sawyer*,
  124 U.S. 200 (1888) ....................................................................................... 24
*Kennedy v. Braidwood Mgmt., Inc.*,
  606 U.S. 748 (2025) ....................................................................................... 16
*Langeman v. Garland*,
  88 F.4th 289 (D.C. Cir. 2023) ................................................................... *passim*
*LeFande v. District of Columbia*,
  841 F.3d 485 (D.C. Cir. 2016) ......................................................................... 8
*Lucia v. SEC*,
  585 U.S. 237 (2018) ....................................................................................... 18
*Marbury v. Madison*,
  1 Cranch 137 (1803) ...................................................................................... 17
*McCormick v. District of Columbia*,
  752 F.3d 980 (D.C. Cir. 2014) ......................................................................... 2
*Myers v. United States*,
  272 U.S. 52 (1926) ......................................................................................... 18
*NRC v. Texas*,
  605 U.S. 665 (2025) ....................................................................................... 22
*O'Donnel v. Barry*,
  148 F.3d 1126 (D.C. Cir. 1998) ..................................................................... 13
*Olim v. Wakinekona*,
  461 U.S. 238 (1983) ....................................................................................... 20
*Paul v. Davis*,
  424 U.S. 693 (1976) ................................................................................. 12, 13

*PHH Corp. v. CFPB*,
  881 F.3d 75 (2018) ............................................................................................... 19
*Ralls Corp. v. Comm. On Foreign Inv. In U.S.*,
  758 F.3d 296 (D.C. Cir. 2014) ....................................................................... 14, 21
*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ........................................................................ 17, 18, 19, 20
*Tate v. District of Columbia*,
  627 F.3d 904 (D.C. Cir. 2010) ............................................................................ 21
*Trump v. United States*,
  603 U.S. 593 (2024) ........................................................................ 3, 16, 19, 20
*United States v. Armstrong*,
  517 U.S. 456 (1996) ............................................................................................ 20
*United States v. Fausto*,
  484 U.S. 439 (1988) ............................................................................................ 23
*United States v. Germaine*,
  99 U.S. 508 (1879) .............................................................................................. 18
*United States v. Texas*,
  599 U.S. 670 (2023) ...................................................................................... 19, 20
*White v. Berry*,
  171 U.S. 366 (1898) ............................................................................................ 24
*Wilbur v. U.S. ex rel. Barton*,
  46 F.2d 217 (D.C. Cir. 1930) .............................................................................. 18
*Wosley v. Chapman*,
  101 U.S. 755 (1879) ............................................................................................ 18
*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ............................................................................................ 19

**Statutes, Rules, and Other Authorities**

U.S. Const. art. II ............................................................................. 17, 18, 19, 20
U.S. Const. amend. V ............................................................................................ 10
5 U.S.C. § 3131 ............................................................................................... 18, 19
5 U.S.C. § 3151 ............................................................................................... 17, 18
5 U.S.C. § 3151(a) ................................................................................................. 22
5 U.S.C. § 7543(b) ................................................................................................ 23
5 U.S.C. § 7703 ..................................................................................................... 22
Fed. R. Evid. 201(b)(2) .......................................................................................... 6

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Kashyap P. Patel, Director, Federal Bureau of Investigation ("FBI"); the FBI; Pamela J. Bondi, Attorney General of the United States; the United States Department of Justice; the Executive Office of the President; and the United States of America, respectfully move to dismiss the Complaint (ECF No. 1) ("Compl.") of Plaintiffs Jane Does 1–9 and John Does 1–3 for failure to state a claim upon which relief can be granted.

## INTRODUCTION

In May and June 2020, rioters and looters besieged cities across the United States. In the District of Columbia, they vandalized landmarks, including the Lincoln Memorial and World War II Memorial. They set fires, including at the historic St. John's Church. They threw rocks, urine, and alcohol, including at Secret Service agents—more than sixty of whom were injured. And they caused millions of dollars in property damage. Over 430 people were arrested. FBI agents were tasked with maintaining a visible police presence to help control the chaos. Nearly all performed with characteristic professionalism, impartiality, and efficiency.

Plaintiffs are former FBI agents who were deployed in the District as part of those law enforcement visibility efforts. On June 4, 2020, while performing their duties, they performed the rioters' signature kneel, which was understood to convey support for the political stances espoused by the Black Lives Matter organization. Plaintiffs claim that rioters "swarm[ed] them such that Plaintiffs had no ability to leave the scene safely," and that Plaintiffs kneeled to protect themselves and de-escalate a dangerous confrontation. Widely publicized photographs of Plaintiffs kneeling are included in the government's concurrently filed motion to compel compliance with Rule 10(a) ("Rule 10 Mot.").

Defendant FBI Director Kashyap P. Patel later determined—after an internal investigation in which Plaintiffs provided sworn statements and were interviewed—that Plaintiffs had engaged

in "unprofessional conduct and a lack of impartiality in carrying out duties."  Compl. ¶ 109.  For that express reason, Director Patel removed Plaintiffs as FBI agents, and the Attorney General subsequently ratified their removals.

Plaintiffs now assert that their terminations were unlawful on various grounds.  They seek immediate reinstatement and an expungement of all records related to their terminations, among other remedies.  But Plaintiffs fail to state a claim for which relief may be granted.

Take their lead First Amendment claim.  "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  Plaintiffs repeatedly emphasize that they kneeled as a tactical maneuver in the course of performing their duties.  That means their conduct does not implicate the First Amendment at all.  And Plaintiffs do not plausibly allege their termination was based on any other private expression.

Plaintiffs' procedural due process claims fare no better.  There is "expansive authority and discretion for FBI leadership to determine the circumstances where an FBI employee may be summarily dismissed."  *Langeman v. Garland*, 88 F.4th 289, 295 (D.C. Cir. 2023) (internal quotation marks omitted).  So Plaintiffs had no property interest in their positions as FBI agents. *See id.*  Even assuming Plaintiffs had a nebulous "liberty" interest in their "reputations," Plaintiffs have not plausibly alleged that FBI leadership "disseminated the reasons for the termination[s] and such dissemination [wa]s defamatory."  *McCormick v. District of Columbia*, 752 F.3d 980, 988 (D.C. Cir. 2014).  Among other reasons, Plaintiffs do not plausibly allege that the purportedly defamatory statements were published to third-parties, let alone provably false.

Plaintiffs' substantive due process claim fails as well.  Plaintiffs do not come close to alleging "conduct intended to injure in some way unjustifiable by any government interest."  *Hurd v. District of Columbia*, 147 F.4th 1036, 1041 (D.C. Cir. 2025).  The government has an obvious interest in dissuading law enforcement officers from appearing to participate in divisive political demonstrations while on the job.

Although plainly defective on all those grounds, the above-described claims also fail based on the Article II removal power.  Given that "conclusive and preclusive" power, Plaintiffs could be removed as FBI agents for any reason, and "courts cannot examine" their removals.  *Trump v. United States*, 603 U.S. 593, 609 (2024).

Jane Doe 5's individual due process and *ultra vires* claims are also without merit.  Both are premised on statutory provisions that purportedly protected her (but not any other Plaintiff) from removal as a non-probationary member of the FBI Senior Executive Service (SES).  Such provisions are unconstitutional to the extent they interfere with the Article II removal power.  In any event, Jane Doe 5's due process claim fails because she lacked a property interest in her position as an FBI agent.  Regardless, she received adequate process.  And the Court lacks subject matter jurisdiction over Jane Doe 5's *ultra vires* claim because Congress has "precluded judicial review."  *E.g.*, *Graham v. Ashcroft*, 358 F.3d 931, 936 (D.C. Cir. 2004) (Roberts, J.).  Even if the Court had jurisdiction, Jane Doe 5 would need to plausibly allege an "extreme" statutory violation to state an *ultra vires* claim.  *See, e.g.*, *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022).  But she fails to allege any violation.

Because Plaintiffs fail to state a claim on the merits, the Court should dismiss the Complaint (including Plaintiffs' derivative Declaratory Judgment Act and Writ of Mandamus claims) in full and with prejudice.

# BACKGROUND

### A.    Factual Background

In late May and early June 2020, rioters wreaked havoc on the District of Columbia under the guise of "highlight[ing] concerns about perceived racial bias and . . . call[ing] for police reforms." Compl. ¶ 4. As Plaintiffs—FBI agents at the time—explain, Plaintiffs were deployed in downtown Washington D.C. to provide law enforcement visibility that could help quell "violent unrest" that included "rioting, assaults, looting of uninvolved businesses, and widespread property damage." *Id.* ¶¶ 4-5; *see also id.* ¶ 64. In one incident, rioters "flung rocks, urine[,] and alcohol" at Secret Service agents, causing multiple injuries including broken bones.[1] Arsonists lit fires near the White House, including at St. John's Church.[2] Throughout, rioters called for the District to "defund the police."[3] Some of Plaintiffs' "unoccupied FBI vehicles were vandalized with anti-law enforcement graffiti." Compl. ¶ 60. All told, at least 430 people were arrested.[4]

For purposes of this motion only, Defendants assume the truth of Plaintiffs' allegations that while performing their duties, Plaintiffs were "confronted by a mob." Compl. ¶ 7; *but see* Rule 10 Mot. at 3-4. According to Plaintiffs, rioters "charged towards" them until Plaintiffs were "backed

---

[1]    ABC News 4, *Secret Service agents injured after Friday's protests near White House* (May 30, 2020), *available at* https://abcnews4.com/news/nation-world/secret-service-agents-injured-after-fridays-protests-near-white-house.

[2]    Fox5 Washington DC, *Chaos erupts as fires blaze across DC during protests surrounding the White House* (updated May 31, 2020), *available at* https://www.fox5dc.com/news/chaos-erupts-as-fires-blaze-across-dc-during-protests-surrounding-the-white-house.

[3]    WTOPnews, *Bowser, DC Council respond to calls to defund police* (June 9, 2020), *available at* https://wtop.com/dc/2020/06/dc-george-floyd-coronavirus-update-june-8/.

[4]    WUSA9, *Nearly 90% of people arrested for riot crimes and vandalism are from DMV, police say* (updated June 8, 2020), *available at* https://www.wusa9.com/article/news/local/dc/outside-agitators-dc-george-floyd-protest-arrests-locals/65-4f2e00fa-cd46-4d3b-86ae-fbf755649644.

up against a wall of the National Archives" as the rioters "directed increasingly agitated shouting and gesturing towards them." *Compl.* ¶ 69. In Plaintiffs' view, the confrontation was "comparable" to the lead-up to the "Boston Massacre," where British soldiers "fearfully fired their weapons into a crowd of dissenting Americans." *Id.* ¶ 7. "Some in the mob began shouting for the FBI personnel to kneel." *Id.* ¶ 70. Plaintiffs appear to assume that their only options were to obey the rioters or shoot them: Rather than "repeat the mistakes of the British soldiers," Plaintiffs "made a considered tactical decision" and "avoided triggering violence by assuming a kneeling posture." *Id.* ¶¶ 7-8.

In other words, having "been informed that the purpose of the[ir] deployment was to show a visible law enforcement presence," Compl. ¶ 64, the officers showed visible law enforcement acquiescence. By then, kneeling was understood to convey solidarity with the "Black lives matter" movement and to support "change in police accountability."[5] After Plaintiffs kneeled, "the mass of people" allegedly "moved on" (and presumably continued rioting). Compl. ¶ 9. Yet in Plaintiffs' view, kneeling had fulfilled George Washington's purported advice to "subdue[] . . . 'riot and insurrection.'" *Id.* ¶ 10 (quoting George Washington, *Farewell Address to the People of the United States* (Sept. 19, 1796)).[6]

Initially, Plaintiffs were not disciplined for their actions. Compl. ¶ 11. But when Defendant Patel became FBI director, the FBI commenced an internal investigation during which

---

[5]    58 News Milwaukee, *Kneel for Nine: Demonstrators gather across Wisconsin to pay tribute to George Floyd* (June 2, 2020), http://www.cbs58.com/news/kneel-for-nine-demonstrators-gather-across-wisconsin-to-pay-tribute-to-george-floyd (cited at Compl. ¶ 56 n.28).

[6]    Washington's farewell address did not discuss how authorities should handle a riotous mob. The relevant portion of his address states that "wise people" should "discourage and restrain" the "common and continual mischiefs of the spirit of party," which "foments occasionally riot and insurrection." George Washington, *Farewell Address to the People of the United States*, *supra*.

"every Plaintiff . . . submitted . . . [a] statement and was interviewed," resulting in a record that spanned "hundreds of pages." *Id.* ¶¶ 104-05.

Director Patel "summarily dismissed" Plaintiffs on September 26, 2025. Compl. ¶ 109. Summary dismissal letters explained that Director Patel had "considered relevant material . . . , including the investigation conducted by the FBI's Inspection Division." *Id.* Director Patel concluded that Plaintiffs had "demonstrated unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government." *Id.* "Pursuant to Article II of the United States Constitution and the laws of the United States, [their] employment with the Federal Bureau of Investigation [was] . . . terminated." *Id.* The Attorney General subsequently ratified Plaintiffs' removal. *See* Memorandum for the Director, Federal Bureau of Investigation (Ex. A).[7]

## B.     Procedural History

On December 8, 2025, Plaintiffs sued Defendants Director Patel, the FBI, the Attorney General, the U.S. Department of Justice, the Executive Office of the President, and the United States. *See* Compl. Plaintiffs claim that their removals violated the First Amendment (Count I) and the Due Process Clause of the Fifth Amendment (Counts II, III, and IV). *Id.* ¶¶ 138-69. Plaintiff Jane Doe V separately claims that her termination violated the Due Process Clause (Count V) and was *ultra vires* (Count VI) because she was a non-probationary SES agent (in the role of Section Chief). *Id.* ¶¶ 170-82. Plaintiffs all assert derivative claims under the Declaratory

---

[7]     Defendants request that the Court take judicial notice of the Attorney General's ratification as a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The names of individual employees, including the twelve Plaintiffs, have been redacted in the attached exhibit pursuant to the tentative order (ECF No. 5) permitting Plaintiffs to proceed under pseudonyms. A version with Plaintiffs' names unredacted is being provided to Plaintiffs' counsel.

Judgment Act (Count VII) and for a writ of mandamus (Count VIII) "commanding Defendants return them to their respective offices." *Id.* ¶ 188.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must have 'facial plausibility,' meaning it must 'plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (per curiam) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Factual allegations, although assumed to be true, must still 'be enough to raise a right to relief above the speculative level.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[T]he Court need not accept inferences drawn by plaintiff[s] if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Id.*; *accord Langeman*, 88 F.4th at 294.

## ARGUMENT

I.     **Plaintiffs Fail To State A Claim Under The First Amendment**

Plaintiffs contend that their terminations for kneeling in the course of performing their duties violate the First Amendment.  Compl. ¶¶ 138-146.

The Supreme Court has slammed the door on this type of claim.  "[G]overnment offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143 (1983).  And "[g]overnment employers . . . need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti*, 547 U.S. at 418.  So "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421; *see also id.* at 423-24 ("Employees who make public statements

outside the course of performing their official duties retain some possibility of First Amendment protection," but "[w]hen a public employee speaks pursuant to employment responsibilities, . . . there is no relevant analogue to speech by citizens who are not government employees.").

*Garcetti* is fatal to Plaintiffs' First Amendment claim. Plaintiffs repeatedly emphasize that in kneeling, they "were performing their duties as FBI Special Agents." Compl. ¶ 77; *see also id.* ¶¶ 8, 9, 74, 76, 106 (Plaintiffs allegedly kneeled as a "tactical" decision). Accordingly, the First Amendment does not shield them from discipline or termination.

Plaintiffs cannot circumvent *Garcetti* by framing their termination as based on "perceived partisan support or affiliation." Compl. ¶ 139. The only conduct that Plaintiffs allege could give rise to any perceived partisan affiliation was their purported "use of de-escalation to quell unrest" by kneeling—*i.e.*, their unprotected conduct while performing official duties. *Id.* ¶ 141; *see also id.* ¶ 127. Plaintiffs do not allege any additional private, protected expression.

Instead, Plaintiffs propose an untenable expansion of First Amendment protections to law enforcement officers' conduct on the job. According to Plaintiffs, if a public employer assesses agent conduct based in part on the employer's "perception of the civilians" involved in an encounter, that assumed perception can be "imputed" to the agents in a manner that violates their First Amendment rights as private citizens. Compl. ¶ 122. But as the Supreme Court has emphasized, public employer "[s]upervisors must ensure that their employees' official communications . . . demonstrate sound judgment, and promote the employer's mission." *Garcetti*, 547 U.S. at 422-23. That is why, as a general matter, courts owe "a wide degree of deference to the employer's judgment" in evaluating the impact of any employee's speech. *LeFande v. District of Columbia*, 841 F.3d 485, 494 (D.C. Cir. 2016). Courts owe even "stronger"

deference when a law enforcement agency disciplines an agent given "the special degree of trust and discipline required in a police force." *Breiterman v. United States Capitol Police*, 15 F.4th 1166, 1176-77 (D.C. Cir. 2021).

That deference necessarily extends to supervisors' assessments of how law enforcement officers should interact with civilians—assessments that may reasonably differ with the circumstances depending on the supervisors' judgment and understanding of the agency's mission. By Plaintiffs' logic, a supervisor could not consider rioters' express political purpose (no matter how contrary to the agency's mission) while evaluating the appropriateness of an agent's conduct because a court could assume any disciplinary action targeted underlying political speech. The Supreme Court has rejected such "displacement of managerial discretion by judicial supervision." *Garcetti*, 547 U.S. at 423.

In any event, the "public statements, private conversations, and other means" alleged in the Complaint do not plausibly establish termination "based on Defendants' perception that [Plaintiffs] were not politically affiliated with President Trump." Compl. ¶ 142. Plaintiffs were expressly terminated for "unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government." *Id.* ¶ 109. And Plaintiffs' allegations do not plausibly establish (or even suggest) otherwise. For example, Plaintiffs cite Director Patel's alleged prior statements that FBI agents were improperly asked to perform "riot control" on January 6, 2021. *See id.* ¶ 123. But whether agents should be in a riot control role in the first place has nothing to do with how agents should comport themselves once tasked with maintaining a visible police presence during a riot—or how FBI leadership should respond to inappropriate behavior in that context. Director Patel's more general alleged prior statements about removing public employees who "undermine the [P]resident's agenda," *id.* ¶ 92, on their face refer to Executive Branch

officials who thwart the Chief Executive's directives.  Such statements do not imply termination based on private speech or political beliefs.  Plaintiffs' additional reliance on irrelevant statements by non-Defendants, *see id.* ¶¶ 89-91 (referencing President Trump's re-post of a Fox News article describing a letter signed by then-Congressman Matthew Gaetz), only underscores the weakness of their claim.

In sum, Plaintiffs' own allegations confirm that Plaintiffs were terminated for kneeling while performing their official duties.  Plaintiffs do not plausibly establish that they were terminated for any additional or alternative reason that implicates the First Amendment.  The Court should dismiss their First Amendment claim.

## II.    Plaintiffs Fail To State Procedural Due Process Claims

The Fifth Amendment provides that "No person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest . . . .  Only after finding the deprivation of a protected interest do [courts] look to see if the [government's] procedures comport with due process."  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citation omitted).  Plaintiffs cannot establish that they were deprived of any cognizable property (Count II) or liberty (Count III) interest.  Even if they were, Plaintiffs received adequate process.

### A.    Plaintiffs Were Not Deprived Of Any Property Interest

Plaintiffs assert that they "had a property interest in the form of their understanding and legitimate expectation that they would not be discharged based on the events of June 4, 2020."  Compl. ¶ 150.  They did not.

"For a property interest to be constitutionally protected by procedural due process, a person must 'have a legitimate claim of entitlement to it,' beyond 'an abstract need or desire.'"  *Langeman*, 88 F.4th at 295 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577

(1972)).  "Such protectable property interests are derived from existing rules or understandings that stem from an independent source such as state law.'"  *Id.* (quoting *Bd. of Regents of State Colls.*, 408 U.S. at 577).  To qualify, "the independent source must place substantive limits on official discretion" in the form of "explicitly mandatory language, *i.e.*, specific directives to the decision maker that if . . . substantive predicates are present, a particular outcome must follow." *Id.* (internal quotation marks omitted).

No independent source foreclosed Plaintiffs' removal.  Plaintiffs rely on an outdated memorandum confirming the FBI director's summary dismissal authority.  Compl. ¶ 115 & n.54. As the D.C. Circuit has already held, that memo "reserve[d] 'expansive authority and discretion' for FBI leadership to determine the circumstances where an FBI employee may be summarily dismissed."  *Langeman*, 88 F.4th at 295 (quoting *Crooks v. Mabus*, 845 F.3d 412, 419 (D.C. Cir. 2016)).  It "does not contain explicit mandatory language" or any "substantive limits on discretion."  *Id.*  The same logic applies to a materially similar snippet from an FBI policy guide that Plaintiffs cite.  *Compare* Compl. ¶ 46.f (emphasizing that summary dismissal is "to be exercised only in compelling or exigent circumstances"), *with Langeman*, 88 F.4th at 295 (presence of "exigent and compelling circumstances" is not a judicially reviewable limit on discretion).

Given the FBI Director's discretion to summarily terminate FBI personnel, Plaintiffs lack any cognizable property interest in their maintaining their positions as agents.  *See Langeman*, 88 F.4th at 294-96 (rejecting similar claim).  Like other public employees "who are terminable at will," Plaintiffs had "no objective basis for believing that they w[ould] continue to be employed indefinitely," much less a property interest guaranteeing that continued employment.  *Hall v. Ford*, 856 F.2d 255, 265 (D.C. Cir. 1988).

The specific circumstances of Plaintiffs' termination do not change that conclusion. Plaintiffs did not gain a property interest in their positions as FBI agents, and the FBI Director did not lose his authority to summarily remove them, merely because Plaintiffs were *also* subject to the slower and more proceduralized disciplinary process set forth in "other official documents." *Contra* Compl. ¶ 155. Plaintiffs cannot point to any document specifically requiring their continued retention or foreclosing application of the FBI Director's summary removal authority. All they can muster is the passage of time between their relevant conduct and their terminations. *See id.* ¶ 152. But that is not a "specific directive[]" requiring "a particular outcome." *Langeman*, 88 F.4th at 295. All along, FBI leadership retained discretion to summarily remove Plaintiffs.

For all those reasons, the Court should dismiss Count II.

**B.    Plaintiffs Were Not Deprived Of Any Liberty Interest**

Plaintiffs also assert that they had a "constitutionally protected liberty interest in professional reputation," and that Director Patel deprived "Plaintiffs of that interest by making multiple public false statements." Compl. ¶¶ 158-59. That claim fails as well.

As an initial matter, the Supreme Court has cast doubt on the availability of a due process claim based on professional reputation. "While . . . a number of [the Court's] prior cases pointed out the frequently drastic effect of the 'stigma' which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 701 (1976). There is "no constitutional doctrine converting every

defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause." *Id.* at 702.[8]

Regardless, the D.C. Circuit has stated there are only "two circumstances" in which termination "might" give rise to a due process claim based on a purported liberty interest. *O'Donnel*, 148 F.3d at 1140. In "[t]he first category of claim, . . . the plaintiff points to the conjunction of official defamation and adverse employment action." *Id.* The second category "turns on the combination of an adverse employment action and a stigma or other disability that foreclose[s] the plaintiff's freedom to take advantage of other employment opportunities." *Id.* (internal citation marks and alteration omitted). Plaintiffs do not plausibly allege either type of claim.

First, Plaintiffs do not plausibly allege any defamatory statement in conjunction with their terminations. Such a statement must occur "at the time of" the adverse employment action. *O'Donnel*, 148 F.3d at 1140. Plaintiffs rely on Director Patel's statement in the termination letters that Plaintiffs "demonstrated unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government." Compl. ¶ 159; *see also id.* ¶ 109. But Plaintiffs do not allege the first element of defamation—that Defendants "published" those letters "to a third party." *E.g.*, *Farah v. Esquire Mag.*, 736 F.3d 528, 533 (D.C. Cir. 2013). They allege only that Plaintiffs "each separately received a letter." Compl. ¶ 108. Of course, disagreement with any privately conveyed statement accompanying termination does not give rise

---

[8]    The D.C. Circuit has recognized that "the conceptual basis for reputation-plus claims is not fully clear." *O'Donnel v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998). Defendants preserve the argument that the Due Process Clause does not protect a liberty interest in professional reputation—and that even when paired with an allegation of defamation, recognizing such a claim would reflect an improper "constitutionalization of tort law." *Id.*; *accord Paul*, 424 U.S. at 701 (rejecting an interpretation that "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States").

to a defamation claim.  Regardless, to the extent the letter's characterizations are not "capable of being proved . . . false," they are "not actionable in defamation."  *Farah*, 736 F.3d at 534-35. Otherwise, Plaintiffs would have defamation claims against the numerous commenters who similarly criticized their actions.[9]

Second, Plaintiffs do not plausibly allege that their freedom to take advantage of other employment opportunities has been foreclosed.  They point to a statement in their dismissal letters that Plaintiffs were "removed from the federal service."  Compl. ¶ 161; *see id.* ¶ 109.  That just describes the function of their dismissals; they were in the federal service as FBI agents, and they were removed from the federal service when terminated.  Such boilerplate is not enough to prevent Plaintiffs from securing other employment.  And Plaintiffs do not squarely allege they have been unable to work.  Some Plaintiffs have allegedly "been unsuccessful in certain instances" when applying for law-enforcement jobs.  *Id.* ¶ 137.  There is no due process violation just because Plaintiffs have not received offers for every position to which they have applied.

### C.    Plaintiffs Received Adequate Process

Even assuming Plaintiffs could establish a protected property or liberty interest, they received "notice and opportunity for hearing appropriate to the nature of the case."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).  "To have notice and a meaningful opportunity to respond, an employee must at least 'know the factual basis for the action,'" *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 40 (D.C. Cir. 2024) (quoting *Ralls Corp. v. Comm. On Foreign Inv. In U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014)), and have a meaningful "opportunity . . . to tell his side of the story," *Gilbert v. Homan*, 520 U.S. 924, 929 (1997).

---

[9]      *See* Rule 10 Mot. at 4, 6 (citing some of these articles, which contain images and/or identities of Plaintiffs).

Here, Plaintiffs received a meaningful opportunity to be heard. They do not plausibly allege that they lacked notice of the factual basis for their terminations. And they acknowledge they were afforded the opportunity to provide sworn statements and be interviewed. Compl. ¶¶ 104-05. Plaintiffs do not explain why that process was inadequate for them to tell their sides of the story.

## III.    Plaintiffs Fail To State A Substantive Due Process Claim

Plaintiffs assert that Defendants "violated Plaintiffs' substantive due process rights" because Plaintiffs' termination "violated bedrock principles of fairness." Compl. ¶¶ 164, 166. Once again, Plaintiffs do not come close to stating a valid claim.

"Identifying unenumerated rights carries a serious risk of judicial overreach." *Dep't of State v. Munoz*, 602 U.S. 899, 910 (2024). To prevent such overreach, a purported substantive due process claim must include a "careful description of the asserted fundamental liberty interest." *Id.* (internal quotation marks omitted). "[T]he Due Process Clause specially protects only those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Id.* (internal quotation marks omitted). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994). When the government takes action against an individual, moreover, "only action that is 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience' qualifies as 'arbitrary in the constitutional sense.'" *Hurd*, 147 F.4th at 1040-41 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* (quoting *Lewis*, 523 U.S. at 849).

Given the high bar for asserting a substantive due process claim, Plaintiffs' claim does not pass the straight face test.  There is no right, deeply rooted in American history and tradition, to continue serving as a federal law enforcement officer.  And Plaintiffs' termination was not intended to injure Plaintiffs at all, let alone in a way unjustifiable by any government interest.  As the termination letters make clear, Plaintiffs were terminated based on concerns regarding inappropriate conduct and the political weaponization of government.  The government generally, and the FBI in particular, have obvious interests in ensuring that agents do not carry out their duties in a partisan or seemingly partisan manner.  *See, e.g.*, *Garcetti*, 547 U.S. at 422-23; *Breiterman*, 15 F.4th at 1177.  Nor does the delay between Plaintiffs' actions and their termination "shock the contemporary conscience."  *Hurd*, 147 F.4th at 1040.  Plaintiffs do not point to, and Defendants are not aware of, any case law indicating that the passage of time between misconduct and removal can itself meet the demanding shocks-the-conscience standard.  And here, the delay is entirely understandable given the changes in leadership (and resulting changes in leadership's judgments regarding the agency's mission and Plaintiffs' conduct) over time.

## IV.    Plaintiffs' Removals Were Lawful Under The Article II Removal Power

As explained in more detail below with respect to Jane Doe 5 (the lone non-probationary Senior Executive Service (SES) Plaintiff), the Article II removal power is an additional basis to dismiss all Plaintiffs' claims.  It is undisputed that the lower-level Plaintiffs lacked the statutory removal protections that Jane Doe 5 purports to enjoy.  And because "no statute restrict[ed] [their] removal, . . . 'there can be no doubt'" that they were removable "at will."  *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 764 (2025) (quoting *Ex Parte Hennen*, 13 Pet. 230, 259 (1839)).  The removal power is also "conclusive and preclusive," so Plaintiffs were subject to removal on any basis, and courts have "no power" to review their removals, *Trump*, 603 U.S. at 607 (quoting

*Marbury v. Madison*, 1 Cranch 137, 166 (1803)).  But given the other clear defects in their claims, the Court need not address Article II with respect to these Plaintiffs.

## V.    **Jane Doe 5 Fails To State A Claim**

Jane Doe 5 raises separate due process and *ultra vires* claims based on her status as a non-probationary SES agent.  Both claims hinge on statutory provisions that she claims precluded her removal.  Specifically, Jane Doe 5 argues that she was required to receive thirty days' notice of her impending termination, an opportunity to respond, and a written decision articulating the specific reasons for removal (which could be only "for cause").  *See* Compl. ¶¶ 173-174, 180 (citing 5 U.S.C. §§ 3151, 7543).  Even assuming those statutory removal protections purport to extend to Jane Doe 5, her claims fail because the protections are unconstitutional as applied in this context.  In any event, Jane Doe 5 received constitutionally adequate process.  And she cannot clear the high bar for stating an *ultra vires* claim because Congress precluded review of her claim.  Plus, Jane Doe 5 does not plausibly allege any statutory violation—let alone the sort of extreme violation required to state an *ultra vires* claim.

### A.    **The Purported Statutory Removal Protections For SES Agents Are Unconstitutional As Applied In This Context**

"Without a clear and effective chain of command, the public cannot 'determine on whom the blame or punishment of a pernicious measure, or series of pernicious measures ought really to fall."  *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 514 (2010)  (quoting The Federalist No. 70, p. 472 (J. Cooke ed. 1961) (A. Hamilton)).  To ensure accountability, the Constitution mandates that "the executive Power shall be vested in a President of the United States."  U.S. Const. art. II, § 1, cl. 1.  "The President's power to remove—and thus supervise—those who wield executive power on his behalf follows from the text of Article II."  *Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020) (noting the power was also "settled by the First Congress" and

"confirmed in the landmark decision" *Myers v. United States*, 272 U.S. 52 (1926)).    "Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enter. Fund*, 561 U.S. at 514. Accordingly, "as a general matter," the President has "the authority to remove those who assist him in carrying out his duties." *Id.* at 513-514.

Jane Doe 5 was thus subject to "unrestricted" removal by Director Patel, as ratified by the Attorney General. *Seila Law*, 591 U.S. at 204; Ex. A.[10]    As an SES agent who exercised significant executive authority, Jane Doe 5 was an inferior officer and therefore removable at will.    To qualify as an officer, there are two "requirement[s]":    an individual must (1) "occupy a 'continuing' position" that is part of the federal government for constitutional purposes and (2) "exercis[e] significant authority pursuant to the laws of the United States." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (quoting *United States v. Germaine*, 99 U.S. 508, 511 (1879); *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam)).

In her role as an SES Section Chief, Jane Doe 5 undoubtedly exercised significant executive authority. *See* Compl. ¶ 99(a).  By definition, SES officials are tasked with "ensur[ing] that the executive management of the Government of the United States is responsive to the needs, policies, and goals of the Nation and otherwise is of the highest quality." 5 U.S.C. § 3131; *see also id.* § 3151 (providing that FBI SES officials "meet the requirements set forth in section 3131 for Senior Executive Service). An SES official "directs the work of an organizational unit," "is held accountable for the success of one or more specific programs or projects," "monitors progress

---

[10]    "It is settled law that the President speaks and acts through the heads of the several departments in relation to subjects which appertain to their respective duties and that 'the acts of the heads of departments, within the scope of their powers, are in law the acts of the President.'" *Wilbur v. U.S. ex rel. Barton*, 46 F.2d 217, 219 (D.C. Cir. 1930) (quoting *Wosley v. Chapman*, 101 U.S. 755, 769 (1879)).

toward organizational goals and periodically evaluates and makes appropriate adjustments to such goals," "supervises the work of employees other than personal assistants," or "otherwise exercises important policy-making, policy-determining, or other executive functions." *Id.* § 3132. In other words, SES officials are there to ensure the government operates smoothly and responsively and efficiently implements executive policies.

To be sure, the Supreme Court has (for now) recognized two narrow "exceptions to the President's unrestricted removal power" over officers—but neither applies here. *Seila Law*, 591 U.S. at 215. The first exception is for a "multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Id.* at 216. The second exception is for "inferior officers with limited duties and no policymaking or administrative authority." *Id.* at 218. The Supreme Court has noted that the reasoning behind those exceptions "has not withstood the test of time." *Id.* at 216 n.2. Regardless, the exceptions "represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Id.* at 218 (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 196 (2018) (Kavanaugh, J., dissenting)). Jane Doe 5's role does not resemble either exception: As an individual SES agent (in the role of Section Chief), Jane Doe 5 had policymaking and administrative authority. *See* 5 U.S.C. §§ 3131, 3132, 3151.

Even if she were not an inferior officer, Jane Doe 5 would have been removable at will under Article II for another, independent reason: In her former position, she exercised "conclusive and preclusive" executive power. *Trump*, 603 U.S. at 608 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring)). Indeed, as Section Chief, Jane Doe 5 wielded "quintessential[]" executive power—"investigat[ing] . . . crime," *Trump v. United States*, 603 U.S. 593, 620 (2024), and "mak[ing] arrests," *United States v. Texas*, 599 U.S. 670,

679 (2023).  Such "decisions about enforcement of 'the Nation's criminal laws' lie within the 'special province of the Executive.'" *Id.* (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).  Because Jane Doe 5 was plainly one of "those who assist[ed]" the President "in carrying out his duties," she was subject to the Article II removal power.  *Free Enter. Fund*, 561 U.S. at 513-14.  Any interference with the removal power by Congress would thwart the chain of accountability in the Executive Branch and "violate[] the separation of powers."  *Seila Law*, 591 U.S. at 205.

Because the statutory removal protections would conflict with the Article II removal power, they do not protect Jane Doe 5 from removal.  *Trump*, 603 U.S. at 608 (Congress is "disable[d] . . . from acting upon the subject").  That means Jane Doe 5 cannot challenge her removal on any basis.  *See id.* at 609.  Viewed another way, Jane Doe 5 could not have a property interest in her position based on statutory provisions that never lawfully protected her.  "[T]he Constitution automatically trumps an inconsistent statute."  *Collins v. Yellen*, 594 U.S. 220, 267 (2021) (Thomas, J., concurring).  Indeed, "the Constitution has always displaced it and the President has always had the power to fire [Jane Doe 5] for any reason."  *Id.*  For the same reason, removal in purported violation of the unlawful protections could not be *ultra vires*.

**B.    Even If The Removal Protections Apply, Jane Doe 5's Claims Fail**

Jane Doe 5 has not plausibly alleged a due process or *ultra vires* claim regardless of whether the removal protections could constitutionally shield her from removal.

1.    Due Process

Removal protections are not enough to give Jane Doe 5 a property interest in her position as an FBI agent.  The "provision of procedural safeguards cannot in itself create a property interest for purposes of due process analysis." *Griffith v. FLRA*, 842 F.2d 487, 495 (D.C. Cir. 1988) (citing *Olim v. Wakinekona*, 461 U.S. 238, 250-251 (1983)).  It follows that "merely conditioning an

employee's removal on compliance with certain specified procedures" does not confer a "right to continued employment." *Bishop v. Wood*, 426 U.S. 341, 345 (1976).  Such procedures certainly cannot create an entitlement to continued employment where Congress has precluded judicial review of the employer's compliance, as discussed below.  *See* pp. 22-23, *infra*.[11]  That is why, for all practical purposes, "a Senior Executive Service employee at the highest level of the Bureau . . . [is] terminable at will by the director" and lacks "any inherent entitlement to remain in his position." *Strzok v. Garland*, Civ. A. No. 19-2367 (ABJ), Memo Op., ECF No. 164, at 28 (D.D.C. Sept. 23, 2025).

Even assuming Jane Doe 5 had some property interest in her continued employment, she received "the process due under the Fifth Amendment." *Tate v. District of Columbia*, 627 F.3d 904, 908 (D.C. Cir. 2010) (noting that the Fifth Amendment inquiry is distinct from any "statutory . . . requirement").  As noted above, Jane Doe 5 and her colleagues received more than enough process.  Jane Doe 5 does not plausibly allege that she lacked notice of the "factual basis for the action." *Ralls*, 758 F.3d at 318.  And she was given "the opportunity to tell [her] side of the story," *Gilbert*, 520 U.S. at 929, because she provided a sworn statement and was interviewed, Compl. ¶ 105.  Jane Doe 5 does not allege that she was ever precluded from advancing any arguments or introducing any evidence in support of her position.

        2.    *Ultra Vires*

Jane Doe 5's second individual claim is styled as "Violation of the Separation of Powers, Legal Nullity, and Ultra Vires Action." Compl. ¶¶ 176-82.  It appears premised on Defendants'

---

[11]     In *Esparraguera*, the D.C. Circuit concluded that an SES employee in the Department of the Army had a property interest in her continued employment. 101 F.4th at 35.  The court did not address whether any statutory removal protections would unconstitutionally interfere with the Article II removal power.  Nor did it address a scenario where Congress had precluded review of compliance with such protections.

alleged violations of the statutory removal requirements.  But Jane Doe 5 can point to no statute that grants her a cause of action to raise such purported violations in federal court.

Jane Doe 5 must therefore plausibly allege a non-statutory *ultra vires* claim.  But implied equitable claims that an agency has violated a federal statute are "extremely limited" in scope. *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988).  As the Supreme Court has explained, an "*ultra vires*" challenge is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds."  *NRC v. Texas*, 605 U.S. 665, 681-82 (2025).  A plaintiff must show that (1) judicial review is not expressly foreclosed; (2) the agency made an extreme legal error; and (3) there is no alternative means for the plaintiff to seek judicial review.  *See, e.g.*, *Changji Esquel Textile Co.*, 40 F.4th at 721-22.

Jane Doe 5 cannot satisfy the first or second requirement.  To start, judicial review is foreclosed.  Plaintiff contends that "certain provisions of the CSRA" (the Civil Service Reform Act) protected her from removal.  Compl. ¶ 49.  But while the CSRA channels judicial review of most covered claims through the Merit Systems Protection Board (and from there to the U.S. Court of Appeals for the Federal Circuit), 5 U.S.C. § 7703, the CSRA treats FBI personnel differently, *see* Compl. ¶ 43.  For non-preference eligible SES agents like Jane Doe 5, the statute gives the Attorney General discretion "to establish a personnel system" that is governed by internal agency regulations and memoranda and overseen by the Director of the FBI and the Deputy Attorney General.  *See* 5 U.S.C. § 3151(a).  Nothing in the CSRA gives an FBI SES employee a right to judicial review—which is presumably why Jane Doe 5 has attempted to assert a non-statutory *ultra vires* claim.

Such claims are categorically barred.  As the Supreme Court has explained, the CSRA "replace[d] the haphazard arrangements for administrative and judicial review of personnel action"

with an "integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 444–45 (1988). That "elaborate framework" compels the conclusion that "extrastatutory review is not available" for "a federal employee's challenge to an employment decision." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11 (2012) (internal quotation marks omitted). "Allowing employees to end-run the CSRA would undermine Congress's efforts to foster a 'unitary and consistent Executive Branch position on matters involving personnel action." *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (quoting *Fausto*, 484 U.S. at 449). In short, "what you get under the CSRA is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (Roberts, J.). As a result, this Court lacks subject matter jurisdiction over Jane Doe 5's standalone *ultra vires* claim. *See Graham*, 358 F.3d at 935.

Regardless, Jane Doe 5 has also failed to plausibly allege that Defendants violated any statute—let alone committed an "error . . . so extreme that one may view it as jurisdictional or nearly so." *Changji*, 40 F.4th at 722 (internal quotation marks omitted). The relevant provisions would have afforded Jane Doe 5 "at least 30 days' advance written notice" and "a reasonable time . . . to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer," as well as a right to be represented by an attorney and "a written decision and specific reasons therefor." 5 U.S.C. § 7543(b).

Jane Doe 5 does not plausibly allege any violation of those requirements. The Complaint does not specify when precisely she received notice, but makes clear she did at some point. Specifically, Jane Doe 5 alleges that the FBI began an internal investigation on June 27, 2025, that the investigation concluded on September 4, 2025, that Jane Doe 5 submitted a sworn statement

and was interviewed, and that Director Patel's termination letter explained that he had reviewed the materials from the internal investigation.  Compl. ¶¶ 102, 104, 105, 107, 109.  The letter also provided "specific reasons" for termination, because it explained that Jane Doe 5 had "demonstrated unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government."  *Id.* ¶ 109.  That those reasons were not "specific to each Plaintiff," *id.*, does not make them unspecific generally—Plaintiffs had all engaged in the same basic conduct.   Jane Doe 5 thus does not plausibly allege any violation, let alone the sort of extreme violation necessary to state an *ultra vires* claim.

**VI.    Plaintiffs' Derivative Claims Should Be Dismissed**

Plaintiffs' last two claims (for a declaratory judgment and mandamus relief) presume that Plaintiffs have stated at least one plausible claim for relief.  *See* Compl. ¶¶ 183-189.  They have not.  Plaintiffs are thus not entitled to a declaratory judgment or mandamus relief.[12]

\*       \*       \*

---

[12]    The Court need not reach any remedial questions at this stage.  But Defendants note that, in all events, Plaintiffs are not entitled to reinstatement.  A federal court may issue an equitable remedy only if the remedy was "traditionally accorded by courts of equity."  *Grupo Mexicano de Desarrolo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).  At the founding, courts of equity could not "restrain an executive officer from making a . . . removal of a subordinate appointee."  *White v. Berry*, 171 U.S. 366, 377 (1898).  "[B]y the 1880s," the Supreme Court "considered it 'well settled that a court of equity has no jurisdiction over the appointment and removal of public officers.'"  *Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting) (quoting *In re Sawyer*, 124 U.S. 200, 212 (1888)).

**CONCLUSION**

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint for failure to state a claim upon which relief can be granted.  Because amendment would be futile, the Court should dismiss with prejudice.


Dated: February 6, 2026                              Respectfully submitted,


                                                     STANLEY E. WOODWARD, JR.
                                                     Associate Attorney General

                                                     MICHAEL WESIBUCH, Senior Counsel
                                                     ANNA EDWARDS, Counsel
                                                     Office of the Associate Attorney General

                                                     JEANINE FERRIS PIRRO
                                                     United States Attorney

                                                     By: _____/s/ Andrew J. Vaden_____
                                                         ANDREW J. VADEN
                                                         Assistant United States Attorney
                                                         DC Bar No. 1044860
                                                         601 D Street, NW
                                                         Washington, DC 20530
                                                         (202) 252-2437

                                                     *Attorneys for the United States of America*