## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **JANE DOES 1–9** and<br>**JOHN DOES 1–3,** | **CIVIL ACTION NO. 25-cv-4258 (TNM)** |
| **Plaintiffs,** | **JUDGE TREVOR N. MCFADDEN** |
| v. | **JURY TRIAL DEMANDED** |
| **KASHYAP P. PATEL**<br>in his official capacity as<br>Director of the Federal Bureau of<br>Investigation<br>935 Pennsylvania Avenue, NW<br>Washington, D.C. 20535; | <u>**FIRST AMENDED COMPLAINT**</u> |

**JANE DOES 1–9** and
**JOHN DOES 1–3,**

        **Plaintiffs,**

    v.

**KASHYAP P. PATEL**
in his official capacity as
Director of the Federal Bureau of
Investigation
935 Pennsylvania Avenue, NW
Washington, D.C. 20535;

**FEDERAL BUREAU OF
INVESTIGATION**
935 Pennsylvania Avenue, NW
Washington, D.C. 20535;

**PAMELA J. BONDI**
in her official capacity as Attorney
General of the United States
950 Pennsylvania Avenue, NW
Washington, D.C. 20530;

**U.S. DEPARTMENT OF JUSTICE**
950 Pennsylvania Avenue, NW
Washington, D.C. 20530;

**EXECUTIVE OFFICE OF THE
PRESIDENT**
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500;

    and

**THE UNITED STATES OF
AMERICA**
Washington, D.C. 20500,

        **Defendants.**

## INTRODUCTION

1.      The First Amendment to the United States Constitution forbids government officials from dismissing public employees for partisan reasons.  Political patronage—where "public employees hold their jobs on the condition that they provide, in some acceptable manner, support for the favored political party"—is unconstitutional because "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Elrod v. Burns*, 427 U.S. 347, 356, 359 (1976) (cleaned up).

2.      This bedrock constitutional protection for public employees preserves President George Washington's vision of a nation united under a "common government," expressed in his 1796 farewell letter when he declined to seek a third term as President and initiated the nation's first peaceful transfer of power.[1]  In the letter, Washington championed "the name of American" over politicization that "enfeeble[s] the public administration," "agitates the community," creates "animosity" among citizens, and "foments occasionally riot and insurrection."[2]  Washington commended "[r]eal patriots," who act to serve the interests of the nation as a whole, over "tools and dupes" who encourage "the people to surrender their interests" for private advantage.[3]

3.      Plaintiffs are the real patriots President Washington envisioned.  As Special Agents with the Federal Bureau of Investigation (FBI), Plaintiffs carried out their duties faithfully, adhering always to the highest principles of non-partisan civil service.  Like Washington, they put the American people first throughout their nearly two centuries of combined service to the FBI.

---

[1] George Washington, *Farewell Address to the People of the United States*, at 6-7 (Sept. 19, 1796), https://www.senate.gov/artandhistory/history/resources/pdf/Washingtons_Farewell_Address.pdf.
[2] *Id.* at 6, 14.
[3] *Id.* at 21.

4.      For years leading up to June 4, 2020, the nation experienced recurring waves of protests sparked by high-profile instances of alleged excessive force and police brutality— particularly in urban communities and against racial minorities.[4]  These events often began as peaceful demonstrations intended to highlight concerns about perceived racial bias and to call for police reforms, but at times escalated into rioting, assaults, looting of uninvolved businesses, and widespread property damage.

5.      On May 25, 2020, nationwide protests emerged after four Minneapolis police officers killed a Black civilian named George Floyd.  In the wake of George Floyd's death, cities across the country, including Washington, D.C., experienced days of initially peaceful protests that later devolved into violent unrest.

6.      At the time, Plaintiffs were stationed in Washington, D.C., as highly trained counterintelligence and counterterrorism Special Agents employed by the FBI.  As national civil unrest stretched into its second week, the FBI deployed Plaintiffs and other FBI personnel into a powder keg in downtown Washington, D.C., equipped with their firearms and FBI-marked vests, but without the advanced planning and training, protective gear, or less-than-lethal munitions that would enable them to engage in crowd control.

7.      On June 4, 2020, Plaintiffs were patrolling the city when they were confronted by a mob that included hostile individuals alongside families with young children.  The volatile

---

[4] Civil unrest had previously unfolded across the country in response to police-involved civilian deaths, including the deaths of nineteen-year-old Timothy Thomas in Cincinnati, Ohio in 2001; eighteen-year-old Michael Brown in Ferguson, Missouri in 2014; Eric Garner in New York, New York in 2014; twelve-year-old Tamir Rice in Cleveland, Ohio in 2014; Freddie Gray in Baltimore, Maryland in 2015; Walter Scott in North Charleston, South Carolina in 2015; Philando Castile in Falcon Heights, Minnesota in 2016; Botham Jean in Dallas, Texas in 2018; and Breonna Taylor in Louisville, Kentucky in March 2020.

situation was comparable to another critical moment from our nation's Founding: the Boston Massacre. But Plaintiffs did not repeat the mistakes of the British soldiers who fearfully fired their weapons into a crowd of dissenting Americans in 1770. Instead, finding their backs to a wall, Plaintiffs remained calm.

8.    Each Plaintiff then made a considered tactical decision focused on saving American lives and maintaining order. Responding to the dangerous situation before them, Plaintiffs avoided triggering violence by assuming a kneeling posture associated with de-escalations between law enforcement officers and their communities during this period of national unrest.

9.    Plaintiffs' de-escalation response was immediately successful. As a result of their tactical decision to kneel, the mass of people moved on without escalating to violence. Plaintiffs did not need to discharge their firearms that day. Plaintiffs saved American lives.

10.    In doing so, Plaintiffs valiantly served their country by maintaining order and avoiding bloodshed, consistent with George Washington's vision of a government that subdues, rather than stokes, "riot and insurrection."[5]

11.    Shortly after the events of June 4, 2020, FBI and DOJ leadership reviewed Plaintiffs' actions and correctly determined that they were consistent with FBI policy and warranted no adverse action of any kind.

12.    But more than five years later, Defendants want to rewrite history. After an internal review process—triggered in 2025 by Defendant Patel himself—again failed to fault Plaintiffs' actions in June 2020, Defendants nevertheless announced Plaintiffs' unlawful terminations in

---

[5] Washington, *Farewell Address* at 14.

4

identical single-page letters accusing them of "unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government."

13.     In fact, the exact opposite is true: It is Defendants who are weaponizing government for political reasons.  Defendants' conduct in terminating Plaintiffs reflects an astounding lack of professionalism and lack of impartiality by the government and violates Plaintiffs' constitutional rights under the First and Fifth Amendments.

14.     Defendants' unlawful retaliation and due process violations undermine the very principles of professional and non-partisan law enforcement that protect Americans' rights and safety every day.  To serve the American people, Plaintiffs and all FBI employees must be free to conduct their official duties without unlawful partisan discrimination.

15.     A half-decade after the FBI resolved the matter in accordance with the law, Plaintiffs must now ask the Court to intervene to right the Defendants' recent wrongs.

16.     To protect Plaintiffs' constitutional rights, the rights of remaining FBI employees, and the vital interests served by the FBI, Plaintiffs request that this Court review and grant relief on the grounds that Defendants' actions violated their First Amendment rights to free association, including non-association, and Fifth Amendment rights to due process; were taken in violation of the separation of powers, without any constitutional authority; and are a legal nullity.  Plaintiffs seek equitable relief in vindication of their constitutional rights; declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; mandamus relief under 28 U.S.C. § 1361; and any other relief deemed appropriate.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' causes of action arise under the Constitution and laws of the United States.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1).   A substantial part of the events giving rise to this claim occurred in this District, and Defendants include agencies and officials of the United States.

## PARTIES

19.     Plaintiffs are former career FBI employees who dedicated their lives to serving their country as federal law enforcement officers.  As FBI Special Agents, Plaintiffs were highly trained and subjected to rigorous standards commensurate with the sensitive work they conducted in the public trust.  Plaintiffs each received multiple awards, including the FBI Director's Award, for their work on matters such as disrupting mass shootings, uncovering foreign espionage, and thwarting cyberattacks.  Plaintiffs include former high-level supervisors, members of the Senior Executive Service (SES), veterans of the military and federal service at other agencies, and agents continuing a family tradition of service to the FBI and other law enforcement entities.[6]

20.     Plaintiff Jane Doe 1 was a Special Agent for over six years, specializing in counterterrorism and crisis cases involving digital exploitation.

21.     Plaintiff Jane Doe 2 was a Special Agent for over fourteen years, specializing in counterterrorism and counterintelligence.

22.     Plaintiff Jane Doe 3 was with the FBI for over fifteen years, including eight years as a Special Agent specializing in counterintelligence and crisis response.

---

[6] As set forth in Plaintiffs' Motion for Leave to Proceed Under Pseudonyms, ECF Nos. 2, 12-1, and the related Memorandum Opinion and Order, ECF No. 5, Plaintiffs proceed under pseudonyms because of a serious risk of retaliation and occupational harm to them and their families.

23.    Plaintiff Jane Doe 4 was a Special Agent for over nine years, specializing in counterterrorism.

24.    Plaintiff Jane Doe 5 was with the FBI for over twenty-seven years, including twenty-two years as a Special Agent specializing in counterterrorism, violent crime, and counterintelligence.  Plaintiff Jane Doe 5 ultimately assumed a position in the FBI's SES and served in that capacity for nearly two years, first as a probationary member of the SES and then as a non-probationary member.

25.    Plaintiff Jane Doe 6 was a Special Agent for over twenty years, specializing in counterintelligence and financial crimes.

26.    Plaintiff Jane Doe 7 was with the FBI for over eleven years, including over seven years as a Special Agent specializing in cybercrime and counterintelligence.

27.    Plaintiff Jane Doe 8 was a Special Agent for over eighteen years, specializing in counterintelligence.

28.    Plaintiff Jane Doe 9 was with the FBI for over fifteen years, including nine years as a Special Agent specializing in counterintelligence and cybercrime.

29.    Plaintiff John Doe 1 was a Special Agent for over seven years, specializing in counterterrorism.

30.    Plaintiff John Doe 2 was a Special Agent for over seventeen years, specializing in counterintelligence.

31.    Plaintiff John Doe 3 was with the FBI for over thirteen years, including seven years as a Special Agent specializing in counterterrorism.

32.    Defendant Kashyap Patel is sued in his official capacity as the Director of the FBI. In that capacity, Patel maintains an office in Washington, D.C.

33.     Defendant FBI is a subordinate component of the Department of Justice (DOJ) pursuant to 28 C.F.R. § 0.1.  The FBI's principal offices are in Washington, D.C.

34.     Defendant Pamela J. Bondi is sued in her official capacity as the Attorney General of the United States.  She is the head of the DOJ and maintains an office in Washington, D.C.

35.     Defendant DOJ is headquartered in Washington, D.C. and is an agency of the United States subject to the jurisdiction of this Court.  DOJ controls its components, including the FBI.

36.     Defendant Executive Office of the President (EOP) is headquartered in Washington, D.C. and is an agency of the United States subject to the jurisdiction of this Court.

37.     Defendant United States of America is responsible for the exercise of state action undertaken by the other named Defendants and being challenged by Plaintiffs.

## FACTUAL BACKGROUND

I.    **The FBI's Internal Guidelines and Review Processes Are Designed to Maintain an Exceptional Workforce**

38.     Since 1908, the FBI has existed within the Department of Justice to protect the American people pursuant to the United States Constitution and laws.  The FBI investigates and prevents criminal violations of federal law including terrorism, espionage, cybercrime, and public corruption.

39.     FBI Special Agents are chosen through a highly selective process and must meet stringent physical, mental, and ethical requirements.  By design, there is no political test for service in the agency.  Instead, the FBI is required to hire, train, and promote talented and dedicated individuals without regard to political affiliation.

8

40.    FBI Special Agents are tasked by their chain of command and leadership team and are not free to refuse assignments based on personal preferences.

41.    FBI Special Agents often face threats to their personal safety, at times going under cover and working in extremely dangerous conditions to obtain information necessary to secure the interests of the United States.

42.    FBI Special Agents swear or affirm an oath of office before beginning their service to "support and defend the Constitution of the United States" and "bear true faith and allegiance to the same," and to "well and faithfully discharge the duties" of their office.

43.    Federal law sets forth merit-based principles and prohibited personnel practices by which executive agencies must abide, including that personnel "should receive fair and equitable treatment in all aspects of personnel management, without regard to political affiliation . . . and with proper regard for their privacy and constitutional rights." 5 U.S.C. § 2301; *see id.* § 2302. The Civil Service Reform Act (CSRA) implements these principles and practices, creating a forum called the Merit Systems Protections Board (MSPB) in which some federal employees may challenge personnel actions. 5 U.S.C. §§ 7511 *et seq.* But the CSRA excludes most FBI employees from its framework in most circumstances. *See* 5 U.S.C. § 7511(b)(8).[7] Instead, the FBI has adopted its own internal procedures that parallel the protections offered by the CSRA.

_____

[7] Two FBI Special Agents unlawfully terminated along with Plaintiffs are protected by the CSRA because they are eligible veterans of the United States Armed Forces. *See* 5 U.S.C. § 7511(a)(1)(B). The eligible veterans have filed actions with the MSPB and, in light of the existing facts and circumstances, as well as the applicable case law, do not join this action at this time. *See Elgin v. Department of Treasury*, 567 U.S. 1, 10 (2012) (holding "covered employees" must proceed in the MSPB, including on "constitutional challenges"). The eligible veterans, with approximately seven and sixteen years of experience with the FBI respectively, would otherwise join and assert the same claims as Plaintiffs.

44.     The FBI's expectations and protections for personnel are memorialized in multiple written documents and implemented through well-established internal practices and procedures.

45.     The FBI publishes a document entitled "FBI Ethics and Integrity Program Policy Directive and Policy Guide."[8]

    a.     Section 7 of the Ethics and Integrity Policy Guide includes detailed provisions expressly protecting FBI employees' rights against coerced political loyalty and conformity, *e.g.*, their rights to political association or non-association, "without fear of penalty or reprisal."[9]

46.     The FBI publishes a document entitled "Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process."[10]

    a.     The document explains that the "FBI's disciplinary process serves to ensure adherence to the Bureau's rigorous standards of conduct" and "provide[s] general categories of misconduct for which employees may be disciplined."[11]

    b.     The document reflects that investigations regarding employee misconduct are handled by the FBI's Inspection Division (INSD); adjudications by the Office of Professional Responsibility (OPR); and appeals by the Human Resources Branch (HRB).[12]

    c.     The document includes a table of FBI Offense Codes with corresponding penalty ranges.

---

[8] *FBI Ethics and Integrity Program Policy Directive and Policy Guide*, FBI (Feb. 2, 2015), https://vault.fbi.gov/fbi-ethics-and-integrity-program-policy-guide.

[9] *Id.* at 7-1.

[10] *Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process*, FBI (Jan. 1, 2017), https://vault.fbi.gov/offense-codes-and-penalty-guidelines-governing-fbis-internal-disciplinary-process/offense-codes-and-penalty-guidelines-governing-fbis-internal-disciplinary-process-final.

[11] *Id.* at 2.

[12] *Id.* at 1.

47. An OPR Policy Guide, dated September 8, 2021, outlines the FBI's policy for OPR matters.[13]

a. The OPR Policy Guide provides that OPR's role is to implement the "Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process" document described above and to apply "FBI standards equally regardless of. . . protected status."[14]

b. The OPR Policy Guide provides that OPR conducts "prompt, thorough, and fair adjudication of employee misconduct cases."[15]

c. The OPR Policy Guide explains that the DOJ's Office of the Inspector General (DOJ-OIG) and the FBI's INSD "review all allegations of employee misconduct to determine whether an investigation is warranted… If an investigation is warranted, an administrative inquiry will be opened and [FBI's INSD or DOJ-OIG] will investigate the matter."[16]

d. The OPR Policy Guide explains that "[u]pon conclusion of the investigative phase, the matter will be referred to OPR for adjudication."[17] At the same time, INSD must "request[] the submission of a *Douglas* Factors assessment," which must in turn be provided to OPR by the employee's supervisor "within two weeks."[18] The *Douglas* Factors are twelve "factors articulated by the Merit Systems Protection Board in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981)" to be considered before imposing any penalty, including the "employee's past work record" and "[m]itigating circumstances surrounding the offense."[19]

e. The OPR Policy Guide provides that OPR will review the entirety of the file "to determine, by a preponderance of the evidence, whether the employee violated an FBI Offense Code."[20] If so, "OPR will determine the appropriate penalty" by reference to the penalty ranges in the "Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process" document

---

[13] *Office of Professional Responsibility Policy Guide*, FBI (Sep. 8, 2021).
[14] *Id.* at 2.
[15] *Id.* at 5.
[16] *Id.* at 6.
[17] *Id.* at 6.
[18] *Id.* at 6.
[19] *Id.* at B-1.
[20] *Id.* at 7.

11

described above.  In addition, "OPR will prepare a report of investigation that addresses the allegations, relevant facts, and applicable legal standards."[21]

    f.    The OPR Policy Guide provides that if OPR proposes removal of a non-probationary FBI employee, it must notify the employee, who is then entitled to "(a) review the redacted 263 [administrative inquiry] file; (b) prepare a written response; and (c) make an oral presentation to the [Assistant Director], OPR."[22]  The Assistant Director then makes a final decision for OPR.  Dismissal decisions by OPR can be appealed to the FBI's Disciplinary Review Board.[23]

    g.    The OPR Policy Guide provides for "summary dismissal" of employees only in cases where "(a) the safety of the public; (b) the safety of fellow employees; (c) national security interests; or (d) other compelling or exigent circumstances are at stake."[24]  Only the FBI Director, Deputy Director, or Assistant Director for OPR may exercise the authority, which "is an extraordinary remedy to be exercised only in compelling or exigent circumstances."[25]  The OPR Policy Guide grants those officials no discretion to summarily dismiss employees for reasons beyond the four identified above.  Indeed, the OPR Policy Guide's provisions on summary dismissal do not even use the word "discretion."

48.    An Internal Affairs Policy Guide, dated July 11, 2024, outlines the FBI's policy for Inspection Division matters.[26]

    a.    The Internal Affairs Policy Guide provides for "fair, timely, and thorough" investigations and reviews of "allegations of misconduct or criminality against FBI employees."[27]

49.    In 2021, DOJ-OIG published a report on the FBI's misconduct investigations process and its compliance with FBI policy.[28]

---

[21] *Id.* at 7.

[22] *Id.* at 7-8.

[23] *Id.* at 8.

[24] *Id.*

[25] *Id.*

[26] *Internal Affairs Policy Guide*, FBI (July 11, 2024).

[27] *Id.* at 2.

[28] *Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations*, 21-127, U.S. Department of Justice, Office of the Inspector General (Sep. 2021) (2021 DOJ-OIG Report), https://oig.justice.gov/sites/default/files/reports/21-127.pdf.

a. The report explains that DOJ-OIG has the right of first refusal for investigation allegations of misconduct by FBI employees and that at the end of such an investigation, DOJ-OIG will "prepare a report of their findings and forward the report to FBI OPR for adjudication."[29]

b. The report explains that summary dismissal is reserved for "extraordinary cases" that "require a strong and swift response" such as "cases that involved child pornography" and "the case of an employee who stole drug evidence for personal use."[30]

c. The report notes that summary dismissal is typically imposed by the Assistant Director of OPR, who in turn reports to the Deputy Director.[31]

50. Congress has provided additional statutory protections for certain categories of FBI employees. Congress authorized the creation of a Senior Executive Service for the FBI and the Drug Enforcement Administration (FBI-DEA SES) and extended certain provisions of the CSRA to the FBI-DEA SES.

a. According to Section 3151 of Title 5 of the United States Code, the regulations establishing the FBI-DEA SES "shall" "provide for" "removal consistent with section 3592" and "removal or suspension consistent with subsections (a), (b), and (c) of section 7543." 5 U.S.C. § 3151(a)(5)(A), (D). Sections 3592 and 7543 are the two primary provisions of the CSRA that protect members of the Senior Executive Service outside the FBI from removal. *See* 5 U.S.C. § 3592 ("Removal from the Senior Executive Service"); 5 U.S.C. § 7543 ("Cause and Procedure" for agency action against an employee).

b. Sections 3151, 3592, and 7543 mandate certain substantive and procedural protections that apply to members of the FBI-DEA SES. *See also* 28 C.F.R. § 0.157 (a) (establishing the FBI-DEA SES "[p]ursuant to 5 U.S.C. 3151").

c. Under Section 7543's standard, members of the Senior Executive Service may be removed "*only* for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function." 5 U.S.C. § 7543(a) (emphasis added). In addition, Section 7543 identifies certain procedural requirements that must be fulfilled prior to a removal for cause, including "at least 30 days' advance written notice" of the

---

[29] *Id.* at 4-5.
[30] *Id.* at 15, 16, 18.
[31] *Id.* at 18.

"specific reasons for the proposed action," at least 7 days to respond, and "a written decision" providing "specific reasons" for the agency's action. 5 U.S.C. § 7543(b).

d. Section 3592 provides that a member of the Senior Executive Service may be removed "during the 1-year period of probation," or "at any time for less than fully successful executive performance as determined" through a formal performance appraisal process. *Id*. § 3592.

51.     Consistent with the FBI-DEA SES statutes, an "FBI SES Policy" outlines the disciplinary standards for FBI SES members.

a. The FBI SES Policy states an intent to "protect senior executives from arbitrary or capricious actions" and "provide for an executive system which is guided by the public interest and free from improper political interference."

b. The FBI SES Policy mirrors Section 7543(a)'s substantive standard for for-cause removal and provides that any non-probationary members of the FBI Senior Executive Service facing removal will receive 30 days' advance written notice with "specific reasons" for the proposed removal, at least seven days to respond, and a written final decision providing "specific reasons" for the removal "at the earliest practicable date." The notice of proposed removal "will inform the employee of his/her right to review the material that is relied on to support the reasons" for the removal.

c. The FBI SES Policy articulates a process for annual performance evaluations of FBI SES members and details how they may be removed for poor performance, mirroring Section 3592's standard for performance-based removals. Like the statute, the FBI SES Policy provides that a non-probationary employee who is removed for poor performance is placed in a GS-15 position.

52.     On information and belief, the FBI possesses additional documents memorializing expectations and protections for its employees.

53.     FBI personnel are further protected by the Constitution they swore an oath to support and defend.

II.  **George Floyd's Murder by Law Enforcement Officers Ignites Unrest Across the Nation**

54.    On May 25, 2020, George Floyd was killed by law enforcement officers in Minneapolis, Minnesota.  Floyd's murder followed the deaths in recent years of multiple other Black citizens due to law enforcement use of force, including Breonna Taylor just months before in March 2020 in Louisville, Kentucky.

55.    The officers' conduct causing George Floyd's death was captured on video taken by bystanders using their cell phones, as well as the officers' own body-worn cameras.  Almost immediately, graphic and disturbing footage became widely available on the internet, showing Minneapolis police officer Derek Chauvin kneeling on Floyd's neck, back, and shoulders for more than nine minutes.  Three other police officers assisted Chauvin, ignoring pleas from Floyd and concerned citizens.  All four officers were later arrested in connection with Floyd's death and ultimately convicted on state and federal charges, including murder.

56.    Beginning on May 26, 2020, civil unrest erupted in Minneapolis and spread across the nation.  The civil unrest included peaceful protesters who sought to express distress and dissent over George Floyd's murder by law enforcement officers.  It also included violent actors who targeted law enforcement officers and caused extensive property damage through arson, vandalism, and looting.

57.    Among other factors, the response to the unrest was complicated by the ongoing COVID-19 pandemic and the distrust between citizens and law enforcement stemming from Floyd's death and other similar high-profile incidents.  Law enforcement officers faced immense challenges containing unrest and preserving safety while respecting the First Amendment rights of lawful protesters.

15

58.     In the aftermath of Floyd's murder, extensive national media coverage publicized the law enforcement response and familiarized members of the public with "taking a knee."  For example, media reports showed that various organizations and communities across the country hosted "Kneel for Nine" events in memory of Floyd, with "nine" reflecting the number of minutes that the police officer had kneeled on Floyd's neck, back, and shoulders.[32]  By early June 2020, major media reports depicted law enforcement officers kneeling during encounters with their communities.[33]

## III.    Plaintiffs Safely De-Escalate Civil Unrest During the June 4, 2020, Deployment

59.     During the relevant period in 2020, Plaintiffs were assigned to the FBI's Washington Field Office (WFO) and worked as Special Agents on counterterrorism and counterintelligence squads, where they identified and prevented threats to the nation.

60.     By June 1, 2020, thousands of people were gathering daily in Washington D.C., including some violent individuals hostile to law enforcement who engaged in arson, property damage, assault, and looting.  Senior federal officials, including then-President Trump, attempted

---

[32] *Ohio State Football Players Do a 'Kneel for Nine' to Honor George Floyd*, Columb. Dispatch (June 3, 2020), http://www.dispatch.com/story/sports/college/football/2020/06/03/ohio-state-football-players-do-kneel-for-nine-to-honor-george-floyd/42171419;  *Kneel for Nine: Demonstrators Gather across Wisconsin to Pay Tribute to George Floyd*, 68 News Milwaukee (June 2, 2020), http://www.cbs58.com/news/kneel-for-nine-demonstrators-gather-across-wisconsin-to-pay-tribute-to-george-floyd.

[33] *See, e.g., NYPD chief kneels with protesters to de-escalate protest*, The Hill (June 2, 2020), https://thehill.com/homenews/state-watch/500616-nypd-chief-kneels-with-protesters-to-deescalate-protest/; *Police Officers Across the U.S. Kneel, Pray Alongside Protesters*, Wash. Post (June 2, 2020), http://www.washingtonpost.com/video/national/police-officers-across-the-us-kneel-pray-alongside-protesters/2020/06/01/a71e5003-bab1-40d4-9822-ebbeaa9737b9_video.html; *Police Officers Kneel as George Floyd's Hearse Arrives at Memorial*, Good Morning America (June 4, 2020), http://www.goodmorningamerica.com/video/71071337.

to expand federal control over the response to the civil unrest engulfing the city, deploying hundreds of FBI personnel into the nation's capital.

61.    An after-the-fact report by the Department of Justice's Office of the Inspector General expressed "serious concerns" as to the deployment of federal officers like Plaintiffs during this period and DOJ-OIG's view that leadership's efforts were "at times . . . chaotic and disorganized."[34]  DOJ-OIG was also "troubled by the Department leadership's decision-making that required DOJ law enforcement agents and elite tactical units to perform missions for which they lacked the proper equipment and training."[35]  DOJ-OIG concluded that such deployments "created safety and security risks for the agents and the public."[36]

62.    Plaintiffs were among the FBI personnel deployed during this period and saw the potential for violence first-hand.  For example, on June 1, multiple Plaintiffs' unoccupied FBI vehicles were vandalized with anti-law enforcement graffiti in downtown D.C.

63.    On June 4, 2020, Plaintiffs were part of a group of approximately twenty-two FBI Special Agents from three different squads deployed by FBI and DOJ leadership to downtown Washington, D.C.  Plaintiffs had minimal knowledge of or experience with their colleagues from different squads at the time of the deployment.

64.    Because Plaintiffs were FBI Special Agents focused on counterterrorism and counterintelligence, Plaintiffs' official duties were focused on thwarting domestic and foreign

---

[34] *A Review of the Department of Justice's Response to Protest Activity and Civil Unrest in Washington, D.C. in Late May and Early June 2020*, 24-085, U.S. Department of Justice, Office of the Inspector General, at 7 (July 2024), https://s3.documentcloud.org/documents/25030046/24-085.pdf.
[35] *Id.*
[36] *Id.* at ii.

threats to the United States, such as mass shootings, terroristic bombings, and other criminal activities. Plaintiffs possessed expertise in highly sensitive law enforcement techniques used to thwart domestic and foreign threats to the United States, including knowledge of specialized technical tools, national and international legal authorities, source development, undercover and covert operations, and domestic and geopolitical affairs. But Plaintiffs' extensive tactical training and experience, at the FBI Academy and while serving as Special Agents, never included law enforcement tactics for crowd control.

65.    Plaintiffs were subject to the DOJ's then-existing Use of Force policy.[37] The policy provided that deadly force may be used "only when necessary, that is, when the officer has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the officer or to another person."[38] The policy explained that "imminent danger may exist" where there is probable cause to believe, for example, that "the subject possess[es] a weapon, or is attempting to gain access to a weapon, under circumstances indicating an intention to use it against the Agents or others."[39] The policy provided that "[e]ven where deadly force is permissible, Agents should assess whether its use creates a danger to third parties that outweighs

---

[37] *FBI Domestic Investigations and Operations Guide (DIOG)* (2016), Part 2 at F-1-F-31, available at http://vault.fbi.gov/FBI%20Domestic%20Investigations%20and%20Operations%20 Guide%20%28DIOG%29/FBI%20Domestic%20Investigations%20and%20Operations%20Guid e%20%28DIOG%29%202016%20Version/FBI%20Domestic%20Investigations%20and%20Ope rations%20Guide%20%28DIOG%29%202016%20Version%20Part%2002%20%28Final%29/vi ew.

[38] *Id.* at F-13.

[39] *Id.* at F-15-16.

the likely benefits of its use."[40]  The policy further provided that it "shall not be construed to require Agents to assume unreasonable risks to themselves."[41]

66.    Plaintiffs had been informed that the purpose of the deployment was to show a visible law enforcement presence, and they wore vests marked "FBI" and carried their firearms. But they were not properly prepared or instructed to conduct crowd control operations.  Plaintiffs were not provided with specific intelligence on the crowds, an operations plan, or instructions on the use of less-than-lethal force to control crowds, and their legal and arrest authorities for the deployment were unclear.

67.    Plaintiffs were not issued sufficient equipment for responding to civil unrest such as riot shields, gas masks, helmets, or other tactical gear.  In stark contrast, National Guard, Bureau of Prisons, and Metropolitan Police Department personnel who were also deployed to the same area received protective equipment and less-than-lethal weapons consistent with their training and experience in crowd control.  In fact, Plaintiffs were as susceptible as civilians to their fellow officers' less-than-lethal munitions: Plaintiffs had no protective equipment to prevent them from experiencing the disabling effects of tear gas if deployed by other law enforcement or military officials.  Similarly, before June 4, 2020, a group of FBI agents had been trapped when National Guardsmen used helicopters to disperse the crowd, catching the unprotected FBI agents alongside the civilians.

68.    Plaintiffs were acutely aware of their limited training and resources as they patrolled downtown D.C. on foot.  As a group of twenty-two agents, Plaintiffs and their colleagues

---

[40] *Id.* at F-17.
[41] *Id.* at F-15.

were vastly outnumbered by the crowds they encountered. At times during this period, FBI personnel were accompanied by tactical teams from other law enforcement entities precisely because of the FBI personnel's lack of training and equipment. But that was not the case on June 4, 2020.

69.    Plaintiffs had been provided only limited information about the identity and intent of the crowds they were to encounter, although they were aware that other government officials deployed during this period had been assailed with rocks while on foot patrol. Because they were deployed to unsecured areas, Plaintiffs had no way of knowing whether individuals they confronted possessed weapons, and if so what kinds of weapons. Plaintiffs observed that the crowds they encountered included agitated individuals as well as families with young children.

70.    At one point during their foot patrol, Plaintiffs and their colleagues were situated near the National Archives when a sea of people began moving past them. Plaintiffs observed a mob that vastly outnumbered their group of FBI Special Agents, with many members of the chaotic scene yelling, chanting, waving banners or closed fists, and throwing objects.

71.    A large section of the throng noticed that Plaintiffs and their colleagues were FBI personnel and intentionally charged toward Plaintiffs, swarming them such that Plaintiffs had no ability to leave the scene safely. Plaintiffs were literally backed up against a wall of the National Archives. The mob directed increasingly agitated shouting and gesturing toward Plaintiffs. From Plaintiffs' perspective, the situation was extremely volatile and rapidly deteriorating, posing a significant risk of escalation to violence to include the potential need for deadly force against civilians.

72.    As individual members of the mob moved toward Plaintiffs aggressively, Plaintiffs maintained their composure, intent on preventing escalation to violence. Some in the mob began

shouting for the FBI personnel to kneel or "take a knee," as widespread national media coverage had shown law enforcement officers throughout the country doing during encounters with the public.

73.    Plaintiffs had limited ability to communicate or coordinate with each other or the mob due to the loud environment and quick reaction time required.  One Plaintiff signaled for the mass of people to back away from the FBI personnel, while another Plaintiff attempted to call for back up on the FBI radio, without success.  Some in the mob were photographing the FBI personnel.

74.    As Plaintiffs observed the extremely volatile situation evolve, each individually considered their options and exercised their professional judgment, informed not only by the actions of the mob but by the actions and positioning of their colleagues.

75.    The Special Agents closest to the mob were the first to kneel.  Their intent was to prevent a dangerous situation in which confrontational or unwitting civilians might make physical contact with agents or even attempt to gain control of FBI service weapons, necessitating the use of lethal force.  In addition to de-escalating, the one-legged kneeling position allowed Plaintiffs to maintain control of their firearms and ability to observe the volatile assemblage while demonstrating a level-headed law enforcement presence that avoided the use of unnecessary force against civilians.

76.    After the first Special Agents kneeled, the mob moved their focus away from the kneeling FBI personnel and trained it onto FBI personnel who remained standing, suggesting that kneeling had been understood by civilians as a de-escalation.  In a matter of moments, all twenty-two of the FBI personnel in the group situated near the National Archives determined that kneeling

21

was the most tactically sound means to prevent violence and to maintain order, and did so.  Shortly

after, the mob moved on without escalation to bloodshed.

77.    Plaintiffs' de-escalation response succeeded, and deadly force never became

necessary.

78.    Plaintiffs demonstrated tactical intelligence in choosing between deadly force—the

only force available to them as a practical matter, given their lack of adequate crowd control

equipment—and a less-than-lethal response that would save lives and keep order.  The Special

Agents selected the option that prevented casualties while maintaining their law enforcement

mission.  Each Plaintiff kneeled for apolitical tactical reasons to defuse a volatile situation, not as

an expressive political act.

79.    Plaintiffs were performing their duties as FBI Special Agents, employing

reasonable de-escalation to prevent a potentially deadly confrontation with American citizens: a

Washington Massacre that could have rivaled the Boston Massacre in 1770.

80.    Plaintiffs' actions fulfilled their constitutional duties as federal officers not to

abridge their fellow American citizens' First Amendment rights to freedom of speech and

assembly, and Fourth Amendment rights against excessive force.

81.    Plaintiffs' actions were consistent with the DOJ's existing Use of Force policy,

which authorized deadly force only when necessary, required agents to consider the danger posed

to third parties before using deadly force, and specifically did not require agents to assume

unreasonable risks to themselves.[42]

---

[42] Plaintiffs' actions were also consistent with the updated Use of Force policy in effect
since 2022.  *See Department of Justice Policy on Use of Force*, Off. Att'y Gen. 1 (May 20, 2022),
https://www.justice.gov/d9/pages/attachments/2022/05/23/departments_updated_use-of-

82.      Plaintiffs were also aware that law enforcement officers who unlawfully kill civilians in the course of their official duties may be subject to criminal charges.  For example, the Minneapolis police officers who killed George Floyd were later convicted of federal and state offenses, including murder.  And before June 2020, prominent officer-involved deaths of civilians had resulted in criminal investigations, indictments, and convictions of officers.

83.      Mindful of the potentially catastrophic consequences, Plaintiffs knew that a split-second misjudgment by any of them could ignite an already-charged national climate and trigger further violence and unrest.

84.      Under challenging circumstances without adequate resources, Plaintiffs upheld their oath of office, which requires them to "support and defend the Constitution," "bear true faith and allegiance to the same," and "well and faithfully discharge the duties" of their office.

## IV.  Years Before Defendant Patel's Tenure, FBI and DOJ Determine Plaintiffs' Actions Reflected No Misconduct

85.      Immediately after this event, Plaintiffs reported the close encounter with civilians that had just taken place.  Relieved that no violence had transpired but frustrated that the de-escalation had become necessary, Plaintiffs returned to the Washington Field Office to debrief up their chain of command.

86.      Then-FBI Director Christopher Wray, who had been appointed by President Trump, met with the group almost immediately.  Director Wray indicated that he understood

---

force_policy.pdf.  Similar to the earlier policy, the updated policy provides that "[i]t is the policy of the Department of Justice to value and preserve human life" and that officers "may use force only when no reasonably effective, safe, and feasible alternative appears to exist."

Plaintiffs had de-escalated a dangerous situation and expressed that he was glad Plaintiffs had come back from the deployment safely.

87.    Then-Deputy Director David Bowdich met with members of the group.  As Deputy Director, Bowdich had supervisory authority over FBI's OPR,[43] and he carefully reviewed the evidence as to what happened on June 4, 2020.  During the meeting, Deputy Director Bowdich confirmed that no one had acted for political reasons.  He assured Plaintiffs that he understood they had de-escalated a dangerous situation and that they would not be penalized for having done so.

88.    FBI personnel also determined that Plaintiffs' de-escalation on June 4, 2020, did not violate the Hatch Act, which restricts political activities for certain government employees to ensure a non-partisan civil service.

89.    DOJ-OIG exhaustively reviewed the summer 2020 deployments of FBI personnel, as reflected in the 2024 report described above.  DOJ-OIG reported no misconduct by Plaintiffs or their colleagues who kneeled on June 4, 2020.

90.    Shortly after the kneeling event, however, individuals on social media began attacking Plaintiffs, falsely painting the de-escalation as a left-wing political act and otherwise disparaging them without knowing or understanding the relevant context for Plaintiffs' actions.

91.    On July 4, 2023, then-former President Trump posted on social media about Plaintiffs and their colleagues who kneeled on June 4, 2020.

---

[43] 2021 DOJ-OIG Report, at 18.

92.    President Trump's post re-posted a Fox News article entitled "Gaetz demands answers on how FBI agents who kneeled for 2020 protesters allegedly got 'plum' promotions."[44] The Fox News article references a letter dated June 27, 2023, signed by then-Congressman Matthew Gaetz that attacked the FBI agents for kneeling—even though Gaetz's letter also acknowledged that the FBI personnel had likely done so to de-escalate a dangerous situation.[45] The article includes quoted statements from Gaetz indicating that he perceived the FBI agents as politically affiliated with the "Biden Administration."[46]

93.    Then-Representative Gaetz is a close political associate of President Trump and Defendant Patel.  In November 2024, President Trump announced his intention to nominate Gaetz to the position of Attorney General, although Gaetz later withdrew.  On December 1, 2024, the day after Defendant Patel was announced as President Trump's future nominee for FBI Director, Gaetz posted a photo on social media of himself and Defendant Patel standing arm in arm.[47]

94.    In 2023, Defendant Patel published a book called *Government Gangsters*, in his private capacity.  Defendant Patel's book advocates for political patronage in government, stating that in the "next administration" (i.e., the administration in which Defendant Patel now serves) certain public employees should "be removed from their posts and replaced with people who won't

---

[44]  Donald Trump (@realDonaldTrump), Truth Social (July 4, 2023 at 4:05 pm). https://truthsocial.com/@realDonaldTrump/posts/110657615450122590, (reposted from Fox News, @FoxNews).

[45]  Houston Keene, *Gaetz demands answers on how FBI agents who kneeled for 2020 protesters allegedly got 'plum' promotions*, Fox News (June 28, 2023), https://www.foxnews.com/politics/gaetz-demands-answers-fbi-agents-kneeled-2020-protesters.

[46]  *Id.*

[47]  Matt Gaetz (@MattGaetz), X (Dec. 1, 2024 at 10:57 A.M. ET) https://x.com/mattgaetz/status/1863251173353943159.

undermine the president's agenda."[48]  Defendant Patel's book further stated that "the Democrats and the Deep State are on the same team" and that "[o]ne of the most cunning and powerful arms of the Deep State is the Federal Bureau of Investigation."[49]

## V.    Defendants Unlawfully Retaliate Against Plaintiffs, Culminating in Blanket Summary Dismissals Despite an Internal Investigation Once Again Showing No Misconduct

95.    During the more than five years between June 2020 and their terminations, Plaintiffs continued to serve their nation with distinction.  Among Plaintiffs' many achievements, they contributed to: (i) an international terrorism case that resulted in the conviction of a foreign national for providing material support to Iran's weapon of mass destruction program; (ii) the first conviction after trial of an intelligence officer for the Chinese government; (iii) one of the largest ransomware disruptions in FBI history that saved victims millions of dollars; (iv) the restructuring of the FBI's Crimes Against Children program; and (v) an espionage case involving a former defense contractor, the last of which Defendant Patel highlighted in an internal email just one week before Plaintiffs were unlawfully terminated.

96.    Nevertheless, shortly after President Trump's second term began on January 20, 2025, Defendants began targeting Plaintiffs for political retribution.

97.    In late January, then-Acting Deputy Attorney General Emil Bove was the highest-ranking political appointee at DOJ, pending the confirmations of an Attorney General, Deputy Attorney General, and FBI Director.  In that capacity, Bove informed the then-Acting FBI Director Brian Driscoll that Bove was receiving "pressure" from White House Deputy Chief of Staff Stephen Miller "to conduct summary firings of agents."  Bove demanded a list of FBI personnel

---

[48] Kash Pramod Patel, Government Gangsters, 138, 212 (2023).
[49] *Id.* at xv, 33.

who had worked on investigations related to the attack on the U.S. Capitol on January 6, 2021, for a "DOJ review for misconduct," which Driscoll "believed would consist of DOJ's assessment as to whether an employee supported the President's political agenda." Driscoll opposed these and other proposed unlawful terminations of FBI personnel and was thereafter himself summarily dismissed in a letter signed by Defendant Patel.[50]

98.     Defendant Patel became the FBI Director on February 21, 2025. Before that date, Defendant Patel had never served in the FBI in any capacity, nor as an agent or police officer in any federal or local law enforcement agency, nor in the United States Armed Forces, nor as a Senate-confirmed official of any kind.[51]

99.     Immediately upon becoming FBI Director, Defendant Patel began working to terminate all of the agents that had been deployed together and kneeled on June 4, 2020, including Plaintiffs. By that time, nearly five years after the kneeling event, several of the agents no longer worked at the FBI.

100.    FBI senior leaders who spoke to Defendant Patel during this early period believed that Defendant Patel had already decided to terminate Plaintiffs, and that the decision had originated from the White House.

101.    Early in Defendant Patel's tenure, despite the FBI and DOJ's earlier review processes failing to find any reason for adverse action against Plaintiffs, multiple Plaintiffs were

---

[50] Compl. at ¶¶ 189-93, *Driscoll et al. v. Patel et al.*, No. 25-cv-03109-JMC (D.D.C. Sep. 10, 2025), Dkt. No. 1.

[51] *See generally United States Senate Committee on the Judiciary Questionnaire for Non-Judicial Nominees*, http://www.judiciary.senate.gov/imo/media/doc/patel_sjq_to_committee.pdf (last visited Dec. 5, 2025).

removed from supervisory positions solely because they had been identified as having kneeled on

June 4, 2020.

    a.  In late March 2025, Plaintiff Jane Doe 5 was informed that she was being removed at the direction of Defendant Patel from her position at FBI Headquarters as a Deputy Assistant Director for the FBI overseeing counterintelligence because she kneeled on June 4, 2020.  Plaintiff Jane Doe 5 had been specifically identified in then-Representative Gaetz's letter.  Plaintiff Jane Doe 5 retained her SES status but was demoted to a Section Chief position.

    b.  In April 2025, Plaintiff Jane Doe 6 was serving as the Legal Attache for the FBI based overseas along with her family.  In that capacity, Plaintiff Jane Doe 6 had previously provided briefings to Defendant Patel with which he said he was very impressed.  Nevertheless, on April 3, 2025, an FBI senior leader informed her that she was being removed from her term position in the Senior Executive Service to a non-Senior Executive Service position, abruptly uprooting her entire family and resulting in a significant pay decrease.  The FBI senior leader informed Plaintiff Jane Doe 6 that Defendant Patel had indicated that his mind was made up and could not be changed.

    c.  In April 2025, Plaintiff Jane Doe 9 was demoted from her position as a supervisor overseeing all FBI ransomware and malware investigations.  An FBI senior leader informed her that the demotion came straight from top level FBI leadership.

    d.  In April 2025, Defendant Patel directed the removal of Plaintiff Jane Doe 8 from her position supervising a counterintelligence squad.

102.    Defendant Patel appointed Steven Jensen to serve as the highest-ranking agent, or

Assistant Director in Charge (ADIC), for the Washington Field Office, beginning in early April.

Jensen was later summarily dismissed in a letter signed by Defendant Patel on the ground that he

allegedly "fail[ed] to execute and perform requested tasks, resulting in an unreasonable delay in

the execution of FBI priorities."[52]

---

[52] Compl. at ¶¶ 116-121, 199, *Driscoll et al. v. Patel et al.*, No. 25-cv-03109-JMC (D.D.C. Sept. 10, 2025), Dkt. No. 1.

103.    Soon after Jensen began in his role, Defendant Patel requested through subordinates that Jensen provide a list of FBI personnel involved in the kneeling event, presumably so that Defendant Patel could terminate them en masse.

104.    Jensen convinced Defendant Patel to allow an internal investigation to take place pursuant to FBI's prescribed procedures before Defendant Patel took further action against Plaintiffs.  On June 27, 2025, an internal investigation of "kneeling during a protest" began in the FBI's Inspection Division.

105.    The FBI's internal procedures direct that reviews and investigations must be conducted in a "fair, timely, and thorough" manner.  In this case, however, more than five years had passed before Defendant FBI initiated its investigation.

106.    Following June 27, 2025, Plaintiffs were notified that they were under investigation for possible violations of Offense Code 2.12 (Violation of Ethical Guidelines) and Offense Code 5.22 (Unprofessional Conduct – On Duty) by "kneeling during a protest."[53]  The standard penalty for violations of those provisions is suspension for fourteen and seven days, respectively.[54]  The notification provided no further detail about why Defendant FBI believed Plaintiffs may have violated those provisions and  included no charge relating to "the political weaponization of the government."

---

[53] *Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process*, FBI (Jan. 1, 2017), https://vault.fbi.gov/offense-codes-and-penalty-guidelines-governing-fbis-internal-disciplinary-process/offense-codes-and-penalty-guidelines-governing-fbis-internal-disciplinary-process-final.

[54] *Id.*

107.    Defendant FBI required each Plaintiff to participate in a mandatory interview, subject to dismissal from the FBI if they refused to do so.  Every Plaintiff separately submitted a requested statement and was interviewed.

108.    The Inspection Division investigation produced hundreds of pages of detailed facts, including Plaintiffs' sworn statements and interviews describing the circumstances surrounding the kneeling event.

109.    The record of the investigation established that each Plaintiff acted apolitically and tactically to de-escalate, with the goal of preserving American lives and maintaining order and not for any improper purpose.  The record of the investigation also included information indicating that the matter had been resolved by FBI leadership five years earlier.

110.    The Inspection Division referred the matter to OPR for the adjudication portion of the internal investigation process, and the Inspection Division provided OPR with the record of the investigation.  OPR received the matter from the Inspection Division for its review on or about September 4, 2025.  As of September 26, 2025, the matter was still pending with OPR, and preparation of the *Douglas* factors—which must be considered under FBI policy before any penalty can be imposed—had not been completed.

111.    Also as of September 26, 2025, Plaintiffs had successfully completed their probationary period and were non-probationary employees of Defendant FBI.  Nevertheless, they had not been afforded the procedural protections provided to non-probationary employees in the event that OPR recommends removal, including the right to review the material on which OPR relied; the right to provide a written response (which may identify witnesses or exculpatory evidence); the right to make an oral presentation to the Assistant Director of OPR at which

testimony and evidence can be submitted; a written decision letter from the Assistant Director of OPR fully stating the reasons for the decision; and the right to an internal appeal.

112.    Instead, on September 26, 2025, Plaintiffs and their colleagues from June 4, 2020, who remained with the FBI each separately received a letter signed by Defendant Patel that purported to terminate them immediately.

113.    The letters reflect no individualized assessment of the facts and circumstances specific to each Plaintiff, despite such an assessment being required under the FBI's internal review process.  Instead, the body of each letter reads as follows:

> This document provides official notice that you are being summarily dismissed from your position at the Federal Bureau of Investigation, and removed from the federal service, under my authority as the FBI Director, effective immediately.  In the course of making this decision, I considered relevant material pertaining to your case, including the investigation conducted by the FBI's Inspection Division.
>
> You have demonstrated unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government.
>
> Pursuant to Article II of the United States Constitution and the laws of the United States, your employment with the Federal Bureau of Investigation is hereby terminated.
>
> If applicable, you may have a right to file an appeal of this removal with the U.S. Merit Systems Protection Board (MSPB) within 30 days of the effective date of the removal action. For more information on how to file an appeal with the MSPB, please visit www.mspb.gov.[55]

---

[55] As discussed above, only two of the fired FBI employees who received this letter possess rights to file an appeal of their terminations before the MSPB.  Neither employee is a Plaintiff in this case.

114.    On information and belief, Defendant Patel understood that, if permitted to take the usual course, the ongoing FBI disciplinary process that was cut short by Defendant Patel's summary action would not have resulted in Plaintiffs' removal from their positions at the FBI, let alone the entire federal service.

115.    Defendant Patel's letter indicated that he had reviewed the materials from the FBI's internal investigation.  But contrary to the letter, the materials gathered in the internal investigation—despite being triggered by Defendant Patel himself to target Plaintiffs—showed that Plaintiffs did not engage in either "unprofessional conduct" or "a lack of impartiality in carrying out duties, leading to the political weaponization of government."  Indeed, the FBI had concluded in 2020 that Plaintiffs committed no Hatch Act violation and that no discipline was otherwise warranted.

116.    Defendant Patel had previously testified under oath to Congress that he "will honor the internal review process of the FBI."[56]  But in this case, he circumvented the FBI's internal processes for his own political purposes.

117.    According to the 2021 DOJ-OIG report referenced above, summary dismissal is typically imposed by the Assistant Director of the FBI's OPR, who in turn reports to the Deputy Director, not the Director.  In 2020, the Deputy Director did not impose any penalty, let alone blanket summary dismissal.  But in 2025, an FBI Director (Defendant Patel) reversed course in

---

[56] PBS NewsHour, *WATCH LIVE: Kash Patel Testifies at Senate Confirmation Hearing for FBI Director*, at 03:05:20 (YouTube, Jan. 30, 2025),  http://www.youtube.com/watch?v=EJkv-vJPgxU&t=4597s.

this case despite being five years removed from the underlying events and having no operational or field experience as a police officer or agent.[57]

118.    Defendant Patel's letter failed to identify any legitimate grounds justifying the use of summary dismissal.  Instead, it relied upon a false allegation, *i.e.*, that Plaintiffs engaged in the "political weaponization of the government," that had not been included in the disciplinary charges against them and was never defined or explained to Plaintiffs.

119.    Following September 26, 2025, Defendant FBI never offered Plaintiffs any post-termination process for challenging their summary dismissals.

120.    In 1997, then-FBI Director Louis Freeh authorized summary dismissal to permit the agency to "act without hesitation" in "extraordinary cases" that require "immediate . . . action."[58]  Likewise, the 2021 DOJ-OIG report described summary dismissal as appropriate for cases that require "a strong and swift response[.]"[59]  Here, the September 26, 2025, summary dismissals took place more than five years after the underlying events and more than seven months after Defendant Patel's tenure as Director began.[60]

121.    To Plaintiffs' knowledge, before 2025, Defendant FBI has never summarily dismissed an employee based on previously rejected allegations of misconduct absent material new evidence.

_____

[57] *See generally United States Senate Committee on the Judiciary Questionnaire for Non-Judicial Nominees*, http://www.judiciary.senate.gov/imo/media/doc/patel_sjq_to_committee.pdf (last visited Dec. 5, 2025).

[58] Memorandum from Louis Freeh, Director, FBI, to all Special Agents in Charge (Mar. 5, 1997) ("Freeh Memo") at 9; *see id.* (only "exigent and compelling circumstances" would justify this remedy).  In the years since 1997, Defendant FBI's summary dismissal policy has been updated by, for example, the 2021 OPR Policy Guide cited herein.

[59] *Id.* at 18.

[60] *Id.*

122.    Defendant Patel has a pattern of abusing the summary dismissal process for political reasons.  Some weeks before Plaintiffs were summarily dismissed, Defendant Patel had used the summary dismissal authority to remove high-level FBI officials for similar retaliatory and unlawful purposes.[61]  On information and belief, since Plaintiffs' summary dismissal, Defendant Patel has misused the tool to remove other FBI employees for political reasons.[62]

123.    Plaintiffs were removed the same day Defendant Patel's termination letters were issued.  Their abrupt departure disrupted ongoing case work and other operations they were actively undertaking in their capacities as FBI Special Agents, including evidence collection in a high-profile assassination case in Utah, innovative cyber operations, and upcoming shifts in support of President Trump's "Making the District of Columbia Safe and Beautiful" executive order.

124.    Defendants' unlawful political retaliation is further evidenced by their adverse treatment of Plaintiffs as compared to FBI agents deployed on January 6, 2021, in Washington, D.C.

125.    On September 27, 2025—the day after summarily firing Plaintiffs—Defendant Patel made a post on social media that underscores the political nature of his terminations of Plaintiffs.  Discussing the attack on the Capitol on January 6, 2021, Defendant Patel said that FBI

---

[61] *See generally,* Compl., *Driscoll*, No. 25-cv-03109-JMC.

[62] *See, e.g.*, *FBI Fires Agents Who Worked on Trump Classified Document Investigation, AP Sources Say*, Wash. Post (Feb. 25, 2026), https://www.washingtonpost.com/politics/2026/02/25/trump-patel-fbi-firings-classified-documents-investigation/1187a242-12b9-11f1-8e8d-fe91db44677b_story.html ("The firings are part of a broader personnel purge under the leadership of Director Kash Patel, [who] has pushed out dozens of employees who either contributed to investigations of the president or who were perceived as not in alignment with the administration's agenda.").

agents were "thrown into crowd control on Jan 6 against FBI standards" and blamed the "failure" on "corrupt leadership."[63]

126.    FBI leadership was the same on June 4, 2020, as it was on January 6, 2021, yet Defendant Patel's September 26, 2025, letter blames Plaintiffs, not their leadership, for the events of June 4, 2020.

127.    Defendant Patel's disparate treatment of these two incidents is the result of Defendants' own partisan political intentions.  Defendants perceived the civilians on January 6, 2021, as politically affiliated with President Trump.  By contrast, Defendants perceived the civilians on June 4, 2020, as not politically affiliated with President Trump.  Defendants then imputed their perception of the civilians to Plaintiffs, concluding that because Plaintiffs de-escalated the dangerous situation instead of escalating to violence, Plaintiffs must not have been politically affiliated with President Trump.  In short, Defendants' imputed perception of Plaintiffs' partisan affiliation explains their adverse treatment of Plaintiffs' successful de-escalation efforts.

128.    In an interview posted to YouTube on October 6, 2025, Defendant Patel again demonstrated that his accusations of "unprofessional conduct" and "lack of impartiality" against Plaintiffs were false and pretextual, and that in fact he treated Plaintiffs differently for partisan political reasons based on imputed perceived political affiliation.  Referring once more to January 6, 2021, Defendant Patel stated, in part, "Do you know what the FBI does not do ever?  Riot control.  We don't do that.  So, the prior leadership sent 250 some odd men and women into a

---

[63] FBI Director Kash Patel (@FBIDirectorKash), X (Sept. 27, 2025, at 8:30 PM ET), https://x.com/FBIDirectorKash/status/1972096661007880321.

situation they're not trained for, put them in harm's way, put the individuals out there in harm's way."[64]

129.    Despite Defendant Patel and Deputy Director Dan Bongino's frequent suggestions that FBI Special Agents are "cops" in the "grabbing-bad-guys business,"[65] the above statements demonstrate that Defendant Patel understands that FBI Special Agents are not street-level police officers extensively trained in crowd control but rather highly trained federal investigators whose core function is the investigation of complex federal crimes.

130.    Defendant Patel would not have summarily dismissed Plaintiffs, nor accused them of the "political weaponization of government," had Defendants' perception of the political affiliation of the civilians on June 4, 2020—and by extension of Plaintiffs—been the same as Defendants' perception of the political affiliation of the civilians on January 6, 2021.

131.    In response to Senator Whitehouse's question, "Have you fired people because they voted for Vice President Harris," Defendant Patel did not respond "no."[66]  Instead, he testified, "I don't ask people who they vote for and neither does the FBI."[67]  On information and belief, Defendant Patel attempts to use indirect means to assess whether FBI personnel are sufficiently

---

[64] NTD, *Exclusive: Kash Patel Talks FBI Operations, January 6, Free Speech*, at 37:42 (YouTube, Oct. 6, 2025), https://www.youtube.com/watch?v=sG5o8EG17IA.
[65] *See, e.g.,* Lauren Irwin, *Patel outlines vision for FBI: 'Let good cops be cops,'* The Hill (Jan. 30, 2025), https://thehill.com/homenews/administration/5115976-fbi-director-nominee-kash-patel-outlines-vision/; FBI Deputy Director Dan Bongino (@FBIDDBongino), X (Dec. 1, 2025 at 8:30 PM ET), https://x.com/FBIDDBongino/status/1995666742803054863.
[66] PBS NewsHour, *WATCH LIVE: FBI Director Patel Appears at Senate Hearing Amid Criticism Over Charlie Kirk Killing*, at 02:10:18 (YouTube, Sept. 16, 2025) https://www.youtube.com/watch?v=X_QSRbrPa-8.
[67] *Id.* at 2:10:23.

affiliated with President Trump. In this case, Defendant Patel assessed Plaintiffs' partisan affiliation based on Plaintiffs' de-escalation of civilians on June 4, 2020.

132.    Defendants targeted Plaintiffs in particular because of Plaintiffs' use of de-escalation with civilians that Defendants perceived as opposed to, or otherwise not affiliated with, President Trump, and imputation to Plaintiffs of that perceived lack of affiliation.

133.    Defendants terminated Plaintiffs based on Defendants' perception of Plaintiffs as not affiliated with President Trump.

134.    Even if Defendants had accurately perceived Plaintiffs' political affiliation, Plaintiffs' political thoughts, beliefs, and affiliations were irrelevant to their job qualifications. Plaintiffs were never political appointees and partisan affiliation has never been a requirement or permissible criteria for evaluating the effective performance of Plaintiffs' duties.

135.    As a result of Defendants' unlawful terminations of Plaintiffs and their colleagues who kneeled, the FBI has lost over two hundred years of combined training and experience in counterintelligence, counterterrorism, cybercrime, and other specialized knowledge essential to the national security.

136.    As of the date of this filing, all Plaintiffs have received SF-50s from Defendant FBI. The SF-50 is a government form titled "Notification of Personnel Action" which is provided to former employees upon personnel actions such as terminations. The SF-50 contains a "Legal Authority" section intended to be completed by the employer, along with a more general "Remarks" section. Multiple Plaintiffs received SF-50s later determined by FBI's Human Resources Department to contain errors as to the legal authority for their terminations. However, the "Remarks" sections of the SF-50s identify the reason for removal as Article II of the United States Constitution.

137.    But Article II of the United States Constitution does not empower Defendants to trample on Plaintiffs' rights.  Federal employees like Plaintiffs are protected by the First and Fifth Amendments, among others, as well as additional rules set by Congress for the Executive Branch's treatment of federal employees, such as the FBI-DEA SES.

138.    At the time of the blanket summary dismissals, multiple Plaintiffs had amassed twenty years' or more worth of federal service but had not yet reached the age of fifty and thus could not retire.  However, they would have been eligible for early retirement under FBI policy. Instead of being offered early retirement, they were summarily dismissed.

139.    As of the date of this filing, Defendant Patel has made multiple public statements falsely indicating that everyone whom he has dismissed from the FBI "weaponized" the agency or otherwise failed in their duties to the FBI.[68]

140.    In fact, Plaintiffs never "weaponized" the FBI.  Throughout their careers, Plaintiffs adhered scrupulously to the FBI's standards of professionalism and impartiality, as the FBI's extensive personnel files as to Plaintiffs reflected before Defendants' unlawful terminations.

141.    Plaintiffs' reputations for professionalism and impartiality are central to maintaining their careers within law enforcement and have been harmed by the false allegations made in Defendant Patel's letter and relevant public statements.

---

[68] *See, e,g.*, Kudlow, *There was No 'Constitutional Basis' for the 2022 Raid on Mar-a-Lago, says FBI Director Patel*, at 8:30 (FOX Business, Aug. 20, 2025), https://www.foxbusiness.com/video/6377153656112; PBS NewsHour, *FBI Director Patel Appears at Senate Hearing*, at 1:06:50; LA Times Studios, *Straight to the Point: FBI Director Kash Patel*, at 2:23 (YouTube, Nov. 25, 2025), https://www.youtube.com/watch?v=eSPFnpfrueE.

142.    Since the terminations, Plaintiffs have sought alternative employment.  Given the highly specialized nature of their positions as FBI Special Agents, where they worked on behalf of the United States government on sophisticated counterintelligence, counterterrorism, and cybercrime matters, among others, Plaintiffs reasonably view their prior employment as FBI Special Agents to have no comparators.

143.    Certain positions within the Executive Branch of the federal government would enable Plaintiffs to remain as federal law enforcement officers, with some offering the possibility of obtaining the same retirement benefits they expected to receive at the FBI.  But on information and belief, Plaintiffs' removals from federal service pursuant to Defendant Patel's letters effectively foreclose them from such positions.

144.    Potential employment opportunities in law enforcement typically require Plaintiffs to disclose whether they have been terminated from federal service. On information and belief, Plaintiffs have been broadly precluded from such employment due to their summary dismissals and the false allegations made in Defendant Patel's letter and public statements.

145.    In their job searches, multiple Plaintiffs have learned from individuals knowledgeable about hiring in law enforcement or law enforcement-adjacent positions that Plaintiffs' dismissals from the FBI would prevent them from being hired for such positions.

146.    As of the date of filing, Plaintiffs collectively have applied to positions within federal, state, and local law enforcement, as well as private positions adjacent to law enforcement, such as government contractors and private investigators, and private positions more tangentially related to law enforcement, such as account and systems managers.  As of the date of filing, no Plaintiff has been offered a position within law enforcement.

a.  Plaintiff Jane Doe 1 has applied to multiple positions and has yet to receive an offer of employment.

b.  Plaintiff Jane Doe 2 obtained a private position outside of law enforcement at a lesser pay rate.

c.  Plaintiff Jane Doe 3 has applied to more than thirty positions in and outside of law enforcement and has yet to receive an offer of employment.

d.  Plaintiff Jane Doe 4 obtained a private position with a government contractor at a lesser pay rate, having applied unsuccessfully to multiple law enforcement positions at the state and local level.

e.  Plaintiff Jane Doe 5 has applied to more than sixty positions and has yet to receive an offer of employment.  In multiple instances, once a prospective employer learned of the FBI dismissal, Plaintiff Jane Doe 5 was informed that she would not be hired.

f.  Plaintiff Jane Doe 6 has applied to more than forty positions and has yet to receive an offer of employment.

g.  Plaintiff Jane Doe 7 obtained a private position outside of law enforcement at a lesser pay rate, having applied to more than twenty-five positions.

h.  Plaintiff Jane Doe 8 has applied to more than forty positions and has yet to receive an offer of employment.  An application for employment with a federal Executive Branch agency was rejected.

i.  Plaintiff Jane Doe 9 obtained a private position outside of law enforcement at a lesser pay rate, after applying to more than forty positions.

j.  Plaintiff John Doe 1 has applied to more than forty positions and has yet to receive an offer of employment.  In multiple instances, potential employers became non-responsive once the circumstances of the FBI dismissal were disclosed.

k.  Plaintiff John Doe 2 has applied to more than forty positions and has yet to obtain employment.

l.  Plaintiff John Doe 3 obtained a private position with a government contractor at a lesser total compensation rate, having applied to more than forty positions.

## COUNT I

### Violation of the First Amendment
### (Retaliation for Perceived Political Affiliation)

147.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

148.    "[T]he First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990) (*citing Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980)); *see also O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996) ("Government officials may not discharge public employees for refusing to support a political party or its candidates."). This prohibition extends to discharging employees on account of perceived partisan support or affiliation, regardless of whether that perception is correct. *See Heffernan v. City of Paterson*, 578 U.S. 266, 268 (2016).

149.    Defendants terminated Plaintiffs because Defendants perceived Plaintiffs to be affiliated with, and supportive of, President Trump's partisan opponents and not affiliated with President Trump. That is a violation of the First Amendment.

150.    Defendants' perception of Plaintiffs' partisan affiliation was based on Plaintiffs' use of de-escalation to quell unrest involving citizens whom Defendants viewed as opposed to, or otherwise not affiliated with, President Trump.

151.    Through public statements, private conversations, and other means, Defendants demonstrated that they believed that Plaintiffs and other FBI personnel should be demoted and/or terminated based on Defendants' perception that such personnel were not politically affiliated with President Trump.

41

152.    Partisan affiliation and political support for President Trump were never legal or appropriate requirements for the effective performance of Plaintiffs' roles as FBI special agents and supervisors.

153.    Defendants' proffered reasons for Plaintiffs' unlawful terminations—"unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government" —were facially pretextual.  Instead, the initiation and timing of the investigation, demotion, and termination decisions were all motivated by, and would not have been made but for, Defendants' perception that Plaintiffs were not politically affiliated with President Trump.

154.    Defendant Patel's own statements demonstrate that his actions in this case were motivated by partisan animus toward Plaintiffs and not by a fair evaluation of the facts on June 4, 2020.

155.    Defendants' unconstitutional actions harmed Plaintiffs by infringing upon the exercise of their constitutional rights, damaging their reputations, depriving them of their rightful status as FBI employees in good standing with the agency, and eliminating their primary source of income and retirement benefits.

## COUNT II

### Violation of the Fifth Amendment
### (Due Process-Property)

156.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

157.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process

of law." Defendants unlawfully deprived Plaintiffs of both property and liberty interests, without due process of law.

158.    "[P]roperty interests subject to procedural due process protection are not limited by a few rigid, technical forms." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). A government employee has a property interest where the government has "fostered rules and understandings" which entitle the employee "to believe that he would lose his job only for" specified reasons. *Ashton v. Civiletti*, 613 F.2d 923, 928 (D.C. Cir. 1979) (finding a protected property interest established by an FBI handbook provision).

159.    As non-probationary employees of the FBI, each Plaintiff had a constitutionally protected property interest in his or her continued employment. Defendant FBI's internal rules, regulations, policies, and procedures regarding employee discipline created an objectively reasonable expectation of continued employment. In particular, these sources fostered a legitimate understanding that Plaintiffs could be discharged only for a job-related reason warranting termination under FBI policy and procedure.

160.    In addition, based on Defendant FBI's internal rules, regulations, policies, and procedures regarding ethics and integrity, Plaintiffs had a property interest flowing from their understanding and legitimate expectation that they would not be discharged based on their actual or perceived political affiliation or lack of political affiliation.

161.    Plaintiffs also had a property interest flowing from their understanding and legitimate expectation that they would not be discharged based on the events of June 4, 2020.

162.    Indeed, by no later than September 2021, Plaintiffs, by virtue of Defendant FBI's conduct, along with its disciplinary regulations, policies, and procedures, reasonably understood

and expected that Defendant FBI's inquiry into their use of de-escalation had ended and that Defendant FBI had found no misconduct by Plaintiffs.

163.    In the ensuing five years, each Plaintiff reasonably relied on that understanding in making critical life decisions, including (1) whether to retain legal counsel to contest any disciplinary charges; (2) whether to resign or retire from the FBI; (3) whether to accept a promotion or reassignment; and (4) whether to pursue alternative employment opportunities.  During this time, Plaintiffs continued to perform their FBI duties with diligence and professionalism.  Further, Plaintiffs reasonably believed that, as employees in good standing, they were accruing credit toward a retirement pension as a federal law enforcement officer.

164.    When the FBI initiated the internal investigation on June 27, 2025, Plaintiffs reasonably understood and expected that the FBI would follow its well-established policies and procedures, as outlined in the OPR Policy Guide, the Internal Affairs Policy Guide, the Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process, the DOJ-OIG Report, and other official documents.  But Defendant FBI did not do so, and it also did not provide constitutionally adequate process.  Among other things, Plaintiffs never received (1) notification that they were being investigated for the "political weaponization of government"; (2) an opportunity to review the government's file or respond to it, including by providing responsive evidence; (3) an oral hearing; (4) an individualized assessment of their specific conduct and the *Douglas* factors; or (5) an opportunity to appeal.  Moreover, Plaintiffs were deprived of a fair proceeding in front of an unbiased decisionmaker.

165.    Plaintiffs reasonably understood and expected that summary dismissal—an extraordinary remedy for cases involving threats to safety or national security, or other such compelling or exigent circumstances—could not be imposed for their actions on June 4, 2020.

166.    In purporting to open an investigation on June 27, 2025, and then summarily terminating Plaintiffs on September 26, 2025, before the disciplinary process had concluded, Defendants deprived Plaintiffs of a property interest in their employment without due process of law.

## COUNT III

### Violation of the Fifth Amendment
### (Due Process-Liberty)

167.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

168.    Government employees possess a "constitutionally protected liberty interest in professional reputation." *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1104 (D.C. Cir. 1985). Defendants' conduct has deprived Plaintiffs of this liberty interest without due process of law.

169.    Defendant Patel deprived each of the Plaintiffs of that interest by terminating them and making multiple public false statements that impugned Plaintiffs' professional reputations and stigmatized them.  This includes falsely accusing them, in connection with their dismissals, of "unprofessional conduct," a "lack of impartiality in carrying out duties," and involvement in "the political weaponization of government."

170.    These false smears defamed each Plaintiff, suggesting they were not faithful and apolitical law enforcement officials. In so doing, the false statements have seriously harmed Plaintiffs' future employment prospects.

171.    Further, Plaintiffs' termination letters purported to remove them from the "federal service."

45

172.    Defendant Patel's letters dismissing Plaintiffs communicate to any future employer that they are unsuitable for any position within the federal government.

173.    Defendants' actions in summarily dismissing Plaintiffs from the FBI have had and will continue to have the broad effect of largely precluding them from pursuing their chosen careers in law enforcement, including law enforcement careers in counterterrorism, cybercrime, counterintelligence, crisis response, violent crime and financial crimes.

174.    Plaintiffs are entitled to, among other remedies, a name-clearing hearing regarding the false public statements regarding their actions and the basis for their respective removals.

**COUNT IV**

**Violation of the Fifth Amendment**
**(Due Process-Substantive Due Process)**

175.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

176.    Defendants' actions also violated Plaintiffs' substantive due process rights.

177.    The Due Process Clause "prevents governmental power from being used for purposes of oppression, or abuse of government power that shocks the conscience, or action that is legally irrational [in that] it is not sufficiently keyed to any legitimate state interests." *Wash. Teachers' Union Local # 6 v. Bd. of Educ. of D.C.*, 109 F.3d 774, 781 (D.C. Cir. 1997) (quotation marks omitted). An act of "grave unfairness," such as "a substantial infringement of state law prompted by personal or group animus" or "a deliberate flouting of the law that trammels significant personal or property rights," may violate the right to due process. *Tri Cty. Indus., Inc. v. District of Columbia*, 104 F.3d 455, 459 (D.C. Cir. 1997).

178.    Defendants' actions violated bedrock principles of fairness protected by the Constitution, statutory guarantees, and common law.  After indicating that Plaintiffs' actions on June 4, 2020, warranted no further process of any kind, Defendant FBI opened an inquiry five years later into the same conduct.  In doing so, Defendant FBI cited no new evidence.  Contrary to its own policies, Defendant FBI then demanded that Plaintiffs provide witness statements long after their memories had faded and evidence was lost.

179.    Switching gears, Defendant FBI and Defendant Patel then abandoned the new investigation and discharged Plaintiffs summarily without basic due process protections.  Five years after the fact, the FBI now insisted that compelling considerations (which it never identified) required immediate action.

180.    In fact, these claims were entirely pretextual.  Defendants dismissed Plaintiffs in a partisan effort to retaliate against FBI employees that they perceived to be sympathetic to President Trump's political opponents.  And Defendants acted summarily to avoid creating any further administrative record that would reveal their actions as vindictive and unjustified.  Having imposed a severe and unwarranted punishment on longstanding and dedicated FBI employees for purely partisan reasons, Defendant Patel then defamed them, attempting to eliminate their prospects of future law enforcement employment, by falsely accusing them of misconduct, including "political weaponization of the government."

181.    This illegal and malicious course of conduct inflicted grave unfairness on Plaintiffs. It was motivated by partisan animus and deliberately flouted the law in ways that trammeled Plaintiffs' personal and property rights.  It violated their constitutional right to due process of law.

## COUNT V

### Violation of the Fifth Amendment
### (Due Process-Property as to Plaintiff Jane Doe 5)

182.    At the time of her removal, Plaintiff Jane Doe 5 had served in the FBI's SES for nearly two years and thus was a non-probationary member of the SES.

183.    By law, Plaintiff Jane Doe 5 could be removed only for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function.

184.    In addition to the property interests described above, Plaintiff Jane Doe 5 had a property interest in continued employment with the FBI flowing from the laws governing the SES, including 5 U.S.C. §§ 3151 and 7543(a).  In particular, she had a property interest in, among other things, salary, health insurance, retirement benefits,  and  other  benefits.

185.    Plaintiff Jane Doe 5 did not receive the notice and opportunity for a hearing to which she was entitled under 5 U.S.C. §§ 3151 and 7543(b) and the FBI SES Policy implementing those statutory provisions.

186.    Among other things, she never received notice that the FBI was proposing to remove her, much less thirty days' notice with "specific reasons for the proposed action [removal]." 5 U.S.C.  § 7543(b)(1).  She also did not have an opportunity to respond to such a notice and never received a written decision articulating the "specific reasons" for her removal.

187.    Plaintiff Jane Doe 5 also did not receive constitutionally adequate due process for all the reasons explained above.

188.    Defendants' deviation from these well-established policies and procedures deprived Plaintiff Jane Doe 5 of property without due process of law.

**COUNT VI**

**Violation of the Separation of Powers, Legal Nullity, and Ultra Vires Action**
**(Plaintiff Jane Doe 5)**

189.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

190.    At the time of her removal, Plaintiff Jane Doe 5 had served in the FBI's SES for nearly two years and thus was a non-probationary member.

191.    Plaintiff Jane Doe 5 was not removed for poor performance.  Nor could she have been, based on her performance evaluations.  Moreover, Plaintiff Jane Doe 5 was not demoted to a GS-15 position, as would have occurred had she been removed for poor performance.

192.    Instead, on September 26, 2025, Plaintiff Jane Doe 5 abruptly received Defendant Patel's letter described above.  The SF-52 form memorializing her termination notes that she was removed from a position within the Senior Executive Service.

193.    As described above, Defendants afforded Plaintiff Jane Doe 5 none of the required due process statutorily mandated in the event of a removal of a member of the FBI SES, according to the FBI SES Policy promulgated pursuant to 5 U.S.C. § 3151 and the mandatory removal protections required by 5 U.S.C. § 7543(a)-(c).   This alone makes the actions a violation of the separation of powers, void, null, and *ultra vires* as to Plaintiff Jane Doe 5.

194.    Plaintiff Jane Doe 5's conduct also did not meet the substantive standard for removal established by 5 U.S.C. § 3151.

195.    Defendants had no lawful authority to terminate Plaintiff Jane Doe 5 from the FBI. Plaintiff Jane Doe 5's termination was *ultra vires* and without legal force or effect.

## COUNT VII

## Declaratory Judgment Act
### (28 U.S.C. §§ 2201 and 2202)

196.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

197.    Plaintiffs are each entitled to declaratory relief on the basis of all claims identified. There is a substantial and ongoing controversy between Plaintiffs and Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that the Defendants do not have authority to remove Plaintiffs without affording each of them all rights and protections set forth by applicable statutes and regulations, the United States Constitution, and the First and Fifth Amendments thereto.

198.    Plaintiffs are further entitled to declaratory relief to establish that their terminations were a legal nullity.

199.    Plaintiffs have each suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities.

## COUNT VIII

## Writ of Mandamus

200.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

201.    In the alternative, Plaintiffs are entitled to a writ of mandamus commanding Defendants to return them to their respective offices and not remove them from federal service without following lawful procedures.  Defendants have a legal duty not to terminate Plaintiffs

unless and until Plaintiffs have been afforded the protections prescribed by law and, absent this Court granting relief, there is no other adequate means of redress.

202.    The provisions of 28 U.S.C. § 1361 create jurisdiction in cases seeking a writ of mandamus against federal officers, employees, and agencies, and they provide for an independent cause of action in the absence of any other available means.  To the extent relief is unavailable under the Constitution, common law equity, or any other law to enjoin unlawful government action, mandamus lies here.

**JURY DEMAND**

203.    Plaintiffs demand a jury trial on all triable issues.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

a.  Issue a declaratory judgment that Defendants' actions violated Plaintiffs' First Amendment rights and order appropriate relief;

b.  Issue a declaratory judgment that Defendants' actions violated Plaintiffs' Fifth Amendment due process rights and order appropriate relief, to include, but not limited to, a name-clearing hearing;

c.  An order requiring Defendants to immediately reinstate Plaintiffs and enjoining Defendants from taking any further adverse personnel action against each of them without providing appropriate procedural and substantive due process as required by law and the Fifth Amendment;

d.  Expunge Plaintiffs' personnel files of all records related to Defendants' unconstitutional demotion and termination decisions;

e.  An award of backpay and other monetary and administrative relief as appropriate;

f.  An award of the costs of this action and reasonable attorney fees under the Equal Access

to Justice Act or any other applicable law; and

g.  Such other relief as the Court may deem just and proper.

Dated: February 27, 2026

Respectfully submitted,

*/s/ John David Kuchta*
JOHN DAVID KUCHTA (DDC No. FL00158)
JOHN KUCHTA LAW, PLLC
12481 Brantley Commons Court
Fort Myers, FL 33907
239-690-6080
jkuchta@robertfoleylaw.com

*Counsel for Plaintiff Jane Doe 6*

*/s/ Mary L. Dohrmann*
MARY L. DOHRMANN (D.C. Bar No. 90042577)
ELIZABETH D. COLLERY (D.C. Bar No. 422246)
SYDNEY FOSTER* (D.C. Bar No. 982340)
WASHINGTON LITIGATION GROUP
1717 K Street, NW, Suite 1120
Washington, D.C. 20006
202-521-8750
mdohrmann@washingtonlitigationgroup.org

*Application for D.D.C. admission pending

*Counsel for Plaintiffs Jane Does 1-9 and John Does 1-3*