**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JANE DOES 1–9** and<br>**JOHN DOES 1–3,**<br><br>        **Plaintiffs,**<br><br>    v.<br><br>**KASHYAP P. PATEL**<br>Director of the Federal Bureau of<br>Investigation, *et al.*,<br><br>        **Defendants.** | **CIVIL ACTION NO. 25-4258 (TNM)** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**AMENDED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 1

LEGAL STANDARD.............................................................................................................. 3

ARGUMENT............................................................................................................................ 4

    I.    Count One Alleges a Valid First Amendment Claim. ............................................ 4

        A.    Applicable Law.............................................................................................. 4

        B.    Plaintiffs Have Adequately Alleged a First Amendment Claim. ......................... 5

    II.    Count Two Alleges A Valid Procedural Due Process Claim Based
        on a Deprivation of Property..................................................................................... 12

        A.    Applicable Law............................................................................................. 12

        B.    The FBI's Disciplinary System Creates a Legitimate Expectation
            of Continued Employment............................................................................... 13

        C.    The FBI's Statements and Conduct Created a Mutually Explicit
            Understanding That Plaintiffs Would Not Be Dismissed Based
            On Their Service on June 4, 2020. .................................................................. 19

    III.    Count Three Alleges a Valid Procedural Due Process Claim Based
        on a Deprivation of Liberty........................................................................................ 21

        A.    Applicable Law............................................................................................. 21

        B.    Plaintiffs Have Adequately Alleged a Deprivation of Liberty. .......................... 22

    IV.    Plaintiffs have Adequately Alleged That They Received Constitutionally
        Deficient Process (Counts Two, Three, and Five)................................................... 25

    V.    Count Four Alleges a Valid Substantive Due Process Claim ................................. 30

    VI.    Count Five Alleges a Valid Procedural Due Process Claim Based
        on Deprivation of Property for Jane Doe 5 ............................................................. 32

    VII.    Count Six Alleges a Valid *Ultra Vires* Claim Based on Jane
        Doe 5's SES Status ................................................................................................... 35

    VIII.    Defendants' Invocation of Article II is Misplaced ................................................. 39

    IX.    Counts Seven and Eight Allege Valid Declaratory Judgment and
        Mandamus Claims ..................................................................................................... 45

CONCLUSION......................................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016) ............................................................................ 5

*Arnett v. Kennedy*,
  416 U.S. 134 (1974) ............................................................................. 17, 21, 24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................ 3

*\*Ashton v. Civiletti*,
  613 F.2d 923 (D.C. Cir. 1979) ................................................................ 13, 34, 39

*Associated Press v. Budowich*,
  No. 25-cv-532, 2025 WL 1095385 (D.D.C. Apr. 11, 2025) ............................... 39

*Bakalis v. Golembeski*,
  35 F.3d 318 (7th Cir. 1994) ............................................................................... 30

*Barkley v. U.S. Marshals Serv. ex rel. Hylton*,
  766 F.3d 25 (D.C. Cir. 2014) ............................................................................ 29

*Barnes v. Zaccari*,
  669 F.3d 1295 (11th Cir. 2012) ......................................................................... 15

*\*Bd. of Regents v. Roth*,
  408 U.S. 564 (1972) ..................................................................................... *passim*

*BEG Invs., LLC v. Alberti*,
  144 F. Supp. 3d 16 (D.D.C. 2015) ....................................................................... 8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................ 3

*Black Lives Matter D.C. v. Trump*,
  544 F. Supp. 3d 15 (D.D.C. 2021) .................................................................... 5, 7

*Brady v. Off. of Sergeant at Arms*,
  520 F.3d 490 (D.C. Cir. 2008) ............................................................................ 7

*\*Branti v. Finkel*,
  445 U.S. 507 (1980) ............................................................................................ 4

*Browning v. Clinton*,
  292 F.3d 235 (D.C. Cir. 2002) ............................................................................ 3

*Buchanan v. Barr*,
  71 F.4th 1003 (D.C. Cir. 2023) ........................................................................... 5

*Cafeteria & Rest. Workers Union, Loc. 473, AFL-CIO v. McElroy*,
  367 U.S. 886 (1961) .......................................................................................... 25

*Carducci v. Regan*,
  714 F.2d 171 (D.C. Cir. 1983) .......................................................................... 28

*Carter v. W. Rsrv. Psychiatric Habilitation Ctr.*,
  767 F.2d 270 (6th Cir. 1985) .......................................................................... 27, 28

*Changji Esquel Textile Co. v. Raimondo*,
  40 F.4th 716 (D.C. Cir. 2022) ........................................................................ 36, 37

*Cinderella Career & Finishing Schs., Inc. v. FTC*,
  425 F.2d 583 (D.C. Cir. 1970) .............................................................................. 29

*\*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532 (1985) ................................................................................... *passim*

*Cnty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998) ........................................................................................ 30, 31

*Connick v. Myers*,
  461 U.S. 138 (1983) ............................................................................................... 9

*Crooks v. Mabus*,
  845 F.3d 412 (D.C. Cir. 2016) .............................................................................. 18

*Dodson v. U.S. Capitol Police*,
  633 F. Supp. 3d 235 (D.D.C. 2022) ...................................................................... 28

*Doe v. U.S. Dep't of Just.*,
  753 F.2d 1092 (D.C. Cir. 1985) ....................................................................... 22, 23

*Douglas v. Veterans Administration*,
  5 M.S.P.R. 280 (1981) .......................................................................................... 14

*EEOC v. St. Francis Xavier Parochial Sch.*,
  117 F.3d 621 (D.C. Cir. 1997) ................................................................................ 3

*Elgin v. Dep't of Treasury*,
  567 U.S. 1 (2012) ................................................................................................. 36

*\*Elrod v. Burns*,
  427 U.S. 347 (1976) ...................................................................................... 4, 5, 44

*\*Esparraguera v. Dep't of the Army*,
  101 F.4th 28 (D.C. Cir. 2024) ....................................................................... *passim*

*Farah v. Esquire Mag.*,
  736 F.3d 528 (D.C. Cir. 2013) .............................................................................. 23

*Fleming v. U.S. Dep't of Agric.*,
  987 F.3d 1093 (D.C. Cir. 2021) ....................................................................... 40, 42

*Free Enter. Fund v. PCAOB*,
  561 U.S. 477 (2010) .............................................................................................. 42

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) ............................................................................................... 9

*Garrison v. District of Columbia*,
  No. 89-0794-OG, 1989 WL 250655 (D.D.C. Oct. 12, 1989) ................................ 27

*Garrow v. Gramm,*
  856 F.2d 203 (D.C. Cir. 1988) ................................................................................. 21

*Greene v. McElroy,*
  360 U.S. 474 (1959) ................................................................................................ 28

*Griffith v. F.L.R.A.,*
  842 F.2d 487 (D.C. Cir. 1988) .................................................................. 14, 36, 37

*Hall v. Ford,*
  856 F.2d 255 (D.C. Cir. 1988) ........................................................................ 12, 21

*\*Heffernan v. City of Paterson,*
  578 U.S. 266 (2016) ............................................................................................. 5, 9

*Hettinga v. United States,*
  677 F.3d 471 (D.C. Cir. 2012) .......................................................................... 3, 11

*Hurd v. D.C.,*
  147 F.4th 1036 (D.C. Cir. 2025) ............................................................................ 30

*Jefferson v. Collins,*
  905 F. Supp. 2d 269 (D.D.C. 2012) ....................................................................... 11

*Jefferson v. Harris,*
  170 F. Supp. 3d 194 (D.D.C. 2016) ....................................................................... 22

*Jimenez Fuentes v. Torres Gaztambide,*
  807 F.2d 236 (1st Cir. 1986) ................................................................................... 5

*Johnson v. United States,*
  628 F.2d 187 (D.C. Cir. 1980) ............................................................................... 34

*Kartseva v. Department of State,*
  37 F.3d 1524 (D.C. Cir. 1994) ......................................................................... 22, 25

*Kennedy v. Braidwood Mgmt., Inc.,*
  606 U.S. 748 (2025) ............................................................................................... 40

*Kizas v. Webster,*
  707 F.2d 524 (D.C. Cir. 1983) ............................................................................... 13

*Krentz v. Robertson,*
  228 F.3d 897 (8th Cir. 2000) ........................................................................... 26, 27

*L'Association des Americains Accidentels v. United States Dep't of State,*
  633 F. Supp. 3d 74 (D.D.C. 2022), *appeal dismissed,*
  No. 22-cv-5262, 2023 WL 5321008, (D.C. Cir. Aug. 18, 2023) ............................ 31

*Langeman v. Garland,*
  88 F.4th 289 (D.C. Cir. 2023) .................................................................... 17, 18, 19

*Leedom v. Kyne,*
  358 U.S. 184 (1958) ......................................................................................... 36, 37

*Lepre v. Dep't of Lab.,*
  275 F.3d 59 (D.C. Cir. 2001) ................................................................................. 36

*Marti Navarro v. United States*,
 104 F. Supp. 2d 96 (D.P.R. 2000)....................................................................... 20, 21

*Mathews v. Eldridge*,
 424 U.S. 319 (1976)................................................................................................. 26

*McCabe v. Barr*,
 490 F. Supp. 3d 198 (D.D.C. 2020).................................................................. *passim*

*Morrison v. Olson,*
 487 U.S. 654 (1988)................................................................................................. 41

*Myers v. United States*,
 272 U.S. 52 (1926)................................................................................................... 41

*N. Am. Butterfly Ass'n v. Wolf*,
 977 F.3d 1244 (D.C. Cir. 2020).............................................................................. 12

*Nat'l Ass'n of Postal Supervisors v. USPS*,
 26 F.4th 960 (D.C. Cir. 2022)................................................................................. 37

*O'Donnell v. Barry,*
 148 F.3d 1126 (D.C. Cir. 1998).............................................................................. 22

*O'Hare Truck Serv., Inc. v. City of Northlake*,
 518 U.S. 712 (1996)................................................................................................... 5

*Oestereich v. Selective Service System Local Board No. 11*,
 393 U.S. 233 (1968)................................................................................................. 37

*Palmeri v. MSPB,*
 164 F.4th 878 (Fed. Cir. 2026) .............................................................................. 34

*Paul v. Davis,*
 424 U.S. 693 (1976)........................................................................................... 23, 24

*Perry v. Sindermann,*
 408 U.S. 593 (1972)....................................................................................... 12, 20, 21

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
 758 F.3d 296 (D.C. Cir. 2014)................................................................................ 28

*Ralpho v. Bell*,
 569 F.2d 607 (D.C. Cir. 1977)................................................................................ 36

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
 490 U.S. 477 (1989)................................................................................................. 42

*Rutan v. Republican Party of Ill.*,
 497 U.S. 62 (1990)................................................................................................. 4, 5

*Sanderson v. First Sec. Leasing Co.*,
 844 P.2d 303 (Utah 1992)....................................................................................... 20

*Seila Law LLC v. CFPB*,
 591 U.S. 197 (2020)..................................................................................... 41, 42, 43

*Stone v. F.D.I.C.*,
   179 F.3d 1368 (Fed. Cir. 1999) ................................................................. 12

*Strzok v. Garland*,
   No. 19-cv-2367, 2025 WL 4662300 (D.D.C. Sep. 23, 2025)...................... 34

*Taylor v. Trump*,
   No. 25-3742 (TJK), 2026 WL 396844 (D.D.C. Feb. 11, 2026) ................ 29

*Trump v. United States*,
   603 U.S. 593 (2024)........................................................................... 42, 43

*U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*,
   413 U.S. 548 (1973)..................................................................................... 9

*United States v. Fausto*,
   484 U.S. 439 (1988)................................................................................... 36

*\*United States v. Perkins*,
   116 U.S. 483 (1886)............................................................................. 40, 41

*Vanover v. Hantman*,
   77 F. Supp. 2d 91 (D.D.C. 1999)............................................................... 15

*Vukadinovich v. Bd. of Sch. Trs.*,
   978 F.2d 403 (7th Cir. 1992) ..................................................................... 27

*W. Virginia State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943)..................................................................................... 4

*Washington Legal Clinic for the Homeless v. Barry*,
   107 F.3d 32 (D.C. Cir. 1997)..................................................................... 18

*Webster v. Doe*,
   486 U.S. 592 (1988)................................................................................... 39

*Williams v. Shinseki*,
   161 F. Supp. 3d 77 (D.D.C. 2011)............................................................... 4

*Withrow v. Larkin*,
   421 U.S. 35 (1975)..................................................................................... 29

## Statutes & Constitutional Provisions

5 U.S.C. § 3132(a)(2)................................................................................. 42

5 U.S.C. § 3132(a)(2)(D) ........................................................................... 42

5 U.S.C. § 3151(a) ..................................................................................... 33

5 U.S.C. § 3151(a)(2)................................................................................. 42

5 U.S.C. § 3151(a)(5)(A) ........................................................................... 33

5 U.S.C. § 3151(a)(5)(D) ..................................................................... 33, 35

5 U.S.C. § 3592(a)(2)................................................................................. 33

5 U.S.C. § 7513 ................................................................................................ 34

5 U.S.C. § 7541 ................................................................................................ 33

5 U.S.C. § 7542 ................................................................................................ 33

5 U.S.C. § 7543(a) ......................................................................... 33, 34, 35, 38

5 U.S.C. § 7543(b) ........................................................................................... 35

5 U.S.C. § 7543(b)(1) ................................................................................. 35, 38

5 U.S.C. § 7543(b)(2) ................................................................................. 35, 38

5 U.S.C. § 7543(b)(4) ................................................................................. 35, 38

Ohio Rev. Code Ann. § 124.11 (1984) ............................................................ 34

Pub. L. No. 95-454, 92 Stat. 1111 (1978) ....................................................... 13

U.S. Const. art. II, § 2, cl. 2 ...................................................................... 40, 41

## Other Authorities

3A Corbin on Contracts § 562 (1960) .............................................................. 20

Appointment & Removal of Fed. Rsrv. Bank Members of the Fed.
Open Mkt. Comm., 43 Op. O.L.C. 263, 2019 WL 11594453 (2019) ............ 44

Black's Law Dictionary (12th ed. 2024) .......................................................... 16

*Offense Codes and Penalty Guidelines Governing FBI's Internal
    Disciplinary Process,* FBI (Jan. 1, 2017) .................................................. 14

*Performance and Development Program Policy Guide* (June 8, 2020),
FBI Human Resources Division,
    (last accessed Apr. 2, 2026) ...................................................................... 15

*Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct
    Investigations*, 21-127, U.S. DOJ-OIG (Sept. 2021) ........................... 14, 17

**INTRODUCTION**

On September 26, 2025, Defendant FBI Director Kash Patel summarily dismissed Plaintiffs and every other FBI Special Agent from a group of twenty-two that de-escalated civil unrest by kneeling on June 4, 2020. Patel fired them, in violation of the First Amendment, because he perceived them as not sharing a partisan affiliation with President Trump. And Patel did so in violation of the Fifth Amendment, disregarding the FBI's own standards and procedures that prevent wasteful and unfounded firings of federal law enforcement officers like Plaintiffs, who collectively possess substantial counterintelligence, counterterrorism, and cybercrime expertise. *See* Plaintiffs' First Amended Complaint (hereinafter "Complaint" or "Compl."), ECF No. 17.

Plaintiffs' exemplary careers as FBI Special Agents extend to their actions on June 4, 2020, when they were executing a crowd control assignment outside FBI Special Agents' expertise. Plaintiffs safely de-escalated a potentially violent encounter, maintaining order and saving lives. More than five years later, Defendants abruptly terminated Plaintiffs, applying a penalty reserved for egregious offenders and citing the false ground that Plaintiffs engaged in "the political weaponization of government." But twenty-two FBI Special Agents did not simultaneously abandon their professional judgment for politics. Had Defendants allowed it, a fair proceeding would have confirmed the agency's prior conclusions that no discipline of any kind was warranted.

Plaintiffs' Complaint has plausibly alleged constitutional and statutory violations, and the case should now proceed to discovery. Accordingly, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss.

**BACKGROUND**

When Patel terminated Plaintiffs on September 26, 2025, Plaintiffs were experienced, non-probationary FBI Special Agents with "nearly two centuries of combined service to the FBI." Compl. ¶¶ 3, 19-31. Plaintiff Jane Doe 5 was also a non-probationary member of the FBI's Senior

1

Executive Service ("SES"). *Id.* ¶ 24. More than five years earlier, Plaintiffs, as part of a group of twenty-two FBI Special Agents, had kneeled to avert potential violence during an encounter with an unruly crowd at a time of civil unrest. *Id.* ¶¶ 54-84. Plaintiffs, despite lacking proper equipment and training, acted as professional and non-partisan officers to avoid bloodshed. *Id.* ¶¶ 64, 67, 77.

After an internal investigation initiated at Patel's behest in 2025 "established that each Plaintiff acted apolitically and tactically . . . [to] preserv[e] American lives and maintain[] order and not for any improper purpose," *id.* ¶ 109, Patel flouted the FBI's disciplinary standards and procedures and used the "extraordinary remedy" of summary dismissal to remove Plaintiffs from federal service. *Id.* ¶¶ 47, 112, 165. At the same time, he falsely accused them of "unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government"—despite no investigation finding misconduct. *Id.* ¶¶ 113, 85-89.

Before he assumed his current post, Patel's book *Government Gangsters* signaled his readiness to engage in unlawful political patronage. *Id.* ¶ 94. And once he became FBI Director, Patel's retaliation campaign against Plaintiffs quickly began, based on his perception that Plaintiffs were insufficiently affiliated with President Trump and/or affiliated with the "Biden Administration." *Id.* ¶¶ 99-103, 90-93. Indeed, "Patel had already decided to terminate Plaintiffs," and "the decision had originated from the White House." *Id.* ¶ 100. More recently, Patel has made false public statements defaming Plaintiffs and other FBI Special Agents whom he has unlawfully terminated. *Id.* ¶ 139. Defendants' actions toward Plaintiffs have caused them extensive reputational and occupational harm. *Id.* ¶¶ 140-46.

Plaintiffs filed suit on December 8, 2025, along with a motion to proceed pseudonymously, ECF Nos. 1, 12, which was granted by the Chief Judge subject to reconsideration by this Court, ECF No. 5. On February 6, 2026, Defendants filed a motion to dismiss and a motion to compel the

use of Plaintiffs' names and photographs in court filings, which Plaintiffs opposed on March 9, 2026. *See* ECF Nos. 14, 15, 19. On February 27, 2026, Plaintiffs filed the First Amended Complaint, and on March 4, 2026, Defendants filed a motion to dismiss the First Amended Complaint ("Mot."). *See* ECF Nos. 17, 18. Plaintiffs now oppose Defendants' Motion.

## LEGAL STANDARD

"A Rule 12(b)(6) motion tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). When deciding a Rule 12(b)(6) motion, the court must treat the complaint's "[f]actual allegations" as "true," and it must "construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (cleaned up). A court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [it] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).[1]

A complaint's factual allegations, taken as true and construed in favor of the plaintiff, need only raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 555. A claim is "plausible on its face" when the facts pled in the complaint allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

---

[1] Accordingly, as discussed in Plaintiffs' opposition to Defendants' motion to compel, ECF No. 19 at 7, the Court is barred from considering the photos Defendants rely upon (Mot. 1) in their motion to dismiss.

**ARGUMENT**

Defendants' motion to dismiss should be denied. Defendants repeatedly ignore the legal standards applicable to a Rule 12(b)(6) motion; they fail to take the Complaint's factual allegations as true, to draw all inferences in favor of Plaintiffs, and to focus only on the four corners of the Complaint. Further, their arguments for dismissal mischaracterize Plaintiffs' First Amendment and Fifth Amendment claims and ignore relevant case law. Indeed, Defendants' arguments only underscore the plausibility of Plaintiffs' claims and the need for discovery. *See Williams v. Shinseki*, 161 F. Supp. 3d 77, 84–86 (D.D.C. 2011) (denying motion to dismiss where government failed "to root its arguments in the factual allegations in the complaint" and noting that "[i]ronically, the need for discovery is made plain by the [government's] own arguments"). Because each count of the Complaint states a claim, dismissal is not warranted.

I.      **COUNT ONE ALLEGES A VALID FIRST AMENDMENT CLAIM.**

Plaintiffs have adequately alleged a First Amendment claim based on retaliation for perceived political affiliation.

A.      **Applicable Law.**

Under the United States Constitution, "'no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Elrod v. Burns*, 427 U.S. 347, 356 (1976) (quoting *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Accordingly, the First Amendment forbids political patronage, in which "public employees hold their jobs on the condition that they provide, in some acceptable manner, support for the favored political party." *Id.* at 359; *see also, e.g.*, *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 74 (1990); *Branti v. Finkel*, 445 U.S. 507, 519 (1980). Nor, "except in the most compelling circumstances," may the government "[wield] its power to interfere with its employees' freedom

4

to believe and associate, or to not believe and not associate." *Rutan,* 497 U.S. at 76; *see also O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996) ("Government officials may not discharge public employees for refusing to support a political party or its candidates."). Consequently, "a patronage system involving the wholesale dismissal of public employees for partisan reasons, applied without regard to an employee's responsibilities," violates the First Amendment. *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 239 (1st Cir. 1986) (*citing Elrod,* 427 U.S. at 367). This same result obtains if the government terminates an employee for her *perceived* affiliation or non-affiliation with a political party, whether or not that perception is accurate. *Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016).

Accordingly, to state a claim for First Amendment retaliation based on perceived partisan affiliation, a plaintiff must allege facts showing that she "engaged in conduct protected under the First Amendment" or was perceived to have done so; that the defendant "took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position"; and "a causal link between the exercise of a constitutional right and the adverse action." *E.g., Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).

### B.      Plaintiffs Have Adequately Alleged a First Amendment Claim.

The Complaint alleges facts plausibly establishing that Defendants terminated Plaintiffs because Patel perceived them as not politically affiliated with President Trump. "Of course, direct evidence of retaliatory animus is not required, especially as this early stage of the proceedings." *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 46–47 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023). But here, the Complaint's allegations easily show Defendants' retaliatory motive, establishing a "causal link" between Defendants' adverse action and their perception of Plaintiffs' partisan affiliation. *Aref*, 833 F.3d at 258.

5

First, the Complaint alleges that Patel is hostile to FBI employees he perceives as not affiliated with President Trump and is engaging in a campaign of partisan political retaliation. For one, in 2023, Patel advocated for public employees to be "removed from their posts and replaced with people who won't undermine the president's agenda," and stated that the FBI is "[o]ne of the most cunning and powerful arms of the Deep State" associated with "the Democrats." Compl. ¶ 9. The Complaint further alleges that Patel has used summary dismissal to fire other FBI agents for similar retaliatory political reasons, and that Patel offered differing treatment of Plaintiffs compared to FBI agents responding to January 6, 2021 unrest, based on his perception of the political affiliations of the civilians involved in the two incidents. *Id.* ¶¶ 122, 124-130. The Complaint also alleges that Patel declined under oath to give a direct answer to whether he has "fired people because they voted" for the Democratic candidate in the 2024 presidential election and instead uses "indirect means" to make such assessments. *Id.* ¶ 131.

The Complaint also alleges that Defendants perceived Plaintiffs as not affiliated with President Trump. Specifically, it alleges that at least two of Patel's close associates (including President Trump) publicly portrayed Plaintiffs and their colleagues who kneeled on June 4, 2020, as affiliated with the "Biden Administration," from whom some allegedly obtained "plum promotions." *Id.* ¶¶ 90-93. Furthermore, the Complaint alleges that when he became FBI Director, "Patel had already decided to terminate Plaintiffs, and [] the decision had come from the White House." *Id.* ¶ 100; *see also id.* ¶ 103 (Patel requested "list of FBI personnel involved in the kneeling event, presumably so that [he] could terminate them en masse"); *id.* ¶ 97 (alleging that in January 2025, then-Acting Deputy Attorney General said he was receiving "pressure" from the White House "to conduct summary firings of [FBI] agents").

6

Further supporting its First Amendment claim, the Complaint alleges unprecedented procedural maneuvers by Defendants. Indeed, the facts alleged show that Defendants failed to follow established procedures in multiple respects, providing evidence of both retaliation and pretext. *See Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 n.3 (D.C. Cir. 2008) (pretext in employment discrimination can be shown by "the employer's failure to follow established procedures or criteria"). In an unprecedented move, Defendants used "summary dismissal" to cut off the pending review process and remove Plaintiffs. Compl. ¶¶ 110, 112. The FBI's *Office of Professional Responsibility Policy Guide* describes summary dismissal as an "extraordinary remedy to be exercised only in compelling or exigent circumstances," *id.* ¶ 47, but no such circumstances existed here: Plaintiffs were dismissed five years after June 4, 2020, without any misconduct found during the FBI's standard procedures. *Id.* ¶¶ 86-89, 109. According to the Complaint, Patel summarily dismissed Plaintiffs while the agency's disciplinary procedures were still pending, understanding that the internal review process would not have resulted in Plaintiffs' removals. *Id.* ¶¶ 110-11, 114. In doing so, he afforded Plaintiffs "no individualized assessment of the facts and circumstances specific to each [agent]," as agency procedures required. *Id.* ¶ 113. Moreover, "the political weaponization of government" was never among the charges provided to Plaintiffs. *See* Compl. ¶ 106; *Brady*, 520 F.3d at 495 n.3 (listing "changes and inconsistencies in the stated reasons for the adverse action" as indicia of pretext).

The Complaint also alleges facts showing that summary dismissal was operationally unsound and disproportionate, further supporting retaliatory motive. *See Black Lives Matter D.C.*, 544 F. Supp. 3d at 47 ("[P]laintiffs have plausibly alleged that the defendants did not have a non-retaliatory motive for their actions and that they reacted with overwhelming force disproportionate to any rational need."). After five years had transpired, Plaintiffs were removed without advance

notice, disrupting their mission-related assignments. *Id.* ¶ 123. And under FBI policy, the offenses charged—Violation of Ethical Guidelines and Unprofessional Conduct—carried standard penalties of fourteen days' and seven days' suspension—making termination wholly disproportionate. *Id.* ¶ 106.

Finally, the Complaint's allegations regarding the timing of Plaintiffs' firings further support their claim of retaliation. Following his confirmation as FBI Director in 2025, Patel began working to terminate Plaintiffs, even though nearly five years had passed since the underlying events. Compl. ¶¶ 99, 105. Although Patel was initially persuaded "to allow an internal investigation to take place pursuant to FBI's prescribed procedures" before taking further action against Plaintiffs, *id.* ¶ 104, he later cut the review short—and fired the FBI employee who had convinced him to allow the standard investigation to proceed. *Id.* ¶¶ 102-04, 110-14. And Patel's invocation of summary dismissal against Plaintiffs occurred shortly after the investigation had established that "each Plaintiff acted apolitically and tactically to de-escalate, with the goal of preserving American lives and maintaining order and not for any improper purpose." *Id.* ¶ 109. Patel's actions were driven by his understanding that "the ongoing FBI disciplinary process . . . would not have resulted in Plaintiffs' removal from their positions at the FBI." *Id.* ¶ 114. "Causation may be inferred—especially at the pleading stage—when the retaliatory act follows close on the heels of the protected activity." *BEG Invs., LLC v. Alberti*, 144 F. Supp. 3d 16, 22 (D.D.C. 2015) (cleaned up). Here, the Complaint alleges that the retaliatory acts of Defendants began as soon as Patel had the authority to retaliate against Plaintiffs, and that the timing of the summary dismissals was precipitated by an internal investigation that appeared likely to resolve favorably to Plaintiffs.

Rather than addressing Plaintiffs' actual First Amendment claim directly, Defendants attempt to muddy the waters, primarily attacking a non-existent claim based on political *expression* rather than political affiliation and claiming that Plaintiffs seek to "circumvent" the expression-based case law. *See* Mot. 7-10. But it is Defendants who are engaging in circumvention: Plaintiffs clearly stated a perceived political affiliation claim, citing the relevant Supreme Court cases. *See* Compl. ¶¶ 1, 148. Defendants say nothing of relevance about the doctrinal framework reflected in *Elrod* and *Branti*, *see supra* at 4-5, on which Plaintiffs rely, and fail to cite the key case relevant to a perceived political affiliation claim, *see Heffernan*, 578 U.S. 266. Instead, Defendants devote much pointless energy to discussing the inapposite *Garcetti* and *Connick* line of precedent, *see* Mot. 7-10; *see also Garcetti v. Ceballos*, 547 U.S. 410 (2006) (addressing freedom of speech claim); *Connick v. Myers*, 461 U.S. 138 (1983) (same).[2]

Contrary to Defendants' contentions, the Complaint alleges facts showing that Plaintiffs' actions on June 4, 2020, were *not* political expression, *see* Compl. ¶¶ 59-89, 109, and in fact that Plaintiffs were "enforc[ing] the law and execut[ing] the programs of the Government without bias or favoritism for or against any political party or group or the members thereof." *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 564-65 (1973). More specifically, Plaintiffs allege that they "kneeled for apolitical tactical reasons to defuse a volatile situation, not as an expressive political act." Compl. ¶ 78; *see also id.* ¶¶ 63, 71-77 (describing pressing strategic

---

[2] While doctrinally distinct, *Connick* and *Garcetti* are entirely consistent with the *Elrod/Branti* line of cases in reinforcing that government employees retain certain First Amendment protections. *See Connick*, 461 U.S. at 143 (rejecting proposition "that a public employee ha[s] no right to object to conditions placed upon the terms of employment" including restrictions inhibiting constitutional rights); *Garcetti*, 547 U.S. at 417 (affirming that "public employees do not surrender all their First Amendment rights by reason of their employment"). Indeed, *Connick* confirmed "that the government [can]not deny employment because of previous membership in a particular party." 461 U.S. at 144 (citing cases).

considerations that led twenty-two FBI agents—from three different squads—to determine kneeling was the best course). The Complaint further alleges that until Patel's termination letters on September 26, 2025, every agency examination of Plaintiffs' actions—including an internal review Patel initiated—produced no findings of misconduct. *See id.* ¶ 86 (then-FBI Director addressed Plaintiffs immediately after deployment and indicated he understood Plaintiffs had de-escalated a dangerous situation); *id.* ¶ 87 (then-Deputy FBI Director determined Plaintiffs did not act for political reasons); *id.* ¶ 88 (FBI personnel determined no Plaintiff violated the Hatch Act); *id.* ¶ 89 (DOJ-OIG reported no misconduct by Plaintiffs). Indeed, the Complaint alleges that the 2025 internal investigation—which Patel's letter claims he reviewed—"established that each Plaintiff acted apolitically and tactically to de-escalate, with the goal of preserving American lives and maintaining order and not for any improper purpose." *Id.* ¶¶ 109, 113-15. Accordingly, while Defendants emphasize the need for "deference when a law enforcement agency disciplines an agent," Mot. at 9, the Complaint alleges that Defendants flouted the FBI's ordinary disciplinary processes—and that the experienced law enforcement professionals who examined Plaintiffs' actions in the ordinary course determined that no discipline was required.

In one paragraph toward the end of their First Amendment argument, Defendants provide a selective recitation of certain allegations from Plaintiffs' Complaint—conspicuously failing to engage those allegations most central to Plaintiffs' claims. *See* Mot. 9-10 (citing Compl. ¶¶ 91-94, 113, 128, 151). First, Defendants argue that "Director Patel's alleged prior statements that FBI agents were improperly asked to perform 'riot control' on January 6, 2021" have "nothing to do" with this case. Mot. 9 (citing Compl. ¶ 128). But the Complaint makes clear the relevance, alleging that Patel "treated Plaintiffs differently for partisan political reasons based on imputed perceived political affiliation." Compl. ¶ 128; *see also id.* ¶ 124-30. Next, Defendants aver that Patel's

10

statements advocating for the removal of public employees who "undermine the president's agenda," Compl. ¶ 94, "do not imply termination based on private speech or political beliefs," Mot. 10. But that conclusory assertion fails to give plaintiffs the benefit of available inferences in their favor, which are powerful here. *See Jefferson v. Collins*, 905 F. Supp. 2d 269, 280 (D.D.C. 2012) (crediting "[a]n equally plausible inference . . . to which the plaintiffs are entitled at the 12(b)(6) stage"). Notably, Defendants fail to address other allegations in the same paragraph further supporting the inference that Patel was motivated by political affiliation. *See* Compl. ¶ 94 (citing Patel's published assertions that "the Democrats and the Deep State are on the same team" and that "[o]ne of the most cunning and powerful arms of the Deep State is the [FBI]").

Finally, Defendants contend that the Complaint's allegations in paragraphs 91 to 93 are "irrelevant." Mot. 10. But those allegations include a social media post about Plaintiffs and their political affiliation by then-former President Trump and a letter by then-Representative Matthew Gaetz—Patel's current boss and close associate, respectively. Those allegations are strong evidence of Defendants' motivation warranting further exploration through discovery. *See, e.g., McCabe v. Barr*, 490 F. Supp. 3d 198, 214 (D.D.C. 2020) (declining to "foreclose the possibility" of First Amendment retaliation based on perceived political affiliation by an Attorney General due to statements by the President "[w]ithout providing some opportunity for discovery").

In sum, Defendants fail to accept the factual allegations as true and draw inferences in favor of Plaintiffs. *See Hettinga*, 677 F.3d at 476. Applying the correct legal standard, Count One of the Complaint should not be dismissed because Plaintiffs pleaded sufficient facts to state a claim of First Amendment retaliation.

II.    **COUNT TWO ALLEGES A VALID PROCEDURAL DUE PROCESS CLAIM BASED ON A DEPRIVATION OF PROPERTY.**

Defendants move to dismiss Count Two's procedural due process claim, arguing that Plaintiffs lacked a protected property interest. Mot. 11-12. Dismissal is unwarranted, however, because Plaintiffs have adequately alleged a property interest in continued FBI employment based on (1) the "overall workings" of the FBI's disciplinary system, which conditions dismissal on work-related reasons; and (2) agency assurances that Plaintiffs' June 4, 2020, service merited no discipline.

### A.    Applicable Law.

"A procedural due process violation under the Fifth Amendment occurs when a government official deprives a person of property without appropriate procedural protections." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1265 (D.C. Cir. 2020). To prevail, the plaintiff must first identify a cognizable property interest. *Id.* Where such an interest exists, constitutional principles determine what process is due. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). The term "property" protects "those claims upon which people rely in their daily lives." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Under *Perry v. Sindermann*, it "denotes a broad range of interests that are secured by 'existing rules or understandings,'" including where "mutually explicit understandings [] support a claim of entitlement to the benefit." 408 U.S. 593, 601 (1972) (quoting *Roth*, 408 U.S. at 577). The key inquiry is whether a plaintiff had a "legitimate expectation" to the benefit in question. *See Hall v. Ford*, 856 F.2d 255, 265 (D.C. Cir. 1988).

In public employment, a property interest arises when the government gives an employee "assurances of continued employment or conditions dismissal only for specific reasons." *Stone v. F.D.I.C.*, 179 F.3d 1368, 1374 (Fed. Cir. 1999). Such rights may stem from statutes or regulations. But they may also arise if the agency has "fostered rules and understandings [that entitle the

12

employee] to believe to that he would lose his job only for a job-related reason." *Ashton v. Civiletti*, 613 F.2d 923, 928 (D.C. Cir. 1979).[3]

In *Ashton*, the D.C. Circuit found that "the FBI has fostered rules and understandings which, by entitling appellant to believe that he would lose his job only for a job-related reason, gave him a property interest in his position." *Id.* That decision rested on, *inter alia*, (1) Ashton's letter of appointment; (2) an FBI handbook specifying that non-probationary employees "may assume that [their] position is secure, if [they] continue to do satisfactory work," which conveyed "the understanding that [the employee] did not hold his position at the whim of his superiors"; and (3) the fact that Ashton's position "was explicitly made probationary for one year," which "would be unnecessary if the employer could dismiss a non-probationary employee at any time and for any reason." *Id.* at 929. As *Ashton* makes clear, a property interest need not rest on a single source. Rather, it "can arise . . . [through] the 'implicit . . . overall workings of a particular government employer.'" *Kizas v. Webster*, 707 F.2d 524, 539 (D.C. Cir. 1983) (citations omitted).

### B.    The FBI's Disciplinary System Creates a Legitimate Expectation of Continued Employment.

Here, Plaintiffs have adequately alleged that the "overall workings" of the FBI – including its comprehensive disciplinary system – created a property right in their continued employment. *See* Compl. ¶¶ 159, 164; *id.* ¶¶ 44-49 (describing disciplinary policies). As in *Ashton*, the agency's current employment system ensures that non-probationary FBI employees will be discharged only for a job-related reason (such as misconduct) and do not serve "at the whim" of their superiors.

---

[3] Many federal employees have a property interest by virtue of the Civil Service Reform Act of 1978 ("CSRA"). Pub. L. No. 95-454, 92 Stat. 1111 (1978). Most FBI employees are excluded from the CSRA, but that "do[es] not prevent the Bureau from giving its employees some security in their jobs." *Ashton*, 613 F.2d at 928. Indeed, as explained herein, the FBI has adopted internal policies and procedures that provide protections analogous to those provided by the CSRA.

13

As DOJ's Inspector General has explained, "[t]he FBI has defined the actions that violate its standards of conduct, identified the range of discipline that it may impose when an employee commits misconduct, and developed a disciplinary process to address misconduct matters." *Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations*, 21-127, U.S. DOJ-OIG (Sept. 2021) ("2021 DOJ-OIG Report") at i; *see also* Compl. ¶ 49 & n.28 (citing document URL). Specifically, an FBI policy titled *Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process* ("Offense Codes") "provide[s] general categories of misconduct for which employees may be disciplined." *Id.* ¶ 46(a); *see also id.* ¶ 46 & n.10 (citing document URL) (Jan. 1, 2017). The policy identifies 64 separate offenses with particularity. *See, e.g.*, Offense Codes at 8 (listing, *e.g.*, Offense Code 2.9, which covers "[m]isrepresenting oneself as a Special Agent in order to conduct an unofficial inquiry, investigation, or database search, or for personal gain"). The policy also provides detailed guidance on the appropriate penalty for violations of each offense, and it sets forth a "Standard Penalty, a Mitigated Range, and an Aggravated Range" for each offense. *Id.* at 2, 5-31. Other guidance documents, including the *Office of Professional Responsibility Policy Guide* ("OPR Policy Guide"), establish a multi-step procedural mechanism for investigating and adjudicating misconduct claims. Compl. ¶¶ 47-48. If an offense code violation is substantiated, a penalty is determined after considering multiple factors identified in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981). *Id.* ¶ 47(d); Offense Codes at 3-4. This process "parallels the procedural protections outlined in the Civil Service Reform Act for more serious penalties." 2021 DOJ-OIG Report at 2.

This highly reticulated disciplinary scheme provides "substantive provisions" that specify "particularized standards or criteria [to] guide … decisionmakers" seeking to remove an FBI employee. *Griffith v. F.L.R.A.*, 842 F.2d 487, 495 (D.C. Cir. 1988) (citation omitted). Significantly,

14

those provisions do not authorize the FBI to dismiss employees for *any* reason. Rather, they authorize dismissal only for offenses identified in the Offense Codes. As a result, FBI employees have a legitimate expectation that dismissal for misconduct will rest on cause, not on no reason at all. The discipline policy thus creates a property right in continued employment.[4]

Case law analyzing similar comprehensive disciplinary schemes supports this conclusion. In *Barnes v. Zaccari*, 669 F.3d 1295 (11th Cir. 2012), for example, the Eleventh Circuit held that a student had a property interest in his continued enrollment based on relevant policies that set forth the university's rules and specified that violations of the rules could be punished with various sanctions. *Id.* at 1304-05. The court explained that the policies did "not authorize [the] institution[] to punish *all* students—only a certain class of students, those violating the rules or regulations of the institution." *Id.* 1304 (emphasis added). "By implication," then, the policies "*with[held]* authority to discipline students who follow the rules and regulations." *Id.* (emphasis added); *see also, e.g.*, *Vanover v. Hantman,* 77 F. Supp. 2d 91, 102-03 (D.D.C. 1999) (finding protected property interest based, in part, on an "elaborate disciplinary procedure" calling for "progressively stringent" discipline), *aff'd on other grounds,* 38 Fed. Appx. 4 (D.C. Cir. 2002); *Conley v. Bd. of Trs. of Grenada Cnty. Hosp.*, 707 F.2d 175, 180 (5th Cir. 1983) (holding a property interest was created by a guidebook that, *inter alia*, lists thirty-six violations that may warrant dismissal).

Rather than addressing these arguments, Defendants rely on a separate FBI policy governing the "summary dismissal" of employees gave the FBI Director authority to fire

---

[4] FBI agents may be dismissed for other job-related reasons besides misconduct, including unacceptable performance, national security concerns, or inability to perform the essential duties and responsibilities of the position. But as with misconduct, the agency has adopted written policies that delineate permissible bases for such removals and establish the processes that must be followed. *See, e.g.*, *Performance and Development Program Policy Guide* (June 8, 2020), FBI Human Resources Division, https://vault.fbi.gov/performance-and-development-program-policy-guide-1083pg (last accessed Apr. 2, 2026).

employees for any reason, rendering them at-will employees without due process rights. Mot. 2, 11-12. That claim is incorrect.

The summary-dismissal policy Defendants invoke appears in the OPR Policy Guide—a policy document that sets forth the FBI's disciplinary procedures. Compl. ¶ 47 (summarizing key provisions of OPR Policy Guide). That policy provides for "summary dismissal"—that is, dismissal without following the extensive procedures outlined elsewhere in the policy—only in cases where "(a) the safety of the public; (b) the safety of fellow employees; (c) national security interests; or (d) other compelling or exigent circumstances are at stake." *Id.* ¶ 47(g). Only the FBI Director, Deputy Director, or Assistant Director for OPR may exercise the authority, which "is an extraordinary remedy to be exercised only in compelling or exigent circumstances." *Id.*

Contrary to Defendants' argument, this policy does not allow the FBI to fire employees for no reason. Instead, that policy allows the agency to penalize misconduct by dismissing an employee without procedural protections. Indeed, Defendants effectively concede this point, describing summary dismissal as a "disciplinary process." Mot. 12.

That concession is obviously correct. To begin with, the summary-dismissal policy is situated in the OPR Policy Guide, which exists, *inter alia*, to "outline[] the FBI's policy" for the adjudicative phase of the FBI's disciplinary process. Compl. ¶ 47. And the policy provides for "dismissal," which the agency characterizes as "an extraordinary *remedy*." *Id.* ¶ 47(g) (emphasis added). As for the policy itself, it addresses when an employee may be dismissed "summarily," that is, without the FBI's ordinary *procedures*. *Id.*; *see* Black's Law Dictionary (12th ed. 2024) (defining "summary" as "[w]ithout the usual formalities"). But nowhere does it suggest that an employee may be dismissed without *substantive* grounds. To the contrary, summary dismissals occur as part of an OPR adjudication of misconduct. Finally, both the DOJ and the FBI have

16

confirmed that summary dismissal is a remedy to penalize misconduct. A 2021 DOJ-OIG report described summary dismissal as a "disciplinary action," that applies when "a subject's *misconduct* warrants dismissal." 2021 DOJ-OIG Report at 13 (emphasis added). The summary-termination policy therefore does not change the fact that dismissal from the FBI must rest on a substantive job-related rationale, including the misconduct identified in the *Offense Codes*. As a result, it casts no doubt on the property interest the agency's disciplinary process has created.

Further, because FBI employees have a property right in continued employment, the agency cannot eliminate Due Process protections. Instead, as noted above, *see supra* at 12, the Constitution itself determines what process is due. *Arnett v. Kennedy,* 416 U.S. 134, 167 (1974) (Powell, J., concurring) ("While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards.").

*Langeman v. Garland,* 88 F.4th 289 (D.C. Cir. 2023), on which Defendants rely (2, 11-12) is not to the contrary. In *Langeman*, an FBI employee who was summarily dismissed contended that he had a "property right in his continued employment" that was "*created*" by a 1997 Memorandum by Former FBI Director Freeh ("Freeh Memo"). 88 F.4th at 294 (citation omitted; emphasis added). That memo (1) mandated certain procedural protections in disciplinary actions; but (2) "preserve[d] [the] discretion" of high-ranking officials to summarily dismiss employees in "extraordinary cases" where "the safety of the public, our fellow employees, national security interests or other compelling considerations may be at stake." *Id.* at 293 (quoting Freeh Memo); *see also* Compl. ¶ 120 & n.58.[5]

---

[5] Defendants acknowledge that the Freeh Memo is "outdated," Mot. at 11. Indeed, the OPR Policy Guide in effect when Plaintiffs were fired included a revised policy. Compl. ¶ 47(g).

17

Although Langeman claimed that he was asserting a property interest in continued employment, his argument actually seemed to assert a property interest in the new disciplinary procedures. In any event, as to the first claim, it clearly lacked merit, because the Freeh Memo did not itself dictate *substantive* grounds for terminating an FBI employee. Moreover, to the extent that Langeman claimed that the Freeh Memo, by describing the circumstances where summary termination might be appropriate, created a property right, the appellate court disagreed, finding that the memo "does not contain explicit mandatory language, but instead reserves 'expansive authority and discretion' for FBI leadership to determine the circumstances where an FBI employee may be summarily dismissed." *Id.* at 295 (citing *Crooks v. Mabus*, 845 F.3d 412, 419 (D.C. Cir. 2016)).

That holding has no bearing here. The appellate court's conclusion that the agency had "authority and discretion" under the Freeh Memo to invoke summary procedures says nothing about whether it can discharge employees without cause. And *Langeman* did not consider whether other FBI policies create a property right to continued employment because the plaintiff there contended that "the Freeh Memo" itself "create[d]" such an interest. *Id.* at 296. Here, by contrast, Plaintiffs' argument that they had such a property right rests on FBI policies—including the "Offense Codes Applicable to FBI's Internal Disciplinary Process"—that do specify the substantive grounds for all dismissals, including summary firings. *See supra* at 14.[6]

---

[6] Even if the current policy did authorize summary dismissal of FBI employees without any work-related rationale, that fact would still not defeat Plaintiffs' property interest. As explained above, the relevant policy provides for summary dismissal *only* where "(a) the safety of the public; (b) the safety of fellow employees; (c) national security interests; or (d) other compelling or exigent considerations are at stake." Compl. ¶ 47(g). This language supplies sufficient "substantive limits" on official discretion to dismiss an employee to give rise to a property interest. *See Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 36 (D.C. Cir. 1997) (cleaned up). As for *Langeman*, the summary-dismissal policy addressed there was meaningfully different. *Compare Langeman*, 88 F.4th at 293, 295-96 (discussing prior policy allowing summary dismissal where

Because Plaintiffs have adequately alleged they have a property interest in their continued employment, discovery is warranted. Plaintiffs' due process theory rests on both the FBI's written disciplinary policies and the "overall workings" of the agency. Discovery is therefore needed to, *inter alia*: (1) identify all relevant documents describing the agency's dismissal policies, including guidance from supervisors and internal memoranda and emails; (2) determine what representations the FBI makes about job security in recruiting and retaining employees; and (3) explore whether the FBI has ever used, or purported to use, summary dismissal without finding misconduct. These critical issues (and others) cannot be conclusively determined based on the pleadings alone. *See, e.g.*, *McCabe,* 490 F. Supp. 3d at 221 (ordering additional discovery on procedural due process claims).

**C.      The FBI's Statements and Conduct Created a Mutually Explicit Understanding That Plaintiffs Would Not Be Dismissed Based On Their Service on June 4, 2020.**

Second, and wholly apart from the property right addressed above, the Complaint also alleges that the FBI created a mutually explicit understanding that Plaintiffs would not be discharged for the events of June 4, 2020. Compl. ¶¶ 161-62. Plaintiffs allege that "[s]hortly after the events of June 4, 2020, FBI and DOJ leadership reviewed Plaintiffs' actions and correctly determined that they were consistent with FBI policy and warranted no adverse action of any kind." *Id.* ¶ 11; *see also supra* at 10 (discussing Compl. ¶¶ 86-89). The Complaint further alleges that, over the next five years, Defendants reinforced that expectation by (1) not investigating or adjudicating any disciplinary case against Plaintiffs (until June 2025), *id.* ¶ 106; (2) promising employees "prompt" adjudications and "timely" investigations of alleged misconduct, *id.* ¶¶ 47(b),

---

"compelling considerations *may* be at stake" (emphasis in original)), *with* Compl. ¶ 47(g) (current policy requires that "compelling . . . considerations *are* at stake" (emphasis supplied)); and *compare Langeman*, 88 F.4th at 295 (focusing on the prior policy's explicit "preserv[ation]" of "discretion" to summarily dismiss), *with* Compl. ¶ 47(g) (omitting that language).

48(a); and (3) issuing a relevant DOJ-OIG report that reported no misconduct by Plaintiffs, *id.* ¶¶ 61, 89.

These allegations independently suffice to allege a property interest flowing from Plaintiffs' expectation that they would not be fired for their service on June 4, 2020. *See Sindermann,* 408 U.S. at 601-02 ("Explicit contractual provisions may be supplemented by other agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances.'" (quoting 3A Corbin on Contracts § 562 (1960))). That (1) an FBI official with authority to do so assured Plaintiffs that they would not be disciplined; and (2) the agency thereafter honored that promise long after any investigation could properly commence, created a "mutually explicit understanding" that the June 4, 2020, incident had been resolved. *See Sanderson v. First Sec. Leasing Co.*, 844 P.2d 303, 306-07 (Utah 1992) (a promise not to fire an employee on a particular ground terminates any "at will" status with respect to that ground because it limits the employer's "freedom to discharge for any reason whatsoever"). That understanding created a "property" interest because it was precisely the sort of "claim[] upon which people rely in their daily lives." *Roth*, 408 U.S. at 577; *see* Compl. ¶ 163 ("[E]ach Plaintiff reasonably relied on that understanding in making critical life decisions.").

No case in this District squarely addresses the facts presented here, highlighting how overtly irregular the FBI's actions have been. Still, *Marti Navarro v. United States*, 104 F. Supp. 2d 96 (D.P.R. 2000), provides support. Marti, an FBI Special Agent, was accused of financial misconduct and issued a letter of censure. *Id.* at 99. Later, a new Special Agent in Charge reconsidered and dismissed him. *Id.* Marti alleged that the letter of censure "vested him with a property interest in continued employment with the FBI," and "effectively barred the FBI from imposing further discipline." *Id.* at 100. While deciding this claim on other grounds, the district

20

court nonetheless acknowledged its force, citing *Sindermann*, 408 U.S. at 599-600, to note that "[u]nder some circumstances, a government employer can create an 'understanding' that binds the government employer and creates a property interest in continued employment." *Id.* at 100 n**.**2.[7]

### III.  COUNT THREE ALLEGES A VALID PROCEDURAL DUE PROCESS CLAIM BASED ON A DEPRIVATION OF LIBERTY.

Defendants also move to dismiss Count Three's procedural due process claim, arguing that Plaintiffs lacked a protected liberty interest. Mot. 13-16. Dismissal is unwarranted because Plaintiffs have adequately alleged a deprivation of two independent liberty interests.

### A.  Applicable Law.

"In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed," extending to a person's reputation and related ability to pursue a chosen profession. *Roth*, 408 U.S. at 572. In the context of government employment, "liberty is not offended by dismissal from employment itself, but instead by dismissal based upon an unsupported charge which could wrongfully injure the reputation of an employee." *Arnett*, 416 U.S. at 157 (1974) (Rehnquist, J.). Where the government makes a "charge against [a person] that might seriously damage his standing and associations in his community," "due process would accord an opportunity to refute the charge." *Roth*, 408 U.S. at 573. Likewise, where the government "imposed on [a person] a stigma or other disability that foreclosed his freedom to take advantage

---

[7] The D.C. Circuit has previously held that two *statutory* provisions prohibiting the dismissal of an employee for certain specified reasons did not create property rights, but in both cases, the Circuit Court expressly noted that the plaintiff had not been discharged in violation of the statute in question. *Hall v. Ford*, 856 F.2d 255, 266 (D.C. Cir. 1988); *Garrow v. Gramm,* 856 F.2d 203, 208 (D.C. Cir. 1988). Thus, this case, where Plaintiffs allege that they were discharged in violation of an express promise, presents a novel issue. Further, while *Hall* and *Garrow* make good sense because a statutory right prohibiting dismissal should be enforced through whatever means the statute itself creates, the same reasoning does not apply when a government employer voluntarily agrees not discharge employees for a particular reason. In such cases, due process ensures that such commitments are not unilaterally withdrawn without procedural protections.

of other employment opportunities." *Id.* This is because "[t]o be deprived not only of present government employment but of future opportunity for it certainly is no small injury." *Id.* at 574 (citation omitted).

In this Circuit, "a plaintiff may avail himself of two different legal theories" with overlapping elements "to establish a reputation-based due-process violation." *Jefferson v. Harris*, 170 F. Supp. 3d 194, 205 (D.D.C. 2016). The first theory, the so-called "reputation-plus" liberty claim, requires "the conjunction of official defamation and [an] adverse employment action." *Id.* Under this theory, "the combination of government defamation plus the failure to rehire or the discharge of a government employee states a liberty interest claim." *Doe v. U.S. Dep't of Just.*, 753 F.2d 1092, 1106-07 (D.C. Cir. 1985). Under the second theory, the so-called "stigma-plus" liberty claim, there is no "official speech" but nevertheless a "continuing stigma or disability," *O'Donnell v. Barry,* 148 F.3d 1126, 1140 (D.C. Cir. 1998), arising from either the government "formally or automatically exclud[ing plaintiff] from work on some category of future State contracts or from other government employment opportunities" or, even without a "binding effect," the government otherwise taking action that has "the broad effect of largely precluding [plaintiff] from pursuing her chosen career." *Id.* at 1141 (discussing *Kartseva v. Department of State*, 37 F.3d 1524 (D.C. Cir. 1994)). In either event, "[g]overnment action that has the effect of 'seriously affecting, if not destroying' a plaintiff's ability to pursue his chosen profession, or 'substantially reducing the value of his human capital' thus infringes a liberty interest." *Id.* at 1142 (cleaned up).

### B.      Plaintiffs Have Adequately Alleged a Deprivation of Liberty.

Plaintiffs have amply pleaded deprivations of their liberty pursuant to both theories. Turning first to the reputation-plus theory, the Complaint establishes that Plaintiffs were terminated from government employment by Defendants, constituting an "adverse action." *See,*

22

*e.g.*, *Paul v. Davis*, 424 U.S. 693, 705 (1976) ("loss of government employment" is a "legal status" implicating liberty interest). Next, Plaintiffs have alleged multiple public statements by Patel "falsely indicating that everyone whom he has dismissed from the FBI 'weaponized' the agency or otherwise failed in their duties to the FBI." Compl. ¶ 139. Accordingly, the Complaint alleges that "the government has actually stigmatized [Plaintiffs'] reputation[s]" by falsely charging them with so-called weaponization or other failures in their duties to the FBI. *Doe*, 753 F.3d at 1111. Finally, the Complaint includes extensive allegations indicating that Plaintiffs' reputations and ability to pursue their chosen careers as FBI agents, and, even more broadly, as law enforcement officers, have been seriously damaged. *See* Compl. ¶¶ 141-46. It alleges that each Plaintiff "dedicated their lives to serving their country as federal law enforcement officers," amassing significant experience. *Id.* ¶ 19. And the Complaint alleges that, despite collectively applying to hundreds of positions, no Plaintiff has been offered a position within law enforcement, and only five have obtained employment, each outside of law enforcement and at a lesser rate of compensation. *Id.* ¶ 146.

In response, Defendants assert that "Plaintiffs do not plausibly allege any defamatory statement in conjunction with their terminations" because Patel's letter was not "published . . . to a third party." Mot. 14 (quoting *Farah v. Esquire Mag.*, 736 F.3d 528, 533 (D.C. Cir. 2013)) (cleaned up). But in fact, the Complaint alleges that Patel has made multiple public statements indicating that everyone he has fired from the FBI engaged in "weaponization" or similar professional failures. Compl. ¶ 139. Defendants offer no response, focusing instead on the obviously injurious accusations in Patel's letters while emphasizing that they were "privately

23

conveyed." Mot. 14. Notwithstanding these arguments, Patel's multiple public statements before and after Plaintiffs' dismissals satisfies the third-party publication requirement for this claim.[8]

Turning next to the stigma-plus, theory, the Complaint alleges that Defendants' termination of Plaintiffs imposed a "continuing stigma or disability"—evident when coupled with Patel's letter—that both excludes Plaintiffs from federal service and broadly precludes them from their chosen careers. *See id.* ¶¶ 113, 141-46. The Complaint's allegations regarding "the highly specialized nature" of Plaintiffs' positions as FBI Special Agents and their difficulties in obtaining comparable employment further support their claim of deprivation of liberty. *Id.* ¶¶ 141-46.

Defendants tout "the confusing nature of the stigma purportedly at issue" and claim that on Plaintiffs' theory "any terminated federal law enforcement officer would have such a claim—no matter the circumstances and government communications surrounding his or her termination." Mot. 15. But there is nothing confusing about the stigma alleged: The Complaint alleges not just "any terminat[ion]," *id.*, but extraordinary summary dismissals. *See, e.g., Roth*, 408 U.S. at 573 (due process implicated where the government makes a "charge against [a person] that might seriously damage his standing and associations in his community"); *Arnett*, 416 U.S. at 157 (noting liberty interest "offended . . . by dismissal based upon an unsupported charge which could wrongfully injure the reputation of an employee"). Defendants further contend that "[t]here is no due process right to be a *federal* law enforcement officer, let alone an *FBI agent*." Mot. 15

---

[8] In connection with their efforts to dismiss Plaintiffs' Fifth Amendment claim based on deprivation of liberty, Defendants again do not squarely engage the allegations in the Complaint. Defendants aver as a preliminary matter that "the Supreme Court has cast doubt on the availability of a due process claim based on professional reputation" and cite *Paul v. Davis* for the proposition that "reputation alone, apart from some more tangible interests such as employment" may not suffice to support a due process claim. Mot. 13 (citing *Paul v. Davis*, 424 U.S. at 701). But this case clearly involves the "tangible interests such as employment" that *Paul v. Davis* countenanced—Plaintiffs' employment as career FBI agents. 424 U.S. at 705.

24

(emphasis in original). But the liberty interest at issue is the right to pursue one's chosen career or profession. *See Cafeteria & Rest. Workers Union, Loc. 473, AFL-CIO v. McElroy*, 367 U.S. 886, 896 (1961). Courts have defined the relevant inquiry in various ways, including as "a short-order cook," *id.*, or "a Russian translator," *Kartseva*, 37 F.3d at 1529. The Complaint plausibly alleges reputational harm and stigma affecting Plaintiffs' ability to pursue their chosen careers, whether defined narrowly (as appropriate for highly trained professionals like Plaintiffs) or more broadly.

Defendants apparently concede that "law enforcement" could be an appropriate field by which to evaluate Plaintiffs' harm but assert that "at least some Plaintiffs have found employment in the field." Mot. 15-16. They point to allegations that two Plaintiffs have obtained employment with government contractors, claiming that "there is no qualifier [in the Complaint] that their jobs are outside of law enforcement." Mot. 16. But that argument ignores the overarching allegation that "no Plaintiff has been offered a position within law enforcement," as well as the related allegation that "government contractors" are "private positions adjacent to law enforcement." Compl. ¶ 146. That two Plaintiffs have obtained private positions at lower compensation rates with government contractors (doing work "adjacent to law enforcement," *id.*) thus is of no moment.

Accordingly, the Complaint establishes that Plaintiffs have suffered reputational harm and stigma that has damaged their employment prospects, in violation of their due process liberty interests.

### IV. PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT THEY RECEIVED CONSTITUTIONALLY DEFICIENT PROCESS (COUNTS TWO, THREE, AND FIVE).

Plaintiffs have also adequately alleged that the process they received in connection with their removals was constitutionally deficient. Defendants' two-paragraph argument to the contrary (Mot. 16) provides no basis for dismissing any of the due process claims.

## A. Applicable Law.

Procedural due process "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Before the government deprives a person of property or liberty, the Due Process Clause generally requires it to provide "notice and [an] opportunity for hearing appropriate to the nature of the case." *Loudermill*, 470 U.S. at 542.

The extent and type of hearing requires a balancing of (1) the "private interest"; (2) the "risk of an erroneous deprivation of such interest" and the "probable value" of additional procedures; and (3) the "[g]overnment's interest." *Eldridge*, 424 U.S. at 335. As to private interest, the Supreme Court has "frequently recognized the severity of depriving a person of the means of livelihood." *Loudermill*, 470 U.S. at 543. Moreover, the "opportunity for [an] employee to present his side of the case is recurringly of obvious value in reaching an accurate decision." *Id.* Finally, the government's interest cuts in both ways, given that "the employer shares the employee's interest in avoiding disruption and erroneous decisions." *Id.* at 544. That is particularly true here, where Plaintiffs collectively provided over 150 years of highly specialized and exemplary service to the FBI. Compl. ¶¶ 19-31.

As Defendants recognize (Mot. 16), where the Due Process Clause applies, a government employee facing termination is generally "entitled" at least to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill*, 470 U.S. at 546. Those requirements suffice *before* termination, however, only if a fuller opportunity to mount a challenge is provided *after* his termination. *See id.* at 546, 547 n.12 (adequacy of pre-termination procedures "rest[ed] in part on the provisions in [state law] for a full post-termination hearing"); *Krentz v. Robertson*, 228 F.3d 897, 902 (8th Cir. 2000).

Thus, "where . . . a court has approved an abbreviated pre-termination hearing, due process requires that a discharged employee's post-termination hearing be substantially more 'meaningful.'" *Carter v. W. Rsrv. Psychiatric Habilitation Ctr.*, 767 F.2d 270, 273 (6th Cir. 1985). "At a minimum, this requires that the discharged employee be permitted to attend the hearing, to have the assistance of counsel, to call witnesses and produce evidence on his own behalf, and to know and have an opportunity to challenge the evidence against him." *Id.*; *see also Krentz*, 228 F.3d at 904 & n.7 (holding that similar "extensive" procedures were "tantamount" to a "full post-termination hearing" (quoting *Loudermill*, 470 U.S. at 546)); *Garrison v. District of Columbia*, No. 89-0794-OG, 1989 WL 250655, at *3 (D.D.C. Oct. 12, 1989).

It follows that where, as here, the government provides *no* post-termination hearing, Compl. ¶ 119, the pre-termination hearing must "provide *all* the procedural safeguards to which due process entitles a tenured public employee," including the robust safeguards that could otherwise be delayed until after a termination. *Vukadinovich v. Bd. of Sch. Trs.*, 978 F.2d 403, 411 (7th Cir. 1992) (citation omitted; emphasis added) (holding public employer complied with the Due Process Clause through pre-termination hearing alone because it was "more akin to a trial," with "[e]ach side call[ing] witnesses and present[ing] evidence, cross-examin[ing] opposing witnesses, argu[ing] their respective cases . . . , and so on").

### B. Plaintiffs Have Adequately Alleged Constitutionally Deficient Procedures.

Plaintiffs' Complaint more than adequately alleges that the procedures the FBI used to terminate them were constitutionally deficient. The FBI's procedures failed to serve as a meaningful "initial check against mistaken decisions." *Loudermill*, 470 U.S. at 545. And they even more plainly flunked the demanding standards that apply where, as here, a single process served as the final check against mistaken decisions.

27

Start with notice. Even for pre-termination hearings, the D.C. Circuit has held that employees "must at least 'know the factual basis for the [proposed employment] action'" to meaningfully argue against it. *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 40 (D.C. Cir. 2024) (quoting *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014)). More generally, "due process requires, at the least, that an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied[,] and be afforded an opportunity to rebut that evidence." *Ralls*, 758 F.3d at 319; *see also, e.g.*, *Greene v. McElroy*, 360 U.S. 474, 496 (1959) ("the evidence used to prove the [g]overnment's case must be disclosed"); *Carducci v. Regan*, 714 F.2d 171, 176 (D.C. Cir. 1983) (Scalia, J.).

Here, however, the FBI never told Plaintiffs that it was considering terminating them, nor did it provide them with the factual evidence it was evaluating. Compl. ¶¶ 47(f), 111, 164. Instead, the FBI merely told Plaintiffs that they were "under investigation for possible violations" of two broad "Offense Codes" by "kneeling during a protest." *Id.* ¶ 106 ("Unprofessional Conduct – On Duty" and "Violation of Ethical Guidelines"). That notice fell far short of the constitutional standard, wholly depriving Plaintiffs of knowledge that their jobs were in jeopardy and the opportunity to refute whatever evidence existed in the government's file. *See Greene*, 360 U.S. at 496; *see also, e.g.*, *Dodson v. U.S. Capitol Police*, 633 F. Supp. 3d 235, 269-71 (D.D.C. 2022).

The agency then failed to provide Plaintiffs with an oral hearing or equivalent opportunity to meaningfully (1) challenge the agency's evidence; and (2) explain why dismissal was unwarranted. Compl. ¶¶ 111, 164; *see Carter*, 767 F.2d at 273 (employee must be "permitted to attend [a] hearing, to have the assistance of counsel, to call witnesses and produce evidence on his own behalf, and to know and have an opportunity to challenge the evidence against him"); *Loudermill*, 470 U.S. at 543 (discussing importance to employees of addressing factual disputes

28

and invoking the discretion of the decisionmaker). An "oral hearing" would have been "especially useful" here, given that the FBI appears to question the "credibility and veracity" of Plaintiffs' account of the June 2020 events. *Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25, 32 (D.C. Cir. 2014) (oral hearings were unnecessary where only medical qualifications were at issue).

These shortcomings had enormous practical ramifications. Had Plaintiffs been informed of the FBI's evidence and particular concerns, they could have supplied targeted arguments and evidence concerning material matters in dispute. For example, if photos in the government's file showed limited perspectives of the June 2020 incident, Plaintiffs could have submitted additional photos, videos, and statements from relevant witnesses. And if the FBI had informed Plaintiffs that they were suspected of engaging in "political weaponization," Compl. ¶¶ 113, 164, Plaintiffs could have rebutted that charge with, *inter alia*, expert testimony on appropriate de-escalation techniques and the limited significance of kneeling in situations like the one Plaintiffs faced.

As a final nail in the coffin, Plaintiffs were deprived of a neutral adjudicator—a flaw that independently denied them due process. "Not only is a biased decisionmaker constitutionally unacceptable[,] but our system of law has always endeavored to prevent even the probability of unfairness." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (citation omitted). Decisionmakers therefore must be disqualified if "a disinterested observer may conclude that the agency has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." *Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970) (cleaned up). Such "prejudg[ment]" may be inferred from the surrounding circumstances, including "abrupt" "interven[tions]" in ordinary processes and "identical outcomes" for affected persons unaccompanied by "individualized explanations." *Taylor v. Trump*, No. 25-3742 (TJK), 2026 WL 396844, at *9-14 (D.D.C. Feb. 11, 2026) (finding likely due process violation); *see also, e.g.*,

29

*McCabe*, 490 F. Supp. 3d at 223 (declining to dismiss due process claim based on allegation that decisionmaker followed "an unmistakable direction from" the President to fire the plaintiff); *Bakalis v. Golembeski*, 35 F.3d 318, 325-26 (7th Cir. 1994).

Plaintiffs' Complaint adequately alleges that Patel—the decisionmaker here, in contravention of the FBI's usual procedures, Compl. ¶¶ 47, 112-13—"prejudged" their case and followed a "predetermined" process, thereby violating their due process rights. *See supra* at 6 (discussing *id.* ¶ 92 (2023 social media post by then-former President Trump); ¶ 97 (pressure from White House to conduct summary firings of FBI agents); ¶¶ 99-104 (Patel's immediate efforts to terminate Plaintiffs at the behest of White House); ¶¶ 110-13 (Patel's cutting short review process with identically worded termination letters)).

What due process demands is a meaningful opportunity to be heard—not a procedural ritual conducted in the shadow of a predetermined outcome. Plaintiffs have easily cleared the modest hurdle of alleging a plausible claim that their termination was foreordained and that the process used to terminate them was constitutionally deficient in a host of other ways.

## V.    COUNT FOUR ALLEGES A VALID SUBSTANTIVE DUE PROCESS CLAIM.

In addition to alleging deprivations of property and liberty interests through unconstitutional procedures, the Complaint also adequately alleges that Defendants violated Plaintiffs' right to substantive due process. Compl. ¶¶ 175-180. After stating the applicable test (*i.e.*, conduct that "shocks the conscience"),[9] Count Four alleges egregious government actions that satisfy this standard.

---

[9] Defendants suggest that Plaintiffs must identify a "fundamental liberty interest." Mot. 17. But where "a specific act of a government officer [] is at issue," the "shocks the conscience" test applies. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *see also Hurd v. D.C.*, 147 F.4th 1036, 1042 (D.C. Cir. 2025). Quoting, *Lewis*, this Court has described the "shocks the conscience" standard as "antecedent to any question about the need for historical examples of enforcing a

In attempting to defend their conduct, Defendants just make matters worse. First, they contend that "the delay between Plaintiffs' actions and their termination" "can[not] [by] itself" meet the relevant test and is excusable given "changes in leadership." Mot. 18. But the delay does *not* stand alone, *see* Compl. ¶¶ 178-180, and the same Executive Branch leadership (*i.e.*, President Trump) was in charge on both dates. More importantly, Defendants ignore what makes the delay shocking: (1) the FBI and DOJ had already concluded that Plaintiffs' actions warranted no discipline, Compl. ¶¶ 11, 86-89; (2) Plaintiffs reasonably relied on that conclusion, *id.* ¶ 163; (3) in resurrecting the matter *five years* later, the agency violated its own disciplinary policies, *id.* ¶¶ 46(b), 47; and (4) the FBI denied Plaintiffs basic due process protections, claiming that "exigent or compelling" circumstances now demanded immediate action, *id.* ¶¶ 164, 179.

Likewise, Defendants contend that "Plaintiffs were terminated based on concerns regarding . . . the political weaponization of government." Mot. 17. But Plaintiffs were provided no notice of this nebulous charge during the truncated disciplinary proceedings. Compl. ¶¶ 113, 164. And, in arguing that Plaintiffs "carr[ied] out their duties in a partisan or seemingly partisan manner," Mot. 17, Defendants ignore Plaintiffs' allegations that their terminations were themselves a partisan attack based on Defendants' perception that Plaintiffs were not politically affiliated with President Trump. *Id.* ¶¶ 149-154, 180-81; *see supra* at 4-11.

Finally, the Supreme Court has clarified that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849. The Complaint alleges that Defendants'

---

liberty interest of the sort claimed," *L'Association des Americains Accidentels v. United States Dep't of State*, 633 F. Supp. 3d 74, 86 (D.D.C. 2022) (citation omitted), *appeal dismissed*, No. 22-cv-5262, 2023 WL 5321008, (D.C. Cir. Aug. 18, 2023), but there is no requirement that a complaint itself specifically identify a historical liberty interest.

actions were "pretextual," "illegal and malicious," and "vindictive and unjustified." *Id.* ¶¶ 180-81. And it identifies numerous actions suggesting an "intent to injure." *See, e.g.*, *id.* ¶¶ 109, 112, 114-15 (Plaintiffs terminated immediately following investigation that showed no misconduct); *id.* ¶ 110 (Plaintiffs terminated without consideration of any individual factors); *id.* ¶ 121 (no similar summary dismissals had ever occurred); *id.* ¶ 123 (abrupt dismissals disrupted critical ongoing case work); *id.* ¶ 138 (Plaintiffs who could have been eligible for early retirement were summarily dismissed instead).

In response, Defendants insist that "Plaintiffs' termination was not intended to injure Plaintiffs at all[.]" Mot. 17. But this retort—which simply ignores Plaintiffs' allegations—does not belong in a motion to dismiss. Instead, dueling factual allegations regarding motive warrant discovery. Accordingly, Defendants' motion to dismiss Count Four should be denied. *See McCabe,* 490 F. Supp. 3d at 225 (declining to dismiss substantive due process claim plausibly alleging that defendants "deliberately flouted" the law to deprive plaintiff of FBI retirement benefits).

## VI.    COUNT FIVE ALLEGES A VALID PROCEDURAL DUE PROCESS CLAIM BASED ON DEPRIVATION OF PROPERTY FOR JANE DOE 5.

In Count Five, Plaintiff Jane Doe 5 has adequately alleged a separate due process claim based on the deprivation of a property interest distinct from the ones discussed in Section II. As a non-probationary member of the SES, Jane Doe 5 was covered by statutory provisions prohibiting the FBI from removing her without cause. Those statutory provisions plainly gave rise to a property interest, which necessarily "exists if [an] employee can be removed only for cause." *Esparraguera*, 101 F.4th at 33 (citation omitted).

At the time of Jane Doe 5's termination, she was a non-probationary member of the FBI's SES. Compl. ¶¶ 24, 182. Her employment was therefore governed by 5 U.S.C. § 3151(a), which authorizes the Attorney General to "establish" the FBI "Senior Executive Service."

Under Section 3151 and the statutory provisions it incorporates, non-probationary members of the FBI SES can be removed only for certain reasons. Specifically, Section 3151 requires that regulations establishing the FBI SES "provide for" (1) "removal consistent with section 3592 [of Title 5]"; and (2) "removal . . . consistent with subsections (a), (b), and (c) of section 7543 [of Title 5]." 5 U.S.C. § 3151(a)(5)(A), (D) (noting exception not relevant here). Section 3592—which is not at issue—specifies that non-probationary "career [SES] appointee[s] may be removed" from the SES "for less than fully successful executive performance" as determined under certain statutory provisions. 5 U.S.C. § 3592(a)(2). And Section 7543—which *is* at issue—specifies that such employees may otherwise be removed "only for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function." 5 U.S.C. § 7543(a); *see also id.* §§ 7541, 7542 (defining terms and describing scope of § 7543). FBI policy reflects these same standards. Compl. ¶ 51(b)-(c).

Sections 3151 and 7543(a) plainly made Jane Doe 5 removable only for cause and thus gave rise to a property interest. That conclusion follows directly from Supreme Court and D.C. Circuit precedent, including *Esparraguera*, which held that an SES employee of the Department of the Army had a property interest in her SES status flowing from Section 3592(a)(2) and its implementing regulations. *See* 101 F.4th at 34-39. Under governing case law, statutory and regulatory provisions have been interpreted to permit only for-cause removal—and thus to create property interests—when they authorize removal for (1) "less than fully successful executive performance," 5 U.S.C. § 3592(a)(2) (*see Esparraguera*, 101 F.4th at 34-39); (2) "misfeasance,

33

malfeasance, or nonfeasance in office," Ohio Rev. Code Ann. § 124.11 (1984) (*see Loudermill*, 470 U.S. at 538-39); or (3) "such cause as will promote the efficiency of the service," 5 U.S.C. § 7513 (*see Johnson v. United States*, 628 F.2d 187, 192-94 (D.C. Cir. 1980)). The statutory language here—which permits removal "only for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function," 5 U.S.C. § 7543(a)—likewise precludes removal "at the whim of [an employee's] superiors" and thus creates a property interest. *Esparraguera*, 101 F.4th at 34 (quoting *Ashton*, 613 F.2d at 929).

Defendants wholly ignore the substantive removal protections codified in Sections 3151(a)(5) and 7543(a), and thus they offer no response to the foregoing analysis. Mot. 22-23. Instead, Defendants rely (Mot. 23) on *Strzok v. Garland*, No. 19-cv-2367, 2025 WL 4662300 (D.D.C. Sep. 23, 2025), which observed that the plaintiff in that case had "acknowledge[d]" that, as a member of the FBI SES, he was "terminable at will" and lacked an "entitlement to remain in his position." *Id.* at *15. But *Strzok* did not mention, much less analyze, Sections 3151 and 7543, and so the plaintiff's failure to recognize that they applied and created a property interest is of no moment. The only decision that *has* addressed whether Sections 3151(a)(5) and 7543(a) give rise to a property interest—a decision Defendants ignore—concluded that they do. *See McCabe*, 490 F. Supp. 3d at 217-19; *see also Palmeri v. MSPB*, 164 F.4th 878, 884 (Fed. Cir. 2026).

Sensing that *Esparraguera* is inconsistent with their position, Defendants assert that *Esparraguera* "did not address a scenario where Congress had precluded review of compliance with [statutory removal] protections." Mot. 23 n.11. Quite to the contrary, the D.C. Circuit squarely *rejected* the argument that the plaintiff's "lack of a right to appeal" her removal from the SES "indicate[d] there is no constitutionally protected property interest." 101 F.4th at 39. In doing so, *Esparraguera* explained that what is relevant is whether the removal decision "is substantively

34

limited by the statute and regulations to a sufficient extent, not what procedural safeguards Congress cho[oses] to provide." *Id.* (relying on, *e.g.*, *Loudermill*, 470 U.S. at 541).

## VII.    COUNT SIX ALLEGES A VALID *ULTRA VIRES* CLAIM BASED ON JANE DOE 5'S SES STATUS.

Plaintiff Jane Doe 5 has also adequately alleged an *ultra vires* claim based on the FBI's flagrant violations of the substantive and procedural protections provided to members of the FBI SES by 5 U.S.C. § 7543(a) and (b). *See* 5 U.S.C. § 3151(a)(5)(D) (applying Section 7543(a) and (b) to members of the FBI SES). As explained above, Section 7543(a) specifies that the FBI may remove non-probationary SES employees "only for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function." 5 U.S.C. § 7543(a). And Section 7543(b) provides such employees certain procedural rights when such a removal is "proposed." As relevant here, Section 7543(b) specifies that such an employee "is entitled to" the following: (1) with one exception not relevant here, "at least 30 days' advance written notice . . . stating specific reasons for the proposed [employment] action" (*i.e.*, removal); (2) "a reasonable time, but not less than 7 days, to answer orally and in writing and to furnish affidavits and other documentary evidence"; and (3) "a written decision and specific reasons therefor." 5 U.S.C. § 7543(b)(1), (2), (4). Because Jane Doe 5 has adequately alleged all the elements of an *ultra vires* claim based on these statutory provisions, Count Six should not be dismissed.

As Defendants acknowledge, review of agency action is available in certain limited circumstances even when a plaintiff lacks a statutory cause of action. Mot. 24. Such review—known as "*ultra vires* review" is available if the plaintiff satisfies three conditions: "(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and

35

contrary to a specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (citation omitted). Defendants do not contest that Jane Doe 5 lacks an alternative procedure for review of the statutory claims here, and so only the first and third conditions are in dispute. Mot. 24. As explained below, both are satisfied here.

*a. First condition.* Jane Doe 5's claim satisfies the first condition because the "statutory preclusion of review" at issue here is "implied rather than express." *Changji*, 40 F.4th at 722 (citation omitted). Jane Doe 5 lacks a statutory cause of action to pursue her claims under Section 7543(a) and (b), but that is not because any statute expressly *forbids* such review. Rather, as Defendants themselves explain, Mot. 24-25, the CSRA does not affirmatively *grant* FBI SES employees such a cause of action, and courts have held that the CSRA's "'elaborate' framework" demonstrates "Congress' intent" to "foreclose judicial review" of statutory claims "to employees to whom the CSRA *denies* statutory review." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10-11 & n.4 (2012) (quoting *United States v. Fausto*, 484 U.S. 439, 443 (1988)).

The preclusion of judicial review here is thus implied, and Defendants offer no argument to the contrary. Nor could they, as the D.C. Circuit has already explained that while the CSRA generally "foreclose[s] [judicial] review" of "nonconstitutional claims" asserted by federal employees outside of the CSRA framework, the "statute leaves the door ajar for review of clear violations of statutory authority under *Leedom v. Kyne*, 358 U.S. 184 (1958)," the leading case recognizing the availability of *ultra vires* claims. *Griffith*, 842 F.2d at 490, 492. That conclusion accords with other D.C. Circuit precedent holding that a statute must include a "clear statement of Congress's preclusive intent" for a court to conclude that *ultra vires* claims are wholly barred. *Lepre v. Dep't of Lab.*, 275 F.3d 59, 72-73 (D.C. Cir. 2001) (discussing case law); *Ralpho v. Bell*, 569 F.2d 607, 613, 622-26 (D.C. Cir. 1977) (same; holding that a statute providing that certain

36

agency action "shall be final and conclusive . . . and not subject to review" was insufficient to bar an *ultra vires* claim (citation omitted)).

**b. Third condition.** At this early stage in the case, Jane Doe 5's *ultra vires* claim also satisfies the third *Changji* condition because she alleges that the FBI "plainly act[ed] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." 40 F.4th at 722. To be sure, the third requirement ensures that *ultra vires* review is of "extremely limited scope" and is "confine[d] to agency error so extreme that one may view it as jurisdictional or nearly so," including when an agency "has disregarded a specific and unambiguous statutory directive" or "violated some specific command of a statute." *Griffith*, 842 F.2d at 493 (citations omitted). But the Supreme Court and the D.C. Circuit have repeatedly found the third condition to be satisfied when an agency has engaged in "an attempted exercise of power that had been specifically withheld" by statute. *Leedom*, 358 U.S. at 189; *see, e.g.*, *id.* at 185-89 (holding that the National Labor Relations Board acted "in excess of its delegated powers and contrary to a specific [statutory] prohibition" when it certified a bargaining unit without following certain procedures required by statute); *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 966, 970-72 (D.C. Cir. 2022). In *Oestereich v. Selective Service System Local Board No. 11*, 393 U.S. 233 (1968), for example, the Supreme Court engaged in *ultra vires* review of a Selective Service Board decision that had refused to grant a statutory draft exemption, explaining that judicial review provided a critical check against "free-wheeling agencies meting out their brand of justice in a vindictive manner." *Id.* at 237.

The Complaint here adequately alleges multiple clear violations of Section 7543 that qualify for *ultra vires* review. Starting with Section 7543's procedural provisions, the Complaint alleges that the notice provided to Jane Doe 5 stated only "that [she] was under investigation for

possible violations" of two specified "Offense Codes" by "kneeling during a protest." Compl. ¶ 106. In contravention of the statute's clear commands, that notice did not even *mention* the employment "action" that ultimately occurred here (removal), let alone include "specific reasons for the proposed action." 5 U.S.C. § 7543(b)(1). And because the FBI failed to give Jane Doe 5 the statutorily required notice, it follows that she also was denied "a reasonable time . . . to answer" a compliant notice "orally and in writing," *id.* § 7543(b)(2)—another clear violation of the statute. The FBI likewise plainly violated the statutory requirement that it issue "a written decision and specific reasons therefor." *Id.* § 7543(b)(4). Although the FBI's termination letter may qualify as a "written decision," that letter lacked the required "specific reasons," instead merely asserting that Jane Doe 5 had "demonstrated unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government." Compl. ¶ 113. If such a barebones assertion qualified as "specific reasons" under the statute, then Congress's specification requirement would serve no meaningful function.

The allegations in the Complaint also plausibly make out a clear violation of Section 7543's substantive provision, which permits the FBI to remove a non-probationary SES employee "only for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function." 5 U.S.C. § 7543(a). Here, only "misconduct" and "malfeasance" are potentially in play, but the facts alleged in the Complaint—read in the light most favorable to Jane Doe 5—make clear that there was no "misconduct" or "malfeasance," regardless of what the outer bounds of those terms might be. Rather, on June 4, 2020, Jane Doe 5 and other FBI Special Agents de-escalated a dangerous situation to avert potential violence involving civilians. *See* Compl. ¶¶ 59-84.

38

At later stages in this litigation, Defendants will have an opportunity to challenge the Complaint's allegations. But as alleged in the Complaint, Jane Doe 5 plainly engaged in no "misconduct" or "malfeasance" under the statute, and the FBI failed to satisfy the statute's specific, clear requirements governing the notice it must provide Jane Doe 5 of the proposed removal, Jane Doe 5's opportunity to be heard, and its final decision. Jane Doe 5's *ultra vires* claim based on Section 7543(a) and (b) should thus proceed to discovery.

## VIII.   DEFENDANTS' INVOCATION OF ARTICLE II IS MISPLACED.

In a single paragraph followed later by a smattering of assertions in their discussion of Plaintiff Jane Doe 5's claims, Defendants make the breathtaking argument that Article II of the Constitution stamps out *all* Plaintiffs' rights under the First and Fifth Amendments and Jane Doe 5's rights under the CSRA. Mot. 18-22. According to Defendants, Article II grants the President unfettered authority to remove Plaintiffs "on any basis," and courts have "no power" to review those removals. Mot. 18 (citation omitted). Defendants advance this sweeping position despite longstanding precedent recognizing that FBI employees and other federal civil servants are entitled to vindicate their constitutional rights (and many statutory rights) in court. *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 602-05 (1988); *Ashton*, 613 F.2d at 923.

As this Court explained in a different First Amendment case, "[c]onstitutional protections would be worth little indeed if they wilt in the face of presidential incursion." *Associated Press v. Budowich*, No. 25-cv-532, 2025 WL 1095385, at *3 (D.D.C. Apr. 11, 2025). As in that case, here Defendants cite "no precedent that would allow this Court to overcome the clear commands of . . . precedent" applying the First Amendment, Fifth Amendment, and the CSRA "in the interest of a greater separation-of-powers concern." *Id.*

The President's removal authority is principally grounded in the Appointments Clause. U.S. Const. art. II, § 2, cl. 2. For purposes of that clause, "federal workers fall into three categories: (i) principal officers, who must be appointed by the President with the advice and consent of the Senate; (ii) inferior officers, who can be appointed by the President, the head of a department, or a court of law; and (iii) non-officer employees, whose appointments are unaddressed (and thus unconstrained) by the Clause." *Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1096 (D.C. Cir. 2021). An "officer" exercises "significant authority pursuant to" federal law, whereas a mere "employee . . . does not." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 759 (2025) (citation omitted). An officer is "inferior" rather than "principal" "if her work is directed and supervised at some level by principal officers," such as the Attorney General and others who report directly to the President. *Fleming*, 987 F.3d at 1103 (citation omitted); *Braidwood*, 606 U.S. at 761.

As explained below, the President does not have unfettered Article II authority to remove all "inferior officers," and it follows *a fortiori* that he lacks such authority to remove non-officer employees. Here, it undisputed that all Plaintiffs except Jane Doe 5 are non-officer employees, and thus the President has no absolute power to remove them. As explained below, Jane Doe 5 also falls into this category, but even if she is an "inferior officer," she still is not subject to the President's unrestricted removal authority. All Plaintiffs may therefore vindicate their constitutional and statutory rights in this case.

Two Supreme Court decisions addressing the President's Article II authority to remove inferior officers are dispositive here. Nearly a century and a half ago, *United States v. Perkins* upheld Congress's ability to "limit and restrict the power of removal" of "inferior officers" appointed by heads of agencies "as [Congress] deems best for the public interest." 116 U.S. 483, 485 (1886). The Supreme Court explained that Congress's authority flows from the Appointments

40

Clause, under which "Congress may by Law vest the Appointment of . . . inferior Officers, as they think proper, . . . in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. The Constitution's grant of "authority" to Congress to "vest" appointment also "implies authority to limit, restrict, and regulate . . . removal." *Perkins*, 116 U.S. at 485; *see also Myers v. United States*, 272 U.S. 52, 161 (1926) (same).

A hundred years later, in *Morrison v. Olson*, the Supreme Court confirmed that where "Congress ha[s] chosen to vest the appointment of 'inferior' executive officials in the head of a department," there is no "specific constitutional impediment to congressionally imposed restrictions on the President's removal powers." 487 U.S. 654, 689 n.27 (1988) (citation omitted). The Court upheld the constitutionality of a statute providing "good-cause tenure protection" to an "independent counsel appointed to investigate and prosecute particular alleged crimes by high-ranking Government officials"—an "inferior officer" the Court described as "[having] limited jurisdiction and tenure" and lacking policymaking or significant administrative authority." *Seila Law LLC v. CFPB*, 591 U.S. 197, 218 (2020) (quoting *Morrison*, 487 U.S. at 691). Justice Scalia—an ardent advocate of the Article II removal power—agreed in *Morrison* that the President lacks "plenary power to remove inferior officers." 487 U.S. at 724 n.4 (Scalia, J., dissenting). He explained that the President "retains control over the executive branch" when inferior officers are "removable for cause" because "cause" includes "the failure to accept supervision," and inferior officers' politically accountable superiors—principal officers—are removable at will. *Id.*

Thus, although Article II "generally" grants the President expansive authority to remove executive officers, *Seila Law*, 591 U.S. at 213, the Supreme Court has repeatedly "left in place" the exception for inferior officers recognized in *Perkins* and *Morrison*. *Id.* at 215, 217 (emphasis

41

omitted).[10] It follows *a fortiori* from this case law that Congress may also regulate the removal of lower-level civil servants who do not rise to the level of "inferior officers."[11] *See, e.g.*, *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 507 (2010) (striking down "novel" dual layer of removal protections for officers but emphasizing that "[n]othing in our opinion . . . should be read to cast doubt on the use of . . . the civil service system"); *Fleming*, 987 F.3d at 1096 (explaining that non-officer employees are "unaddressed (and thus unconstrained)" by the Appointments Clause).

As noted above, the parties agree that all Plaintiffs other than Jane Doe 5 are non-officer employees, and thus Defendants' Article II arguments fail out of the gate as to those Plaintiffs. Defendants' two arguments specific to Jane Doe 5 are likewise meritless.

First, Defendants miss the mark in arguing that Jane Doe 5 was an "inferior officer" with "policymaking or administrative authority" who does not qualify for the inferior-officer exception. Mot. 20-21. In support, they rely exclusively on the fact that she was a member of the SES at the time of her termination. Significantly, however, not all SES members are necessarily inferior officers with policymaking or administrative authority. Instead, a position can be classified as SES when, for example, the employee merely "supervises the work of employees other than personal assistants." 5 U.S.C. § 3132(a)(2)(D); *id.* § 3151(a)(2) (applying § 3132(a)(2) to the FBI). Given

---

[10] Defendants claim that a footnote in *Seila Law* questioned "the reasoning behind th[is] exception." Mot. 21 (citing *Seila Law*, 591 U.S. at 216 n.2). But the footnote did not even *address* the inferior-officer exception, let alone cast doubt on it. Regardless, this Court must follow *Perkins* and *Morrison* unless the Supreme Court overrules them. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).

[11] In a single sentence, Defendants boldly suggest that the President has unfettered removal authority over FBI *non-officer employees*, too. Mot. 18. But the sole decision on which they rely—*Trump v. United States*, 603 U.S. 593 (2024), merely explained that the President enjoys the "unrestricted power of removal" with respect to "executive *officers* whom *he has appointed,*" while acknowledging the inferior-officer exception just discussed. *Id.* at 609 (citations omitted; emphasis added).

that the Complaint does not include any allegations as to what Jane Doe 5's job as Section Chief entailed, Compl. ¶¶ 24, 101(a), Defendants have fallen far short in showing that Jane Doe 5 was an "inferior officer," let alone that she wielded "policymaking or administrative authority" within the meaning of *Morrison*. Such authority, of course, must exceed the significant powers wielded by the independent counsel in *Morrison*, who was appointed to "investigate and prosecute particular alleged crimes by high-ranking Government officials." *Seila Law*, 591 U.S. at 217.

Second, Defendants mistakenly contend that even if Jane Doe 5 was not an inferior officer, she was still subject to the President's unfettered removal authority because she assertedly "investigat[ed] crime" and "ma[de] arrests." Mot. 21 (cleaned up). To be sure, the "investigation and prosecution of crimes is a quintessentially executive function," *Trump v. United States*, 603 U.S. 593, 620 (2024) (citation omitted), but not all employees who perform these functions are subject to the President's unfettered removal authority. If that were so, *Morrison*—which upheld statutory restrictions on removing an independent counsel responsible for investigating and prosecuting crimes, *Seila Law*, 591 U.S. at 217—would have come out differently. Rather, even with respect to law-enforcement functions performed by the Department of Justice, "[t]he President's management of the Executive Branch requires him to have unrestricted power to remove the *most important* of his subordinates—*such as the Attorney General*—in their *most important* duties." *Trump*, 603 U.S. at 621 (emphasis added; cleaned up). And the well-established case law discussed above—including *Perkins* and *Morrison*—controls the question whether such officials are subject to the President's unrestricted removal authority. *See id.* (cross-referencing discussion of that case law appearing earlier in the opinion (*id.* at 608-09)). Defendants' sweeping argument concerning Jane Doe 5 therefore fails.

43

Because the President does not have the unrestricted power to remove Plaintiffs, this Court need not attempt to reconcile the President's Article II removal authority, on the one hand, and Plaintiffs' rights under the First and Fifth Amendments, on the other hand. But even if the President's Article II removal authority extended to rank-and-file employees such as Plaintiffs, the Constitution would require that he exercise it in a manner that respects important and compatible rights enshrined elsewhere in the Constitution, including the First and Fifth Amendments. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 352 (1976) (plurality op.) (rejecting contention that recognizing First Amendment political-association claims by federal employees would interfere with "the executive's responsibility to ensure that the laws be faithfully executed" because "there can be no impairment of executive power . . . where actions pursuant to that power are impermissible under the Constitution"). Tellingly, Defendants offer no reason to think that the Article II removal power must *always* trump other constitutional requirements.

If this case implicated the President's Article II removal authority, the Court would also need to address whether Plaintiffs' removals were invalid—at least initially—because they were ordered by the Director of the FBI, not the Attorney General. Compl. ¶¶ 112-13. The Attorney General ultimately ratified the FBI Director's removal decisions, but not until February 5, 2026, the day before Defendants filed their initial motion to dismiss in this case. *See* Mot. Ex. A. The Attorney General's ratification—which represents only the latest chapter in the FBI's chaotic and aberrational approach to Plaintiffs' firings—was quite plainly spurred by this litigation. And for good reason, given that the Department of Justice itself recognizes that Article II removal authority cannot be delegated to officials beneath Department heads. *See* Appointment & Removal of Fed. Rsrv. Bank Members of the Fed. Open Mkt. Comm., 43 Op. O.L.C. 263, 281-82 & n.8, 2019 WL 11594453, at *12-13 & n.8 (2019) ("[T]he authority to remove inferior officers may not be

44

delegated to an agency official other than the department head, or another official constitutionally competent to appoint that officer in the first place."). Accordingly, to the extent that Article II removal authority has any bearing here, it provides yet another reason that Plaintiffs' terminations were unlawful—they were made by the wrong official.

## IX.   COUNTS SEVEN AND EIGHT ALLEGE VALID DECLARATORY JUDGMENT AND MANDAMUS CLAIMS.

Defendants seek dismissal of the Complaint's declaratory judgment and mandamus claims on the ground that Plaintiffs "have not" "stated at least one plausible claim for relief." Mot. 26. As set forth above, Plaintiffs have stated a claim in each count of the Complaint. Accordingly, Counts Seven and Eight should not be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.

Dated: April 3, 2026                              Respectfully submitted,

/s/ John David Kuchta                            /s/ Mary L. Dohrmann
JOHN DAVID KUCHTA (D.D.C. No. FL00158)           MARY L. DOHRMANN (D.C. Bar No.
JOHN KUCHTA LAW, PLLC                            90042577)
12481 Brantley Commons Court                     ELIZABETH D. COLLERY (D.C. Bar No.
Fort Myers, FL 33907                             422246)
239-690-6080                                     SYDNEY FOSTER (D.C. Bar No. 982340)
jkuchta@robertfoleylaw.com                       ALEXANDER KRISTOFCAK*
                                                 WASHINGTON LITIGATION GROUP
Counsel for Plaintiff Jane Doe 6                 1717 K Street, NW, Suite 1120
                                                 Washington, D.C. 20006
                                                 202-521-8750
                                                 mdohrmann@washingtonlitigationgroup.org

                                                 Counsel for Plaintiffs Jane Does 1-9 and John
                                                 Does 1-3

                                                 *D.D.C. admission pending; admitted only in
                                                 California and New York; practicing under the
                                                 supervision of D.C. Bar members

45