UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JANE DOES 1-9, *et al.*,

          Plaintiffs,

    v.

KASHYAP P. PATEL,
Director, Federal Bureau of Investigation,
*et al.*,

          Defendants.

Civil Action No. 25-4258 (TNM)

**REPLY IN FURTHER SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES............................................................................................................... ii

INTRODUCTION ............................................................................................................................1

ARGUMENT ...................................................................................................................................5

     I.       Plaintiffs Fail To State A Claim Under The First Amendment.............................5

     II.      Plaintiffs Fail To State Procedural Due Process Claims.......................................8

           A.       Plaintiffs Were Not Deprived Of Any Property Interest ............................9

           B.       Plaintiffs Were Not Deprived Of Any Liberty Interest ............................12

           C.       Plaintiffs Received Adequate Process .......................................................14

     III.     Plaintiffs Fail To State A Substantive Due Process Claim .................................16

     IV.    Plaintiffs' Removals Were Lawful Under The Article II Removal Power...........18

     V.     Jane Doe 5 Fails To State A Claim......................................................................19

           A.       The Purported Statutory Removal Protections For SES Agents Are Unconstitutional As Applied In This Context...........................................19

           B.       Even If Jane Doe 5 Is Statutorily Protected From Removal, Her Claims Fail...........................................................................................................21

     VI.    Plaintiffs' Derivative Claims Should Be Dismissed...........................................25

CONCLUSION..............................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Americains Accidentels v. United States Dep't of State*,
633 F. Supp. 3d 74 (D.D.C. 2022) ...................................................................16, 17

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ...............................................................................1, 5

*Ashton v. Civiletti*,
613 F.2d 923 (D.C. Cir. 1979) .................................................................................11

*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972) ..............................................................................................9, 10

*Branti v. Finkel*,
445 U.S. 507 (1980) ....................................................................................................6

*Breiterman v. United States Capitol Police*,
15 F.4th 1166 (D.C. Cir. 2021) ......................................................................2, 6, 17

*Brown v. Entertainment Merchants Ass'n*,
564 U.S. 786 (2011) ....................................................................................................6

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ..............................................................................4, 25

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) ............................................................................................15, 16

*Crooks v. Mabus*,
845 F.3d 412 (D.C. Cir. 2016) .................................................................................10

*Dep't of State v. Munoz*,
602 U.S. 899 (2024) ..................................................................................................17

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) ......................................................................................................23

*Elrod v. Burns*,
427 U.S. 347 (1976) ....................................................................................................6

*Esparraguera v. Dep't of the Army*,
101 F.4th 28 (D.C. Cir. 2024) ..................................................................................15

*Farah v. Esquire Mag.*,
736 F.3d 528 (D.C. Cir. 2013) .........................................................................2, 3, 12

*Fornaro v. James*,
416 F.3d 63 (D.C. Cir. 2005) ...................................................................................24

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) ..............................................................................................1, 18

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ...................................................................................1, 5, 7, 17

*Garrow v. Gramm*,
856 F.2d 203 (D.C. Cir. 1988) .................................................................................22

*Gibson v. Berryhill*,
411 U.S. 564 (1973) ..................................................................................................16

*Gilbert v. Homan*,
    520 U.S. 924 (1997) ............................................................................................................... 15
*Graham v. Ashcroft*,
    358 F.3d 931 (D.C. Cir. 2004) ........................................................................................ 4, 23
*Griffith v. FLRA*,
    842 F.2d 487 (D.C. Cir. 1988) ............................................................................... 22, 23, 24
*Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
    920 F.3d 1 (D.C. Cir. 2019) ................................................................................................. 18
*Hall v. Ford*,
    856 F.2d 255 (D.C. Cir. 1988) .......................................................................................... 9, 22
*Harrison v. Bowen*,
    815 F.2d 1505 (D.C. Cir. 1987) ......................................................................................... 12
*Heffernan v. City of Paterson, N.J.*,
    578 U.S. 266 (2016) ............................................................................................................ 6, 7
*Holman v. Williams*,
    436 F. Supp. 2d 68 (D.D.C. 2006) ..................................................................................... 12
*Jewell v. Jagadesan*,
    No. 25-CV-1322 (DLF), 2026 WL 686105 ........................................................................... 5
*Kartseva v. Dep't of State*,
    37 F.3d 1524 (D.C. Cir. 1994) ....................................................................................... 13, 14
*Kennedy v. Braidwood Mgmt., Inc.*,
    606 U.S. 748 (2025) ............................................................................................................. 19
*Langeman v. Garland*,
    88 F.4th 289 (D.C. Cir. 2023) ........................................................................... 2, 9, 10, 22
*Leedom v. Kyne*,
    358 U.S. 184 (1958) ............................................................................................................. 24
*Lewis*,
    534 U.S. n.8 ........................................................................................................................... 17
*Marbury v. Madison*,
    1 Cranch 137 (1803) ............................................................................................................ 19
*Marti Navarro v. United States*,
    104 F. Supp. 2d 96 (D.P.R. 2000) ...................................................................................... 11
*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ............................................................................................................. 14
*McCabe v. Barr*,
    490 F. Supp. 3d 198 (D.D.C. 2020) ................................................................................... 18
*Morrison v. Olson*,
    487 U.S. 654 (1988) ........................................................................................................ 20, 21
*Morrissey v. Brewer*,
    408 U.S. 471 (1972) ............................................................................................................. 15
*NRC v. Texas*,
    605 U.S. 665 (2025) ............................................................................................................. 24
*O'Donnel v. Barry*,
    148 F.3d 1126 (D.C. Cir. 1998) ...................................................................................... 2, 12
*Olim v. Wakinekona*,
    461 U.S. 238 (1983) ............................................................................................................. 22

*Orange v. District of Columbia,*
    59 F.3d 1267 (D.C. Cir. 1995)................................................................................................12
*Perry v. Sindermann,*
    408 U.S. 593 (1972)................................................................................................................11
*Pickering v. Bd. of Ed. of Township High Sch. Dist. 205, Will Cnty., Ill.,*
    391 U.S. 563 (1968)..................................................................................................................7
*Sacramento v. Lewis,*
    523 U.S. 833 (1998)...........................................................................................................3, 17
*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
    591 U.S. 197 (2020).........................................................................................................20, 21
*Singh v. District of Columbia,*
    55 F. Supp. 3d 55 (D.D.C. 2014) ...........................................................................................14
*Strzok v. Garland,*
    Civ. A. No. 19-2357 (ABJ), 2025 WL 4662300 (D.D.C. Sept. 23, 2025)........................14, 22
*Trump v. United States,*
    603 U.S. 593 (2024).....................................................................................................4, 19, 21
*Wilbur v. U.S. ex rel. Barton,*
    46 F.2d 217 (D.C. Cir. 1930)..................................................................................................18
*Winder v. Erste,*
    566 F.3d 209 (D.C. Cir. 2009)..................................................................................................6
*Winters v. New York,*
    333 U.S. 507 (1948)..................................................................................................................6
*Wosley v. Chapman,*
    101 U.S. 755 (1879)................................................................................................................18
*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952)................................................................................................................21

**Statutes**

5 U.S.C. § 3131.............................................................................................................................20
5 U.S.C. § 7123.............................................................................................................................23
5 U.S.C. § 7511(b)(8)....................................................................................................................16
5 U.S.C. § 7543(b) .................................................................................................................24, 25

Defendants Kashyap P. Patel, Director, Federal Bureau of Investigation ("FBI"); the FBI; Todd Blanche, Acting Attorney General of the United States; the United States Department of Justice; the Executive Office of the President; and the United States of America, respectfully submit this reply in further support of their Motion to Dismiss Plaintiffs' Amended Complaint for failure to state a claim upon which relief can be granted (ECF No. 18).

**INTRODUCTION**

At every step, Plaintiffs' Opposition (ECF No. 22, "Opp.") envisions an FBI force with no accountability to political leadership and, in turn, the people. In Plaintiffs' view, principal officers appointed by the President and confirmed by the Senate may not discipline agents for any on-the-job conduct so long as that conduct can give rise to an inference of a disapproved "political affiliation" (no matter how radical); may not summarily terminate law enforcement officers without the judiciary's blessing; may not revisit the results of internal investigations conducted by their predecessors; and may not exercise the Article II removal power to ensure a chain of accountability. The Supreme Court has rejected Plaintiffs' broad theory of government "ruled by functionaries." *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010). This Court should as well. Plaintiffs' claims all fail as a matter of law.

To start, Plaintiffs cannot rehabilitate their defective First Amendment claim. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Plaintiffs were terminated because they kneeled during an anti-law-enforcement riot, and they do not dispute that is unprotected conduct. Plaintiffs nevertheless seek to avoid *Garcetti* by asserting they were terminated based on their perceived political affiliations. But the only "conduct protected under the First Amendment" that they allege is their unprotected kneeling. *Aref v. Lynch*,

833 F.3d 242, 258 (D.C. Cir. 2016). Plaintiffs do not address (and cannot deny) the absurd implications of their argument—that FBI leadership cannot discipline officers for their official conduct any time such conduct gives rise to an inference of an underlying political view where leadership has criticized that political view. The logic of their position would extend to even the most extreme on-the-job speech and conduct. That is untenable, particularly given "the special degree of trust and discipline required in a police force" or any law enforcement agency. *Breiterman v. United States Capitol Police*, 15 F.4th 1166, 1176-77 (D.C. Cir. 2021).

Plaintiffs' many due process arguments fare no better. They had no property interest in their employment, which was always subject to the Director's summary dismissal authority. Although certain routine dismissals are conducted under the non-summary procedures Plaintiffs discuss at length, courts cannot second-guess the FBI Director's determination that "exigent and compelling circumstances" warrant summary dismissal. *See Langeman v. Garland*, 88 F.4th 289, 295 (D.C. Cir. 2023). Prior leadership's failure to discipline Plaintiffs cannot cabin Director Patel's exercise of his summary dismissal authority, let alone in a manner creating a property interest for Plaintiffs. Once again, the logic of Plaintiffs' position would lead to absurd results. Mere inaction by predecessors cannot undermine future leadership's express summary termination authority. Plaintiffs all but admit that "[n]o case" supports their novel contrary position. Opp. 20.

Plaintiffs have not asserted a cognizable liberty interest, either. Plaintiffs concede that their termination letters were not defamatory and instead rely on earlier and later public statements that did not even discuss Plaintiffs specifically. *See* Opp. 23-24. Plaintiffs simply ignore that a defamatory statement must occur "at the time of" the adverse employment action, *O'Donnel v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998), and that the statements they cite are not "capable of being proved . . . false." *Farah v. Esquire Mag.*, 736 F.3d 528, 534-35 (D.C. Cir. 2013). Plaintiffs'

- 2 -

"stigma" theory fails as well.  Any purported stigma is difficult to reconcile with their desire to remain pseudonymous, which presumes that third-parties do not know their identities.  Plaintiffs are left to argue that "summary dismissals" necessarily give rise to a stigma-based liberty interest, Opp. 24, which would seriously undermine (if not entirely negate) the FBI Director's power to make important personnel decisions for compelling or exigent reasons without jumping through bureaucratic hoops.  That would take the "summary" out of summary dismissal.

In any event, Plaintiffs received sufficient process.  Plaintiffs (i) were on notice that they were being investigated for kneeling during a protest, and (ii) had an opportunity to be heard by providing statements and being interviewed.  Plaintiffs did not allege what else they would have said or provided with additional procedures and cannot amend their (already amended) complaint through briefing.  Even their vague, post-hoc arguments about "additional photos, videos, and statements" and "expert witnesses" could not have made a difference given that the basic underlying facts were not in dispute.  Opp. 29.  Plaintiffs' argument that the Due Process Clause requires FBI personnel decisions to be made not by the Director, but by some unidentified "neutral adjudicator," *id.*, reflects yet another misunderstanding of how accountable government works.

Plaintiffs similarly fail to clear the high bar to state a substantive due process claim.  They expressly decline to identify a fundamental liberty interest.  Opp. 30-31 n.9.  That alone is dispositive.  Regardless, nothing "shocks the conscience" about an FBI Director's conclusion that conveying solidarity with anti-law enforcement rioters while on patrol warrants summary dismissal, even if a prior Director did not come to the same conclusion.  Opp. 30.  Maintaining a force that reflects the FBI's mission based on current leadership's understanding of that mission is within the broad category of "any government interest" that can justify executive action under the demanding standard.  *City of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

Plaintiffs' claims also fail for the overarching reason that they are subject to the conclusive and preclusive Article II removal power. "[C]ourts cannot examine" the exercise of that power for any reason. *Trump v. United States*, 603 U.S. 593, 609 (2024). And here, the power was validly exercised as to all Plaintiffs, including Jane Doe 5. Her status as a Senior Executive Service ("SES") section chief makes her an inferior officer with (at least) significant administrative authority who is clearly subject to the removal power. Jane Doe 5's position bears no resemblance to the exceedingly narrow exceptions that have been applied to the otherwise unrestricted removal power. And even if she were not an inferior officer, Jane Doe 5's performance of significant, quintessentially executive investigative and prosecutorial functions while supervising FBI agents (like the other Plaintiffs' performance of those executive functions) would have rendered her subject to the chief law enforcer's removal power.

Although she is subject to Article II removal, Jane Doe 5's claims fail for independent reasons. Plaintiffs admit that statutory removal protections do not automatically confer property rights. *See* Opp. 21 n.7. And any property interest that Jane Doe 5 may have by virtue of her (unlawful) protections would be significantly diminished by the fact that Congress has "precluded judicial review" of her termination. *E.g.*, *Graham v. Ashcroft*, 358 F.3d 931, 936 (D.C. Cir. 2004). Like the other Plaintiffs, Jane Doe 5 also received sufficient process. Her *ultra vires* claim is not reviewable, *id.*, and does not plausibly allege a statutory violation, let alone an "extreme" one, *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022).

Because Plaintiffs' amended complaint fails to state a claim on the merits, the Court should dismiss the amended complaint, including Plaintiffs' derivative Declaratory Judgment Act and Writ of Mandamus claims, in full and with prejudice.

- 4 -

## ARGUMENT

### I.    Plaintiffs Fail To State A Claim Under The First Amendment

Plaintiffs do not dispute that the conduct at the heart of this case, which the bulk of their amended complaint seeks to portray as heroic, is unprotected by the First Amendment (and, in their view, not even "expressive"). Opp. 9; *see Garcetti*, 547 U.S. at 418. Instead, Plaintiffs rely on their "perceived partisan affiliation" theory. *Id.* at 5. The theory appears to work as follows:

> 1. Plaintiffs kneeled during a protest while performing their official duties.
>
> 2. As a result of Plaintiffs kneeling, Defendants inferred that they were "not affiliated with President Trump." Opp. 6.
>
> 3. Private political affiliation of public employees is protected by the First Amendment. *See* Opp. 4-5.
>
> 4. Plaintiffs' termination for kneeling was really termination for their private political affiliation and thus violates the First Amendment.

There are multiple problems with this theory. To start, Plaintiffs acknowledge that they must allege they were "'engaged in conduct protected under the First Amendment' or were perceived to have done so," Opp. 5 (quoting *Aref*, 833 F.3d at 258). But the only conduct that Plaintiffs allege could give rise to any perceived partisan affiliation was their purported "use of de-escalation to quell unrest" by kneeling—*i.e.*, their unprotected conduct while performing official duties. *Id.* ¶ 150; *see also id.* ¶ 132. In other words, the supposed perceived partisan affiliation they assert is intertwined with, and entirely dependent on, their unprotected conduct. *See Jewell v. Jagadesan*, No. 25-CV-1322 (DLF), 2026 WL 686105, at *4 (dismissing an "assumed political viewpoint" claim where the plaintiff did not allege "speech 'as a citizen' or any other protected conduct" (quoting *Garcetti*, 547 U.S. at 422)).

Adopting Plaintiffs' theory would largely gut *Garcetti*.  After all, extreme or inappropriate on-duty conduct could often lead to an inference of political views that leadership has criticized, and in those circumstances the unprotected conduct and the political views cannot be disentangled. The government's interest in disciplining official conduct is arguably at its zenith in such circumstances given that apparent partisanship undermines "the special degree of trust and discipline required" in a law enforcement agency.  *Breiterman*, 15 F.4th 1166, 1176-77 (D.C. Cir. 2021).  But under Plaintiffs' theory, an officer expressing such views would always enjoy some First Amendment protection.  That would be true whether the "perceived partisan affiliation" related to a past President or a terrorist organization.

Indeed, because the First Amendment protects political and apolitical expression (and the line between the two is often blurry), Plaintiffs' theory cannot even logically be limited to political affiliation.  *Cf. Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 790 (2011) ("What is one man's amusement, teaches another's doctrine." (quoting *Winters v. New York*, 333 U.S. 507, 510 (1948))).  Any official conduct or speech that gives rise to an inference of some privately held (and privately protected) viewpoint should, on Plaintiffs' telling, enjoy protection.  But the entire premise of *Garcetti* is that what "might otherwise be just the sort of citizen speech protected by the First Amendment" is *not* protected.  *Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009).

In lieu of *Garcetti*, Plaintiffs rely on several inapposite authorities.  *See* Opp. 4-5.  No one disputes that public officials can privately "engage[] in protected activity."  *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 274 (2016) (citing *Branti v. Finkel*, 445 U.S. 507, 519 (1980); *Elrod v. Burns*, 427 U.S. 347, 359 (1976)).  When the official speaks "*as a citizen* on a matter of public concern," "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."

*Garcetti*, 547 U.S. at 418 (citing *Pickering v. Bd. of Ed. of Township High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968) (emphasis added)).  But here, Plaintiffs did not speak as citizens.  *Heffernan*'s holding—that an employer's "mistake" about whether the discharged official "in fact engaged in [private] protected political activity" does not change the First Amendment analysis, 578 U.S. at 268—is irrelevant when *un*protected official conduct is at issue.  That is true regardless of whether or not such official conduct led to an inference of political affiliation (which *Heffernan*, *Branti*, and *Elrod* did not address).

Even putting all that aside, Plaintiffs have not plausibly alleged any "causal link between Defendants' adverse action and their perception of Plaintiffs' partisan affiliation."  Opp. 5 (internal quotation marks omitted).  The Director's and others' alleged public statements about agents not "undermin[ing] the president's agenda," "the Deep State," and "personnel involved in the kneeling," *id*. at 6, on their face refer to official conduct and actions.  That the Director allegedly equated "the Democrats and the Deep State" two years before his appointment, *id*. at 11 (citing Am. Compl. ¶ 94), only underscores that unprotected conduct pursuant to official duties can often be intertwined with politics.  And the amended complaint's allegation that "other FBI agents" have been terminated for "political reasons," *id.* (citing Am. Compl. ¶ 122), is conclusory and could not establish anything with respect to *these* agents.  Plaintiffs cannot rely on statements made by a non-Defendant former congressman.  *Id.* (citing Am. Compl. ¶¶ 90-93).  And Plaintiffs' attempt to contrast their treatment with that of "FBI agents responding to January 6, 2021 unrest," *id.* (citing Am. Compl. ¶¶ 124-130), ignores the absence of any analogous allegations in the amended complaint about such agents' conduct.  Regardless, Director Patel's alleged statement that FBI agents do not generally perform "[r]iot control," Am. Compl. ¶ 128, does not plausibly suggest that any termination for any conduct during riot control was motivated by partisan affiliation.  To

say that FBI agents are not properly trained to handle a riot is not to imply that it is therefore appropriate for FBI agents to appear to express solidarity with anti-law-enforcement rioters.

Plaintiffs' additional arguments only confirm the weakness of their theory. They suggest that Director Patel's exercise of his "summary dismissal" authority somehow establishes political targeting. Opp. 7. But summary dismissal is supposed to be unusual. By definition, it occurs when "compelling or exigent circumstances are at stake." Am. Compl. ¶ 47(g). Egregious officer conduct can obviously give rise to such circumstances. And whether summary dismissal is "disproportionate," Opp. 7, is a discretionary judgment by the Director that has nothing to do with the First Amendment, *see* pp. 9-10, *infra*. The "timing of Plaintiffs' firing" also does not establish they were targeted for their private political beliefs. Opp. 8. Plaintiffs' allegations suggest at most that Director Patel disagreed with prior leadership's handling of the kneeling incident and acted accordingly. That does not support any inference about private political views.

In the end, Plaintiffs' allegations do not plausibly establish that they were terminated because Director Patel correctly or mistakenly believed they privately supported any politician. Instead, the allegations make clear that Plaintiffs were terminated because Plaintiffs publicly— and in performing their official duties—supported anti-law-enforcement rioters.

The Court should dismiss Plaintiffs' First Amendment claim.

## II.    Plaintiffs Fail To State Procedural Due Process Claims

Plaintiffs cannot establish that they were deprived of any cognizable property or liberty interest. Regardless, Plaintiffs received adequate process. Plaintiffs' contrary arguments would significantly undermine the FBI Director's summary dismissal authority in favor of judicial oversight of law enforcement personnel decisions.

## A.    Plaintiffs Were Not Deprived Of Any Property Interest

"For a property interest to be constitutionally protected by procedural due process, a person must 'have a legitimate claim of entitlement to it,' beyond 'an abstract need or desire.'" *Langeman*, 88 F.4th at 295 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Such an entitlement must be "derived from existing rules or understandings that stem from an independent source.'" *Id.* (quoting *Bd. of Regents of State Colls.*, 408 U.S. at 577). "[T]he independent source must place substantive limits on official discretion" in the form of "explicitly mandatory language." *Id.* (internal quotation marks omitted).

No independent source mandated Plaintiffs' continued employment. To the contrary, Plaintiffs have acknowledged that the FBI Director retains "summary dismissal" authority. Opp. 16; *see also* Am. Compl. ¶ 47(g) (describing FBI policy providing for "summary dismissal" when "compelling or exigent circumstances are at stake"). As a result, Plaintiffs had "no objective basis for believing that they w[ould] continue to be employed indefinitely." *Hall v. Ford*, 856 F.2d 255, 265 (D.C. Cir. 1988). Their arguments about *other* disciplinary procedures *outside* the summary dismissal process, Opp. 14-15, are irrelevant; Plaintiffs' employment was always subject to the Director's summary dismissal power.

Plaintiffs cannot evade the breadth of that discretionary power. Their assertion that they were terminated "without *substantive* grounds," *id.* at 16, ignores the substantive grounds stated in their termination letters, Am. Compl. ¶ 113 ("unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government"). So when Plaintiffs argue they were terminated "for no reason," they must mean they believe the reasons stated when the Director invoked his summary dismissal authority were mistaken. *See* Opp. 16. But the D.C. Circuit has made clear that the summary dismissal authority "reserves 'expansive authority and discretion' for FBI leadership to determine the circumstances where an FBI employee may be

- 9 -

summarily dismissed." *Langeman*, 88 F.4th at 295 (quoting *Crooks v. Mabus*, 845 F.3d 412, 419 (D.C. Cir. 2016)). Whether "compelling or exigent circumstances are at stake" is for the Director to decide; it is not a "substantive limit on official discretion." *Id.* Accordingly, Plaintiffs cannot establish a property interest by second-guessing the Director's exercise of that discretion.

Plaintiffs' other property-interest arguments fall flat. They appear to claim a constitutionally-based "property right in continued employment," such that "the agency cannot eliminate Due Process protections." Opp. 17. "Property interests, of course, are not created by the Constitution." *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). And the independent source on which Plaintiffs seek to rely is the FBI's disciplinary policies. But those policies themselves provide for summary dismissal. To be sure, Plaintiffs also purport to rely on the "overall workings" of the FBI. Opp. 13, 19. But such nebulous "workings" could not establish any "explicitly mandatory" limits on the Director's express and undisputed summary termination authority. *Langeman*, 88 F.4th at 295.

Finally, Plaintiffs argue that prior leadership's decision not to discipline them, combined with a lack of intervening reconsideration until 2025, gave Plaintiffs the "understanding" that they "would not be discharged for the events of June 4, 2020." Opp. 19. But Plaintiffs' purported "understanding" is not a "legitimate claim of entitlement." *Langeman*, 88 F.4th at 295. Plaintiffs essentially argue that the FBI entered into an oral contract not to fire Plaintiffs. *See* Opp. 20 (citing contract principles about "words and conduct"). Of course, there was no consideration or promise here (aside from the written documents and policies governing Plaintiffs' employment, including the Director's summary termination authority). Confusingly, Plaintiffs repeatedly refer to an "express promise." Opp. 21 n.7. But they do not allege any specific promise, let alone a promise that they could *never* be summarily terminated by *any* Director for their past conduct. The results

of prior investigations do not create property interests that bind future Directors. Were it otherwise, Directors could tie their successors' hands, distorting the chain of accountability that runs from law enforcement personnel to the Director, Attorney General, President, and the people. Ultimately, Plaintiffs admit that "[n]o case" supports their novel theory of a property interest based on the presumption that prior internal investigations are binding forever. Opp. 20.

Instead, Plaintiffs rely on a case from the District of Puerto Rico that they admit was decided "on other grounds." Opp. 20 (citing *Marti Navarro v. United States*, 104 F. Supp. 2d 96 (D.P.R. 2000)). Indeed, that court rejected a plaintiff's due process claim. *See* 104 F. Supp. 2d at 100. The fact that, "[u]nder some circumstances, the government can create an 'understanding' that . . . creates a property interest," *id.* at 100 n.2 (quoting *Perry v. Sindermann*, 408 U.S. 593, 599-600 (1972)), says nothing about whether that occurred here. There could not have been any "rules or mutually *explicit* understandings" conferring a property right, *Perry*, 408 U.S. at 601, given the Director's express summary termination authority. Plaintiffs suggest that authority could not overcome their prior understanding "without procedural protections." Opp. 21 n.7. But even accepting their (unjustified) understanding, the summary dismissal policy *does* provide some "protections" because it may be exercised only by "the FBI Director, Deputy Director, or Assistant Director for OPR." Am. Compl. ¶ 47(g). As noted above, given that summary dismissal is expressly reserved for "extraordinary" situations, *id.*, any general "workings" regarding prior exercise of that authority could not move the needle, Opp. 19.[1]

---

[1]    For the same reasons, Plaintiffs' reliance on *Ashton v. Civiletti*, 613 F.2d 923 (D.C. Cir. 1979), fails. *See* Opp. 13. *Ashton* did not concern or discuss the Director's summary dismissal authority. And its facts, which involved "termination of . . . employment solely by reason . . . of homosexuality," *id.* at 924, are far afield from this case.

### B.    Plaintiffs Were Not Deprived Of Any Liberty Interest

Plaintiffs have not established a deprivation of liberty based on "defamation" or "continuing stigma." Opp. 22.

In "[t]he first category of claim, . . . the plaintiff points to the conjunction of official defamation and adverse employment action." *O'Donnel*, 148 F.3d at 1140. But here, Plaintiffs do not point to any statement (let alone a defamatory one) "at the time of" the adverse employment action. *Id.* They do not rely on their termination letters. Opp. 23. Instead, they point to "multiple public statements." *Id.* Because Plaintiffs do not (and could not) argue these statements were made in conjunction with Plaintiffs' terminations, their theory fails. In any event, alleged statements that "everyone" the Director terminated (not specific to Plaintiffs) "weaponized the agency or otherwise failed in their duties," *id.* (internal quotation marks omitted), are plainly not the sort of statements that are "capable of being proved . . . false," so they are "not actionable in defamation." *Farah*, 736 F.3d at 534-35. Additionally, dismissal for "unsatisfactory job performance" rather than some "enduring defect in . . . personality," cannot "rise to the level of constitutional harm." *Holman v. Williams*, 436 F. Supp. 2d 68, 79 (D.D.C. 2006) (citing *Harrison v. Bowen*, 815 F.2d 1505, 1518 (D.C. Cir. 1987)). Plaintiffs do not address these dispositive points.

Plaintiffs' "stigma-plus theory" fails, too. Opp. 24. They no longer squarely rely on the factual statement in their termination letters that Plaintiffs have been removed from "federal service" as a result of their terminations. Am. Compl. ¶ 171. Instead, Plaintiffs rely on their "extraordinary summary dismissals." Opp. 24. But they do not allege why any third parties, let alone potential employers, would even be aware of the summary nature of their dismissals. Plaintiffs do not dispute that the termination letters were not published to third parties (and they seek to proceed pseudonymously in this very case). *See id.* at 23; *see Orange v. District of*

- 12 -

*Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995) (rejecting stigma theory because "injury to reputation cannot occur in the absence of public disclosure of the allegedly damaging statements").

Even if there were a public record, the bare fact of summary dismissal cannot automatically give rise to this type of claim.  Summary dismissal does not cause any "tangible change in status" as required "to be actionable under the due process clause," let alone "foreclose[]" Plaintiffs "from reentering the field."  *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528, 1529 (D.C. Cir. 1994). Otherwise, any law enforcement officer terminated for especially compelling or exigent (but not publicly stated) reasons would, paradoxically, be able to assert this sort of claim.

It is also not even clear what Plaintiffs mean when they argue they can no longer "pursue their chosen careers."  Opp. 25.  To the extent they define their careers "narrowly"—to include only the very jobs from which they were terminated—Plaintiffs cannot circularly define their field of work.  Opp. 25; *see also* Am. Compl. ¶ 142 (arguing that Plaintiffs' "prior employment as FBI Special Agents . . . ha[s] no comparators").  This, again, would give any terminated FBI agent a due process claim (effectively nullifying the Director's summary termination power).

To the extent Plaintiffs define their careers "more broadly," to include "law enforcement," Plaintiffs concede that at least two plaintiffs are "doing work adjacent to law enforcement" as government contractors.  Opp. 25 (internal quotation marks omitted).  The amended complaint contrasts such contractor positions with those "more tangentially related to law enforcement, such as account and systems managers."  Am. Compl. ¶ 146.  So two Plaintiffs are performing work with at least some law enforcement nexus.  Plaintiffs cannot vaguely suggest they are doing law-enforcement-related work, then use the lack of detail in their allegations as a basis for discovery.

More generally, the amended complaint lacks detail necessary to discern whether and to what extent other Plaintiffs have had trouble getting positions related to law enforcement.  The

- 13 -

only Plaintiffs whom the complaint even squarely alleges have applied to law enforcement positions are Jane Doe 3 and Jane Doe 4 (who is one of the contractors apparently doing law enforcement adjacent work). *See* Am. Compl. ¶ 146. Other Plaintiffs claim to have applied unsuccessfully to positions as a general matter, but the nature of those positions, and other factors that could bear on their search (like geography), remain a mystery. That is not enough for Plaintiffs to plausibly allege they have been "broadly preclu[ded]" from working in law enforcement in the sense that can give rise to this sort of claim. *Kartseva*, 37 F.3d at 1530.

## C.    Plaintiffs Received Adequate Process

Because Plaintiffs have not established a protected property or liberty interest, they were not entitled to any particular process. In any event, the process owed to them would be minimal. For all the reasons discussed above, the "private interest" at issue is limited at best, and the "[g]overnment's interest" in taking decisive action to maintain an accountable law enforcement force that reflects the FBI's mission is significant. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). What is more, the "risk of an erroneous deprivation" and the "probable value of additional procedures" are both non-existent in this circumstance. *Id.* As Plaintiffs emphasize, there had been multiple investigations into their conduct, including the latest investigation in which they provided sworn statements and were interviewed. In their amended complaint, Plaintiffs did not allege what "additional photos, videos, and statements from relevant witnesses," or what "expert testimony," they would have "submitted." Opp. 29. Plaintiffs cannot now amend their complaint "through an opposition brief." *Singh v. District of Columbia*, 55 F. Supp. 3d 55, 70 (D.D.C. 2014). Even if they could, their assertions are too vague to suggest any additional process could have made any difference. Assuming for the sake of argument that people could have different opinions about what occurred, "the circumstances surrounding the [events] at issue . . . were not in dispute." *Strzok v. Garland*, No. 19-2357 (ABJ), 2025 WL 4662300, at *28 (D.D.C. Sept. 23, 2025).

- 14 -

Plaintiffs thus received "notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). Although Plaintiffs assert they lacked formal notice, Opp. 28, it is undisputed that they knew "the factual basis for the action,'" *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 40 (D.C. Cir. 2024) (quoting *Ralls Corp. v. Comm. On Foreign Inv. In U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014)); *see* Am. Compl. ¶ 106. And Plaintiffs had a meaningful "opportunity . . . to tell [their] side of the story." *Gilbert v. Homar*, 520 U.S. 924, 929 (1997). Not only in their sworn statements and interviews, Am. Compl. ¶¶ 107-08, but also during the prior investigation that formed part of the record before Director Patel, *see id.* ¶¶ 87-89, 115. Whether Plaintiffs had "an oral hearing" is immaterial, Opp. 28, because "[t]he opportunity to present reasons, either in person or in writing," satisfies due process, *Loudermill*, 470 U.S. at 546.

Plaintiffs nevertheless argue, based on a smattering of quotes from decades-old out-of-circuit opinions, that they were entitled to either "a fuller opportunity to mount a challenge . . . *after* . . . termination," Opp. 26, or a pre-termination hearing "akin to a trial, with each side calling witnesses and presenting evidence, cross-examining opposing witnesses, arguing their respective cases, and so on," Opp. 27 (internal quotation marks and alterations omitted). That is incorrect. Plaintiffs received "notice and an opportunity to respond." *Loudermill*, 470 U.S. at 546. There is no requirement that they receive "a full adversarial evidentiary hearing prior to adverse governmental action." *Id.* at 545. "Due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Requiring full trial before dismissal would all but eliminate the Director's summary dismissal power. And because Plaintiffs have already had an adequate "opportunity to present [their] side

- 15 -

of the story," *Loudermill*, 470 U.S. at 546, they are not entitled to any additional post-termination procedures. As discussed above, such procedures would serve no purpose here.

As a last gasp, Plaintiffs assert a bold theory nowhere in their complaint: that they were "deprived of a neutral adjudicator." Opp. 29. According to Plaintiffs, Director Patel didn't just need to jump through more hoops—he could not be the "decisionmaker" *at all*. Opp. 30. This theory would not only undermine accountability within the FBI—it would entirely eliminate it. In any termination, a supervisory official approves the personnel action. That does not mean there was any "prejudgment of the facts," which are not even seriously disputed, or "personal interest," which is not alleged. *E.g.*, *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973). And to the extent Plaintiffs object to the absence of post-termination review by a body like the Merit Systems Protection Board, that objection would negate Congress's deliberate choice to exclude FBI officials from that agency's review. *See* 5 U.S.C. § 7511(b)(8). If a decision to terminate itself created the sort of bias problem that gives rise to a due process violation, summary termination would (once again) be a dead letter.

### III.    Plaintiffs Fail To State A Substantive Due Process Claim

Plaintiffs argue that their substantive due process claim "warrant[s] discovery" because their complaint "stat[es] the applicable test (*i.e.*, conduct that 'shocks the conscience')" and "egregious government actions that satisfy this standard." Opp. 30-31.

To start, Plaintiffs misunderstand the applicable test. They recognize "this Court has described the 'shocks the conscience standard as 'antecedent to any question about the need for historical examples of enforcing a fundamental liberty interest.'" Opp. 30-31 n. 9 (quoting *L'Association des Americains Accidentels v. United States Dep't of State*, 633 F. Supp. 3d 74, 86 (D.D.C. 2022)). But Petitioners appear to believe this means "there is no requirement that the

- 16 -

complaint itself specifically identify a historical liberty interest." *Id.* And they do not attempt to identify one in their opposition.

Plaintiffs ignore that an "antecedent" requirement, by definition, is not a *sole* requirement. Whether Plaintiffs have satisfied the shocks-the-conscience standard is a "threshold issue"—that is, an *additional* gatekeeping requirement because Plaintiffs "challenge executive action on substantive due process grounds." *L'Association des Americains Accidentels*, 633 F. Supp. 3d at 86. "Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action, and only then might there be a debate about the sufficiency of historical examples of enforcement of the right claimed, or its recognition in other ways." *Lewis*, 534 U.S. at 847 n.8. At the second step, Plaintiffs do not and could not ground their substantive due process claim in any "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Dep't of State v. Munoz*, 602 U.S. 899, 910 (2024). That alone is dispositive.

To be clear, the claim fails at the threshold as well. "[C]onduct deliberately intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849. The FBI has an obvious interest in ensuring that agents do not carry out their duties in a manner that undermines law enforcement. *See, e.g.*, *Garcetti*, 547 U.S. at 422-23; *Breiterman*, 15 F.4th at 1177. Plaintiffs try to sidestep this obvious rationale based on their allegations that their terminations were "pretextual" and "unjustified," such that they should get discovery into Defendants' "motive[s]." Opp. 32. But the demanding substantive due process test asks whether government action was "unjusti*fiable*," *Lewis*, 523 U.S. at 849 (emphasis added), not whether a plaintiff disagrees with the action or how the government has explained it. Plaintiffs can point to no authority suggesting that summary

dismissal shocks the conscience just because a previous investigation occurred, time has passed, and (for example) some "Plaintiffs . . . could have been eligible for early retirement."  Opp. 32. There is none.[2]  New leadership having different views on how prior conduct should be evaluated in light of the agency's mission is hardly anomalous, let alone conscience-shocking.

## IV.    Plaintiffs' Removals Were Lawful Under The Article II Removal Power

Given the other defects in Plaintiffs' claims, the Court need not address the Article II removal power (particularly with respect to the Plaintiffs other than Jane Doe 5).  But that power wipes out all Plaintiffs' claims.  "[A]s a general matter," the President has "the authority to remove those who assist him in carrying out his duties."  *Free Enter. Fund*, 561 U.S. at 513-14.  The Attorney General may exercise this power on the President's behalf.  *Wilbur v. U.S. ex rel. Barton*, 46 F.2d 217, 219 (D.C. Cir. 1930) (citing *Wosley v. Chapman*, 101 U.S. 755, 769 (1879)).[3] Plaintiffs were law enforcement officers in the Executive Branch.  The President is the Nation's chief law enforcer, and Article II requires that he can determine who will serve in his law

---

[2]    Plaintiffs rely solely on *McCabe v. Barr*, 490 F. Supp. 3d 198 (D.D.C. 2020).  *See* Opp. 32.  That non-binding decision is inapposite in multiple respects.  For example, it expressly declined to apply the shocks-the-conscience standard.  *See McCabe*, 490 F. Supp. 3d at 225. Instead, the Court held that the plaintiff had plausibly alleged that the defendants "deliberately flouted" the law.  *McCabe*, 490 F. Supp. at 225.  Plaintiffs have not meaningfully argued that Defendants deliberately flouted the law here.  Instead, they rely exclusively on the shocks-the-conscience standard as the "applicable test."  Opp. 30.  In any event, for all the reasons explained above and below, Plaintiffs do not plausibly allege that Defendants "flouted the law in a manner that trammeled significant personal or property rights," let alone did so "deliberately."  *McCabe*, 490 F. Supp. at 225.  In *McCabe*, the plaintiff had already "retired from the FBI."  *Id.*  There is nothing like that here.

[3]    For the same reason, the Court need not consider Plaintiffs' argument that the removals "were made by the wrong official."  Opp. 45; *cf. Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1, 13 (D.C. Cir. 2019) ("We have repeatedly held that a properly appointed official's ratification of an allegedly improper official's prior action . . . resolves the claim on the merits by remedying the defect (if any) from the initial appointment." (internal quotation marks and alterations omitted)).

enforcement agencies.  Congress apparently agrees; putting aside Jane Doe 5, Plaintiffs did not enjoy any statutory removal protections and thus were removable "at will."  *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 764 (2025) (quoting *Ex Parte Hennen*, 13 Pet. 230, 259 (1839)).

Plaintiffs argue that even when the removal power applies, it must be "exercise[d] . . . in a manner that respects important and compatible rights enshrined elsewhere in the Constitution."  Opp. 44.  But courts have "no power" to review any valid assertion of the "conclusive and prelusive" removal power.  *Trump*, 603 U.S. at 607 (quoting *Marbury v. Madison*, 1 Cranch 137, 166 (1803)).  Not under the First Amendment, not under the Due Process Clause, and not based on any other assertion of purported illegality.  If the First Amendment could constrain the removal power, the President could not consider the expressed viewpoints of Executive Branch officials to determine whether they should be part of his chain of command.  That is not the law: "once it is determined that the President acted within the scope of his exclusive authority, his discretion in exercising such authority cannot be subject to further judicial examination."  *Id.* at 608.

## V.    Jane Doe 5 Fails To State A Claim

Jane Doe 5's claims fail for the same reason—it is especially clear that she is subject to the Article II removal power as an FBI SES officer.  Regardless, Jane Doe 5 did not have a property interest in her position, received adequate process in any event, and cannot satisfy the demanding standard for *ultra vires* claims—which in this context are entirely unreviewable.

### A.    The Purported Statutory Removal Protections For SES Agents Are Unconstitutional As Applied In This Context

Defendants concede that Jane Doe 5 was subject to the Article II removal power if she were an "inferior officer" who wielded "policymaking or administrative authority."  Opp. 43.  But the SES statute itself makes clear that all SES agents exercise at least significant administrative authority.  SES officials are tasked with "ensur[ing] that the executive management of the

Government of the United States is responsive to the needs, policies, and goals of the Nation and otherwise is of the highest quality." 5 U.S.C. § 3131; *see also id.* § 3151 (providing that FBI SES officials "meet the requirements set forth in section 3131 for Senior Executive Service). An SES official "directs the work of an organizational unit," "is held accountable for the success of one or more specific programs or projects," "monitors progress toward organizational goals and periodically evaluates and makes appropriate adjustments to such goals," "supervises the work of employees other than personal assistants," or "otherwise exercises important policy-making, policy-determining, or other executive functions." *Id.* § 3132. It is impossible to do one or more of those things without exercising policy *or* administrative authority. Congress itself has thus made clear that SES officials are inferior officers. And Jane Doe 5 cannot explain why acting as a "Section Chief" who, at a minimum, supervised other FBI agents (and other employees with more substantive duties than personal assistants) as she carried out quintessentially executive prosecutorial and investigative functions would not qualify her as exercising at least significant administrative authority. Am. Compl. ¶ 101(a).

Instead, Jane Doe 5 argues only that to be removable at will, her powers "must exceed" those of the independent counsel at issue in *Morrison v. Olson*, 487 U.S. 654, 689 (1988). But *Morrison* expressly held that the independent counsel was an inferior officer. *Id.* at 672-273. And as the Supreme Court has repeatedly explained, *Morrison*'s limited holding that the *sui generis* independent counsel at issue could be shielded from removal rested on a fact-bound conclusion that the independent counsel had "limited duties and no policymaking or administrative authority." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 218 (2020). That conclusion cannot possibly control here, where a statute provides that an officer like Jane Doe 5 *must* exercise some policymaking or administrative authority to hold her SES position. Further, Jane Doe 5's

responsibilities lacked the substantive limits from *Morrison*: She was not "appointed to investigate and prosecute particular alleged crimes by high-ranking Government officials" "identified by others," *Seila Law*, 591 U.S. at 217, 219, but instead had far broader-ranging authority to investigate matters as section chief. Accordingly, *Morrison*'s narrow exception to the otherwise unrestricted power to remove inferior officers does not apply.

If Jane Doe 5 were not an inferior officer, she still would have been removable at will because she, like the other Plaintiffs, exercised "conclusive and preclusive" executive power. *Trump*, 603 U.S. at 608 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring)). Plaintiffs agree that "the 'investigation and prosecution of crimes is a quintessentially executive function.'" Opp. 43 (quoting *Trump*, 603 U.S. at 620). They nevertheless argue that "not all employees who perform these functions are subject to the President's unfettered removal authority." *Id.* While that argument fails for the reasons explained in the government's motion to dismiss (at 18, 21-22), Jane Doe 5 is not just any "employee." She was an FBI section chief playing a supervisory role in Executive Branch law enforcement. As noted, that distinguishes her from the independent counsel in *Morrison*. And even under that decision's unorthodox "balancing test," 487 U.S. at 711 (Scalia, J., dissenting), insulating such a law enforcement supervisor from removal would "interfere with [the President's] constitutional obligation to ensure the faithful execution of the laws," *id.* at 693.

Because any statutory removal protections conflict with the Article II removal power, Jane Doe 5 cannot challenge her removal on any basis. *See Trump*, 603 U.S. at 609; pp. 18-19, *supra*.

**B.      Even If Jane Doe 5 Is Statutorily Protected From Removal, Her Claims Fail**

Jane Doe 5 has not plausibly alleged a due process or *ultra vires* claim regardless of whether her removal protections must give way to Article II.

- 21 -

1.      Due Process

Removal protections are not enough to give Jane Doe 5 a property interest in her position as an FBI agent. The "provision of procedural safeguards cannot in itself create a property interest for purposes of due process analysis." *Griffith v. FLRA*, 842 F.2d 487, 495 (D.C. Cir. 1988) (citing *Olim v. Wakinekona*, 461 U.S. 238, 250-251 (1983)). Jane Doe 5 acknowledges that "[t]he D.C. Circuit has previously held that two statutory provisions prohibiting the dismissal of an employee for certain specified reasons did not create property rights." Opp. 21 n.7 (citing *Hall v. Ford*, 856 F.2d 255, 266 (D.C. Cir. 1988); *Garrow v. Gramm*, 856 F.2d 203, 208 (D.C. Cir. 1988)). "It is not enough that a statute prohibits the dismissal of an employee for certain specified reasons. For that employee to have a constitutionally protected property interest in his job, the statute must provide the employee with an objectively reasonable expectation that he is entitled to retain it." *Hall*, 856 F.2d at 266. Even when an officer can be terminated "only for cause," the officer can expect to remain employed "*unless* they do something warranting their termination." *Id.* at 265 (emphasis in original). And given the Director's "expansive authority and discretion . . . to determine the circumstances where an FBI employee may be summarily dismissed," *Langeman*, 88 F.4th at 295 (internal quotation marks omitted), Jane Doe 5 had to know she served at the Director's pleasure. FBI SES agents generally understand they are "terminable at will by the director" and lack "any inherent entitlement to remain in [their] position[s]." *Strzok v. Garland*, Civ. A. No. 19-2367 (ABJ), Memo Op., ECF No. 164, at 28 (D.D.C. Sept. 23, 2025). Jane Doe 5 notes that *Strzok* did not address the statutory provisions on which Jane Doe 5 relies. But that is

- 22 -

the point—the terminated FBI SES agent in that case did not even think to assert that he could expect to remain in his position despite the Director's contrary judgment.[4]

At a minimum, for the same reasons, any property interest that Jane Doe 5 had in her position was limited and would require correspondingly limited process. But, as discussed above, Jane Doe 5 and her colleagues received more than enough process and have neither alleged nor persuasively explained what they would have done with more process. *See* pp. 14-16, *supra*.

### 2. *Ultra Vires*

Jane Doe 5's *ultra vires* claim is not reviewable. She cites various cases providing that Congress must foreclose judicial review expressly. *See* Opp. 36. But as to the Civil Service Reform Act ("CSRA"), courts have been clear: "extrastatutory review is not available" for "a federal employee's challenge to an employment decision." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11 (2012) (internal quotation marks omitted). There is no "judicial review of personnel actions outside the bounds of the CSRA," regardless of whether a claim is styled *ultra vires*. *Graham*, 358 F.3d at 934. Otherwise, Plaintiffs—who were not granted any review rights under the CSRA—would enjoy "greater rights than [a]re available under the CSRA to employees who enjoy[] rights under that statute." *Id.*

Jane Doe 5's contrary argument (Opp. 36) mischaracterizes *Griffith*. That decision arose in the distinct context of judicial review of a Federal Labor Relations Authority arbitration decision under 5 U.S.C. § 7123, where the question at issue "was the proper test to be applied where review uncovers a procedural error in the personnel decision under review." 842 F.2d at 493. Even then, the D.C. Circuit at most acknowledged the possibility of an "extremely limited scope" claim under

---

[4]   As noted in Defendants' motion to dismiss (at 23 n.11), *Esparraguera* did not address whether the distinct removal protections at issue there would interfere with the Article II removal power, or a scenario where Congress has precluded judicial review of statutory compliance.

*Leedom v. Kyne*, 358 U.S. 184 (1958), while holding that the "error asserted" in *Griffith* was "plainly not judicially correctable" under that standard, 842 F.2d at 493. "A series of opinions from the Supreme Court and [the D.C. Circuit]" in the decades since, and in the distinguishable context of a direct challenge to a removal, "make clear that [the CSRA's] remedial provisions are exclusive, and may not be supplemented by the recognition of additional rights to judicial review having their sources outside the CSRA." *Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005). The D.C. Circuit has applied this logic "in a variety of contexts," rejecting proposed "implied private right[s] of action," claims "under the APA," "*Bivens* remed[ies]," "*Vitarelli* actions," and beyond. *Id.* at 67. There is no basis to make an exception for *ultra vires* claims.

Jane Doe 5 could not come close to stating such a claim anyway. As *Griffith* itself makes clear (and Jane Doe 5 acknowledges), any *ultra vires* claim must allege an "error so extreme that one may view it as jurisdictional or nearly so." 842 F.2d at 493; Opp. 37. Such "a Hail Mary pass . . . rarely succeeds." *NRC v. Texas*, 605 U.S. 665, 681-82 (2025). Jane Doe 5 does not plausibly allege any error at all. Jane Doe 5's allegations do not suffice to establish any violation of 5 U.S.C. § 7543(b)'s removal provisions. Those provisions would have afforded Jane Doe 5 "at least 30 days' advance written notice" and "a reasonable time . . . to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer," as well as a right to be represented by an attorney and "a written decision and specific reasons therefor." 5 U.S.C. § 7543(b). Jane Doe 5 had a chance to submit evidence. Nothing stopped her from enlisting an attorney. And she received a termination letter explaining the basis for her termination. Am. Compl. ¶¶ 104, 107, 108, 110, 113, 114. The statute requires nothing more.

At a minimum, there was no *extreme* error. Jane Doe 5 faults the notice she received for not expressly articulating that she may be terminated. Opp. 38 (citing Am. Compl. ¶ 106). But

- 24 -

she acknowledges that the notice listed two "Offense Codes," *id.*, and the amended complaint points to internal guidelines showing that such violations could result in "dismissal," Am. Compl. ¶ 106 n.53.[5]  Jane Doe 5 thus understood the nature of the inquiry and what was at stake.  And she had "a reasonable time . . . to answer . . . orally and in writing," Opp. 37, as evidenced by the fact that she *did* answer orally and in writing by providing a sworn statement and being interviewed. The termination letters gave "specific reasons" by explaining that Jane Doe 5 had "demonstrated unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government."  Am. Compl. ¶ 113.  Jane Doe 5's conclusory assertion that the letters did not contain *enough* detail cannot demonstrate that Defendants acted "contrary to a specific prohibition in the statute that is clear and mandatory."  *Changji*, 40 F.4th at 722.  The same is true for Jane Doe 5's disagreement with the Director's discretionary judgment that Jane Doe 5 engaged in "misconduct or malfeasance."  Opp. 38 (internal quotation marks omitted).

## VI.    Plaintiffs' Derivative Claims Should Be Dismissed

Plaintiffs do not dispute that their declaratory judgment and mandamus claims rise or fall with their other claims.  *See* Opp. 45.  So these derivative claims also fail.

### CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Amended Complaint for failure to state a claim upon which relief can be granted.  Because amendment would be futile, the Court should dismiss with prejudice.

---

[5]    *Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process*, FBI (Jan. 1, 2017), https://vault.fbi.gov/offense-codes-and-penalty-guidelines-governing-fbis-internal-disciplinary-process/offense-codes-and-penalty-guidelines-governing-fbis-internal-disciplinary-process-final/.  The policy states potential discipline for violations of Offense Code 2.12 at page 9 and for violations of Offense Code 5.22 at page 17.

Dated: April 17, 2026                    Respectfully submitted,


                                         STANLEY E. WOODWARD, JR.
                                         Associate Attorney General

                                         MICHAEL WESIBUCH, Senior Counsel
                                         ANNA EDWARDS, Counsel
                                         Office of the Associate Attorney General

                                         JEANINE FERRIS PIRRO
                                         United States Attorney

                                         By:  _____/s/ Andrew J. Vaden_____
                                             ANDREW J. VADEN
                                             Assistant United States Attorney
                                             DC Bar No. 1044860
                                             601 D Street, NW
                                             Washington, DC 20530
                                             (202) 252-2437

                                         *Attorneys for the United States of America*