UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE DOES 1-4, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>KASHYAP P. PATEL,<br>Director, Federal Bureau of Investigation,<br>*et al.*,<br><br>Defendants. | Civil Action No. 25-4258 (TNM) |

**MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**
**AND MEMORANDUM IN SUPPORT THEREOF**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

BACKGROUND .......... 5

A. Factual Background .......... 5

B. Procedural History .......... 7

LEGAL STANDARD .......... 8

ARGUMENT .......... 9

I. Plaintiffs' Removals Were Lawful Under The Article II Removal Power .......... 9

II. Plaintiffs Fail To State A Claim Under The First Amendment .......... 12

III. Plaintiffs Fail To State Procedural Due Process Claims .......... 16

A. Plaintiffs Were Not Deprived Of Any Property Interest .......... 16

B. Plaintiffs Were Not Deprived Of Any Liberty Interest .......... 18

C. Plaintiffs Received Adequate Process .......... 22

IV. Plaintiffs Fail To State A Substantive Due Process Claim .......... 23

V. Linden Fails To State A Claim .......... 24

A. Due Process .......... 25

B. *Ultra Vires* .......... 27

VI. Plaintiffs' Derivative Claims Should Be Dismissed .......... 30

CONCLUSION .......... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999) ....... 16

*Americains Accidentels v. United States Dep't of State*,
633 F. Supp. 3d 74 (D.D.C. 2022) ....... 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....... 8

*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972) ....... 16, 17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....... 8

*Bishop v. Wood*,
426 U.S. 341 (1976) ....... 25

*Breiterman v. United States Capitol Police*,
15 F.4th 1166 (D.C. Cir. 2021) ....... 14, 24

*Brown v. Entertainment Merchants Ass'n*,
564 U.S. 786 (2011) ....... 14

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ....... 5, 27, 28

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) ....... 22

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) ....... 23, 24

*Collins v. Yellen*,
594 U.S. 220 (2021) ....... 25

*Connick v. Myers*,
461 U.S. 138 (1983) ....... 12

*Crooks v. Mabus*,
845 F.3d 412 (D.C. Cir. 2016) ....... 17

*Dep't of Navy v. Egan*,
484 U.S. 518 (1988) ....... 11

*Dep't of State v. Munoz*,
602 U.S. 899 (2024) ....... 23

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) ....... 28

*Esparraguera v. Dep't of the Army*,
101 F.4th 28 (D.C. Cir. 2024) ....... 22, 26

*Farah v. Esquire Magazine*,
736 F.3d 528 (D.C. Cir. 2013) ....... 19, 20

*Fornaro v. James*,
416 F.3d 63 (D.C. Cir. 2005) ....... 28

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ........................................ passim
*Gilbert v. Homan*,
520 U.S. 924 (1997) ........................................ 22, 26
*Graham v. Ashcroft*,
358 F.3d 931 (D.C. Cir. 2004) ........................................ 4, 28
*Griffith v. FLRA*,
842 F.2d 487 (D.C. Cir. 1988) ........................................ 25, 27
*Grosdidier v. Chairman, Broadcasting Bd. of Governors*,
560 F.3d 495 (D.C. Cir. 2009) ........................................ 28
*Hall v. Ford*,
856 F.2d 255 (D.C. Cir. 1988) ........................................ 18, 25, 26
*Harrison v. Bowen*,
815 F.2d 1505 (D.C. Cir. 1987) ........................................ 20
*Hettinga v. United States*,
677 F.3d 471 (D.C. Cir. 2012) ........................................ 8
*Holman v. Williams*,
436 F. Supp. 2d 68 (D.D.C. 2006) ........................................ 20
*Hurd v. District of Columbia*,
147 F.4th 1036 (D.C. Cir. 2025) ........................................ 4, 23, 24
*Jewell v. Jagadesan*,
Civ. A. No. 25-CV-1322 (DLF), 2026 WL 686105 (D.D.C. Mar. 11, 2026) .......................... 13
*Kartseva v. Dep't of State*,
37 F.3d 1524 (D.C. Cir. 1994) ........................................ 21, 22
*Langeman v. Garland*,
88 F.4th 289 (D.C. Cir. 2023) ........................................ passim
*LeFande v. District of Columbia*,
841 F.3d 485 (D.C. Cir. 2016) ........................................ 14
*Mathews v. Eldridge*,
424 U.S. 319 (1976) ........................................ 22
*McCormick v. District of Columbia*,
752 F.3d 980 (D.C. Cir. 2014) ........................................ 4
*Morrison v. Olson*,
487 U.S. 654 (1988) ........................................ 10, 11
*NRC v. Texas*,
605 U.S. 665 (2025) ........................................ 27
*O'Donnel v. Barry*,
148 F.3d 1126 (D.C. Cir. 1998) ........................................ 19, 20
*Olim v. Wakinekona*,
461 U.S. 238 (1983) ........................................ 25
*Orange v. District of Columbia*,
59 F.3d 1267 (D.C. Cir. 1995) ........................................ 20
*Paul v. Davis*,
424 U.S. 693 (1976) ........................................ 18, 19
*Ralls Corp. v. Comm. On Foreign Inv. In U.S.*,
758 F.3d 296 (D.C. Cir. 2014) ........................................ 22, 26

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) ........................................ 12
*Strzok v. Garland*,
No. 19-2357 (AJB), 2025 WL 4662300 (D.D.C. Sept. 23, 2025) ........................................ 23
*Tate v. District of Columbia*,
627 F.3d 904 (D.C. Cir. 2010) ........................................ 26
*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) ........................................ 3, 9, 10, 11
*Trump v. United States*,
603 U.S. 593 (2024) ........................................ 3, 9, 10
*UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trustees of Dist. of Columbia*,
56 F.3d 1469 (D.C. Cir. 1995) ........................................ 23
*United States v. Fausto*,
484 U.S. 439 (1988) ........................................ 28
*United States v. Gray*,
648 F.3d 562 (7th Cir. 2011) ........................................ 10
*United States v. Perkins*,
116 U.S. 483 (1886) ........................................ 11
*United States v. Texas*,
599 U.S. 670 (2023) ........................................ 10
*United States v. U.S. Dist. Court for the E. Dist. of Mich., S. Div.*,
407 U.S. 297 (1972) ........................................ 10
*Winder v. Erste*,
566 F.3d 209 (D.C. Cir. 2009) ........................................ 14
*Winters v. New York*,
333 U.S. 507 (1948) ........................................ 14
*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........................................ 9

**Statutes**

5 U.S.C. § 3132 ........................................ 12
5 U.S.C. § 3151(a) ........................................ 27
5 U.S.C. § 7543(b) ........................................ 29
5 U.S.C. § 7703 ........................................ 27
18 U.S.C. § 3052 ........................................ 10
28 U.S.C. § 533(1) ........................................ 10

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Kashyap P. Patel, Director, Federal Bureau of Investigation ("FBI"); the FBI; Todd W. Blanche, Attorney General of the United States; the United States Department of Justice; the Executive Office of the President; and the United States of America, respectfully move to dismiss the Second Amended Complaint (ECF No. 27) ("2AC") of Plaintiffs Jane Does 1–4, 6, 7, and 9, John Does 1-3, Sarah Linden, and Amy Oakes for failure to state a claim upon which relief can be granted.

**INTRODUCTION**

In May and June 2020, rioters and looters besieged cities across the United States. In the District of Columbia, they vandalized landmarks, including the Lincoln Memorial and World War II Memorial. They set fires, including at the historic St. John's Church. They threw rocks, urine, and alcohol, including at Secret Service agents—more than sixty of whom were injured. And they caused millions of dollars in property damage. Over 430 people were arrested. FBI agents were tasked with maintaining a visible police presence to help control the chaos. Nearly all performed with characteristic professionalism, impartiality, and efficiency.

Plaintiffs are former FBI agents who were deployed in the District as part of those law enforcement visibility efforts. On June 4, 2020, while performing their duties, they performed the rioters' signature kneel, which was understood to convey support for the political stances espoused by the Black Lives Matter organization. Plaintiffs claim that rioters "swarm[ed] them such that Plaintiffs had no ability to leave the scene safely," and that Plaintiffs kneeled to protect themselves and de-escalate a dangerous confrontation. 2AC ¶ 71. This "extremely volatile and rapidly deteriorating" situation, *id*., was captured in the photographs appearing on the following page. *See* Rule 10 Mot. (ECF No. 29) at 3-4.


FBI


FBI

After an internal investigation in which Plaintiffs provided sworn statements and were interviewed, Defendant FBI Director Kashyap P. Patel determined that Plaintiffs had engaged in "unprofessional conduct and a lack of impartiality in carrying out duties." 2AC ¶ 113. For that express reason, Director Patel removed Plaintiffs as FBI agents, and then-Attorney General Pamela Bondi subsequently ratified their removals.

Plaintiffs now assert that their terminations were unlawful on various grounds. They seek immediate reinstatement and an expungement of all records related to their terminations, among other remedies. But Plaintiffs fail to state a claim for which relief may be granted.

All of Plaintiffs' claims fail based on the Article II removal power. "[T]he President may remove his subordinates at will." *Trump v. Slaughter*, 146 S. Ct. 2283, 2297 (2026). Given that "conclusive and preclusive" power, Plaintiffs could be removed as FBI agents for any reason, and "courts cannot examine" their removals. *Trump v. United States*, 603 U.S. 593, 609 (2024). Although all Plaintiffs were plainly subject to the Article II removal power given the nature of their roles in the Executive Branch, that conclusion is even more straightforward for Plaintiff Sarah Linden, a member of the Senior Executive Service ("SES").

Regardless, Plaintiffs' claims also fail on the merits. Take their lead First Amendment claim. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Plaintiffs repeatedly emphasize that they kneeled as a tactical maneuver in the course of performing their duties. That means their conduct does not implicate the First Amendment at all. And Plaintiffs do not plausibly allege their termination was based on any other private expression.

Plaintiffs' procedural due process claims fare no better. There is "expansive authority and discretion for FBI leadership to determine the circumstances where an FBI employee may be summarily dismissed." *Langeman v. Garland*, 88 F.4th 289, 295 (D.C. Cir. 2023) (internal quotation marks omitted). So Plaintiffs had no property interest in their positions as FBI agents. *See id.* Even assuming Plaintiffs had a nebulous "liberty" interest in their "reputations," Plaintiffs have not plausibly alleged that FBI leadership "disseminated the reasons for the termination[s] and such dissemination [wa]s defamatory." *McCormick v. District of Columbia*, 752 F.3d 980, 988 (D.C. Cir. 2014). Among other reasons, Plaintiffs do not plausibly allege that the purportedly defamatory statements were published to third parties, let alone provably false.

Plaintiffs' substantive due process claim fails as well. Plaintiffs do not come close to alleging "conduct intended to injure in some way unjustifiable by any government interest." *Hurd v. District of Columbia*, 147 F.4th 1036, 1041 (D.C. Cir. 2025). The government has an obvious interest in dissuading law enforcement officers from appearing to participate in divisive political demonstrations while on the job.

Linden's individual due process and *ultra vires* claims are also without merit. Both are premised on statutory provisions that purportedly protected her (but not any other Plaintiff) from removal as a non-probationary member of the FBI Senior Executive Service ("SES"). Such provisions are unconstitutional to the extent they interfere with the Article II removal power. In any event, Linden's due process claim fails because she lacked a property interest in her position as an FBI agent. Regardless, she received adequate process. And the Court lacks subject matter jurisdiction over Linden's *ultra vires* claim because Congress has "precluded judicial review." *E.g.*, *Graham v. Ashcroft*, 358 F.3d 931, 936 (D.C. Cir. 2004) (Roberts, J.). Even if the Court had jurisdiction, Linden would need to plausibly allege an "extreme" statutory violation to state an

*ultra vires* claim. *See, e.g.*, *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022). But she fails to allege any violation.

Because Plaintiffs fail to state a claim on the merits, the Court should dismiss the Second Amended Complaint (including Plaintiffs' derivative Declaratory Judgment Act and Writ of Mandamus claims) in full and with prejudice.

## BACKGROUND

### A. Factual Background

In late May and early June 2020, rioters wreaked havoc on the District of Columbia under the guise of "highlight[ing] concerns about perceived racial bias and . . . call[ing] for police reforms." 2AC ¶ 4. As Plaintiffs—FBI agents at the time—explain, Plaintiffs were deployed in downtown Washington D.C. to provide law enforcement visibility that could help quell "violent unrest" that included "rioting, assaults, looting of uninvolved businesses, and widespread property damage." *Id.* ¶¶ 4-5; *see also id.* ¶ 69. In one incident, rioters "flung rocks, urine[,] and alcohol" at Secret Service agents, causing multiple injuries including broken bones.[1] Arsonists lit fires near the White House, including at St. John's Church.[2] Throughout, rioters called for the District of Columbia to "defund the police."[3] Some of Plaintiffs' "unoccupied FBI vehicles were vandalized with anti-law enforcement graffiti." 2AC ¶ 62. All told, at least 430 people were arrested.[4]

---

[1] ABC News 4, *Secret Service agents injured after Friday's protests near White House* (May 30, 2020), *available at* https://abcnews4.com/news/nation-world/secret-service-agents-injured-after-fridays-protests-near-white-house.

[2] Fox5 Washington DC, *Chaos erupts as fires blaze across DC during protests surrounding the White House* (updated May 31, 2020), *available at* https://www.fox5dc.com/news/chaos-erupts-as-fires-blaze-across-dc-during-protests-surrounding-the-white-house.

[3] WTOPnews, *Bowser, DC Council respond to calls to defund police* (June 9, 2020), *available at* https://wtop.com/dc/2020/06/dc-george-floyd-coronavirus-update-june-8/.

[4] WUSA9, *Nearly 90% of people arrested for riot crimes and vandalism are from DMV, police say* (updated June 8, 2020), *available at*

For purposes of this motion only, Defendants assume the truth of Plaintiffs' allegations that while performing their duties, Plaintiffs were "confronted by a mob." 2AC ¶ 7; *but see* Rule 10 Mot. (ECF No. 29) at 3-4. According to Plaintiffs, rioters "charged towards" them until Plaintiffs were "backed up against a wall of the National Archives" as the rioters "directed increasingly agitated shouting and gesturing towards [them]." 2AC ¶ 71. In Plaintiffs' view, the confrontation was "comparable" to the lead-up to the "Boston Massacre," where British soldiers "fearfully fired their weapons into a crowd of dissenting Americans." *Id.* ¶ 7. "Some in the mob began shouting for the FBI personnel to kneel." *Id.* ¶ 72. Plaintiffs appear to assume that their only options were to obey the rioters or shoot them: Rather than "repeat the mistakes of the British soldiers," Plaintiffs "made a considered tactical decision" and "avoided triggering violence by assuming a kneeling posture." *Id.* ¶¶ 7-8.

In other words, having "been informed that the purpose of the[ir] deployment was to show a visible law enforcement presence," 2AC ¶ 66, the officers showed visible law enforcement acquiescence. By then, kneeling was understood to convey solidarity with the "Black lives matter" movement and to support "change in police accountability."[5] After Plaintiffs kneeled, "the mass of people" allegedly "moved on" (and presumably continued rioting). 2AC ¶ 9. Yet in Plaintiffs' view, kneeling had fulfilled George Washington's purported advice to "subdue[] . . . 'riot and

---

https://www.wusa9.com/article/news/local/dc/outside-agitators-dc-george-floyd-protest-arrests-locals/65-4f2e00fa-cd46-4d3b-86ae-fbf755649644.

[5] 58 News Milwaukee, *Kneel for Nine: Demonstrators gather across Wisconsin to pay tribute to George Floyd* (June 2, 2020), http://www.cbs58.com/news/kneel-for-nine-demonstrators-gather-across-wisconsin-to-pay-tribute-to-george-floyd (cited at 2AC ¶ 58 n.32).

insurrection.'" *Id.* ¶ 10 (quoting George Washington, *Farewell Address to the People of the United States* (Sept. 19, 1796)).[6]

Initially, Plaintiffs were not disciplined for their actions. 2AC ¶ 11. But when Defendant Patel became FBI director, the FBI commenced an internal investigation during which "[e]very Plaintiff separately submitted a requested statement and was interviewed," resulting in a record that spanned "hundreds of pages." *Id.* ¶¶ 107-08.

Director Patel "summarily dismissed" Plaintiffs on September 26, 2025. 2AC ¶ 113. Summary dismissal letters explained that Director Patel had "considered relevant material . . . , including the investigation conducted by the FBI's Inspection Division." *Id.* Director Patel concluded that Plaintiffs had "demonstrated unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government." *Id.* "Pursuant to Article II of the United States Constitution and the laws of the United States, [their] employment with the Federal Bureau of Investigation [was] . . . terminated." *Id.* Then-Attorney General Bondi subsequently ratified Plaintiffs' removal. *See* Memorandum for the Director, Federal Bureau of Investigation (Ex. A).[7]

### B. Procedural History

On December 8, 2025, Plaintiffs sued Defendants Director Patel, the FBI, the Attorney General, the U.S. Department of Justice, the Executive Office of the President, and the United

---

[6] Washington's farewell address did not discuss how authorities should handle a riotous mob. The relevant portion of his address states that "wise people" should "discourage and restrain" the "common and continual mischiefs of the spirit of party," which "foments occasionally riot and insurrection." George Washington, *Farewell Address to the People of the United States*, *supra*.

[7] Defendants request that the Court take judicial notice of the Attorney General's ratification as a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). A partially redacted version of the ratification document is attached.

States. *See* ECF No. 1. Plaintiffs claimed that their removals violated the First Amendment (Count I) and the Due Process Clause of the Fifth Amendment (Counts II, III, and IV). *Id.* ¶¶ 138-69. Linden separately claimed that her termination violated the Due Process Clause (Count V) and was *ultra vires* (Count VI) because she was a non-probationary SES agent (in the role of Section Chief). *Id.* ¶¶ 170-82. Plaintiffs all asserted derivative claims under the Declaratory Judgment Act (Count VII) and for a writ of mandamus (Count VIII) "commanding Defendants return them to their respective offices." *Id.* ¶ 188. After Defendants filed a motion to dismiss, Plaintiffs filed an amended complaint asserting the same claims and have now filed a Second Amended Complaint in light of the Court's pseudonymity ruling. *See* Mem. Order (ECF No. 25); Minute Order (Aug. 14, 2026).

**LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must have 'facial plausibility,' meaning it must 'plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (per curiam) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Factual allegations, although assumed to be true, must still 'be enough to raise a right to relief above the speculative level.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[T]he Court need not accept inferences drawn by plaintiff[s] if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Id.*; *accord Langeman*, 88 F.4th at 294.

## ARGUMENT

### I. Plaintiffs' Removals Were Lawful Under The Article II Removal Power

The Supreme Court's decision in *Trump v. Slaughter*, 146 S. Ct. 2283 (2026), compels dismissal of all claims. *Slaughter* confirms that Plaintiffs were removable for any reason under Article II.

In *Slaughter*, the Supreme Court analyzed, in careful detail, the extent of permissible removal restrictions for Executive Branch officials who exercise the President's executive power. "Nearly 250 years ago," the Supreme Court explained, "the Framers decided to vest 'the executive Power' in one person—a President of the United States of America." 146 S. Ct. at 2291 (quoting U.S. Const. art. II, § 1, cl. 1) (cleaned up). "With just one President in charge, they reasoned, there would be no doubt 'on whom the blame or the punishment of a pernicious measure ought really to fall.'" *Id.* (quoting The Federalist No. 70, p. 428 (A. Hamilton) (Clinton Rossiter ed. 1961)) (cleaned up). The Executive Branch is thus run by the President—the "'Chief Magistrate' with whom the buck stops"—"and below him various 'assistants or deputies'" who "must be removable by the President" if they are to "remain accountable." *Id.* at 2293 (quoting The Federalist No. 72, at 436 (A. Hamilton)).

Accordingly, "the President may remove his subordinates at will." *Slaughter*, 146 S. Ct. at 2297. Such subordinates include at least all those who exercise "quintessentially executive function[s]" that are within the President's "'conclusive and preclusive' authority." *Trump v. United States*, 603 U.S. 593, 607-08, 620 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring)). Because "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority," the President can remove subordinates whose functions involve such subjects for any reason or no reason at all. *Id.* at 609.

Several subjects within the President's conclusive and preclusive authority are relevant here. For example, the "investigation and prosecution of crimes is a quintessentially executive function" that "plainly implicate[s]" the President's "conclusive and preclusive authority." *Trump*, 603 U.S. at 620 (quoting *Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting)) (alterations and internal quotation marks omitted); *accord United States v. U.S. Dist. Court for the E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972) (describing "the investigative duty of the executive"). More generally, "decisions about enforcement of the Nation's criminal laws," including decisions to "make[] arrests and prosecute[] offenses on behalf of the United States, . . . lie within the special province of the Executive." *United States v. Texas*, 599 U.S. 670, 679 (2023) (internal quotation marks omitted).

As its name implies, the FBI exercises these conclusive and preclusive powers on behalf of the President. In setting forth the Attorney General's power to appoint FBI officials, Congress indicated that the primary functions of such officials are "to detect and prosecute crimes against the United States." 28 U.S.C. § 533(1). In practice, the FBI is the tip of the spear for the Executive Branch because it "investigate[s] 'crimes against the United States.'" *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 175 (1993) (quoting 28 U.S.C. § 533). The FBI also "make[s] arrests" for such offenses. *E.g.*, 18 U.S.C. § 3052. Of course, the FBI does all this with a view towards eventual prosecution of offenders; and when charges are brought, the FBI's investigative function might render it part of the "prosecutorial team" for various legal and practical purposes. *See United States v. Gray*, 648 F.3d 562, 566 (7th Cir. 2011) (describing "investigators assisting in a prosecution"). In all those ways, the FBI's powers and duties are "executive through and through." *Slaughter*, 146 S. Ct. at 2305.

Plaintiffs are thus the precise sort of "subordinates" whom the President must be able to remove "at will." *Slaughter*, 146 S. Ct. at 2297. As individuals, they were engaged in carrying out the FBI's executive functions. Plaintiffs have described themselves as "federal investigators whose core function [wa]s the investigation of complex federal crimes." 2AC ¶ 129. The gravamen of their job descriptions is that they were involved in investigations, arrests, and prosecutions. *See* 2AC ¶¶ 20-31 (describing areas of specialization for each Plaintiff, including "counterterrorism," "crisis cases involving digital exploitation," "counterintelligence," "crisis response," "violent crime," "financial crimes," and "cybercrime"). So there is no doubt that Plaintiffs helped carry out the President's conclusive and preclusive authorities. That Plaintiffs did so in the "counterintelligence," "counterterrorism," and broader "national security" contexts only reinforces the point. 2AC ¶¶ 6, 135; *see also id.* ¶¶ 20-31; *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) (emphasizing "the authority of the Executive in military and national security affairs").

Plaintiff Sarah Linden was removable at will for yet another reason. Even without regard for the President's conclusive and preclusive authorities, the Article II removal power extends to all "officers." 146 S. Ct. at 2293. As *Slaughter* made clear, whether such officers are supervised by others is irrelevant; the Article II removal power reaches "the lowest officers, the middle grade, and the highest." *Id.* at 2296 (quoting 1 Annals of Cong. 499 (Rep. Madison)). To be sure, the Supreme Court has recognized an exceedingly narrow exception to that principle in two decisions. *See United States v. Perkins*, 116 U.S. 483 (1886) and *Morrison*, 487 U.S. 654.[8] But any exception would apply only to those inferior officers with "limited duties and no policymaking or

---

[8] After *Slaughter*, which relied in part on the *Morrison* dissent and did not mention *Perkins*, the continued application of this exception is "at best . . . uncertain[]." *Slaughter*, 146 S. Ct. at 2344 (Sotomayor, J., dissenting).

administrative authority." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 218 (2020). Even Plaintiffs have acknowledged as much. *See* ECF No. 22 at 43 (conceding that the Article II removal power would apply to an "inferior officer" who wielded "policymaking or administrative authority").

Linden was not only an FBI agent, but also a member of the SES. Linden was thus unquestionably an inferior officer who had significant "policymaking or administrative authority." *Seila Law*, 591 U.S. at 218. Congress has expressly provided that SES agents have significant policymaking or administrative authority. *See* 5 U.S.C. § 3132 (an SES agent "directs the work of an organizational unit," "is held accountable for the success of one or more specific programs or projects," "monitors progress toward organizational goals and periodically evaluates and makes appropriate adjustments to such goals," "supervises the work of employees other than personal assistants," or "otherwise exercises important policy-making, policy-determining, or other executive functions.").

## II. <u>Plaintiffs Fail To State A Claim Under The First Amendment</u>

Plaintiffs contend that their terminations for kneeling in the course of performing their duties violate the First Amendment. 2AC ¶¶ 147-155.

The Supreme Court has slammed the door on this type of claim. "[G]overnment offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143 (1983). And "[g]overnment employers . . . need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti*, 547 U.S. at 418. So "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421; *see also id.* at 423-24 ("Employees who make public statements

outside the course of performing their official duties retain some possibility of First Amendment protection," but "[w]hen a public employee speaks pursuant to employment responsibilities, . . . there is no relevant analogue to speech by citizens who are not government employees.").

*Garcetti* is fatal to Plaintiffs' First Amendment claim. Plaintiffs repeatedly emphasize that in kneeling, they "were performing their duties as FBI Special Agents." 2AC ¶ 79; *see also id.* ¶¶ 8, 9, 76, 78, 109 (Plaintiffs allegedly kneeled as a "tactical" decision). Accordingly, the First Amendment does not shield them from discipline or termination.

Plaintiffs cannot circumvent *Garcetti* by framing their termination as based on "perceived partisan support or affiliation." 2AC ¶ 148. The only conduct that Plaintiffs allege could give rise to any perceived partisan affiliation was their purported "use of de-escalation to quell unrest" by kneeling—*i.e.*, their unprotected conduct while performing official duties. *Id.* ¶ 150; *see also id.* ¶ 132. Plaintiffs do not allege any additional private, protected expression.

Instead, Plaintiffs propose an untenable expansion of First Amendment protections to law enforcement officers' conduct on the job. According to Plaintiffs, if a public employer assesses agent conduct based in part on the employer's "perception of the civilians" involved in an encounter, that assumed perception can be "imputed" to the agents in a manner that violates their First Amendment rights as private citizens. 2AC ¶ 127. But the supposed perceived partisan affiliation they assert is intertwined with, and entirely dependent on, their unprotected conduct. *See Jewell v. Jagadesan*, Civ. A. No. 25-1322 (DLF), 2026 WL 686105, at *4 (D.D.C. Mar. 11, 2026) (dismissing an "assumed political viewpoint" claim where the plaintiff did not allege "speech 'as a citizen' or any other activity protected by the First Amendment" (quoting *Garcetti*, 547 U.S. at 422)). Indeed, because the First Amendment protects political and apolitical

expression (and the line between the two is often blurry), Plaintiffs' theory cannot even logically be limited to political affiliation. *Cf. Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 790 (2011) ("What is one man's amusement, teaches another's doctrine." (quoting *Winters v. New York*, 333 U.S. 507, 510 (1948)). Any official conduct or speech that gives rise to an inference of some privately held (and privately protected) viewpoint should, on Plaintiffs' telling, enjoy protection. But the entire premise of *Garcetti* is that what "might otherwise be just the sort of citizen speech protected by the First Amendment" is *not* protected. *Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009).

As the Supreme Court has emphasized, moreover, public employer "[s]upervisors must ensure that their employees' official communications . . . demonstrate sound judgment, and promote the employer's mission." *Garcetti*, 547 U.S. at 422-23. That is why, as a general matter, courts owe "a wide degree of deference to the employer's judgment" in evaluating the impact of any employee's speech. *LeFande v. District of Columbia*, 841 F.3d 485, 494 (D.C. Cir. 2016). Courts owe even "stronger" deference when a law enforcement agency disciplines an agent given "the special degree of trust and discipline required in a police force." *Breiterman v. United States Capitol Police*, 15 F.4th 1166, 1176-77 (D.C. Cir. 2021).

That deference necessarily extends to supervisors' assessments of how law enforcement officers should interact with civilians—assessments that may reasonably differ with the circumstances depending on the supervisors' judgment and understanding of the agency's mission. By Plaintiffs' logic, a supervisor could not consider rioters' express political purpose (no matter how contrary to the agency's mission) while evaluating the appropriateness of an agent's conduct because a court could assume any disciplinary action targeted underlying political speech. The

Supreme Court has rejected such "displacement of managerial discretion by judicial supervision." *Garcetti*, 547 U.S. at 423.

In any event, the "public statements, private conversations, and other means" alleged in the Complaint do not plausibly establish termination "based on Defendants' perception that [Plaintiffs] were not politically affiliated with President Trump." 2AC ¶ 151. Plaintiffs were expressly terminated for "unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government." *Id.* ¶ 113. And Plaintiffs' allegations do not plausibly establish (or even suggest) otherwise. For example, Plaintiffs cite Director Patel's alleged prior statements that FBI agents were improperly asked to perform "riot control" on January 6, 2021. *See id.* ¶ 128. But whether agents should be in a riot control role in the first place has nothing to do with how agents should comport themselves once tasked with maintaining a visible police presence during a riot—or how FBI leadership should respond to unprofessional conduct in that context. Director Patel's more general alleged prior statements about removing public employees who "undermine the [P]resident's agenda," *id.* ¶ 94, on their face refer to Executive Branch officials who thwart the Chief Executive's directives. Such statements do not imply termination based on private speech or political beliefs. Plaintiffs' additional reliance on irrelevant statements by non-Defendants, *see id.* ¶¶ 91-93 (referencing President Trump's re-post of a Fox News article describing a letter signed by then-Congressman Matthew Gaetz), only underscores the weakness of their claim.

In sum, Plaintiffs' own allegations confirm that Plaintiffs were terminated for kneeling while performing their official duties.[9] Plaintiffs do not plausibly establish that they were

[9] For the same reason, an FBI document purportedly "protecting FBI employees' rights against coerced political loyalty and conformity," 2AC ¶ 45(a), is irrelevant. The document expressly states that employees "have a duty to carry out [their] official FBI mission in an objective

terminated for any additional or alternative reason that implicates the First Amendment. The Court should dismiss their First Amendment claim.

## III. Plaintiffs Fail To State Procedural Due Process Claims

The Fifth Amendment provides that "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest . . . . Only after finding the deprivation of a protected interest do [courts] look to see if the [government's] procedures comport with due process." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citation omitted). Plaintiffs cannot establish that they were deprived of any cognizable property (Count II) or liberty (Count III) interest. Even if they were, Plaintiffs received adequate process.

### A. Plaintiffs Were Not Deprived Of Any Property Interest

Plaintiffs assert that "each Plaintiff had a constitutionally protected property interest in his or her continued employment" and a "property interest flowing from their understanding and legitimate expectation that they would not be discharged based on the events of June 4, 2020." 2AC ¶¶ 159, 161. They did not.

"For a property interest to be constitutionally protected by procedural due process, a person must 'have a legitimate claim of entitlement to it,' beyond 'an abstract need or desire.'" *Langeman*, 88 F.4th at 295 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). "Such protectable property interests are derived from existing rules or understandings that stem from an independent source such as state law.'" *Id.* (quoting *Bd. of Regents of State*

---

and unbiased manner," such that "impartiality in the performance of [their] investigatory and law enforcement functions is of critical importance." FBI, *FBI Ethics and Integrity Program Policy Directive and Policy Guide* 7-1 (Feb. 2, 2015), *available at* https://vault.fbi.gov/fbi-ethics-and-integrity-program-policy-guide.

*Colls.*, 408 U.S. at 577). To qualify, "the independent source must place substantive limitations on official discretion" in the form of "explicitly mandatory language, *i.e.*, specific directives to the decisionmaker that if . . . substantive predicates are present, a particular outcome must follow." *Id.* (internal quotation marks omitted).

No independent source foreclosed Plaintiffs' removal. Plaintiffs rely on an outdated memorandum confirming the FBI director's summary dismissal authority. 2AC ¶ 120 & n.58. As the D.C. Circuit has already held, that memo "reserve[d] 'expansive authority and discretion' for FBI leadership to determine the circumstances where an FBI employee may be summarily dismissed." *Langeman*, 88 F.4th at 295 (quoting *Crooks v. Mabus*, 845 F.3d 412, 419 (D.C. Cir. 2016)). It "does not contain explicit mandatory language" or any "substantive limits on discretion." *Id.* Plaintiffs note that the "FBI's summary dismissal policy has been updated" since that memo. 2AC ¶ 120 n.58. But they do not (and could not) allege there has been any material update—for all relevant purposes, the summary dismissal policy remains the same. *See id.* ¶ 47(g). And the D.C. Circuit has already held that the language in that policy (requiring summary dismissal "only in compelling or exigent circumstances," *id.*), is not a judicially reviewable limit on discretion. *Langeman*, 88 F.4th at 295. Whether "compelling or exigent circumstances are at stake" is for the Director to decide; it is not a "substantive limit on official discretion." *Id.*

Plaintiffs also make much of procedures that apply to non-probationary employees *outside* the summary dismissal context. *See, e.g.*, 2AC ¶¶ 47(f), 111. But given the FBI Director's discretion to summarily terminate FBI personnel, Plaintiffs lack any cognizable property interest in maintaining their positions as agents. *See Langeman*, 88 F.4th at 294-96 (rejecting similar claim). Like other public employees "who are terminable at will," Plaintiffs had "no objective basis for believing that they w[ould] continue to be employed indefinitely," much less a property

interest guaranteeing that continued employment. *Hall v. Ford*, 856 F.2d 255, 265 (D.C. Cir. 1988).

The specific circumstances of Plaintiffs' termination do not change that conclusion. Plaintiffs did not gain a property interest in their positions as FBI agents, and the FBI Director did not lose his authority to summarily remove them, merely because Plaintiffs were *also* subject to the slower and more proceduralized disciplinary process set forth in "other official documents." *Contra* 2AC ¶ 164. Plaintiffs cannot point to any document specifically requiring their continued retention or foreclosing application of the FBI Director's summary removal authority. All they can muster is the passage of time between their relevant conduct and their terminations. *See id.* ¶ 163. But that is not a "specific directive[]" requiring "a particular outcome." *Langeman*, 88 F.4th at 295. All along, FBI leadership retained discretion to summarily remove Plaintiffs.

For all those reasons, the Court should dismiss Count II.

### B. Plaintiffs Were Not Deprived Of Any Liberty Interest

Plaintiffs also assert that they had a "constitutionally protected liberty interest in professional reputation," and that Director Patel deprived "Plaintiffs of that interest by terminating them and making multiple public false statements." 2AC ¶¶ 168-69. That claim fails as well.

As an initial matter, the Supreme Court has cast doubt on the availability of a due process claim based on professional reputation. "While . . . a number of [the Court's] prior cases pointed out the frequently drastic effect of the 'stigma' which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 701 (1976). There is "no constitutional doctrine converting every

defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause." *Id.* at 702.[10]

Regardless, the D.C. Circuit has stated there are only "two circumstances" in which termination "might" give rise to a due process claim based on a purported liberty interest. *O'Donnel*, 148 F.3d at 1140. In "[t]he first category of claim, . . . the plaintiff points to the conjunction of official defamation and adverse employment action." *Id.* The second category "turns on the combination of an adverse employment action and a stigma or other disability that foreclose[s] the plaintiff's freedom to take advantage of other employment opportunities." *Id.* (internal quotation marks and alteration omitted). Plaintiffs do not plausibly allege either type of claim.

First, Plaintiffs do not plausibly allege any defamatory statement in conjunction with their terminations. Such a statement must occur "at the time of" the adverse employment action. *O'Donnel*, 148 F.3d at 1140. Plaintiffs rely on Director Patel's statement in the termination letters that Plaintiffs demonstrated "unprofessional conduct" and a "lack of impartiality in carrying out duties," leading to "the political weaponization of government." 2AC ¶ 169; *see also id.* ¶ 113. But Plaintiffs do not allege the first element of defamation—that Defendants "published" those letters "to a third party." *E.g.*, *Farah v. Esquire Mag.*, 736 F.3d 528, 533 (D.C. Cir. 2013). In fact, the entire premise of Plaintiffs' motion to proceed pseudonymously was that their "names" have not even been "made public." ECF No. 2 at 6. Plaintiffs allege only that they "each separately

---

10 The D.C. Circuit has recognized that "the conceptual basis for reputation-plus claims is not fully clear." *O'Donnel v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998). Defendants preserve the argument that the Due Process Clause does not protect a liberty interest in professional reputation—and that even when paired with an allegation of defamation, recognizing such a claim would reflect an improper "constitutionalization of tort law." *Id.*; *accord Paul*, 424 U.S. at 701 (rejecting an interpretation that "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States").

received a letter." 2AC ¶ 112. Of course, disagreement with any privately conveyed statement accompanying termination does not give rise to a defamation claim. Regardless, to the extent the letter's characterizations are not "capable of being proved . . . false," they are "not actionable in defamation." *Farah*, 736 F.3d at 534-35. Otherwise, Plaintiffs would have defamation claims against the numerous commenters who similarly criticized their actions. *See* Rule 10 Mot. (ECF No. 29) at 4, 6 (citing some of these articles, which contain images and/or identities of Plaintiffs). Additionally, dismissal for "unsatisfactory job performance" rather than some "enduring defect in . . . personality," cannot "rise to the level of constitutional harm." *Holman v. Williams*, 436 F. Supp. 2d 68, 79 (D.D.C. 2006) (citing *Harrison v. Bowen*, 815 F.2d 1505, 1518 (D.C. Cir. 1987)).

Second, Plaintiffs do not plausibly allege that their freedom to take advantage of other employment opportunities has been foreclosed due to a "stigma or disability arising from official action." *O'Donnel*, 148 F.3d at 1140. They point to a statement in their dismissal letters that Plaintiffs were removed from "federal service." 2AC ¶ 171. In their view, the letters imply that Plaintiffs are "unsuitable for any position within the federal government." *Id.* ¶ 172. But here again, Plaintiffs do not allege that Defendants disseminated the termination letters, or even Plaintiffs' names, to any third party, let alone to prospective employers. So, as Plaintiffs themselves indicate, the only plausible explanation for any difficulty finding employment is that Plaintiffs have been required to "disclose whether they have been terminated from federal service." *Id.* ¶ 144. The bare fact of their termination is obviously not a cognizable "stigma or other disability" that could give rise to this type of claim. *O'Donnel*, 148 F.3d at 1140. Otherwise, any terminated federal law enforcement officer would have such a claim—no matter the circumstances and government communications surrounding his or her termination. *See Orange v. District of*

*Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995) (rejecting stigma theory because "injury to reputation cannot occur in the absence of public disclosure of the allegedly damaging statements").

Even putting aside the confusing nature of the stigma purportedly at issue, there are other problems with Plaintiffs' purported stigma-based claim. Plaintiffs allege that given the nature of their positions as FBI agents, there are "no comparators" outside the "Executive Branch of the federal government." 2AC ¶¶ 142, 143. But Plaintiffs cannot circularly define their field of work as the very work from which they were terminated. There is no due process right to be a *federal* law enforcement officer, let alone an *FBI agent*. Additionally, to "constitute a status change of due process import," Plaintiffs' "disqualification from future opportunities" would need to be "automatic or formal"—the fact they may be "at [a] competitive disadvantage relative to other applicants" is not enough. *Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C. Cir. 1994). Even if Defendants had disseminated the termination letters, Plaintiffs have not been formally disqualified from anything.

Similarly, to have been practically "preclude[d] . . . from pursuing [a] profession" in the relevant sense would require that Plaintiffs have been 'foreclosed from reentering the field." *Id*. But although Plaintiffs were all terminated for the same reasons and received the same letters, their allegations (which are current only as of February 27, 2026) demonstrate that at least some Plaintiffs have found employment in the field. *See* 2AC ¶¶ 146(d), (*l*) (Jane Doe 4 and John Doe 3 are employed by government contractors (and, unlike other Plaintiffs, there is no qualifier that their jobs are outside of law enforcement)). It follows that other factors, beyond any stigma tied to official action, are impacting who has obtained which types of jobs.

More generally, the second amended complaint lacks detail necessary to discern whether and to what extent other Plaintiffs have had trouble getting positions related to law enforcement.

The only Plaintiffs whom the complaint even squarely alleges have applied to law enforcement positions are Jane Doe 3 and Jane Doe 4 (who is one of the contractors apparently doing law enforcement adjacent work). *See* 2AC ¶ 146. Other Plaintiffs claim to have applied unsuccessfully to positions as a general matter, but the nature of those positions, and other factors that could bear on their search (like geography), remain a mystery. That is not enough for Plaintiffs to plausibly allege they have been "broadly preclu[ded]" from working in law enforcement in the sense that can give rise to this sort of claim. *Kartseva*, 37 F.3d at 1530.

### C. Plaintiffs Received Adequate Process

Even assuming Plaintiffs could establish a protected property or liberty interest, they received "notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). "To have proper notice and a meaningful opportunity to respond, an employee must at least 'know the factual basis for the action,'" *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 40 (D.C. Cir. 2024) (quoting *Ralls Corp. v. Comm. On Foreign Inv. In U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014)), and have a meaningful "opportunity . . . to tell his side of the story[.]" *Gilbert v. Homar*, 520 U.S. 924, 929 (1997).

For all the reasons discussed above, the "private interest" at issue is limited at best, and the "[g]overnment's interest" in taking decisive action to maintain an accountable law enforcement force that reflects the FBI's mission is significant. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). What is more, the "risk of an erroneous deprivation" and the "probable value of additional procedures" are both non-existent in this circumstance. *Id.* It is undisputed that Plaintiffs knew "the factual basis for the action,'" *Esparraguera*, 101 F.4th at 40 (quoting *Ralls Corp.*, 758 F.3d at 318); *see* 2AC ¶ 106. In fact, Plaintiffs admit they "were notified that they were under investigation for possible violations" of various FBI policies for their conduct of "kneeling during a protest." 2AC ¶ 106. And Plaintiffs received a meaningful opportunity to be heard. They

acknowledge they were afforded the opportunity to provide sworn statements and be interviewed. *Id.* ¶¶ 107-08. Plaintiffs do not explain why that process was inadequate for them to tell their sides of the story. Assuming for the sake of argument that people could have different opinions about what occurred, "the circumstances surrounding the [events] at issue . . . were not in dispute." *Strzok v. Garland*, No. 19-2357 (AJB), 2025 WL 4662300, at *28 (D.D.C. Sept. 23, 2025).

Finally, because Plaintiffs had the opportunity before they were terminated, it makes no difference that the FBI "never offered" additional "post-termination process." 2AC ¶ 119; *see UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trustees of Dist. of Columbia*, 56 F.3d 1469, 1473 (D.C. Cir. 1995) ("[A] pre-deprivation hearing is certainly the preferred manner of satisfying due process.").

## IV. <u>Plaintiffs Fail To State A Substantive Due Process Claim</u>

Plaintiffs assert that Defendants "violated Plaintiffs' substantive due process rights" because Plaintiffs' termination "violated bedrock principles of fairness." 2AC ¶¶ 176, 178. Once again, Plaintiffs do not come close to stating a valid claim.

"Identifying unenumerated rights carries a serious risk of judicial overreach." *Dep't of State v. Munoz*, 602 U.S. 899, 910 (2024). To prevent such overreach, a purported substantive due process claim must include a "careful description of the asserted fundamental liberty interest." *Id.* (internal quotation marks omitted). "[T]he Due Process Clause specially protects only those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Id.* (internal quotation marks omitted). When the government takes action against an individual, moreover, "only action that is 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience' qualifies as 'arbitrary in the constitutional sense.'" *Hurd*, 147 F.4th at 1040-41 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of

official action most likely to rise to the conscience-shocking level." *Id.* (quoting *Lewis*, 523 U.S. at 849). Accordingly, Plaintiffs must establish *both* government conduct that "shocks the conscience" *and* identify "historical examples" of the "fundamental liberty interest" they purport to invoke. *L'Association des Americains Accidentels v. United States Dep't of State*, 633 F. Supp. 3d 74, 86 (D.D.C. 2022).

Given the high bar for asserting a substantive due process claim, Plaintiffs' claim does not pass the straight face test. There is no right, deeply rooted in American history and tradition, to continue serving as a federal law enforcement officer. And Plaintiffs' termination was not intended to injure Plaintiffs at all, let alone in a way unjustifiable by any government interest. As the termination letters make clear, Plaintiffs were terminated based on concerns regarding inappropriate conduct and the political weaponization of government. The government generally, and the FBI in particular, have obvious interests in ensuring that agents do not carry out their duties in a partisan or seemingly partisan manner. *See, e.g.*, *Garcetti*, 547 U.S. at 422-23; *Breiterman*, 15 F.4th at 1177. Nor does the delay between Plaintiffs' actions and their termination "shock the contemporary conscience." *Hurd*, 147 F.4th at 1040. Plaintiffs do not point to, and Defendants are not aware of, any case law stating or indicating that the passage of time between misconduct and removal can itself meet the demanding shocks-the-conscience standard. And here, the delay is entirely understandable given the changes in leadership (and resulting changes in leadership's judgments regarding the agency's mission and Plaintiffs' conduct) over time.

## V. <u>Linden Fails To State A Claim</u>

Linden raises separate due process and *ultra vires* claims based on her status as a non-probationary SES agent. Both claims hinge on statutory provisions that she claims precluded her removal. Specifically, Linden argues that she was required to receive thirty days' notice of her impending termination, an opportunity to respond, and a written decision articulating the specific

reasons for removal (which could be only "for cause"). *See* 2AC ¶¶ 185-186, 193 (citing 5 U.S.C. §§ 3151, 7543).

As discussed above, any such removal protections would be unconstitutional as applied in this context because they would interfere with the Article II removal power. *See* Section I, *supra*. Linden could not have a property interest in her position based on statutory provisions that never lawfully protected her. "[T]he Constitution automatically trumps an inconsistent statute." *Collins v. Yellen*, 594 U.S. 220, 267 (2021) (Thomas, J., concurring). Indeed, "the Constitution has always displaced it and the President has always had the power to fire [Linden] for any reason." *Id.* For the same reason, removal in purported violation of the unlawful protections could not be *ultra vires*.

In any event, Linden received constitutionally adequate process. And she cannot clear the high bar for stating an *ultra vires* claim because Congress precluded review of her claim. Plus, Linden does not plausibly allege any statutory violation—let alone the sort of extreme violation required to state an *ultra vires* claim.

**A. Due Process**

Even if lawful, removal protections are not enough to give Linden a property interest in her position as an FBI agent. The "provision of procedural safeguards cannot in itself create a property interest for purposes of due process analysis." *Griffith v. FLRA*, 842 F.2d 487, 495 (D.C. Cir. 1988) (citing *Olim v. Wakinekona*, 461 U.S. 238, 250-251 (1983)). It follows that "merely conditioning an employee's removal on compliance with certain specified procedures" does not confer a "right to continued employment." *Bishop v. Wood*, 426 U.S. 341, 345 (1976). "It is not enough that a statute prohibits the dismissal of an employee for certain specified reasons. For that employee to have a constitutionally protected property interest in his job, the statute must provide the employee with an objectively reasonable expectation that he is entitled to retain it." *Hall*, 856

F.2d at 266. Even when an officer can be terminated "only for cause," the officer can expect to remain employed "*unless* they do something warranting their termination." *Id.* at 265 (emphasis in original). Such procedures certainly cannot create an entitlement to continued employment where Congress has precluded judicial review of the employer's compliance, as discussed below. *See* Section V.B, *infra*.[11] And given the Director's "expansive authority and discretion . . . to determine the circumstances where an FBI employee may be summarily dismissed," *Langeman*, 88 F.4th at 295 (internal quotation marks omitted), Linden had to know she served at the Director's pleasure. That is why, for all practical purposes, "a Senior Executive Service employee at the highest level of the Bureau . . . [is] terminable at will by the director" and lacks "any inherent entitlement to remain in [her] position." *Strzok v. Garland*, Civ. A. No. 19-2367 (ABJ), Mem. Op., ECF No. 164, at 28 (D.D.C. Sept. 23, 2025).

Even assuming Linden had some property interest in her continued employment, she received "the process due under the Fifth Amendment." *Tate v. District of Columbia*, 627 F.3d 904, 908 (D.C. Cir. 2010). That Fifth Amendment inquiry is distinct from any "statutory . . . requirement." *Id.* And, as noted above, Linden and her colleagues received more than enough process. Linden does not plausibly allege that she lacked notice of the "factual basis for the action." *Ralls*, 758 F.3d at 318; *see* 2AC ¶ 106 ("kneeling during a protest"). And she was given "the opportunity to tell [her] side of the story," *Gilbert*, 520 U.S. at 929, because she provided a sworn statement and was interviewed. 2AC ¶ 107. Linden does not allege that she was

---

[11] In *Esparraguera*, the D.C. Circuit concluded that an SES employee in the Department of the Army had a property interest in her continued employment. 101 F.4th at 35. The court did not address whether any statutory removal protections would unconstitutionally interfere with the Article II removal power. Nor did it address a scenario where Congress had precluded review of compliance with such protections.

ever precluded from advancing any arguments or introducing any evidence in support of her position.

**B. *Ultra Vires***

Linden's second individual claim is styled as "Violation of the Separation of Powers, Legal Nullity, and Ultra Vires Action." 2AC ¶¶ 189-195. It appears premised on Defendants' alleged violations of the statutory removal requirements. But Linden can point to no statute that grants her a cause of action to raise such purported violations in federal court.

Linden must therefore plausibly allege a non-statutory *ultra vires* claim. But implied equitable claims that an agency has violated a federal statute are "extremely limited" in scope. *Griffith*, 842 F.2d at 493. As the Supreme Court has explained, an "*ultra vires*" challenge is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *NRC v. Texas*, 605 U.S. 665, 681-82 (2025). A plaintiff must show that (1) judicial review is not expressly foreclosed; (2) the agency made an extreme legal error; and (3) there is no alternative means for the plaintiff to seek judicial review. *See, e.g.*, *Changji Esquel Textile Co.*, 40 F.4th at 721-22.

Linden cannot satisfy the first or second requirement. To start, judicial review is foreclosed. Plaintiff contends that "certain provisions of the CSRA" (the Civil Service Reform Act) protected her from removal. 2AC ¶ 50. But while the CSRA channels judicial review of most covered claims through the Merit Systems Protection Board (and from there to the U.S. Court of Appeals for the Federal Circuit), 5 U.S.C. § 7703, the CSRA treats FBI personnel differently, *see* 2AC ¶ 43. For non-preference eligible SES agents like Linden, the statute gives the Attorney General discretion to "establish a personnel system" that is governed by internal agency regulations and memoranda and overseen by the Director of the FBI and the Deputy Attorney General. *See* 5 U.S.C. § 3151(a). Nothing in the CSRA gives an FBI SES employee a right to

judicial review—which is presumably why Linden has attempted to assert a non-statutory *ultra vires* claim.

Such claims are categorically barred. As the Supreme Court has explained, the CSRA "replace[d] the haphazard arrangements for administrative and judicial review of personnel action" with an "integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 444–45 (1988). That "elaborate framework" compels the conclusion that "extrastatutory review is not available" for "a federal employee's challenge to an employment decision." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11 (2012) (internal quotation marks omitted). "Allowing employees to end-run the CSRA would undermine Congress's efforts to foster a 'unitary and consistent Executive Branch position on matters involving personnel action." *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (quoting *Fausto*, 484 U.S. at 449). There is no "judicial review of personnel actions outside the bounds of the CSRA," regardless of whether a claim is styled ultra vires. *Graham*, 358 F.3d at 934. Otherwise, Plaintiffs—who were not granted any review rights under the CSRA—would enjoy "greater rights than [a]re available under the CSRA to employees who enjoy[] rights under that statute." *Id.* In short, "what you get under the CSRA is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (Roberts, J.). As a result, this Court lacks subject matter jurisdiction over Linden's standalone *ultra vires* claim. *See Graham*, 358 F.3d at 935.

Regardless, Linden has also failed to plausibly allege that Defendants violated any statute—let alone committed an "error . . . so extreme that one may view it as jurisdictional or nearly so." *Changji*, 40 F.4th at 722 (internal quotation marks omitted). The relevant provisions

would have afforded Linden "at least 30 days' advance written notice" and "a reasonable time . . . to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer," as well as a right to be represented by an attorney and "a written decision and specific reasons therefor." 5 U.S.C. § 7543(b).

Linden does not plausibly allege any violation of those requirements. The Complaint does not specify when precisely she received notice, but makes clear she did at some point. Specifically, Linden alleges that the FBI began an internal investigation on June 27, 2025, that the investigation concluded on September 4, 2025, and that Linden submitted a sworn statement and was interviewed. Linden faults the notice she received for not expressly articulating that she may be terminated. 2AC ¶ 106. But she acknowledges that the notice listed two "Offense Codes," *id.*, and the second amended complaint points to internal guidelines showing that such violations could result in "dismissal." *Id.* ¶ 106 n.53.[12] Linden thus understood the nature of the inquiry and what was at stake. Linden had a chance to submit evidence. Nothing stopped her from enlisting an attorney. And she received a termination letter explaining the basis for her termination. 2AC ¶¶ 104, 107, 108, 110, 113, 114. The letter provided "specific reasons" for termination, because it explained that Linden had "demonstrated unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government." *Id.* ¶ 113. The statute requires nothing more.

Linden thus does not plausibly allege any violation, let alone the sort of *extreme* violation necessary to state an *ultra vires* claim.

---

[12] *Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process*, FBI (Jan. 1, 2017), https://vault.fbi.gov/offense-codes-and-penalty-guidelines-governing-fbisinternal-disciplinary-process/offense-codes-and-penalty-guidelines-governing-fbis-internaldisciplinary-process-final. The policy states potential discipline for violations of Offense Code 2.12 at page 9 and for violations of Offense Code 5.22 at page 17.

### VI. <u>**Plaintiffs' Derivative Claims Should Be Dismissed**</u>

Plaintiffs' last two claims (for a declaratory judgment and mandamus relief) presume that Plaintiffs have stated at least one plausible claim for relief. *See* 2AC ¶¶ 196-202. They have not. Plaintiffs are thus not entitled to a declaratory judgment or mandamus relief.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' second amended complaint for failure to state a claim upon which relief can be granted. Because amendment would be futile, the Court should dismiss with prejudice.

Dated: September 30, 2026

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General

MICHAEL WEISBUCH
Deputy Associate Attorney General

ANNA EDWARDS, Counsel
Office of the Associate Attorney General

JEANINE FERRIS PIRRO
United States Attorney

By: *\/s/ Andrew J. Vaden*
ANDREW J. VADEN
Assistant United States Attorney
DC Bar No. 1044860
601 D Street, NW
Washington, DC 20530
(202) 252-2437

*Attorneys for the United States of America*