**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JANE DOES 1-4** ***et al.*****,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**KASHYAP P. PATEL** ***et al.*****,**<br><br>**Defendants.** | **No. 25-cv-4258 (TNM)** |

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

BACKGROUND .......... 1

LEGAL STANDARD .......... 3

ARGUMENT .......... 3

I. Count One Alleges a Valid First Amendment Claim. .......... 4

A. Applicable Law. .......... 4

B. Plaintiffs Have Adequately Alleged a First Amendment Claim. .......... 5

II. Count Two Alleges a Valid Procedural Due Process Claim Based on a Deprivation of Property .......... 10

A. The FBI's Disciplinary System Creates a Legitimate Expectation of Continued Employment. .......... 11

1. Applicable Law .......... 11

2. The FBI's Disciplinary System .......... 12

3. The Summary Dismissal Policy .......... 15

4. *Langeman v. Garland* .......... 16

B. The FBI Created a Mutually Explicit Understanding That Plaintiffs Would Not Be Dismissed Based on Their Service on June 4, 2020. .......... 18

III. Count Three Alleges a Valid Procedural Due Process Claim Based on a Deprivation of Liberty .......... 20

A. Applicable Law. .......... 20

B. Plaintiffs Have Adequately Alleged a Deprivation of Liberty. .......... 21

IV. Plaintiffs Have Adequately Alleged That They Received Constitutionally Deficient Process (Counts Two, Three, and Five) .......... 24

A. Applicable Law .......... 24

B. Plaintiffs Have Adequately Alleged Constitutionally Deficient Procedures. .......... 26

V. Count Four Alleges a Valid Substantive Due Process Claim .......... 29

VI. Count Five Alleges a Valid Procedural Due Process Claim Based on a Deprivation of Property for Linden. .......... 30

VII. Count Six Alleges a Valid *Ultra Vires* Claim Based on Linden's SES Status .......... 33

VIII. Defendants’ Invocation of Article II is Misplaced ........ 37
A. The Modest Restrictions on Removing Civil Servants That Plaintiffs Invoke Here Comport with Article II ........ 38
B. Defendants' Arguments to the Contrary Miss the Mark ........ 40
C. This Court Need Not Resolve Other Issues That Would Arise if This Case Implicated the President's Article II Removal Authority ........ 44
IX. Counts Seven and Eight Allege Valid Declaratory Judgment and Mandamus Claims ........ 45
CONCLUSION ........ 45

# TABLE OF AUTHORITIES

**Cases**

*Am. President Lines, LLC v. Matson, Inc.*,
633 F. Supp. 3d 209 (D.D.C. 2022) ........ 3

*Arnett v. Kennedy*,
416 U.S. 134 (1974) ........ 20

**Ashton v. Civiletti*,
613 F.2d 923 (D.C. Cir. 1979) ........ 11, 12, 32

*Bakalis v. Golembeski*,
35 F.3d 318 (7th Cir. 1994) ........ 28

*Barkley v. U.S. Marshals Serv. ex rel. Hylton*,
766 F.3d 25 (D.C. Cir. 2014) ........ 27

*Barnes v. Zaccari*,
669 F.3d 1295 (11th Cir. 2012) ........ 14

*Bd. of Regents v. Roth*,
408 U.S. 564 (1972) ........ 19, 20, 21, 23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 3

*Berk v. Choy*,
607 U.S. 187 (2026) ........ 3

*Black Lives Matter D.C. v. Trump*,
544 F. Supp. 3d 15 (D.D.C. 2021),
*aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023) ........ 7

*Brady v. Off. of Sergeant at Arms*,
520 F.3d 490 (D.C. Cir. 2008) ........ 6, 7

*Branti v. Finkel*,
445 U.S. 507 (1980) ........ 4

*Browning v. Clinton*,
292 F.3d 235 (D.C. Cir. 2002) ........ 3

*Buchanan v. Barr*,
71 F.4th 1003 (D.C. Cir. 2023) ........ 7

*Cafeteria & Rest. Workers Union v. McElroy*,
367 U.S. 886 (1961) ........ 23

*Carducci v. Regan*,
714 F.2d 171 (D.C. Cir. 1983) ........ 26

*Carter v. W. Rsrv. Psychiatric Habilitation Ctr.*,
767 F.2d 270 (6th Cir. 1985) ........ 25, 27

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) .......... 34, 35

*Cinderella Career & Finishing Schs., Inc. v. FTC*,
425 F.2d 583 (D.C. Cir. 1970) .......... 28

*Clark v. Libr. of Cong.*,
750 F.2d 89 (D.C. Cir. 1984) .......... 5

**Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) .......... 11, 16, 24, 25, 26, 27, 32

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) .......... 29, 30

*Comans v. EOP*,
840 F. Supp. 3d 1036 (E.D. Va. 2026),
*appeal docketed*, No. 26-2242 (4th Cir. Sep. 11, 2026). .......... 37, 44

**Comey v. U.S. DOJ*,
2026 WL 3203254 (S.D.N.Y. Oct. 26, 2026) .......... 37, 38, 41, 42, 44

*Conley v. Bd. of Trs.*,
707 F.2d 175 (5th Cir. 1983) .......... 14

*Connick v. Myers*,
461 U.S. 138 (1983) .......... 8

*Dodson v. U.S. Capitol Police*,
633 F. Supp. 3d 235 (D.D.C. 2022) .......... 27

*Doe v. U.S. DOJ*,
753 F.2d 1092 (D.C. Cir. 1985) .......... 21, 22

*Douglas v. Veterans Admin.*,
5 M.S.P.R. 280 (1981) .......... 13

*EEOC v. St. Francis Xavier Parochial Sch.*,
117 F.3d 621 (D.C. Cir. 1997) .......... 3

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) .......... 34

**Elrod v. Burns*,
427 U.S. 347 (1976) .......... 4, 44

**Esparraguera v. Dep't of the Army*,
101 F.4th 28 (D.C. Cir. 2024) .......... 11, 26, 31, 32

*Farah v. Esquire Mag.*,
736 F.3d 528 (D.C. Cir. 2013) .......... 22

*Fleming v. U.S. Dep't of Agric.*,
987 F.3d 1093 (D.C. Cir. 2021) .......... 38

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010) .......... 38, 40, 44

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ... 8

*Garrison v. District of Columbia*,
1989 WL 250655 (D.D.C. Oct. 12, 1989) ... 26

*Garrow v. Gramm*,
856 F.2d 203 (D.C. Cir. 1988) ... 20

*Greene v. McElroy*,
360 U.S. 474 (1959) ... 26, 27

*Griffith v. FLRA*,
842 F.2d 487 (D.C. Cir. 1988) ... 13, 35

*Hall v. Ford*,
856 F.2d 255 (D.C. Cir. 1988) ... 20, 32

**Heffernan v. City of Paterson*,
578 U.S. 266 (2016) ... 5, 8

*Hettinga v. United States*,
677 F.3d 471 (D.C. Cir. 2012) ... 3

*Hurd v. District of Columbia*,
147 F.4th 1036 (D.C. Cir. 2025) ... 29

*Jefferson v. Collins*,
905 F. Supp. 2d 269 (D.D.C. 2012) ... 10

*Jefferson v. Harris*,
170 F. Supp. 3d 194 (D.D.C. 2016) ... 21

*Jimenez Fuentes v. Torres Gaztambide*,
807 F.2d 236 (1st Cir. 1986) ... 5

*Johnson v. United States*,
628 F.2d 187 (D.C. Cir. 1980) ... 32

*Kartseva v. Dep't of State*,
37 F.3d 1524 (D.C. Cir. 1994) ... 21, 23

*Kennedy v. Braidwood Mgmt., Inc.*,
606 U.S. 748 (2025) ... 38

*Kizas v. Webster*,
707 F.2d 524 (D.C. Cir. 1983) ... 12

*Krentz v. Robertson*,
228 F.3d 897 (8th Cir. 2000) ... 25

*L'Association des Americains Accidentels v. U.S. Dep't of State*,
633 F. Supp. 3d 74 (D.D.C. 2022) ... 29

*Langeman v. Garland*,
88 F.4th 289 (D.C. Cir. 2023) ... 16, 17, 18

*Leedom v. Kyne*,
358 U.S. 184 (1958) ... 35

*Lepre v. Dep't of Lab.*,
275 F.3d 59 (D.C. Cir. 2001) ... 35

*Locurto v. Safir*,
264 F.3d 154 (2d Cir. 2001) ... 25

*Marti Navarro v. United States*,
104 F. Supp. 2d 96 (D.P.R. 2000) ... 19, 20

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ... 24

**McCabe v. Barr*,
490 F. Supp. 3d 198 (D.D.C. 2020) ... 10, 18, 28, 30, 33

*Media Matters for Am. v. FTC*,
805 F. Supp. 3d 105 (D.D.C. 2025) ... 8

**Morrison v. Olson*,
487 U.S. 654 (1988) ... 39, 40, 41, 42

*Myers v. United States*,
272 U.S. 52 (1926) ... 39

*N. Am. Butterfly Ass'n v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020) ... 11

*Nat'l Ass'n of Postal Supervisors v. USPS*,
26 F.4th 960 (D.C. Cir. 2022) ... 35

**O'Donnell v. Barry*,
148 F.3d 1126 (D.C. Cir. 1998) ... 21

*O'Hare Truck Serv., Inc. v. City of Northlake*,
518 U.S. 712 (1996) ... 5

*Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*,
393 U.S. 233 (1968) ... 35, 36

*Palmeri v. MSPB*,
164 F.4th 878 (Fed. Cir. 2026) ... 33

*Paul v. Davis*,
424 U.S. 693 (1976) ... 21, 22

**Perry v. Sindermann*,
408 U.S. 593 (1972) ... 11, 19

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
758 F.3d 296 (D.C. Cir. 2014) ... 26

*Ralpho v. Bell*,
569 F.2d 607 (D.C. Cir. 1977) ... 35

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
490 U.S. 477 (1989) ........ 41

*Rutan v. Republican Party of Ill.*,
497 U.S. 62 (1990) ........ 4, 5

*Sanderson v. First Sec. Leasing Co.*,
844 P.2d 303 (Utah 1992) ........ 19

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ........ 43, 44

*Stone v. FDIC*,
179 F.3d 1368 (Fed. Cir. 1999) ........ 11

*Strzok v. Garland*,
828 F. Supp. 3d 40 (D.D.C. 2025) ........ 32

*Tarpeh-Doe v. United States*,
904 F.2d 719 (D.C. Cir. 1990) ........ 12, 18

*Taylor v. Trump*,
2026 WL 396844 (D.D.C. Feb. 11, 2026) ........ 28

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) ........ 38, 40, 41

*Trump v. United States*,
603 U.S. 593 (2024) ........ 41, 42

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) ........ 40, 41

*United States v. Fausto*,
484 U.S. 439 (1988) ........ 34

**United States v. Perkins*,
116 U.S. 483 (1886) ........ 39

*U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*,
413 U.S. 548 (1973) ........ 9

*Vanover v. Hantman*,
77 F. Supp. 2d 91 (D.D.C. 1999),
*aff'd*, 38 F. App'x 4 (D.C. Cir. 2002) ........ 14

*Vukadinovich v. Bd. of Sch. Trs.*,
978 F.2d 403 (7th Cir. 1992) ........ 26

*Williams v. Shinseki*,
161 F. Supp. 3d 77 (D.D.C. 2011) ........ 4

*Withrow v. Larkin*,
421 U.S. 35 (1975) ........ 28

**Constitutional Provisions and Statutes**

U.S. Const. art. II, § 2, cl. 2 ........ 37

5 U.S.C. § 3132(a)(2)(D) ........ 44

5 U.S.C. § 3151(a) ........ 31

5 U.S.C. § 3151(a)(2) ........ 44

5 U.S.C. § 3151(a)(5)(A) ........ 31

5 U.S.C. § 3151(a)(5)(D) ........ 33

5 U.S.C. § 3592(a)(2) ........ 31, 32

5 U.S.C. § 7513 ........ 32

5 U.S.C. § 7541 ........ 31

5 U.S.C. § 7542 ........ 31

5 U.S.C. § 7543(a) ........ 31, 32, 33, 36, 37

5 U.S.C. § 7543(b) ........ 33, 37

5 U.S.C. § 7543(b)(1) ........ 33, 36

5 U.S.C. § 7543(b)(2) ........ 33, 36

5 U.S.C. § 7543(b)(4) ........ 33, 36

Pub. L. No. 95-454, 92 Stat. 1111 (1978) ........ 11

Ohio Rev. Code Ann. § 124.11 (1984) ........ 32

**Other Authorities**

3A Corbin on Contracts § 562 (1960) ........ 19

Appointment & Removal of Fed. Rsrv. Bank Members of the Fed. Open Mkt. Comm., 43 Op. O.L.C. 263, 2019 WL 11594453 (2019) ........ 45

Black's Law Dictionary (12th ed. 2024) ........ 16

FBI Human Resources Division, *Performance and Development Program Policy Guide* (June 8, 2020), https://vault.fbi.gov/performance-and-development-program-policy-guide-1083pg ........ 13, 14

FBI, *Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process* (Jan. 1, 2017), https://vault.fbi.gov/offense-codes-and-penalty-guidelines-governing-fbis-internal-disciplinary-process/offense-codes-and-penalty-guidelines-governing-fbis-internal-disciplinary-process-final ........ 13

U.S. Dep't of Justice, Office of the Inspector General, *Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations*, 21-127 (Sep. 2021), https://oig.justice.gov/sites/default/files/reports/21-127.pdf ........ 12, 13, 16

## INTRODUCTION

On September 26, 2025, Defendant FBI Director Kash Patel summarily dismissed Plaintiffs and every other FBI Special Agent from a group of 22 that de-escalated civil unrest by kneeling on June 4, 2020. Patel fired them, in violation of the First Amendment, because he perceived them as not sharing a partisan affiliation with President Trump. And Patel did so in violation of the Fifth Amendment, disregarding the FBI's own standards and procedures that prevent wasteful and unfounded firings of federal law enforcement officers like Plaintiffs, who collectively possess substantial counterintelligence, counterterrorism, and cybercrime expertise. *See* Plaintiffs' Second Amended Complaint (hereinafter "Complaint" or "Compl."), ECF No. 27.

Plaintiffs' exemplary careers as FBI Special Agents extend to their actions on June 4, 2020, when they were executing a crowd control assignment outside FBI Special Agents' expertise. Plaintiffs safely de-escalated a potentially violent encounter, maintaining order and saving lives. More than five years later, Defendants abruptly terminated Plaintiffs, applying a penalty reserved for egregious offenders and citing the false ground that Plaintiffs engaged in "the political weaponization of government." But 22 FBI Special Agents did not simultaneously abandon their professional judgment for politics. Had Defendants allowed it, a fair proceeding would have confirmed the agency's prior conclusions that no discipline of any kind was warranted.

Plaintiffs' Complaint has plausibly alleged constitutional and statutory violations, and the case should now proceed to discovery. This Court should deny Defendants' motion to dismiss.

## BACKGROUND

When Patel terminated Plaintiffs on September 26, 2025, Plaintiffs were experienced, non-probationary FBI Special Agents with "nearly two centuries of combined service to the FBI." Compl. ¶¶ 3, 19-31. Plaintiff Sarah Linden was also a non-probationary member of the FBI's Senior Executive Service ("SES"). *Id.* ¶ 24. More than five years earlier, Plaintiffs, as part of a

group of 22 FBI Special Agents, had kneeled to avert potential violence during an encounter with an unruly crowd at a time of civil unrest. *Id.* ¶¶ 54-84. Plaintiffs, despite lacking proper equipment and training, acted as professional and non-partisan officers to avoid bloodshed. *Id.* ¶¶ 64, 67, 77.

After an internal investigation initiated at Patel's behest in 2025 "established that each Plaintiff acted apolitically and tactically . . . [to] preserv[e] American lives and maintain[] order and not for any improper purpose," *id.* ¶ 109, Patel flouted the FBI's disciplinary standards and procedures and used the "extraordinary remedy" of summary dismissal to remove Plaintiffs from federal service. *Id.* ¶¶ 47, 112, 165. At the same time, he falsely accused them of "unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government"—despite no investigation finding misconduct. *Id.* ¶¶ 113, 85-89.

Before he assumed his current post, Patel's book *Government Gangsters* signaled his readiness to engage in unlawful political patronage. *Id.* ¶ 94. And once he became FBI Director, Patel's retaliation campaign against Plaintiffs quickly began, based on his perception that Plaintiffs were insufficiently affiliated with President Trump or were affiliated with the "Biden Administration." *Id.* ¶¶ 99-103, 90-93. Indeed, "Patel had already decided to terminate Plaintiffs," and "the decision had originated from the White House." *Id.* ¶ 100. More recently, Patel has made false public statements defaming Plaintiffs and other FBI Special Agents whom he has unlawfully terminated. *Id.* ¶ 139. Defendants' actions toward Plaintiffs have caused them extensive reputational and occupational harm. *Id.* ¶¶ 140-46.

Plaintiffs filed suit on December 8, 2025, along with a motion to proceed pseudonymously, ECF Nos. 1, 12, which was granted by the Chief Judge, ECF No. 5, and reaffirmed by this Court as to all but two Plaintiffs, ECF No. 25. Plaintiffs subsequently filed a Second Amended Complaint revealing the identities of those two Plaintiffs, ECF No. 27, and Defendants filed a motion to

dismiss that complaint ("Mot."), ECF No. 30. Plaintiffs now oppose Defendants' motion.

## LEGAL STANDARD

"A Rule 12(b)(6) motion tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up) (factual allegations need only raise a right to relief above the speculative level). When deciding a Rule 12(b)(6) motion, the court must treat the complaint's "[f]actual allegations" as "true," and it must "construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (cleaned up). A court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [it] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); Fed. R. Civ. P. 12(d).[1]

## ARGUMENT

Defendants' motion to dismiss should be denied. Defendants repeatedly ignore the legal standards applicable to a Rule 12(b)(6) motion; they fail to take the Complaint's factual allegations as true, to draw all inferences in favor of Plaintiffs, and to focus only on the four corners of the Complaint. Further, their arguments for dismissal mischaracterize Plaintiffs' First Amendment and

[1] Accordingly, this Court is barred from considering the evidence Defendants reproduced in their motion to dismiss, Mot. 2—two photos showing a limited perspective of the 2020 deployment. *See also, e.g.*, *Berk v. Choy*, 607 U.S. 187, 193-94 (2026) ("When evaluating whether a plaintiff has stated a claim, the court cannot consider 'matters outside the pleadings.'" (quoting Fed. R. Civ. P. 12(d))); *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 235 (D.D.C. 2022) (not considering exhibits submitted with motion to dismiss).

Fifth Amendment claims and ignore relevant case law. Indeed, Defendants' arguments only underscore the plausibility of Plaintiffs' claims and the need for discovery. *See Williams v. Shinseki*, 161 F. Supp. 3d 77, 84-86 (D.D.C. 2011) (denying motion to dismiss where government failed "to root its arguments in the factual allegations in the complaint" and noting that "[i]ronically, the need for discovery is made plain by the [government's] own arguments").

Defendants fare no better in arguing that Article II grants them the unfettered authority to fire FBI agents—and, indeed, any employee exercising the Executive Branch's authority—at any time, for any reason, without any process, regardless of what other constitutional provisions and laws enacted by Congress forbid. This Court should reject the government's invitation to remake more than a century of precedent, which establishes that there is no conflict between Article II and the modest rights Plaintiffs invoke against discrimination and arbitrary treatment.

## I. COUNT ONE ALLEGES A VALID FIRST AMENDMENT CLAIM.

Plaintiffs have adequately alleged they were removed from their positions based on their perceived political affiliation in violation of the First Amendment.

### A. Applicable Law.

Under the United States Constitution, "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Elrod v. Burns*, 427 U.S. 347, 356 (1976) (plurality opinion) (cleaned up). The First Amendment generally forbids political patronage, in which "public employees hold their jobs on the condition that they provide, in some acceptable manner, support for the favored political party." *Id.* at 359; *see Rutan v. Republican Party of Ill.*, 497 U.S. 62, 74 (1990); *Branti v. Finkel*, 445 U.S. 507, 519 (1980). Nor, "except in the most compelling circumstances," may the government "wield[] its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate." *Rutan*, 497 U.S. at 76. "[C]onditioning public employment on the provision of support for the favored

political party 'unquestionably inhibits protected belief and association.'" *Id.* at 69 (cleaned up).

Under the First Amendment, "[g]overnment officials" therefore "may not discharge public employees for refusing to support a political party or its candidates, unless political affiliation is a reasonably appropriate requirement for the job in question." *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996). Thus, "a patronage system involving the wholesale dismissal of public employees for partisan reasons, applied without regard to an employee's responsibilities," violates the First Amendment. *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 239 (1st Cir. 1986). This same result obtains if the government terminates an employee for her *perceived* affiliation or non-affiliation with a political party, whether or not that perception is accurate. *Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016). Plaintiffs bringing such a claim must show only that their perceived political affiliation was a "substantial" or "motivating" factor in their dismissals. *Clark v. Libr. of Cong.*, 750 F.2d 89, 101 (D.C. Cir. 1984) (cleaned up) (explaining defendant then must show such affiliation was not a but-for cause of the removal).

### B. Plaintiffs Have Adequately Alleged a First Amendment Claim.

Here, Defendants wisely do not contend that political affiliation is an appropriate job qualification for FBI agents. Thus, the only question presented is whether the Complaint plausibly alleges that Patel terminated Plaintiffs because he perceived them as not politically affiliated with President Trump. The Complaint does so in spades.

To begin, the Complaint alleges that Patel is hostile to FBI employees he perceives as not affiliated with President Trump and is engaging in a campaign of partisan political retaliation. For one, in 2023, Patel advocated for public employees to be "removed from their posts and replaced with people who won't undermine the president's agenda," and stated that the FBI is "[o]ne of the most cunning and powerful arms of the Deep State" associated with "the Democrats." Compl. ¶ 94 (cleaned up). The Complaint alleges that Patel has put these words into action, repeatedly using

summary dismissal to fire FBI agents for political reasons. *Id.* ¶ 122. Significantly, Patel has declined under oath to give a direct answer to whether he has "fired people because they voted" for the Democratic candidate in the 2024 presidential election, and he uses "indirect means"—short of asking them whom they voted for—to make such assessments. *Id.* ¶ 131.

The Complaint also alleges that Defendants perceived Plaintiffs as not affiliated with President Trump. It alleges that at least two of Patel's close associates (including President Trump) publicly portrayed Plaintiffs and their colleagues who kneeled on June 4, 2020, as affiliated with the "Biden Administration," from whom some allegedly obtained "plum promotions." *Id.* ¶¶ 90-93. Furthermore, the Complaint alleges that when he became FBI Director, "Patel had already decided to terminate Plaintiffs, and [] the decision had come from the White House." *Id.* ¶ 100; *see also id.* ¶ 103 (Patel requested "list of FBI personnel involved in the kneeling event, presumably so that [he] could terminate them en masse"); *id.* ¶ 97 (in January 2025, then-Acting Deputy Attorney General said he was receiving "pressure" from the White House "to conduct summary firings of [FBI] agents"). The Complaint also explains Patel treated Plaintiffs very differently than the FBI agents who responded to the January 6, 2021, unrest based on Patel's perception of the political affiliations of the civilians involved in the incidents. *Id.* ¶¶ 124-130.

Further supporting Plaintiffs' First Amendment claim, the Complaint alleges unprecedented procedural maneuvers by Defendants. *See Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 n.3 (D.C. Cir. 2008) (pretext in employment discrimination can be shown by "the employer's failure to follow established procedures or criteria"). In a highly unusual move, Defendants used "summary dismissal" to cut off the pending review process and remove Plaintiffs. Compl. ¶¶ 110, 112. Although FBI policy specifies that summary dismissal is an "extraordinary remedy to be exercised only in compelling or exigent circumstances," *id.* ¶ 47(g), no such

circumstances existed here: Plaintiffs were dismissed five years after June 4, 2020, without any misconduct found during the FBI's standard procedures. *Id.* ¶¶ 86-89, 109. Patel summarily dismissed Plaintiffs while the agency's disciplinary procedures were still pending, understanding that the internal review process would not have resulted in removals. *Id.* ¶¶ 110-11, 114. Plaintiffs received "no individualized assessment of the facts and circumstances specific to each [agent]," as agency procedures required. *Id.* ¶ 113. Moreover, "the political weaponization of government" was never among the charges provided to Plaintiffs. *See id.* ¶ 106; *Brady*, 520 F.3d at 495 n.3 (listing "changes and inconsistencies in the stated reasons for the adverse action" as indicia of pretext).

The Complaint also alleges facts showing that summary dismissal was operationally unsound and disproportionate, further supporting retaliatory motive. *See Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 47 (D.D.C. 2021) ("[P]laintiffs have plausibly alleged that the defendants did not have a non-retaliatory motive for their actions and that they reacted with overwhelming force disproportionate to any rational need."), *aff'd on other grounds sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023). After five years had transpired, Plaintiffs were removed without advance notice, disrupting their mission-related assignments. Compl. ¶ 123. And under FBI policy, the offenses charged—Violation of Ethical Guidelines and Unprofessional Conduct—carried standard penalties of only fourteen days' and seven days' suspension. *Id.* ¶ 106.

Finally, the Complaint's allegations regarding the timing of Plaintiffs' firings further support their claim of retaliation. Immediately following his confirmation as FBI Director in 2025, Patel began working to terminate Plaintiffs, even though nearly five years had passed since the underlying events. Compl. ¶¶ 99, 105. Although Patel was initially persuaded "to allow an internal investigation to take place pursuant to FBI's prescribed procedures," *id.* ¶ 104, he later cut the

review short—and fired the FBI employee who had convinced him to allow the standard investigation to proceed. *Id.* ¶¶ 102-04, 110-14. Patel summarily dismissed Plaintiffs shortly after the investigation had established they "acted apolitically and tactically to de-escalate," not for any "improper purpose." *Id.* ¶ 109. Patel acted because he understood that the regular disciplinary process would not have resulted in removal. *Id.* ¶ 114. These allegations—that Defendants' efforts to remove Plaintiffs began as soon as Patel had authority to retaliate against them, and that Plaintiffs' summary dismissals were precipitated by an internal investigation likely to resolve in their favor—further support the conclusion that Patel fired them for retaliatory reasons. *See Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 136 (D.D.C. 2025) (finding "retaliatory animus" where FTC Chairman "wasted no time after taking office to initiate" "investigation").

Rather than addressing Plaintiffs' First Amendment political *affiliation* claim directly, Defendants primarily attack a non-existent claim based on political *expression* and insist that Plaintiffs seek to "circumvent" expression-based case law. Mot. 12-15. But it is Defendants who are engaging in circumvention: Plaintiffs clearly stated a perceived political affiliation claim, citing the relevant Supreme Court cases. *See* Compl. ¶¶ 1, 148. Defendants largely ignore the doctrinal framework reflected in *Elrod* and *Branti* on which Plaintiffs rely, and fail to cite *Heffernan*, 578 U.S. 266, the key case relevant to a perceived political affiliation claim. Instead, Defendants devote much pointless energy to discussing the inapposite *Garcetti*/*Connick* line of precedent addressing freedom of speech claims. *see Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Connick v. Myers*, 461 U.S. 138 (1983).[2]

---

[2] While doctrinally distinct from the *Elrod/Branti* line of cases, *Connick*, *Garcetti*, and their progeny reinforce that government employees retain certain First Amendment protections. *See, e.g.*, *Garcetti*, 547 U.S. at 417 ("public employees do not surrender all their First Amendment rights by reason of their employment"). Indeed, *Connick* confirmed "that the government [can]not deny employment because of previous membership in a particular party." 461 U.S. at 144.

Contrary to Defendants' contentions, the Complaint alleges facts showing that Plaintiffs' actions on June 4, 2020, were *not* political expression, *see* Compl. ¶¶ 59-89, 109, and that Plaintiffs were instead "enforc[ing] the law and execut[ing] the programs of the Government without bias or favoritism for or against any political party or group." *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 564-65 (1973). Specifically, Plaintiffs allege that they "kneeled for apolitical tactical reasons to defuse a volatile situation, not as an expressive political act." Compl. ¶ 78; *see also id.* ¶¶ 63, 71-77 (describing pressing strategic considerations that led 22 FBI agents—from three different squads—to determine kneeling was the best course). The Complaint further alleges that until Patel's 2025 termination letters, every agency examination of Plaintiffs' actions—including an internal review Patel initiated—produced no findings of misconduct. *See id.* ¶ 86 (then-FBI Director addressed Plaintiffs immediately after deployment and indicated he understood Plaintiffs had de-escalated a dangerous situation); *id.* ¶ 87 (then-Deputy FBI Director determined Plaintiffs did not act for political reasons); *id.* ¶ 88 (FBI personnel determined no Plaintiff violated the Hatch Act); *id.* ¶ 89 (DOJ-OIG reported no misconduct by Plaintiffs). Indeed, the Complaint alleges that the 2025 internal investigation—which Patel's letter claims he reviewed—established that each Plaintiff acted appropriately. *Id.* ¶¶ 109, 113-15. Accordingly, while Defendants emphasize the need for "deference when a law enforcement agency disciplines an agent," Mot. 14, the Complaint alleges that the experienced law enforcement professionals who examined Plaintiffs' actions in the ordinary course determined that no discipline was required.

In one paragraph toward the end of their First Amendment argument, Defendants provide a selective recitation of certain allegations from Plaintiffs' Complaint—conspicuously failing to engage those allegations most central to Plaintiffs' claims. *See* Mot. 15 (citing Compl. ¶¶ 91-94, 113, 128, 151). First, Defendants argue that "Director Patel's alleged prior statements that FBI

agents were improperly asked to perform 'riot control' on January 6, 2021" have "nothing to do" with this case. Mot. 15 (citing Compl. ¶ 128). But the Complaint makes clear the relevance, alleging that Patel "treated Plaintiffs differently for partisan political reasons based on imputed perceived political affiliation." Compl. ¶ 128; *see also id.* ¶¶ 124-30. Next, Defendants aver that Patel's statements advocating for the removal of public employees who "undermine the [P]resident's agenda," *id.* ¶ 94, "do not imply termination based on private speech or political beliefs," Mot. 15. But that conclusory assertion fails to give Plaintiffs the benefit of available inferences in their favor, which are powerful here. *See Jefferson v. Collins*, 905 F. Supp. 2d 269, 280 (D.D.C. 2012) (crediting "[a]n equally plausible inference . . . to which the plaintiffs are entitled at the 12(b)(6) stage"). Notably, Defendants fail to address other allegations in the same paragraph further supporting the inference that Patel was motivated by political affiliation. *See* Compl. ¶ 94 (citing Patel's published assertions that "the Democrats and the Deep State are on the same team" and that "[o]ne of the most cunning and powerful arms of the Deep State is the [FBI]").

Finally, Defendants contend that the Complaint's allegations in paragraphs 91 to 93 are "irrelevant." Mot. 15. But those allegations include a social media post about Plaintiffs and their political affiliation by then-former President Trump and a letter by then-Representative Matthew Gaetz—Patel's current boss and close associate, respectively. Those allegations are strong evidence of Defendants' motivation warranting further exploration through discovery. *See, e.g.*, *McCabe v. Barr*, 490 F. Supp. 3d 198, 214 (D.D.C. 2020) (declining to "foreclose the possibility" of a similar *Elrod/Branti* retaliation claim "[w]ithout providing some opportunity for discovery").

## II. COUNT TWO ALLEGES A VALID PROCEDURAL DUE PROCESS CLAIM BASED ON A DEPRIVATION OF PROPERTY.

Defendants move to dismiss Count Two's procedural due process claim, arguing that Plaintiffs lacked a protected property interest. Mot. 16-17. In fact, Plaintiffs have adequately

alleged a property interest based on (1) the FBI's current disciplinary system; and (2) agency assurances that Plaintiffs' June 4, 2020, service merited no discipline.

### A. The FBI's Disciplinary System Creates a Legitimate Expectation of Continued Employment.

**1. Applicable Law.** "A procedural due process violation under the Fifth Amendment occurs when a government official deprives a person of property without appropriate procedural protections." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1265 (D.C. Cir. 2020). To prevail, the plaintiff must first identify a cognizable property interest. *Id.* Where such an interest exists, constitutional principles (rather than the agency's own procedures) determine what process is due. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).

A property interest in employment arises when the government gives an employee "assurances of continued employment or conditions dismissal only for specific reasons." *Stone v. FDIC*, 179 F.3d 1368, 1374 (Fed. Cir. 1999). The government can create such an interest in more than one way. A statute or regulation, for example, might place substantive limitations on when an agency can fire a worker. *Loudermill*, 470 U.S. at 538. But a property interest may also arise without a "for cause" removal provision. Specifically, an employee acquires a property interest "if the government has fostered 'rules and understandings'" that entitle her "to believe that she would lose her job only for a job-related reason." *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024) (quoting *Ashton v. Civiletti*, 613 F.2d 923, 928 (D.C. Cir. 1979)) (cleaned up).[3]

This distinct line of doctrine, which originated in *Perry v. Sindermann*, 408 U.S. 593, 599, 602 (1972), was previously applied to the FBI in *Ashton*, 613 F.2d at 928. There, the D.C. Circuit found that "the FBI ha[d] fostered rules and understandings which, by entitling appellant to believe

[3] Thus, although most FBI employees are excluded from the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (1978), that fact "do[es] not prevent the Bureau from giving its employees some security in their jobs." *Ashton*, 613 F.2d at 928.

that he would lose his job only for a job-related reason, gave him a property interest in his position." *Id.* That decision rested on, *inter alia*, (1) Ashton's letter of appointment; (2) an FBI handbook specifying that non-probationary employees "may assume that [their] position is secure, if [they] continue to do satisfactory work"; and (3) the fact that Ashton's position "was explicitly made probationary for one year," which "would be unnecessary if the employer could dismiss a non-probationary employee at any time and for any reason." *Id.* at 929. As *Ashton* makes clear, a property interest "can arise . . . [through] the 'implicit . . . overall workings of a particular government employer.'" *Kizas v. Webster*, 707 F.2d 524, 539 (D.C. Cir. 1983) (citations omitted).

Defendants contend that a property interest can arise only if an independent source "limits official discretion" using "explicitly mandatory language." Mot. 17 (cleaned up). But that contention elides this line of precedent. Under *Perry*, "[i]t is possible . . . for a legitimate expectation to arise based upon the consistent practice of a decisional body—even in the absence of express regulatory language." *Tarpeh-Doe v. United States*, 904 F.2d 719, 724 (D.C. Cir. 1990).

**2. The FBI's Disciplinary System.** Plaintiffs have adequately alleged that the "overall workings" of the FBI—including its comprehensive disciplinary system—created a property right in employment. Compl. ¶¶ 159, 164; *id.* ¶¶ 44-49 (describing disciplinary policies). As in *Ashton*, that system ensures that non-probationary FBI employees will be discharged only for a job-related reason (such as misconduct) and do not serve "at the whim" of their superiors. 613 F.2d at 929.

As DOJ's Inspector General has explained, "[t]he FBI has defined the actions that violate its standards of conduct, identified the range of discipline that it may impose when an employee commits misconduct, and developed a disciplinary process to address misconduct matters." *Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations* at i, 21-127, U.S. DOJ-OIG (Sep. 2021) ("2021 DOJ-OIG Report"); *see* Compl. ¶ 49 & n.28 (citing

document). Specifically, a 2017 FBI policy titled *Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process* ("Offense Codes") "provide[s] general categories of misconduct for which employees may be disciplined." Compl. ¶ 46(a); *see id.* ¶ 46 & n.10 (citing document). The policy identifies 64 separate offenses with particularity. *See, e.g.*, Offense Codes at 8 (Offense Code 2.9) (covering "[m]isrepresenting oneself as a Special Agent in order to conduct an unofficial inquiry, investigation, or database search, or for personal gain"). The policy also provides detailed guidance on the appropriate penalty for violations of each offense. *Id.* at 2, 5-31. Other guidance documents, including the *Office of Professional Responsibility Policy Guide* ("OPR Policy Guide"), establish a multi-step procedural mechanism for investigating and adjudicating misconduct claims. Compl. ¶¶ 47-48. If an offense code violation is substantiated, a penalty is determined after considering multiple factors identified in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981). Compl. ¶ 47(d); Offense Codes at 3-4. This process "parallels" certain "procedural protections outlined in the [CSRA]." 2021 DOJ-OIG Report at 2.

Here, although no statute or regulation grants rank-and-file FBI agents for-cause removal protections, the FBI has created a highly reticulated scheme that includes "substantive provisions" that specify "particularized standards or criteria [to] guide . . . decisionmakers" seeking to remove an FBI employee. *Griffith v. FLRA*, 842 F.2d 487, 495 (D.C. Cir. 1988) (citation omitted). Such a scheme creates a reasonable belief that non-probationary employees such as Plaintiffs, Compl. ¶ 111, will be fired only for a work-related reason. It therefore creates a property right in continued employment.[4]

---

[4] FBI agents may be dismissed for other job-related reasons besides misconduct, including unacceptable performance, national security concerns, or inability to perform the essential duties and responsibilities of the position. But as with misconduct, the agency has adopted written policies that delineate permissible bases for such removals and establish the processes that must be followed. *See, e.g.*, FBI Human Resources Division, *Performance and Development Program*

Case law analyzing similar comprehensive disciplinary schemes supports this conclusion. In *Barnes v. Zaccari*, 669 F.3d 1295 (11th Cir. 2012), for example, the Eleventh Circuit held that a student had a property interest in his continued enrollment based on policies that set forth the university's rules and specified sanctions for violations. *Id.* at 1304-05. These policies did "not authorize [the] institution[] to punish *all* students—only a certain class of students, those violating the rules or regulations of the institution." *Id.* at 1304 (emphasis added). "By implication," then, they "*with*[*held*] authority to discipline students who follow the rules and regulations." *Id.* (emphasis added); *see Vanover v. Hantman*, 77 F. Supp. 2d 91, 102-03 (D.D.C. 1999) (property interest arose, in part, from "elaborate disciplinary procedure" calling for "progressively stringent" discipline), *aff'd on other grounds*, 38 F. App'x 4 (D.C. Cir. 2002); *Conley v. Bd. of Trs.*, 707 F.2d 175, 180 (5th Cir. 1983) (guidebook that, *inter alia*, lists 36 violations that may warrant dismissal created property interest).

Defendants address none of this, choosing instead to mischaracterize Plaintiffs' argument. First, Defendants inexplicably contend that Plaintiffs "rely on" a superseded 1997 FBI memorandum establishing procedures for "summary dismissal." Mot. 17. As the discussion above makes clear, Plaintiffs' argument in no ways rests on that document.

Second, Defendants contend that "Plaintiffs . . . make much of *procedures* that apply to non-probationary employees" under the FBI's disciplinary system. *Id.* (emphasis added). They are wrong again. Plaintiffs' argument does not rest on the FBI's disciplinary *procedures*, but rather on the overall disciplinary system that provides *substantive standards* defining misconduct and specifying the range of discipline that the agency may impose.

---

*Policy Guide* (June 8, 2020), https://vault.fbi.gov/performance-and-development-program-policy-guide-1083pg (last accessed Oct. 28, 2026).

**3. The Summary Dismissal Policy.** Because Defendants cannot dispute that the foregoing policies and practices give rise to an expectation of continued employment sufficient to create a property interest, they are left to argue that a separate policy—the current FBI policy governing "summary dismissal" of employees—somehow negates employees' expectations and renders them "terminable at will." Mot. 17. A careful examination of that policy refutes this argument.

The summary dismissal policy appears in the OPR Policy Guide—a document that sets forth the FBI's disciplinary procedures. Compl. ¶ 47 (summarizing key provisions of OPR Policy Guide). The policy provides for "summary dismissal"—that is, dismissal without following the extensive procedures outlined elsewhere in the OPR Policy Guide—only in cases where "(a) the safety of the public; (b) the safety of fellow employees; (c) national security interests; or (d) other compelling or exigent circumstances are at stake." *Id.* ¶ 47(g). Only the FBI Director, Deputy Director, or Assistant Director for OPR may exercise the authority, which "is an extraordinary remedy to be exercised only in compelling or exigent circumstances." *Id.*

Contrary to Defendants' argument, the summary dismissal policy does not allow the FBI to fire employees for any reason or no reason at all. Instead, in exceptional circumstances, it allows the agency to dismiss employees for misconduct without affording them the usual procedural protections. Defendants effectively concede the point, describing summary dismissal as a "disciplinary process." Mot. 18.[5]

That concession is obviously correct. The OPR Policy Guide, which includes the summary dismissal policy, outlines the FBI's policy for the *adjudicative* phase of its disciplinary process. Compl. ¶ 47. And the summary dismissal policy provides for "dismissal," which the FBI

[5] Notably, the government has conceded in other cases that the cited summary dismissal policy does *not* authorize dismissal at "any time for any reason." *Doe 1 v. Patel*, No. 26-cv-959 (D.D.C.), ECF No. 38, at 8 (citation omitted); *Garman v. Patel*, No. 26-cv-1086 (D.D.C.), ECF No. 48, at 8.

characterizes as "an extraordinary *remedy*." *Id.* ¶ 47(g) (emphasis added). Specifically, the policy addresses when an employee may be dismissed "summarily," that is, without the FBI's ordinary *procedures*. *Id.*; *see* Black's Law Dictionary (12th ed. 2024) (defining "summary" as "[w]ithout the usual formalities"). The summary dismissal policy nowhere suggests that an employee may be removed without *substantive* grounds. To the contrary, summary dismissals occur as part of an OPR adjudication of misconduct; the 2021 DOJ-OIG report, for example, described summary dismissal as a "disciplinary action" that applies when "a subject's *misconduct* warrants dismissal." 2021 DOJ-OIG Report at 13 (emphasis added). The policy therefore does not change the fact that dismissal requires a job-related rationale, such as the misconduct identified in the Offense Codes. Thus, it casts no doubt on the property interest the agency's disciplinary system has created.

And because FBI employees have a property right in continued employment, the agency cannot dismiss them without affording them constitutionally adequate procedures. *Loudermill*, 470 U.S. 541. Nor may Defendants claim that, because Plaintiffs' property interest arises from the FBI's own policies, the agency can dictate through its summary termination policy what kind of process they will receive. The Supreme Court rejected that contention long ago, explaining that such a "'bitter with the sweet' approach misconceives the constitutional guarantee." *Id.*

**4. *Langeman v. Garland.*** Instead of grappling with the summary dismissal policy's text and context, Defendants rest their argument to the contrary on *Langeman v. Garland*, 88 F.4th 289 (D.C. Cir. 2023). *See* Mot. 17. In *Langeman*, an FBI employee who was summarily dismissed contended that he had a "property right in his continued employment" that was "*created*" by a now-outdated 1997 Memorandum by former FBI Director Freeh ("Freeh Memo"). 88 F.4th at 294 (citation omitted; emphasis added); Mot. 17 (conceding Freeh Memo is "outdated"). That memo (1) mandated certain procedural protections in disciplinary actions; but (2) "preserve[d] [the]

discretion" of high-ranking officials to summarily dismiss employees in specified categories of "extraordinary cases" requiring "immediate" action where "compelling circumstances may be at stake." *Langeman*, 88 F.4th at 293 (quoting Freeh Memo); *see also* Compl. ¶ 120 & n.58.

Reading the Freeh Memo like a statute, Langeman argued that the memo imposed "substantive restrictions on the exercise of [the FBI's] discretion" to summarily dismiss him and thereby created a property interest in his continued employment. Final Reply Br. for Pl.-Appellant at 8-9, *Langeman*, 88 F.4th 289 (No. 22-5264) ("*Langeman* Reply Br."); *see also id.* at 1, 3. As a result, he argued, due process required a pre-termination hearing to determine whether the memo's standards for summary dismissal were satisfied. *Id.* at 8-10. The D.C. Circuit disagreed. Using the test Langeman had proposed, it found that the Freeh Memo "does not contain explicit mandatory language, but instead reserves 'expansive authority and discretion' for FBI leadership to determine the circumstances where an FBI employee may be summarily dismissed." 88 F.4th at 295 (citation omitted); *id.* at 296 (finding an "absence of substantive limitations on official discretion").

That holding has no bearing here. Plaintiffs do not contend that their property interest was created by either the language in the outdated Freeh Memo or the FBI's current summary dismissal policy. Instead, they rely on the FBI's comprehensive employment policies and practices currently in effect—including the Offense Codes—not cited to or before the court in *Langeman*. Furthermore, *Langeman* did not address the legal framework that appropriately applies to Plaintiffs' claim that the FBI fostered rules and understandings supporting a reasonable belief that they would be fired only for a job-related reason. *See supra* at 11-12. Indeed, no party in *Langeman* even cited *Perry* or *Ashton*. *See* Final Br. for Pl.-Appellant, *Langeman*, 88 F.4th 289 (No. 22-

5264); Br. for Appellees, *Langeman*, 88 F.4th 289 (No. 22-5264); *Langeman* Reply Br. In short, *Langeman* did not consider—let alone resolve—the property interest argument advanced here.[6]

For all these reasons, Plaintiffs have adequately alleged a property interest in their continued employment. Discovery is warranted to determine how the FBI has actually advertised its positions and interpreted and implemented its disciplinary policies. Such factual matters cannot be resolved based on the pleadings alone and may prove critical to deciding Plaintiffs' due process claims. *See McCabe*, 490 F. Supp. 3d at 221 (ordering additional discovery on procedural due process claims); *Tarpeh-Doe*, 904 F.2d at 724 ("evidence of the Department's past practice" could bolster property interest claim even in the face of statutes or regulations that, "*without more*," fail to create a property interest).

**B. The FBI Created a Mutually Explicit Understanding That Plaintiffs Would Not Be Dismissed Based on Their Service on June 4, 2020.**

Second, the Complaint adequately alleges that the FBI created a mutually explicit understanding that Plaintiffs would not be discharged for the events of June 4, 2020. Compl. ¶¶ 161-62. Plaintiffs allege that "[s]hortly after the events of June 4, 2020, FBI and DOJ leadership reviewed Plaintiffs' actions and correctly determined that they were consistent with FBI policy and warranted no adverse action of any kind." *Id.* ¶¶ 11, 86-89. The Complaint further alleges that, over the next five years, Defendants reinforced that expectation by (1) not investigating or adjudicating any disciplinary case against Plaintiffs (until June 2025), *id.* ¶ 106; (2) promising

---

[6] To be sure, Plaintiffs do not concede that *Langeman*'s conclusion that the Freeh Memo failed to supply "substantive limits" on official discretion would even apply to the current summary dismissal policy. In fact, the two policies are meaningfully different. *Compare Langeman*, 88 F.4th at 295-96 (discussing prior policy allowing summary dismissal where "compelling considerations *may* be at stake" (citation omitted)), *with* Compl. ¶ 47(g) (current policy requires that "compelling . . . circumstances *are* at stake" (emphasis added; citation omitted)); and *compare Langeman*, 88 F.4th at 295 (focusing on the prior policy's explicit "preserv[ation]" of "discretion" to summarily dismiss (citation omitted)), *with* Compl. ¶ 47(g) (omitting that language). In any event, as noted above, that line of analysis does not apply to Plaintiffs' argument here.

employees "prompt" adjudications and "timely" investigations of alleged misconduct, *id.* ¶¶ 47(b), 48(a); and (3) issuing a DOJ-OIG report that found no misconduct, *id.* ¶¶ 61, 89.

These allegations independently suffice to allege a property interest flowing from Plaintiffs' expectation that they would not be fired for their service on June 4, 2020. *See Perry*, 408 U.S. at 601-02 ("Explicit contractual provisions may be supplemented by other agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances.'" (quoting 3A Corbin on Contracts § 562 (1960))). The FBI created a "mutually explicit understanding" that the 2020 incident had been resolved because (1) an FBI official with authority to do so assured Plaintiffs that they would not be disciplined, Compl. ¶ 87; and (2) the agency honored that promise long after any investigation could properly commence. *See Sanderson v. First Sec. Leasing Co.*, 844 P.2d 303, 306-07 (Utah 1992) (promise not to fire employee on particular ground terminates any "at will" status with respect to that ground because it limits employer's "freedom to discharge for any reason"). That understanding created a "property" interest because it was precisely the sort of "claim[] upon which people rely in their daily lives." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *see* Compl. ¶ 163 **(**alleging reasonable reliance).

No case in this District squarely addresses facts like these, highlighting how overtly irregular the FBI's actions have been. Still, *Marti Navarro v. United States*, 104 F. Supp. 2d 96 (D.P.R. 2000), provides support. Marti, an FBI Special Agent, was accused of financial misconduct and censured. Later, a new supervisor reconsidered and dismissed him. *Id.* at 99. Marti alleged that the letter of censure "vested him with a property interest in continued employment with the FBI," and "effectively barred the FBI from imposing further discipline." *Id.* at 100. While not deciding this claim, the district court acknowledged its force, citing *Perry* in noting that

"[u]nder some circumstances, a government employer can create an 'understanding' that binds the government employer and creates a property interest in continued employment." *Id.* at 100 n.2.[7]

## III. COUNT THREE ALLEGES A VALID PROCEDURAL DUE PROCESS CLAIM BASED ON A DEPRIVATION OF LIBERTY.

Defendants also move to dismiss Count Three's procedural due process claim, arguing that Plaintiffs lacked a protected liberty interest. Mot. 18-22. Dismissal is unwarranted because Plaintiffs have adequately alleged a deprivation of two independent liberty interests.

### A. Applicable Law.

"In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed," extending to a person's reputation and related ability to pursue a chosen profession. *Roth*, 408 U.S. at 572. In the context of government employment, "liberty is not offended by dismissal from employment itself, but instead by dismissal based upon an unsupported charge which could wrongfully injure the reputation of an employee." *Arnett v. Kennedy*, 416 U.S. 134, 157 (1974) (plurality opinion) (Rehnquist, J.). Where the government makes a "charge against [a person] that might seriously damage his standing and associations in his community," "due process would accord an opportunity to refute the charge." *Roth*, 408 U.S. at 573. The same principle applies where the government "impose[s] on [a person] a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities." *Id.* This is because "[t]o be deprived not only of present government employment but of future opportunity for it

[7] The D.C. Circuit has previously held that two *statutory* provisions prohibiting the dismissal of an employee for specified reasons did not create property rights, but in both cases, it noted that the plaintiff had not been discharged in violation of the relevant statute. *Hall v. Ford*, 856 F.2d 255, 266 (D.C. Cir. 1988); *Garrow v. Gramm*, 856 F.2d 203, 208 (D.C. Cir. 1988). Thus, this case, where Plaintiffs allege Defendants breached an express promise not to discipline, presents a novel issue. Further, *Hall* and *Garrow* make sense because a statutory right should be enforced through whatever means the statute provides. The same reasoning does not apply when a government employer voluntarily agrees not to discharge employees for a particular reason. In such cases, due process ensures that such commitments are not withdrawn without procedural protections.

certainly is no small injury." *Id.* at 574 (citation omitted).

In this Circuit, "a plaintiff may avail himself of two different legal theories" with overlapping elements "to establish a reputation-based due-process violation." *Jefferson v. Harris*, 170 F. Supp. 3d 194, 205 (D.D.C. 2016). The first theory, the "reputation-plus" liberty claim, requires "the conjunction of official defamation and [an] adverse employment action." *Id.* Under this theory, "the combination of government defamation plus the failure to rehire or the discharge of a government employee states a liberty interest claim." *Doe v. U.S. DOJ*, 753 F.2d 1092,1106-07 (D.C. Cir. 1985). Under the second theory, the "stigma-plus" liberty claim, there is no "official speech" but nevertheless a "continuing stigma or disability," *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998), arising from either the government "formally or automatically exclud[ing plaintiff] from work on some category of future State contracts or from other government employment opportunities" or, even without a "binding effect," the government otherwise taking action that has "the broad effect of largely precluding [plaintiff] from pursuing her chosen career." *Id.* at 1141 (discussing *Kartseva v. Dep't of State*, 37 F.3d 1524 (D.C. Cir. 1994)). In either event, "[g]overnment action that has the effect of 'seriously affecting, if not destroying' a plaintiff's ability to pursue his chosen profession, or 'substantially reducing the value of his human capital' . . . infringes a liberty interest." *Id.* at 1142 (cleaned up).

**B. Plaintiffs Have Adequately Alleged a Deprivation of Liberty.**

Plaintiffs have amply pleaded deprivations of their liberty pursuant to both theories. Turning first to the reputation-plus theory, the Complaint establishes that Plaintiffs were terminated from employment by Defendants, constituting an "adverse action." *See, e.g.*, *Paul v. Davis*, 424 U.S. 693, 705 (1976) ("loss of government employment" implicates liberty interest). Next, Plaintiffs have alleged multiple public statements by Patel "falsely indicating that everyone whom he has dismissed from the FBI 'weaponized' the agency or otherwise failed in their duties

to the FBI." Compl. ¶ 139. Accordingly, the Complaint alleges that "the government has actually stigmatized [Plaintiffs'] reputation[s]" by falsely charging them with so-called weaponization or other failures in their duties to the FBI. *Doe*, 753 F.3d at 1111. Finally, the Complaint includes extensive allegations indicating that Plaintiffs' reputations and ability to pursue their chosen careers as FBI agents, and, even more broadly, as law enforcement officers, have been seriously damaged. *See* Compl. ¶¶ 141-46. It alleges that each Plaintiff "dedicated their lives to serving their country as federal law enforcement officers," amassing significant experience. *Id.* ¶ 19. And the Complaint alleges that, despite collectively applying to hundreds of positions, no Plaintiff has been offered a position within law enforcement. *Id.* ¶ 146. As of February 2026, only five have obtained employment, each outside of law enforcement and at a lesser rate of compensation. *Id.*

In response, Defendants assert that Plaintiffs do not allege any "defamatory statement in conjunction with their terminations" because Patel's termination letters were not "published to a third party." Mot. 19 (quoting *Farah v. Esquire Mag.*, 736 F.3d 528, 533 (D.C. Cir. 2013)) (cleaned up). In fact, the Complaint alleges that Patel has made multiple public statements indicating that *everyone* he fired from the FBI engaged in "weaponization" or similar professional failures. Compl. ¶ 139. These statements amply satisfy the third-party publication requirement.[8]

Turning next to the stigma-plus, theory, the Complaint alleges that Defendants' termination of Plaintiffs imposed a "continuing stigma or disability"—evident when coupled with Patel's letters—that both excludes Plaintiffs from federal service and broadly precludes them from their

---

[8] Defendants also contend that "the Supreme Court has cast doubt on the availability of a due process claim based on professional reputation" and cite *Paul v. Davis* for the proposition that "reputation alone, apart from some more tangible interests such as employment," may not suffice to support a due process claim. Mot. 18 (quoting *Paul*, 424 U.S. at 701). But this case clearly involves the "tangible interests such as employment" that *Paul* countenanced—Plaintiffs' employment as career FBI agents. 424 U.S. at 705.

chosen careers. *See id.* ¶¶ 113, 141-46. The Complaint's allegations regarding "the highly specialized nature" of Plaintiffs' positions as FBI Special Agents and their difficulties in obtaining comparable employment further support their claim of deprivation of liberty. *Id.* ¶¶ 141-46.

Defendants claim that the "nature of the stigma" here is "confusing" and argue that on Plaintiffs' theory, "any terminated federal law enforcement officer would have [a] claim—no matter the circumstances and government communications surrounding his or her termination." Mot. 20-21. But there is nothing confusing about the stigma, and its unique impact on Plaintiffs is obvious: The Complaint alleges not just "any terminat[ion]," *id.*, but extraordinary summary dismissals seriously hampering Plaintiffs' ability to pursue careers in law enforcement. *See, e.g.*, *Roth*, 408 U.S. at 573 (due process implicated where government makes a "charge against [a person] that might seriously damage his standing and associations in his community"). Defendants further contend that "[t]here is no due process right to be a *federal* law enforcement officer, let alone an *FBI agent*." Mot. 21. But the liberty interest at issue is the right to pursue one's chosen career or profession. *See Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 896 (1961). Courts have defined the relevant inquiry in various ways, including as "a short-order cook," *id.*, or "a Russian translator," *Kartseva*, 37 F.3d at 1529. The Complaint plausibly alleges reputational harm and stigma affecting Plaintiffs' ability to pursue their chosen careers, whether defined narrowly (as appropriate for highly trained professionals like Plaintiffs) or more broadly.

Defendants apparently concede that "law enforcement" could be an appropriate field by which to evaluate Plaintiffs' harm but nitpick the Complaint, arguing that it lacks sufficient "detail" about Plaintiffs' attempts to procure employment. Mot. 21-22. But the only question before this Court is whether Plaintiffs' claims may proceed to discovery, and it is at the summary-judgment stage that the "detail" Defendants demand will become relevant. In any event,

Defendants' picayune attacks on the Complaint fail. For example, Defendants assert that "at least some Plaintiffs have found employment in the field." *Id.* at 21. In making this argument, they point to allegations that two Plaintiffs have obtained employment with government contractors, claiming that "there is no qualifier [in the Complaint] that their jobs are outside of law enforcement." *Id.* But that argument ignores the overarching allegation that "no Plaintiff has been offered a position within law enforcement," as well as the related allegation that "government contractors" are "private positions adjacent to law enforcement." Compl. ¶ 146. That two Plaintiffs have obtained private positions at lower compensation rates with government contractors (doing work "adjacent to law enforcement," *id.*) thus is of no moment.

## IV. PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT THEY RECEIVED CONSTITUTIONALLY DEFICIENT PROCESS (COUNTS TWO, THREE, AND FIVE).

Plaintiffs have also adequately alleged that the process they received in connection with their removals was constitutionally deficient. Defendants' three-paragraph argument to the contrary, Mot. 22-23, provides no basis for dismissing any of the due process claims.

### A. Applicable Law.

Procedural due process "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Before the government deprives a person of property or liberty, the Due Process Clause generally requires it to provide "notice and [an] opportunity for hearing appropriate to the nature of the case." *Loudermill*, 470 U.S. at 542.

The extent and type of hearing requires a balancing of (1) the "private interest"; (2) the "risk of an erroneous deprivation of such interest" and the "probable value" of additional procedures; and (3) the "[g]overnment's interest." *Eldridge*, 424 U.S. at 335. As to private interest, the Supreme Court has "frequently recognized the severity of depriving a person of the means of

livelihood." *Loudermill*, 470 U.S. at 543. Moreover, the "opportunity for [an] employee to present his side of the case is recurringly of obvious value in reaching an accurate decision." *Id.* Finally, the government's interest cuts in both ways, given that "the employer shares the employee's interest in avoiding disruption and erroneous decisions." *Id.* at 544. That is particularly true here, where Plaintiffs collectively provided over 150 years of highly specialized and exemplary service to the FBI. Compl. ¶¶ 19-31.

Where the Due Process Clause applies, a government employee facing termination is generally "entitled" at least to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill*, 470 U.S. at 546. Those requirements suffice *before* termination, however, only if a fuller opportunity to mount a challenge is provided *after* his termination. The Supreme Court made this clear in *Loudermill*, explaining that "the existence of post-termination procedures is relevant to the necessary scope of pretermination procedures" and emphasizing that the Court's conclusions about the adequacy of pre-termination procedures "rest[ed] in part on the provisions in [state law] for a *full* post-termination hearing." *Id.* at 546, 547 n.12 (emphasis added); *see also Krentz v. Robertson*, 228 F.3d 897, 902 (8th Cir. 2000); *Locurto v. Safir*, 264 F.3d 154, 173-74 (2d Cir. 2001).

Thus, "where . . . a court has approved an abbreviated pre-termination hearing, due process requires that a discharged employee's post-termination hearing be substantially more 'meaningful.'" *Carter v. W. Rsrv. Psychiatric Habilitation Ctr.*, 767 F.2d 270, 273 (6th Cir. 1985). "At a minimum, this requires that the discharged employee be permitted to attend the hearing, to have the assistance of counsel, to call witnesses and produce evidence on his own behalf, and to know and have an opportunity to challenge the evidence against him." *Id.*; *see also Krentz*, 228 F.3d at 904 & n.7 (holding that similar "extensive" procedures were "tantamount" to a "full post-

termination hearing" (quoting *Loudermill*, 470 U.S. at 546)); *Garrison v. District of Columbia*, 1989 WL 250655, at *3 (D.D.C. Oct. 12, 1989).

It follows that where, as here, the government provides *no* post-termination hearing, Compl. ¶ 119, the pre-termination hearing must "provide *all* the procedural safeguards to which due process entitles a tenured public employee," including robust safeguards that could otherwise be delayed. *Vukadinovich v. Bd. of Sch. Trs.*, 978 F.2d 403, 411 (7th Cir. 1992) (citation omitted; emphasis added) (public employer complied with the Due Process Clause because pre-termination hearing was "more akin to a trial," with "[e]ach side call[ing] witnesses and present[ing] evidence, cross-examin[ing] opposing witnesses, argu[ing] their respective cases . . . , and so on").

### B. Plaintiffs Have Adequately Alleged Constitutionally Deficient Procedures.

Plaintiffs' Complaint more than adequately alleges that the procedures the FBI used to terminate them were constitutionally deficient. The FBI's procedures failed to serve as a meaningful "initial check against mistaken decisions." *Loudermill*, 470 U.S. at 545. And they even more plainly flunked the demanding standards that apply where, as here, a single process served as the final check against mistaken decisions.

Start with notice. Even for pre-termination hearings, the D.C. Circuit has held that employees "must at least 'know the factual basis for the [proposed employment] action'" to meaningfully argue against it. *Esparraguera*, 101 F.4th at 40 (quoting *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014)). More generally, "due process requires, at the least, that an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied[,] and be afforded an opportunity to rebut that evidence." *Ralls*, 758 F.3d at 319; *see also, e.g.*, *Greene v. McElroy*, 360 U.S. 474, 496 (1959) ("evidence used to prove the [g]overnment's case must be disclosed"); *Carducci v. Regan*, 714 F.2d 171, 176 (D.C. Cir. 1983) (Scalia, J.).

Here, however, the FBI never told Plaintiffs that it was considering terminating them, nor did it provide them with the factual evidence it was evaluating. Compl. ¶¶ 47(f), 111, 164. Instead, the FBI merely told Plaintiffs that they were "under investigation for possible violations" of two broad "Offense Codes" by "kneeling during a protest." *Id.* ¶ 106 ("Unprofessional Conduct—On Duty" and "Violation of Ethical Guidelines"). That notice fell far short of the constitutional standard, wholly depriving Plaintiffs of knowledge that their jobs were in jeopardy and the opportunity to refute whatever evidence existed in the government's file. *See Greene*, 360 U.S. at 496; *see also, e.g.*, *Dodson v. U.S. Capitol Police*, 633 F. Supp. 3d 235, 269-71 (D.D.C. 2022).

The agency then failed to provide Plaintiffs with an oral hearing or equivalent opportunity to meaningfully (1) challenge the agency's evidence; and (2) explain why dismissal was unwarranted. Compl. ¶¶ 111, 164; *see Carter*, 767 F.2d at 273 (employee must be "permitted to attend [a] hearing, to have the assistance of counsel, to call witnesses and produce evidence on his own behalf, and to know and have an opportunity to challenge the evidence against him"); *Loudermill*, 470 U.S. at 543 (discussing importance to employees of addressing factual disputes and invoking the discretion of the decisionmaker). An "oral hearing" would have been "especially useful" here, given that the FBI appears to question the "credibility and veracity" of Plaintiffs' account of the June 2020 events. *Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25, 32 (D.C. Cir. 2014) (oral hearings were unnecessary where only medical qualifications were at issue).

These shortcomings had enormous practical ramifications. Had Plaintiffs been informed of the FBI's evidence and particular concerns, they could have supplied targeted arguments and evidence concerning material matters in dispute. For example, if photos in the government's file showed limited perspectives of the June 2020 incident, Plaintiffs could have submitted additional photos, videos, and statements from relevant witnesses. And if the FBI had informed Plaintiffs that

they were suspected of engaging in "political weaponization," Compl. ¶¶ 113, 164, Plaintiffs could have rebutted that charge with, *inter alia*, expert testimony on appropriate de-escalation techniques and the limited significance of kneeling in situations like the one Plaintiffs faced.

As a final nail in the coffin, Plaintiffs were deprived of a neutral adjudicator—a flaw that independently denied them due process. "Not only is a biased decisionmaker constitutionally unacceptable[,] but our system of law has always endeavored to prevent even the probability of unfairness." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (citation omitted). Decisionmakers therefore must be disqualified if "a disinterested observer may conclude that the agency has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." *Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970) (cleaned up). Such "prejudg[ment]" may be inferred from the surrounding circumstances, including "abrupt" "interven[tions]" in ordinary processes and "identical outcomes" for affected persons unaccompanied by "individualized explanations." *Taylor v. Trump*, 2026 WL 396844, at *9-14 (D.D.C. Feb. 11, 2026) (finding likely due process violation); *see also, e.g.*, *McCabe*, 490 F. Supp. 3d at 223 (declining to dismiss due process claim based on allegation that decisionmaker followed "an unmistakable direction from" the President to fire the plaintiff); *Bakalis v. Golembeski*, 35 F.3d 318, 325-26 (7th Cir. 1994).

Plaintiffs' Complaint adequately alleges that Patel—the decisionmaker here, in contravention of the FBI's usual procedures, Compl. ¶¶ 47, 112-13—"prejudged" their case and followed a "predetermined" process, thereby violating their due process rights. *See id.* ¶ 164; *supra* at 2, 5-10 (discussing Compl. ¶ 92 (2023 social media post by then-former President Trump criticizing Plaintiffs for kneeling); ¶ 97 (pressure from White House to conduct summary firings of FBI agents); ¶¶ 99-104 (Patel's efforts immediately upon taking office to fire Plaintiffs at the

behest of White House); ¶¶ 110-13 (Patel's cutting short review process with identically worded termination letters)). Thus, although the Due Process Clause generally permits the FBI Director and other FBI officials to serve as decisionmakers concerning employee dismissals, unique circumstances here indicate that Patel did not serve as a neutral adjudicator of Plaintiffs' cases.

Plaintiffs have thus easily cleared the modest hurdle of alleging a plausible claim that their termination was foreordained and that the process used to terminate them was constitutionally deficient in a host of other ways.

## V. COUNT FOUR ALLEGES A VALID SUBSTANTIVE DUE PROCESS CLAIM.

In addition to alleging procedural due process violations, Count Four of the Complaint also adequately alleges egregious government actions that satisfy the "shocks the conscience" standard applied to substantive due process violations. Compl. ¶¶ 175-180.[9]

Defendants' attempts to defend their conduct just make matters worse. First, they contend that "the delay between Plaintiffs' actions and their termination" "can[not] [by] itself" meet the relevant test and is excusable given "changes in leadership." Mot. 24. But the delay does *not* stand alone, *see* Compl. ¶¶ 178-180, and the same Executive Branch leadership (*i.e.*, President Trump) existed on both dates. More importantly, Defendants ignore what makes the delay shocking: (1) the FBI and DOJ had already decided to impose no discipline, *id.* ¶¶ 11, 86-89; (2) Plaintiffs reasonably relied on that decision, *id.* ¶ 163; (3) in resurrecting the matter *five years* later, the FBI violated its own disciplinary policies, *id.* ¶¶ 46(b), 47; and (4) it then denied due process because

---

[9] Defendants suggest that Plaintiffs must identify a "fundamental liberty interest." Mot. 23-24 (citation omitted). But where "a specific act of a government officer [] is at issue," the "shocks the conscience" test applies. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *see also Hurd v. D.C.*, 147 F.4th 1036, 1042 (D.C. Cir. 2025). Quoting *Lewis*, this Court has described the "shocks the conscience" standard as "*antecedent* to any question about the need for historical examples of enforcing a liberty interest of the sort claimed." *L'Association des Americains Accidentels v. U.S. Dep't of State*, 633 F. Supp. 3d 74, 86 (D.D.C. 2022) (emphasis added; citation omitted). Defendants cite no case holding that such an interest must be alleged in the Complaint.

"exigent or compelling" circumstances allegedly demanded immediate action, *id.* ¶¶ 164, 179.

Likewise, Defendants contend that "Plaintiffs were terminated based on concerns regarding . . . the political weaponization of government." Mot. 24. But Defendants provided no notice of this nebulous charge during the truncated proceedings. Compl. ¶¶ 113, 164. And, in arguing that Plaintiffs "carr[ied] out their duties in a partisan or seemingly partisan manner," Mot. 24, Defendants ignore Plaintiffs' own allegations that they were victims of a partisan attack based on a perception that they were politically disloyal to President Trump. *See supra* at 5-10.

Finally, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849. The Complaint alleges that Defendants' actions were "pretextual," "illegal and malicious," and "vindictive and unjustified." Compl. ¶¶ 180-81. And it identifies numerous actions suggesting an "intent to injure." *See, e.g.*, *id.* ¶¶ 109, 112, 114-15 (Plaintiffs terminated immediately following investigation that showed no misconduct); *id.* ¶ 110 (Plaintiffs terminated without consideration of any individual factors); *id.* ¶ 121 (no similar summary dismissals had ever occurred); *id.* ¶ 123 (abrupt dismissals disrupted critical ongoing case work); *id.* ¶ 138 (Plaintiffs who could have been eligible for early retirement were summarily dismissed instead).

Defendants insist that "Plaintiffs' termination was not intended to injure Plaintiffs at all." Mot. 24. But this retort—which simply ignores Plaintiffs' allegations—does not belong in a motion to dismiss. Instead, dueling factual allegations regarding motive warrant discovery. *See McCabe*, 490 F. Supp. 3d at 225 (declining to dismiss substantive due process claim plausibly alleging that defendants "deliberately flouted" the law to deprive plaintiff of FBI retirement).

## VI. COUNT FIVE ALLEGES A VALID PROCEDURAL DUE PROCESS CLAIM BASED ON A DEPRIVATION OF PROPERTY FOR LINDEN.

In Count Five, Plaintiff Sarah Linden has adequately alleged a separate due process claim

based on the deprivation of a property interest distinct from the ones discussed in Section II. As a non-probationary member of the SES, Linden was covered by statutory provisions prohibiting the FBI from removing her without cause. And a property interest necessarily "exists if [an] employee can be removed only for cause." *Esparraguera*, 101 F.4th at 33 (citation omitted).

At the time of Linden's termination, she was a non-probationary member of the FBI's SES. Compl. ¶¶ 24, 182. Her employment was therefore governed by 5 U.S.C. § 3151(a), which authorizes the Attorney General to "establish" the FBI "Senior Executive Service."

Under Section 3151 and the statutory provisions it incorporates, non-probationary members of the FBI SES can be removed only for certain reasons. Specifically, Section 3151 requires that regulations establishing the FBI SES "provide for" (1) "removal consistent with section 3592 [of Title 5]"; and (2) "removal . . . consistent with subsections (a), (b), and (c) of section 7543 [of Title 5]." 5 U.S.C. § 3151(a)(5)(A), (D) (noting exception not relevant here). Section 3592—which is not at issue—specifies that non-probationary "career [SES] appointee[s] may be removed" from the SES "for less than fully successful executive performance" as determined under certain statutory provisions. *Id.* § 3592(a)(2). And Section 7543—which *is* at issue—specifies that such employees may otherwise be removed "only for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function." *Id.* § 7543(a); *see also id.* §§ 7541, 7542 (defining terms and describing scope of § 7543). FBI policy reflects these same standards. Compl. ¶ 51(b)-(c).

Sections 3151 and 7543(a) plainly made Linden removable only for cause and thus gave rise to a property interest. That conclusion follows directly from Supreme Court and D.C. Circuit precedent, including *Esparraguera*, which held that an SES employee of the Department of the Army had a property interest in her SES status flowing from Section 3592(a)(2) and its

implementing regulations. *See* 101 F.4th at 34-39.[10] Under governing case law, statutory and regulatory provisions have been interpreted to permit only for-cause removal—and thus to create property interests—when they authorize removal for (1) "less than fully successful executive performance," 5 U.S.C. § 3592(a)(2) (*see Esparraguera*, 101 F.4th at 34-39); (2) "misfeasance, malfeasance, or nonfeasance in office," Ohio Rev. Code Ann. § 124.11 (1984) (*see Loudermill*, 470 U.S. at 538-39); or (3) "such cause as will promote the efficiency of the service," 5 U.S.C. § 7513 (*see Johnson v. United States*, 628 F.2d 187, 192-94 (D.C. Cir. 1980)). The statutory language here—which permits removal "only for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function," 5 U.S.C. § 7543(a)—likewise precludes removal "at the whim of [an employee's] superiors" and thus creates a property interest. *Esparraguera*, 101 F.4th at 34 (quoting *Ashton*, 613 F.2d at 929); *accord Hall*, 856 F.2d at 265 (teacher had property interest in employment when handbook said he should feel he had "tenure as long as his teaching services were satisfactory" (cleaned up)).

Defendants resist this conclusion, arguing that Linden had no property interest in her continued employment because the FBI's summary dismissal policy granted Patel the authority to fire her for any reason. Mot. 26. But the summary dismissal policy did no such thing, *see supra* at 15-16, and regardless, the governing *statutes* trump any inconsistent FBI *policy*. Defendants fare no better in relying on *Strzok v. Garland*, 828 F. Supp. 3d 40 (D.D.C. 2025), which observed that the plaintiff in that case had "acknowledge[d]" that, as a member of the FBI SES, he was "terminable at will" and lacked an "entitlement to remain in his position." *Id.* at 67. Significantly,

---

[10] Defendants incorrectly assert that *Esparraguera* did not "address a scenario" where the CSRA precludes judicial review of removal claims. Mot. 26 n.11. Quite the opposite, *Esparraguera* squarely *rejected* the argument that the plaintiff's "lack of a right to appeal" her removal from the SES "indicate[d] there is no constitutionally protected property interest." 101 F.4th at 39.

*Strzok* did not mention, much less analyze Sections 3151 and 7543, and so the plaintiff's failure to recognize that they applied and created a property interest is of no moment. The only decision that *has* addressed whether Sections 3151(a)(5) and 7543(a) give rise to a property interest—a decision Defendants ignore—concluded that they do. *See McCabe*, 490 F. Supp. 3d at 217-19; *see also Palmeri v. MSPB*, 164 F.4th 878, 884 (Fed. Cir. 2026).

## VII. COUNT SIX ALLEGES A VALID *ULTRA VIRES* CLAIM BASED ON LINDEN'S SES STATUS.

Plaintiff Linden has also adequately alleged an *ultra vires* claim based on the FBI's flagrant violations of the substantive and procedural protections provided to members of the FBI SES by 5 U.S.C. § 7543(a) and (b). *See* 5 U.S.C. § 3151(a)(5)(D) (applying Section 7543(a) and (b) to members of the FBI SES). As explained above, Section 7543(a) specifies that the FBI may remove non-probationary SES employees "only for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function." 5 U.S.C. § 7543(a). And Section 7543(b) provides such employees certain procedural rights when such a removal is "proposed." As relevant here, Section 7543(b) specifies that such an employee "is entitled to" the following: (1) with one exception not relevant here, "at least 30 days' advance written notice . . . stating specific reasons for the proposed [employment] action" (*i.e.*, removal); (2) "a reasonable time, but not less than 7 days, to answer orally and in writing and to furnish affidavits and other documentary evidence"; and (3) "a written decision and specific reasons therefor." 5 U.S.C. § 7543(b)(1), (2), (4). Because Linden has adequately alleged all the elements of an *ultra vires* claim based on these statutory provisions, Count Six should not be dismissed.

As Defendants acknowledge, review of agency action is available in limited circumstances even when, as here, a plaintiff lacks a statutory cause of action. Mot. 27. Such review—known as "*ultra vires* review" is available if the plaintiff satisfies three conditions: "(i) the statutory

preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (citation omitted). Defendants do not contest that Linden lacks an alternative procedure for review of the statutory claims here, and so only the first and third conditions are in dispute. Mot. 27. As explained below, both are satisfied here.

***a. First condition.*** The first condition under *Changji* is plainly met here. That condition does not require an inquiry into whether another statute bars judicial review of statutory claims as a general matter, as Defendants suggest; rather, it requires analysis of whether the "statutory preclusion of review" at issue is "implied rather than express." *Changji*, 40 F.4th at 722 (citation omitted). Here, Linden lacks a statutory cause of action to pursue her claims under Section 7543(a) and (b), but that is not because any statute expressly *forbids* such review. Rather, as Defendants themselves explain, Mot. 27-28, the CSRA does not affirmatively *grant* FBI SES employees such a cause of action, and courts have held that the CSRA's "'elaborate' framework" demonstrates "Congress' intent" to generally "foreclose judicial review" of claims "to employees to whom the CSRA *denies* statutory review." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10-11 & n.4 (2012) (quoting *United States v. Fausto*, 484 U.S. 439, 443 (1988)).

The putative statutory preclusion of judicial review is therefore implied—not express—and so the first *Changji* factor is satisfied. Indeed, the D.C. Circuit has already concluded as much in *Griffith*, its only decision addressing whether CSRA rights can sometimes be vindicated through an *ultra vires* claim. *Griffith* explained that while, as a general rule, the CSRA "foreclose[s] [judicial] review" of statutory claims asserted by federal employees outside of the CSRA framework, the "statute leaves the door ajar for review of clear violations of statutory authority

under *Leedom v. Kyne*, 358 U.S. 184 (1958)," the leading case recognizing the availability of *ultra vires* claims. *Griffith*, 842 F.2d at 490, 492. That conclusion accords with other D.C. Circuit precedent holding that a statute must include a "clear statement of Congress's preclusive intent" for a court to conclude that *ultra vires* claims are wholly barred. *Lepre v. Dep't of Lab.*, 275 F.3d 59, 72-73 (D.C. Cir. 2001) (discussing case law). Under this doctrine, even statutes providing that agency action "shall be final and conclusive . . . and not subject to review" do not categorically foreclose *ultra vires* claims alleging obvious violations of clear statutory commands. *Ralpho v. Bell*, 569 F.2d 607, 613, 622-26 (D.C. Cir. 1977) (citation omitted). The same result necessarily obtains under the CSRA's less robust, implied bar on judicial review.

***b. Third condition.*** Linden's *ultra vires* claim also satisfies the third *Changji* condition because she alleges that the FBI "plainly act[ed] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." 40 F.4th at 722. To be sure, the third requirement ensures that *ultra vires* review is of "extremely limited scope" and is "confine[d] to agency error so extreme that one may view it as jurisdictional or nearly so," including when an agency "has disregarded a specific and unambiguous statutory directive" or "violated some specific command of a statute." *Griffith*, 842 F.2d at 493 (citations omitted). But the Supreme Court and the D.C. Circuit have repeatedly found the third condition to be satisfied when an agency has engaged in "an attempted exercise of power that had been specifically withheld" by statute. *Leedom*, 358 U.S. at 189; *see, e.g.*, *id.* at 185-89 (holding that the National Labor Relations Board acted "in excess of its delegated powers and contrary to a specific [statutory] prohibition" when it certified a bargaining unit without following certain procedures required by statute); *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 966, 970-72 (D.C. Cir. 2022). In *Oestereich v. Selective Service System Local Board No. 11*, 393 U.S. 233 (1968), for example, the Supreme

Court engaged in *ultra vires* review of a Selective Service Board decision that had refused to grant a statutory draft exemption, explaining that judicial review provided a critical check against "free-wheeling agencies meting out their brand of justice in a vindictive manner." *Id.* at 237.

The Complaint adequately alleges multiple clear violations of Section 7543 that qualify for *ultra vires* review. Starting with Section 7543's procedural provisions, the Complaint alleges that the notice to Linden stated only "that [she] was under investigation for possible violations" of two specified "Offense Codes" by "kneeling during a protest." Compl. ¶ 106. In contravention of the statute's clear commands, the notice did not even *mention* the employment "action" that ultimately occurred here (removal), let alone include "specific reasons for the proposed action." 5 U.S.C. § 7543(b)(1). And because the FBI failed to give Linden the required notice, she also was denied "a reasonable time . . . to answer" a compliant notice "orally and in writing," *id.* § 7543(b)(2)—another clear violation of the statute. The FBI likewise plainly violated the statutory requirement that it issue "a written decision and specific reasons therefor." *Id.* § 7543(b)(4). Although the FBI's termination letter may qualify as a "written decision," that letter lacked the required "specific reasons," instead merely asserting that Linden had "demonstrated unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government." Compl. ¶ 113. If such a barebones assertion qualified as "specific reasons" under the statute, then Congress's specification requirement would serve no meaningful function.

The allegations in the Complaint also plausibly make out a clear violation of Section 7543's substantive provision, which permits removal "only for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function." 5 U.S.C. § 7543(a). Here, only "misconduct" and "malfeasance" are potentially in play, but the facts alleged in the Complaint—read in the light most favorable to Linden—make clear that there

was no "misconduct" or "malfeasance," regardless of what the outer bounds of those terms might be. Rather, on June 4, 2020, Linden and other FBI Special Agents de-escalated a dangerous situation to avert potential violence involving civilians. *See* Compl. ¶¶ 59-84.

At later stages in this litigation, Defendants will have an opportunity to challenge the Complaint's allegations. But as alleged in the Complaint, Linden plainly engaged in no "misconduct" or "malfeasance" under the statute, and the FBI failed to satisfy the statute's specific, clear requirements governing the notice it must provide Linden of the proposed removal, her opportunity to be heard, and its final decision. Linden's *ultra vires* claim based on Section 7543(a) and (b) should thus proceed to discovery.

## VIII. DEFENDANTS' INVOCATION OF ARTICLE II IS MISPLACED.

Finally, Defendants make the astonishing argument that Article II of the Constitution stamps out Plaintiffs' rights under the First and Fifth Amendments and Linden's rights under the CSRA. Mot. 9-12. Under Defendants' theory, federal officials have the constitutional right to dismiss FBI agents for "*any* reason," Mot. 9 (emphasis added), including disdain for the agent's religious beliefs, dislike of the agent's political party, or rank racial discrimination—actions long seen as flagrant violations of bedrock constitutional and statutory rights. This Court should join the chorus of courts that have rejected Defendants' invitation to "overturn nearly two centuries of Supreme Court precedent." *Comey v. U.S. DOJ*, 2026 WL 3203254, at *12 (S.D.N.Y. Oct. 26, 2026); *see also Comans v. EOP*, 840 F. Supp. 3d 1036, 1041-45 (E.D. Va. 2026), *appeal docketed*, No. 26-2242 (4th Cir. Sep. 11, 2026).

To begin, some stage-setting. The Appointments Clause, U.S. Const. art. II, § 2, cl. 2, establishes three classifications of public servants: "(i) principal officers, who must be appointed by the President with the advice and consent of the Senate; (ii) inferior officers, who can be appointed by the President, the head of a department, or a court of law; and (iii) non-officer

employees, whose appointments are unaddressed (and thus unconstrained) by the Clause." *Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1096 (D.C. Cir. 2021). An "officer" exercises "significant authority pursuant to" federal law, whereas a mere "employee . . . does not." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 759 (2025) (citation omitted). An officer is "inferior" rather than "principal" "if her work is directed and supervised at some level by principal officers," such as the Attorney General and others who report directly to the President. *Fleming*, 987 F.3d at 1103 (cleaned up); *Braidwood*, 606 U.S. at 761.

As explained below, Article II requires that the President have free rein to dismiss nearly all *principal officers*, but it permits modest restrictions on the dismissal of *inferior officers*, and it unquestionably allows restrictions on the removal of *mere employees*. Here, there is no dispute that all Plaintiffs other than Linden were mere employees of the FBI. Linden was also an employee, but even Defendants concede that she was at most an inferior officer. It is therefore constitutional for Congress—and is entirely unproblematic for other constitutional provisions—to prohibit the termination of FBI agents like Plaintiffs for arbitrary and abusive reasons, while allowing termination for work-related reasons.

### A. The Modest Restrictions on Removing Civil Servants That Plaintiffs Invoke Here Comport with Article II.

Article II requires nearly all principal officers to be removable at will. *Trump v. Slaughter*, 146 S. Ct. 2283, 2291, 2293-97 (2026); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 483 (2010). Such "assistants or deputies" of the President who "derive their offices from his appointment" and are "subject to his superintendence" must be removable at will to "remain accountable" to him. *Slaughter*, 146 S. Ct. at 2293 (cleaned up). The same is not true of inferior officers or, *a fortiori*, mere employees. *See Comey*, 2026 WL 3203254, at *12-16 (explaining that case law discussed below recognizes that Congress may "regulate and limit the removal of inferior officers").

Rather, nearly a century and a half ago, *United States v. Perkins* held that Article II does not prohibit Congress from imposing limits on the executive's authority to remove "inferior officers." 116 U.S. 483, 485 (1886). *Perkins* explained that the Appointments Clause's grant of "authority" to Congress to "vest" the appointment of inferior officers in department heads "implies authority to limit, restrict, and regulate . . . removal." *Id.* Applying that principle, the Court upheld the constitutionality of a statute barring the discharge of naval officers except by court martial. *Id.*

In his opinion for the Supreme Court in *Myers v. United States*, 272 U.S. 52 (1926), Chief Justice Taft—an ardent advocate of the removal power—affirmed *Perkins*. *Myers* invalidated a law restricting the removal of officers appointed by the President and confirmed by the Senate, *id.* at 106-08, 176, but repeatedly confirmed that Congress may limit the removal of inferior officers appointed by department heads, *see id.* at 127, 161-64. Indeed, *Myers* expressly extolled "the Civil Service Law" as it applied "to inferior offices." *Id.* at 173-74.

Fifty years later, *Morrison v. Olson* confirmed that where "Congress ha[s] chosen to vest the appointment of 'inferior' executive officials in the head of a department," there is no "specific constitutional impediment to congressionally imposed restrictions on the President's removal powers." 487 U.S. 654, 689 n.27 (1988) (citation omitted). The Court went on to uphold the constitutionality of a for-cause removal restriction that applied to an inferior officer—an independent counsel appointed to investigate and prosecute certain "high-ranking Government officials for violations of federal criminal laws." *Id.* at 660, 672, 685-97. In dissent, Justice Scalia disagreed that the independent counsel was an inferior officer. *See id.* 715-23 (Scalia J., dissenting). But, endorsing *Perkins*, he agreed with the majority that the President lacks "plenary power" to remove such officers. *Id.* at 723-24 & n.4. Justice Scalia explained that the President retains "control over all exercises of the executive power" even when inferior officers are

removable only "for cause" because "cause" includes "the failure to accept supervision," and inferior officers' politically accountable superiors—principal officers—are removable at will. *Id.* at 724 n.4 (emphasis omitted); *see also id.* at 695-96 (majority opinion) (making similar point).

Thus, to ensure the President can control the Executive Branch, Article II requires inferior officers and employees to follow the directions of their superiors, who can fire them if they refuse. But the government does not have a right to arbitrarily abuse—or worse, cruelly retaliate and discriminate against—civil servants. *See also United States v. Arthrex, Inc.*, 594 U.S. 1, 24-27 (2021) (plurality opinion) (explaining in remedial ruling that administrative patent judges—inferior officers—can retain statutory for-cause removal protections if their decisions are reviewable by a principal officer); *id.* at 44 (Breyer, J., concurring in the judgment in relevant part) (agreeing with remedy); *Free Enter. Fund*, 561 U.S. at 507 ("[n]othing in our opinion . . . should be read to cast doubt on" the "civil service system"). The limited rights against mistreatment that Plaintiffs invoke here—including First Amendment protections against political affiliation discrimination, Fifth Amendment guarantees of procedural due process, and (for Linden) statutory prohibitions on dismissal without cause—are thus fully consistent with Article II.

### B. Defendants' Arguments to the Contrary Miss the Mark.

Defendants offer three arguments to the contrary, but none is persuasive.

**1.** First, Defendants argue that the Supreme Court's recent decision in *Slaughter* "compels" this Court to conclude that Article II renders nugatory the constitutional and statutory rights invoked here. Mot. 9. But *Slaughter* struck down restrictions on the President's power to remove a *principal* officer, building on precedent recognizing his unique need to remove such officers. *See supra* at 38; *Slaughter*, 146 S. Ct. at 2308 n.6 (question limited to principal officers); *id.* at 2311 (Gorsuch, J., concurring) (Court addressed "principal officers"). And *Slaughter* expressly disclaimed deciding any question concerning "officials not before" the Court. *Id.* at 2306 (majority

opinion). Thus, this Court must continue to follow *Perkins*, *Morrison*, and *Arthrex* when a case concerns the removal of inferior officers or employees. *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) (only Supreme Court has "prerogative of overruling" its decisions).

Regardless, *Slaughter* reinforces the conclusion that Article II poses no impediment to Plaintiffs' suit. *Slaughter* extolled Chief Justice Taft's "landmark" and "scholarly" decision in *Myers*—which emphatically endorsed removal protections for inferior officers and employees—as the Court's "best word" on the removal power. 146 S. Ct. at 2298-99. Furthermore, although *Slaughter* stressed that the President must be able to remove principal officers at will to ensure they remain accountable to him, that reasoning was unique to those officers who "derive their offices from [the President's] appointment" and are "subject to his superintendence." *Id.* at 2293 (citation omitted); *see supra* at 38. For the mass of federal workers whom the President does *not* appoint, at-will removal is unnecessary to ensure democratic accountability. *Morrison*, 487 U.S. at 724 n.4 (Scalia, J., dissenting). Instead, as *Arthrex* explained, the fact that principal officers supervise civil servants' actions "means the President remains responsible for the exercise of executive power." 594 U.S. at 27. Justice Gorsuch's concurrence in *Slaughter* thus rightly took it as a given that the decision did not invalidate "the civil service laws" that "afford rank-and-file agency employees considerable protection against removal." 146 S. Ct. at 2317 (Gorsuch, J., concurring); *see also Comey*, 2026 WL 3203254, at *17 (discussing limited impact of *Slaughter*).

**2.** Invoking *Trump v. United States*, 603 U.S. 593 (2024), Defendants argue that Article II invalidates Plaintiffs' civil service protections because, as FBI agents, Plaintiffs "were involved in investigations, arrests, and prosecutions" and thus assertedly "helped carry out the President's conclusive and preclusive authorities." Mot. 9-11. This sweeping argument—which would invalidate civil service protections for all federal workers engaged in law enforcement, including

all Department of Justice employees—rests on a misreading of *Trump*. *See also Comey*, 2026 WL 3203254, at *17-20 (rejecting similar argument).

To be sure, as *Trump* explained, the "investigation and prosecution of crimes is a quintessentially executive function." 603 U.S. at 620 (cleaned up). And the "deci[sion] [as to] which crimes to investigate and prosecute" is within the Executive Branch's "exclusive authority"—that is, the authority the Constitution vests exclusively in the President that Congress and courts cannot control. *Id.* (cleaned up); *id.* at 607-09. As a result, *Trump* held that then-former President Trump was immune from criminal prosecution for his discussions with the Department of Justice about investigating election fraud. *Id.* at 619-21. But it simply does not follow that all employees who are involved in investigating and prosecuting crimes are therefore subject to the President's unfettered removal authority. Indeed, if that were so, *Morrison*—which upheld statutory restrictions on removing an independent counsel responsible for investigating and prosecuting crimes, *Morrison*, 487 U.S. at 685-97—would have come out differently.

Rather, even with respect to Department of Justice employees performing law-enforcement functions, *Trump* embraced a limited proposition concerning removal authority: that "the President's management of the Executive Branch requires him to have unrestricted power to remove the *most important* of his subordinates—*such as the Attorney General*—in their *most important* duties." 603 U.S. at 620-21 (emphasis added; cleaned up) (holding then-former President was immune from prosecution for threatening to remove Acting Attorney General). That is because—as *Trump* itself made clear—the President enjoys the "unrestricted power of removal" with respect to "executive *officers* . . . whom *he has appointed*," *id.* at 608-09 (emphasis added; cleaned up), whereas *Perkins* and *Morrison* govern the removal of inferior officers appointed by department heads, *see id.* at 609 (referencing the inferior-officer "exception[] to the President's

unrestricted removal authority" discussed in *Seila Law LLC v. CFPB*, 591 U.S. 197, 215 (2020)).[11]

**3.** Finally, when Defendants *do* grapple with the inferior-officer exception in *Perkins* and *Morrison*, Mot. 11-12, they miss the mark entirely. Defendants seem to recognize that the exception remains good law, *id.* at 11 & n.8, and they offer no basis for concluding that it does not protect all Plaintiffs other than Linden. Nor could Defendants do so: it is undisputed that those Plaintiffs were mere employees for constitutional purposes, and it is constitutional to provide them civil service protections that are at least as generous as those available to inferior officers.

Rather, Defendants contend that Linden does not qualify for the inferior-officer exception and must be removable for any reason or no reason at all. According to Defendants, under *Seila Law*, that exception applies only to inferior officers with "limited duties and no policymaking or administrative authority." Mot. 11-12 (quoting *Seila Law*, 591 U.S. at 218). And Defendants contend that *no* member of the SES meets this definition by virtue of 5 U.S.C. § 3132, which specifies when a position is part of the SES. That argument fails at each stage of the analysis.

As an initial matter, the half-sentence in *Seila Law* on which Defendants rely is dictum through and through. It simply described the inferior officer entitled to removal protections in *Morrison* and had no relevance to *Seila Law*'s ultimate holding invalidating removal restrictions on a *principal* officer. 591 U.S. at 217-18, 238. That half-sentence therefore did not radically cabin the holdings of *Perkins* and *Morrison*, which govern here.

Regardless, Defendants fall far short in attempting to show that Linden was an "inferior

---

[11] Significantly, in at least some parallel district court cases, the government has *declined* to argue that Article II negates the rights of rank-and-file FBI agents under the First Amendment, Fifth Amendment, and civil service statutes. *See Garman v. Patel*, No. 26-cv-1086 (D.D.C.), ECF No. 28-1; *Doe 1 v. Patel*, No. 26-cv-959 (D.D.C.), ECF No. 18-1; *Maltinsky v. Patel*, No. 25-cv-4031 (D.D.C.), ECF No. 16-1 (agent in training). The government's sound decision not even to *mount* such an argument in those cases exposes just how far out on a limb it is here.

officer," let alone that she wielded "policymaking or administrative authority." Such authority, of course, must exceed the significant powers wielded by the powerful independent counsel in *Morrison*, who had full and independent authority to "investigate and prosecute particular alleged crimes by high-ranking Government officials." *Seila Law*, 591 U.S. at 217; *Comey*, 2026 WL 3203254, at *16 (describing independent counsel's powers, including her powers to appoint employees). And yet the only argument Defendants muster relies on 5 U.S.C. § 3132, which notes that a position can be classified as SES when, for example, the employee merely "supervises the work of employees other than personal assistants." 5 U.S.C. § 3132(a)(2)(D); *id.* § 3151(a)(2). That is not enough to show that all members of the SES, including Linden, are inferior officers who are not entitled to any civil service protections. *See also Free Enterprise Fund*, 561 U.S. at 506-07 & n.9 (describing limited civil service protections Congress has provided SES employees and distinguishing them from the protections raising Article II concerns in that case); *Comans*, 840 F. Supp. 3d at 1041-45 & n.2 (upholding SES protections against Article II challenge).

### C. This Court Need Not Resolve Other Issues That Would Arise if This Case Implicated the President's Article II Removal Authority.

Because this case does not implicate the President's Article II removal authority, this Court need not attempt to reconcile that authority with Plaintiffs' rights under the First and Fifth Amendments. But even if the President's Article II removal authority extended to Plaintiffs, the Constitution would require that the government respect important and compatible rights enshrined elsewhere in the Constitution, including the First and Fifth Amendments. *See, e.g.*, *Elrod*, 427 U.S. at 352 (dictum) (rejecting contention that First Amendment political-association claims could interfere with "the executive's responsibility to ensure that the laws be faithfully executed"); *supra* at 5 (First Amendment doctrine recognizes political affiliation can be an appropriate requirement for some jobs, but not Plaintiffs' positions). Tellingly, Defendants offer no reason to think that the

Article II removal power must *always* trump other constitutional requirements.

If this case implicated the President's Article II removal authority, the Court would also need to address whether Plaintiffs' removals were invalid—at least initially—because they were ordered by the Director of the FBI, not the Attorney General. Compl. ¶¶ 112-13. The Attorney General later ratified the FBI Director's removal decisions, but not until February 5, 2026, the day before Defendants filed their initial motion to dismiss. *See* Mot. Ex. A. That maneuver—which represents only the latest chapter in the FBI's chaotic and aberrational approach to Plaintiffs' firings—was plainly spurred by this litigation. And for good reason, given that the Department of Justice itself recognizes that Article II removal authority cannot be delegated to officials beneath Department heads. *See* Appointment & Removal of Fed. Rsrv. Bank Members of the Fed. Open Mkt. Comm., 43 Op. O.L.C. 263, 281-83 & n.8, 2019 WL 11594453, at *12-13 & n.8 (2019) ("[T]he authority to remove inferior officers may not be delegated to an agency official other than the department head, or another official constitutionally competent to appoint that officer in the first place."). Therefore, if Article II removal authority had any bearing here, it would provide yet another reason that Plaintiffs' terminations were unlawful—they were made by the wrong official.

## IX. COUNTS SEVEN AND EIGHT ALLEGE VALID DECLARATORY JUDGMENT AND MANDAMUS CLAIMS.

Defendants seek dismissal of the Complaint's declaratory judgment and mandamus claims on the ground that Plaintiffs "have not" "stated at least one plausible claim for relief." Mot. 30. As set forth above, Plaintiffs have stated a claim in each count of the Complaint. Accordingly, Counts Seven and Eight should not be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss Plaintiffs' Second Amended Complaint.

Dated: October 30, 2026

Respectfully submitted,

/s/ John David Kuchta
JOHN DAVID KUCHTA (D.D.C. No. FL00158)
JOHN KUCHTA LAW, PLLC
12481 Brantley Commons Court
Fort Myers, FL 33907
239-690-6080
jkuchta@robertfoleylaw.com

*Counsel for Plaintiff Jane Doe 6*

/s/ Mary L. Dohrmann
MARY L. DOHRMANN (D.C. Bar No. 90042577)
ELIZABETH D. COLLERY (D.C. Bar No. 422246)
SYDNEY FOSTER (D.C. Bar No. 982340)
KIRBY MAYO (D.C. Bar No. 1656596)
WASHINGTON LITIGATION GROUP
1717 K Street, NW, Suite 1120
Washington, D.C. 20006
202-521-8750
mdohrmann@washingtonlitigationgroup.org

*Counsel for Plaintiffs Jane Does 1-4, 6-7, 9, John Does 1-3, Sarah Linden, and Amy Oakes*