UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE DOES 1-4, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KASHYAP P. PATEL,<br>Director, Federal Bureau of Investigation,<br>*et al.*,<br><br>Defendants. | Civil Action No. 25-4258 (TNM) |

**REPLY IN FURTHER SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 1

I. Plaintiffs' Removals Were Lawful Under The Article II Removal Power ........ 1

II. Plaintiffs Fail To State A Claim Under The First Amendment ........ 7

III. Plaintiffs Fail To State Procedural Due Process Claims ........ 11

A. Plaintiffs Were Not Deprived Of Any Property Interest ........ 11

B. Plaintiffs Were Not Deprived Of Any Liberty Interest ........ 14

C. Plaintiffs Received Adequate Process ........ 16

IV. Plaintiffs Fail To State A Substantive Due Process Claim ........ 19

V. Linden Fails To State A Claim ........ 20

A. Due Process ........ 21

B. Ultra Vires ........ 22

VI. Plaintiffs' Derivative Claims Should Be Dismissed ........ 24

CONCLUSION ........ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Americains Accidentels v. United States Dep't of State*,
633 F. Supp. 3d 74 (D.D.C. 2022) ........ 19
*Ashton v. Civiletti*,
613 F.2d 923 (D.C. Cir. 1979) ........ 14
*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972) ........ 11
*Breiterman v. U. S. Capitol Police*,
15 F.4th 1166 (D.C. Cir. 2021) ........ 8, 19
*Brown v. Entertainment Merchants Ass'n*,
564 U.S. 786 (2011) ........ 8
*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ........ 24
*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) ........ 17, 18
*County of Sacramento v. Lewis*,
523 U.S. 833 (1998) ........ 19, 20
*Dep't of State v. Munoz*,
602 U.S. 899 (2024) ........ 19
*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) ........ 22
*Elrod v. Burns*,
427 U.S. 347 (1976) ........ 9
*Esparraguera v. Dep't of the Army*,
101 F.4th 28 (D.C. Cir. 2024) ........ 17
*Farah v. Esquire Mag.*,
736 F.3d 528 (D.C. Cir. 2013) ........ 14
*Fornaro v. James*,
416 F.3d 63 (D.C. Cir. 2005) ........ 22, 23
*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) ........ 1
*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ........ 7, 8, 9, 19
*Garrow v. Gramm*,
856 F.2d 203 (D.C. Cir. 1988) ........ 21
*Gibson v. Berryhill*,
411 U.S. 564 (1973) ........ 18
*Gilbert v. Homan*,
520 U.S. 924 (1997) ........ 17
*Graham v. Ashcroft*,
358 F.3d 931 (D.C. Cir. 2004) ........ 22

*Griffith v. FLRA*,
842 F.2d 487 (D.C. Cir. 1988) .......... 20, 22, 23
*Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
920 F.3d 1 (D.C. Cir. 2019) .......... 7
*Heffernan v. City of Paterson, N.J.*,
578 U.S. 266 (2016) .......... 9
*Hall v. Ford*,
856 F.2d 255 (D.C. Cir. 1988) .......... 12, 21
*Holman v. Williams*,
436 F. Supp. 2d 68 (D.D.C. 2006) .......... 14
*Jewell v. Jagadesan*,
Civ. A. No. 25-1322 (DLF), 2026 WL 686105 (D.D.C. Mar. 11, 2026) .......... 8
*Kartseva v. Dep't of State*,
37 F.3d 1524 (D.C. Cir. 1994) .......... 15, 16
*Langeman v. Garlan*d,
88 F.4th 289 (D.C. Cir. 2023) .......... 11, 12, 21
*Leedom v. Kyne*,
358 U.S. 184 (1958) .......... 22
*Marti Navarro v. United States*,
104 F. Supp. 2d 96 (D.P.R. 2000) .......... 13
*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......... 16
*McCabe v. Barr*,
490 F. Supp. 3d 198 (D.D.C. 2020) .......... 20
*Morrison v. Olson*,
487 U.S. 654 (1988) .......... 2, 5, 6
*Morrissey v. Brewer*,
408 U.S. 471 (1972) .......... 18
*Myers v. United States*,
272 U.S. 52 (1926) .......... 6
*NRC v. Texas*,
605 U.S. 665 (2025) .......... 23
*O'Donnel v. Barr*y,
148 F.3d 1126 (D.C. Cir. 1998) .......... 14
*Orange v. District of Columbia*,
59 F.3d 1267 (D.C. Cir. 1995) .......... 15
*Perry v. Sindermann*,
408 U.S. 593 (1972) .......... 13
*Pickering v. Bd. of Ed. of Township High Sch. Dist. 205, Will Cnty., Ill.*,
391 U.S. 563 (1968) .......... 9
*Printz v. United States*,
521 U.S. 898 (1997) .......... 7
*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .......... 2, 3, 5
*Singh v. District of Columbia*,
55 F. Supp. 3d 55 (D.D.C. 2014) .......... 17

*Strzok v. Garland*,
No. 19-2357 (ABJ), 2025 WL 4662300 (D.D.C. Sept. 23, 2025) .................................... 17, 21
*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) .................................... 1, 3, 4
*Trump v. United States*,
603 U.S. 593 (2024) .................................... 2, 4, 5, 6
*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) .................................... 3, 4
*United States v. Perkins*,
116 U.S. 483 (1886) .................................... 3
*Wilbur v. U.S. ex rel. Barton*,
46 F.2d 217 (D.C. Cir. 1930) .................................... 6
*Winder v. Erste*,
566 F.3d 209 (D.C. Cir. 2009) .................................... 9

**Statutes and Other Authorities**

U.S. Const. art. II .................................... *passim*
5 U.S.C. § 3131 .................................... 5
5 U.S.C. § 3132 .................................... 2, 5
5 U.S.C. § 7123 .................................... 22
5 U.S.C. § 7511(b)(8) .................................... 18
5 U.S.C. § 7543(b) .................................... 23

Defendants Kashyap P. Patel, Director, Federal Bureau of Investigation ("FBI"); the FBI; Todd Blanche, Attorney General of the United States; the United States Department of Justice; the Executive Office of the President; and the United States of America, respectfully submit this reply in further support of their Motion to Dismiss Plaintiffs' Second Amended Complaint (ECF No. 27, "2AC") for failure to state a claim upon which relief can be granted.

## INTRODUCTION

At every step, Plaintiffs' Opposition (ECF No. 32, "Opp.") envisions an FBI force independent from political leadership and, in turn, the will of the people. Plaintiffs argue the Article II removal power does not extend to FBI agents—placing them outside any chain of accountability. But the Supreme Court has rejected Plaintiffs' broad theory of government "ruled by functionaries." *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010). This Court should as well. Regardless, Plaintiffs' claims all fail as a matter of law.

## ARGUMENT

### I. <u>Plaintiffs' Removals Were Lawful Under The Article II Removal Power</u>

Plaintiffs' argument that they were shielded from Article II removal would undermine if not destroy the accountability that Article II guarantees. They propose a three-part framework: that "nearly" all principal officers are subject to Article II; that "modest" restrictions are allowed for inferior officers; and that apparently all non-officer "employees" can have "civil service protections that are at least as generous as those available to inferior officers," if not completely unlimited protections. Opp. 38, 42 (formatting modified). That is not the law.

Instead, the President, "with whom the buck stops," is in charge of the Executive Branch. *Trump v. Slaughter*, 146 S. Ct. 2283, 2293 (2026). Accordingly, "the President may remove his subordinates at will." *Id.* at 2297. That power extends at least to all those who exercise "quintessentially executive function[s]" that are within the President's "'conclusive and

preclusive' authority." *Trump v. United States*, 603 U.S. 593, 607-08, 620 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring)). Because "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority," the President can remove subordinates whose functions involve such subjects for any reason. *Id.* at 609.

Under these principles, all Plaintiffs are subject to Article II because the "investigation and prosecution of crimes is a quintessentially executive function" that "plainly implicate[s]" the President's "conclusive and preclusive authority." *Id.* at 620 (quoting *Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting)). The Supreme Court has specifically recognized the President's need to carry out his constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, through the Attorney General and other Justice Department officials, *Trump*, at 620. And Article II removal applies to Plaintiff Sarah Linden (the only Plaintiff with statutory removal protections) for the additional reason that she was clearly an inferior officer who, as an SES agent, could not have had "limited duties and no policymaking or administrative authority." *Seila Law LLC v. CFPB*, 591 U.S. 197, 218 (2020); *see* 5 U.S.C. § 3132.

Plaintiffs' contrary arguments are vague and incorrect. They assert that inferior officers can have purportedly "modest" for-cause removal protections. Opp. 38. At times, Plaintiffs seem to imply that "mere employees" can have unlimited removal protections, such that Article II does not apply at all. But Plaintiffs end up asserting only that non-officer employees can have "civil service protections that are at least as generous as those available to inferior officers" (though here, the non-SES Plaintiffs do not have any civil service protections). *Id.* at 38, 42. This is wrong at every step.

Take Plaintiff's argument that "Article II does not prohibit Congress from imposing limits on the executive's authority to remove 'inferior officers.'" Opp. 39 (citing *United States v. Perkins*, 116 U.S. 483, 485 (1886)). The Supreme Court has said much to the contrary in the 140 years since *Perkins*. Specifically, any inferior-officer exception to the Article II removal power applies only to "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 218.

Nor do the principles outlined in *Slaughter* apply only to principal officers. Even the *Slaughter* dissent resigned itself to the fact that those principles prevent "drawing a line" on the President's removal authority "at principal officers." 146 S. Ct. at 2344 (Sotomayor, J., dissenting). After all, "[i]inferior officers … wield some executive power." *Id.* (Sotomayor, J., dissenting). And "[r]egardless of their rank, if the President cannot have such individuals removed at will, then there is a break in the chain of dependence . . . which . . . must reach" from the President "down all the way to the lowest officers." *Id.* (Sotomayor, J., dissenting) (internal quotation marks omitted). That is exactly right. In fact, the only exceptions acknowledged by *Slaughter* to the general-removability rule is for officers to whom executive power is not "attached," or for those limited to "functions traditionally handled outside the Executive Branch." *Id.* at 2306. Accordingly, even assuming the limited inferior-officer exception survives *Slaughter*, it simply cannot apply here.

Plaintiffs resort to arguing that under *United States v. Arthrex, Inc.*, 594 U.S. 1, 24-27 (2021) (plurality opinion), Article II requires only that a principal officer can supervise a "federal worker[]," such that the Article II removal power need not apply. Opp. 41. But *Arthrex* did not address "workers" who perform quintessentially Executive law enforcement functions. Regardless, *Arthrex* stands for the proposition that an official's exercise of executive authority can

raise a distinct Article II concern when the official's decisions are insulated from review by a principal officer. 594 U.S. at 14-23. That does not support Plaintiff's inference that any official who is subject to supervision can thus be shielded from Article II removal. Indeed, almost all executive personnel (including everyone below the Attorney General in the Department of Justice) is subject to some supervision. By Plaintiffs' logic relying on *Arthrex*, the Deputy Attorney General could be shielded from Article II removal. That cannot be right.

Instead, the relevant Article II question is not whether an FBI agent possesses unfettered discretion over every consequential law enforcement decision, but whether the authority she does exercise is "conclusive and preclusive" executive authority. Federal investigation and prosecution of crimes are quintessential executive functions, and FBI agents exercise those functions on behalf of the Executive Branch. If the Attorney General could not remove FBI agents at will, those agents could make law enforcement decisions with which the President disagrees, in an area where the President is supposed to have "conclusive and preclusive" power.

Accordingly, Plaintiff's distinction between employees and inferior officers is a red herring. *See Slaughter*, 146 S. Ct. at 2344 (Sotomayor, J., dissenting) (acknowledging that "likely many employees within the civil service . . . wield some executive power" that logically implicates the *Slaughter* majority's reasoning). To the extent employees may be "subordinates" to the President, *Slaughter*, 146 S. Ct. at 2297, whose functions are essential to the President's exercise of his "conclusive and preclusive" authority, *Trump v. United States*, 603 U.S. at 607-08, they are necessarily subject to the Article II removal power. And to the extent the non-binding decisions in *Comans* and *Comey* suggest otherwise, they are simply wrong.

Of course, Linden is removable for the additional reason that she was an inferior officer who exercised at least significant administrative authority. SES members are tasked with the very

executive management of the Government of the United States and are responsible for the effectiveness of Executive Branch officers and employees working beneath them. 5 U.S.C. § 3131. An SES official "directs the work of an organizational unit," "is held accountable for the success of one or more specific programs or projects," "monitors progress toward organizational goals and periodically evaluates and makes appropriate adjustments to such goals," "supervises the work of employees other than personal assistants," or "otherwise exercises important policy-making, policy-determining, or other executive functions." *Id.* § 3132. It is impossible to do one or more of those things without exercising policy *or* administrative authority. Removal restrictions for that kind of officer would definitionally "interfere" with the President's free reign over quintessentially executive operations within is branch of the federal Government. *Seila Law*, 591 U.S. at 217.

In response to all this, Linden argues that she did not exercise the same powers as the Independent Counsel in *Morrison*. Opp. 43. But *Morrison* expressly held that the independent counsel was an inferior officer. *Id.* at 672-73. And as the Supreme Court has repeatedly explained, *Morrison*'s limited holding that the *sui generis* independent counsel at issue could be shielded from removal rested on a fact-bound conclusion that the independent counsel had "limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 218. That conclusion cannot possibly control here. In her own, different role within the Executive Branch, Linden (by definition under the SES statute) exercised substantial executive authority as necessary (i) to be deemed an officer, and (ii) for whatever is left of the narrow *Perkins* exception for certain inferior officers not to apply. Even under *Morrison*'s unorthodox "balancing test," 487 U.S. at 711 (Scalia, J., dissenting), insulating such a law enforcement supervisor from removal (or any Plaintiff here

from removal) would "interfere with [the President's] constitutional obligation to ensure the faithful execution of the laws," *id.* at 693.

After failing to overcome Article II, Plaintiffs ask the Court to artificially narrow it to avoid supposedly difficult questions. For example, Plaintiffs question whether the removal power "trump[s] other constitutional requirements" (without squarely arguing to the contrary). Opp. 45. But the answer to that question is straightforward, because the Supreme Court could not have been clearer: Courts have "no power" to review any valid assertion of the "conclusive and prelusive" removal power. *Trump*, 603 U.S. at 607 (quoting *Marbury v. Madison*, 1 Cranch 137, 166 (1803)). Not under the First Amendment, not under the Due Process Clause, and not based on any other assertion of purported illegality. And it is Plaintiffs' position, not this feature of Article II, that would lead to destructive results. For example, if the First Amendment could constrain the removal power, the President could not consider the expressed viewpoints of Executive Branch officials to determine whether they should be part of his chain of command. That is why, "once it is determined that the President acted within the scope of his exclusive authority, his discretion in exercising such authority cannot be subject to further judicial examination." *Id.* at 608.

Similarly, Plaintiffs half-heartedly suggest that if the Court applies Article II, the Court will "need to address whether Plaintiffs' removals were invalid . . . initially." Opp. 45. Not so. Plaintiffs do not dispute the Attorney General may exercise the Article II removal power on the President's behalf. *Wilbur v. U.S. ex rel. Barton*, 46 F.2d 217, 219 (D.C. Cir. 1930) (citing *Wosley v. Chapman*, 101 U.S. 755, 769 (1879)); *see* Opp. 45 (arguing only "that Article II removal authority cannot be delegated to officials beneath Department heads").[1] Given that the D.C.

---

1 *See also Myers v. United States*, 272 U.S. 52, 60 (1926) ("Each head of a department is and must be the President's alter ego in the matters of that department where the President is

Circuit has "repeatedly held that a properly appointed official's ratification of an allegedly improper official's prior action . . . resolves the claim on the merits by remedying the defect (if any) from the initial appointment," there is no question that Plaintiffs have been terminated pursuant to Article II. *Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1, 13 (D.C. Cir. 2019) (internal quotation marks and alterations omitted).

## II. Plaintiffs Fail To State A Claim Under The First Amendment

Even if the Article II removal power did not preclude all of Plaintiffs' claims, those claims would still clearly fail. That includes Plaintiffs' misguided First Amendment claim. Plaintiffs do not dispute that the conduct at the heart of this case, which the bulk of their second amended complaint seeks to portray as heroic, is unprotected by the First Amendment. *See* Opp. 9 ("Plaintiffs' actions . . . were *not* political expression[.]"); *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Instead, Plaintiffs rely on their "perceived political affiliation" theory. Opp. 8. The theory appears to work as follows:

1. Plaintiffs kneeled during a protest while performing their official duties.

2. As a result of Plaintiffs kneeling, Defendants inferred that Plaintiffs "were insufficiently affiliated with President Trump." Opp. 2.

3. Private political affiliation of public employees is protected by the First Amendment. *See* Opp. 4-5.

4. Plaintiffs' termination for kneeling was really termination for their private political affiliation and thus violates the First Amendment.

---

required by law to exercise authority); *Printz v. United States*, 521 U.S. 898, 922 (1997) (the President fulfills his duties both "personally and through officers whom he appoints").

There are multiple problems with this theory. To start, the only conduct that Plaintiffs allege could give rise to any perceived partisan affiliation was their purported "use of de-escalation to quell unrest" by kneeling—*i.e.*, their unprotected conduct while performing official duties. 2AC ¶ 150; *see also id.* ¶ 132. In other words, the supposed perceived partisan affiliation they assert is intertwined with, and entirely dependent on, their unprotected conduct. *See Jewell v. Jagadesan*, Civ. A. No. 25-1322 (DLF), 2026 WL 686105, at *4 (D.D.C. Mar. 11, 2026) (dismissing an "assumed political viewpoint" claim where the plaintiff did not allege "speech 'as a citizen' or any other protected conduct" (quoting *Garcetti*, 547 U.S. at 422)).

Adopting Plaintiffs' theory would largely gut *Garcetti*. After all, extreme or inappropriate on-duty conduct could often lead to an inference of political views that leadership has criticized, and in those circumstances the unprotected conduct and the political views cannot be disentangled. The government's interest in disciplining official conduct is arguably at its zenith in such circumstances given that apparent partisanship undermines "the special degree of trust and discipline required" in a law enforcement agency. *Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1176-77 (D.C. Cir. 2021). But under Plaintiffs' theory, an officer expressing such views would always enjoy some First Amendment protection. That would be true whether the "perceived partisan affiliation" related to a past President or a terrorist organization.

Indeed, because the First Amendment protects political and apolitical expression (and the line between the two is often blurry), Plaintiffs' theory cannot even logically be limited to political affiliation. *Cf. Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 790 (2011) ("What is one man's amusement, teaches another's doctrine." (quoting *Winters v. New York*, 333 U.S. 507, 510 (1948))). Any official conduct or speech that gives rise to an inference of some privately held (and privately protected) viewpoint should, on Plaintiffs' telling, enjoy protection. But the entire

premise of *Garcetti* is that what "might otherwise be just the sort of citizen speech protected by the First Amendment" is *not* protected. *Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009).

In lieu of *Garcetti*, Plaintiffs rely on several inapposite authorities. *See* Opp. 4-5, 8. No one disputes that public officials can privately "engage[] in protected activity." *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 274 (2016) (citing *Branti v. Finkel*, 445 U.S. 507, 519 (1980); *Elrod v. Burns*, 427 U.S. 347, 359 (1976)). When the official speaks "*as a citizen* on a matter of public concern," "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418 (citing *Pickering v. Bd. of Ed. of Township High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968) (emphasis added)). But here, Plaintiffs did not speak as citizens. *Heffernan*'s holding—that an employer's "mistake" about whether the discharged official "in fact engaged in [private] protected political activity" does not change the First Amendment analysis, 578 U.S. at 268—is irrelevant when *un*protected official conduct is at issue. That is true regardless of whether or not such official conduct allegedly led to an inference of political affiliation (which *Heffernan*, *Branti*, and *Elrod* did not address).

Even putting all that aside, Plaintiffs have not plausibly alleged any causal link between Defendants' adverse action and their alleged perception of Plaintiffs' partisan affiliation. The Director's and others' alleged public statements about agents not "undermin[ing] the president's agenda" and "the Deep State," Opp. 5, on their face refer to official conduct and actions. That the Director allegedly equated "the Democrats and the Deep State" two years before his appointment, *id*. at 10, only underscores that unprotected conduct pursuant to official duties can often be intertwined with politics. And the second amended complaint's allegation that "other FBI agents" have been terminated for "political reasons," *id.* at 6, is conclusory and could not establish anything

with respect to *these* agents. Plaintiffs cannot seriously rely on statements made by a non-Defendant former congressman. *Id.* at 10. And Plaintiffs' attempt to contrast their treatment with that of "FBI agents who responded to the January 6, 2021 unrest," *id.* at 6, ignores the absence of any analogous allegations in the second amended complaint about such agents' conduct. Regardless, Director Patel's alleged statement that FBI agents do not generally perform "[r]iot control," *id.* at 10, does not plausibly suggest that any termination for any conduct during riot control was motivated by partisan affiliation. To say that FBI agents are not properly trained to handle a riot is not to imply that it is therefore appropriate for FBI agents to appear to express solidarity with anti-law-enforcement rioters.

Plaintiffs' additional arguments only confirm the weakness of their theory. They suggest that Director Patel's exercise of his "summary dismissal" authority somehow establishes political targeting. Opp. 8. But summary dismissal is supposed to be unusual. By definition, it occurs when "compelling or exigent circumstances are at stake." 2AC ¶ 47(g). Egregious officer conduct can obviously give rise to such circumstances. And whether summary dismissal is "disproportionate," Opp. 7, is a discretionary judgment by the Director that has nothing to do with the First Amendment, *see infra* at pp. 11-12. The "timing of Plaintiffs' firings" also does not establish they were targeted for their private political beliefs. Opp. 7. Plaintiffs' allegations suggest at most that Director Patel disagreed with prior leadership's handling of the kneeling incident and acted accordingly. That does not support any inference about private political views.

In the end, Plaintiffs' allegations do not plausibly establish that they were terminated because Director Patel correctly or mistakenly believed they privately supported any politician. Instead, the allegations make clear that Plaintiffs were terminated because Plaintiffs publicly—and in performing their official duties—supported anti-law-enforcement rioters. Whether Director

Patel could have (or did) draw any inference about their political views based on that official conduct is irrelevant.

The Court should dismiss Plaintiffs' First Amendment claim.

## III. <u>Plaintiffs Fail To State Procedural Due Process Claims</u>

Plaintiffs cannot establish that they were deprived of any cognizable property or liberty interest. Regardless, Plaintiffs received adequate process. Plaintiffs' contrary arguments would significantly undermine the FBI Director's summary dismissal authority in favor of judicial oversight of law enforcement personnel decisions.

### A. Plaintiffs Were Not Deprived Of Any Property Interest

"For a property interest to be constitutionally protected by procedural due process, a person must 'have a legitimate claim of entitlement to it,' beyond 'an abstract need or desire.'" *Langeman v. Garland*, 88 F.4th 289, 295 (D.C. Cir. 2023) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). "Property interests, of course, are not created by the Constitution." *Bd. of Regents of State Colleges*, 408 U.S. at 577. Such an entitlement must be "derived from 'existing rules or understandings that stem from an independent source.'" *Langeman*, 88 F.4th at 295 (quoting *Bd. of Regents of State Colls.*, 408 U.S. at 577). "[T]he independent source must place substantive limitations on official discretion" in the form of "explicitly mandatory language." *Id.* (internal quotation marks omitted).

No independent source mandated Plaintiffs' continued employment. To the contrary, the independent source on which Plaintiffs seek to rely is the FBI's disciplinary policies. But those policies themselves provide for summary dismissal. Plaintiffs have acknowledged that the FBI Director retains "summary dismissal" authority. Opp. 15; *see also* 2AC ¶ 47(g) (describing FBI policy providing for "summary dismissal" when "compelling or exigent circumstances are at stake"). As a result, Plaintiffs had "no objective basis for believing that they w[ould] continue to

be employed indefinitely." *Hall v. Ford*, 856 F.2d 255, 265 (D.C. Cir. 1988). Their arguments about *other* disciplinary procedures *outside* the summary dismissal process, Opp. 12-14, are all irrelevant; Plaintiffs' employment was always subject to the Director's summary dismissal power.

Plaintiffs cannot evade the breadth of that discretionary power. Their assertion that they were terminated "without *substantive* grounds," Opp. 16, ignores the substantive grounds stated in their termination letters, 2AC ¶ 113 ("unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government"). So Plaintiffs really mean they believe the reasons stated when the Director invoked his summary dismissal authority were mistaken. But the D.C. Circuit has made clear that the summary dismissal authority "reserves 'expansive authority and discretion' for FBI leadership to determine the circumstances where an FBI employee may be summarily dismissed." *Langeman*, 88 F.4th at 295 (quoting *Crooks v. Mabus*, 845 F.3d 412, 419 (D.C. Cir. 2016)). Whether "compelling or exigent circumstances are at stake" is for the Director to decide; it is not a "substantive limit on official discretion." *Id.* Accordingly, Plaintiffs cannot establish a property interest by second-guessing the Director's exercise of that discretion.

Plaintiffs' other property-interest arguments fall flat. For example, Plaintiffs purport to rely on the "overall workings" of the FBI. Opp. 12. But such nebulous "workings" could not establish any "explicitly mandatory" limits on the Director's express and undisputed summary termination authority. *Langeman*, 88 F.4th at 295. Similarly, Plaintiffs argue that prior leadership's decision not to discipline them, combined with a lack of intervening reconsideration until 2025, gave Plaintiffs the "understanding" that they "would not be discharged for the events of June 4, 2020." Opp. 18. But Plaintiffs' purported "understanding" is not a "legitimate claim of entitlement." *Langeman*, 88 F.4th at 295. Plaintiffs essentially argue that the FBI entered into an

oral contract not to fire Plaintiffs. *See* Opp. 19 (citing contract principles about "words and conduct"). Confusingly, Plaintiffs repeatedly refer to an "express promise." Opp. 20 n.7. But they do not allege any specific promise, let alone a promise that they could *never* be summarily terminated by *any* Director for their past conduct. Of course, there was no consideration or promise here (aside from the written documents and policies governing Plaintiffs' employment, including the Director's summary termination authority). And the mere results of prior investigations do not create property interests that bind future Directors. Were it otherwise, Directors could tie their successors' hands, distorting the chain of accountability that runs from law enforcement personnel to the *current* Director, Attorney General, President, and the people. Ultimately, Plaintiffs admit that "[n]o case" supports their novel theory of a property interest based on the presumption that prior internal investigations are binding forever. Opp. 19.

Instead, Plaintiffs rely on a case from the District of Puerto Rico that they admit was decided "on other grounds." Opp. 19 (citing *Marti Navarro v. United States*, 104 F. Supp. 2d 96 (D.P.R. 2000)). Indeed, that court rejected a plaintiff's due process claim. *See Marti Navarro*, 104 F. Supp. 2d at 100. The fact that, "[u]nder some circumstances, the government can create an 'understanding' that . . . creates a property interest," *id.* at 100 n.2 (quoting *Perry v. Sindermann*, 408 U.S. 593, 599-600 (1972)), says nothing about whether that occurred here. There could not have been any "rules or mutually *explicit* understandings" conferring a property right, *Perry*, 408 U.S. at 601, given that any and all representations would have been made against the backdrop of the Director's express summary termination authority. Plaintiffs suggest that authority could not overcome their prior understanding "without procedural protections." Opp. 20 n.7. But even accepting their (unjustified) understanding, the summary dismissal policy *does* provide some

"protections" because it may be exercised only by "the FBI Director, Deputy Director, or Assistant Director for OPR." 2AC ¶ 47(g).[2]

Simply put, an FBI agent who was terminated pursuant to a well-established summary dismissal policy cannot possibly claim to have had an expectation of entitlement to continued employment as if that policy did not exist.

**B. Plaintiffs Were Not Deprived Of Any Liberty Interest**

Plaintiffs have not established a deprivation of liberty based on "defamation" or "continuing stigma." Opp. 21.

In "[t]he first category of claim, . . . the plaintiff points to the conjunction of official defamation and adverse employment action." *O'Donnel v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998). But here, Plaintiffs do not point to any statement (let alone a defamatory one) "at the time of" the adverse employment action. *Id.* They do not rely on their termination letters. Opp. 22. Instead, they point to "multiple public statements." *Id.* Because Plaintiffs do not (and could not) argue these statements were made in conjunction with Plaintiffs' terminations, their theory fails. In any event, alleged statements that "everyone" the Director terminated (not specific to Plaintiffs) "weaponized the agency or otherwise failed in their duties," *id.* (formatting modified and internal quotation marks omitted), are plainly not the sort of statements that are "capable of being proved . . . false," so they are "not actionable in defamation." *Farah v. Esquire Mag.*, 736 F.3d 528, 534-35 (D.C. Cir. 2013). Additionally, dismissal for "unsatisfactory job performance" rather than some "enduring defect in . . . personality," cannot "rise to the level of constitutional harm." *Holman v.*

[2] For the same reasons, Plaintiffs' reliance on *Ashton v. Civiletti*, 613 F.2d 923 (D.C. Cir. 1979), fails. *See* Opp. 13. *Ashton* did not concern or discuss the Director's summary dismissal authority. And its facts, which involved "termination of . . . employment solely by reason . . . of homosexuality," *id.* at 924, are far afield from this case.

*Williams*, 436 F. Supp. 2d 68, 79 (D.D.C. 2006) (citing *Harrison v. Bowen*, 815 F.2d 1505, 1518 (D.C. Cir. 1987)). Plaintiffs do not meaningfully address these dispositive points.

Plaintiffs' "stigma-plus theory" fails, too. Opp. 22. Plaintiffs rely on their "extraordinary summary dismissals." Opp. 23. But they do not allege why any third parties, let alone potential employers, would even be aware of the summary nature of their dismissals. Plaintiffs do not dispute that the termination letters were not published to third parties (and all but two of them are proceeding under pseudonyms). *See id.* at 22-23; *Orange v. District of Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995) (rejecting stigma theory because "injury to reputation cannot occur in the absence of public disclosure of the allegedly damaging statements").

Even if there were a public record, the bare fact of summary dismissal cannot automatically give rise to this type of claim. Summary dismissal does not cause any "tangible change in status" as required "to be actionable under the due process clause," let alone "foreclose[]" Plaintiffs "from reentering the field." *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528, 1529 (D.C. Cir. 1994). Otherwise, any law enforcement officer terminated for especially compelling or exigent (but not publicly stated) reasons would, paradoxically, be able to assert this sort of claim.

It is also not even clear what Plaintiffs mean when they argue they can no longer "pursue their chosen careers." Opp. 23. To the extent they define their careers "narrowly"—to include only the very jobs from which they were terminated—Plaintiffs cannot circularly define their field of work. Opp. 23; *see also* 2AC ¶ 142 (arguing that Plaintiffs' "prior employment as FBI Special Agents . . . ha[s] no comparators"). This, again, would give any terminated FBI agent a due process claim (effectively nullifying the Director's summary termination power).

To the extent Plaintiffs define their careers "more broadly," to include "law enforcement," Plaintiffs concede that at least two plaintiffs are "doing work adjacent to law enforcement" as

government contractors. Opp. 24 (internal quotation marks omitted). The second amended complaint contrasts such contractor positions with those "more tangentially related to law enforcement, such as account and systems managers." 2AC ¶ 146. So two Plaintiffs are performing work with at least some law enforcement nexus. Plaintiffs cannot vaguely suggest they are doing law-enforcement-related work, then use the lack of detail in their allegations as a basis for discovery.

More generally, the second amended complaint lacks detail necessary to discern whether and to what extent other Plaintiffs have had trouble getting positions related to law enforcement. The only Plaintiffs whom the complaint even squarely alleges have applied to law enforcement positions are Jane Doe 3 and Jane Doe 4 (who is one of the contractors apparently doing law enforcement adjacent work). *See* 2AC ¶ 146. Other Plaintiffs claim to have applied unsuccessfully to positions as a general matter, but the nature of those positions, and other factors that could bear on their search (like geography), remain a mystery. That is not enough for Plaintiffs to plausibly allege they have been "broadly preclu[ded]" from working in law enforcement in the sense that can give rise to this sort of claim. *Kartseva*, 37 F.3d at 1530.

**C. Plaintiffs Received Adequate Process**

Because Plaintiffs have not established a protected property or liberty interest, they were not entitled to any particular process. In any event, the process owed to them would be minimal. For all the reasons discussed above, the "private interest" at issue is limited at best, and the "[g]overnment's interest" in taking decisive action to maintain an accountable law enforcement force that reflects the FBI's mission is significant. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). What is more, the "risk of an erroneous deprivation" and the "probable value of additional procedures" are both non-existent in this circumstance. *Id.* As Plaintiffs emphasize, there had been multiple investigations into their conduct, including the latest investigation in which they

provided sworn statements and were interviewed. In their second amended complaint, Plaintiffs did not allege what "additional photos, videos, and statements from relevant witnesses," or what "expert testimony," they would have "submitted." Opp. 27. Plaintiffs cannot now amend their complaint "through an opposition brief." *Singh v. District of Columbia*, 55 F. Supp. 3d 55, 70 (D.D.C. 2014). Even if they could, their assertions are too vague to suggest any additional process could have made any difference. Assuming for the sake of argument that people could have different opinions about what occurred, "the circumstances surrounding the [events] at issue . . . were not in dispute." *Strzok v. Garland*, Civ. A. No. 19-2357 (ABJ), 2025 WL 4662300, at *28 (D.D.C. Sept. 23, 2025).

Plaintiffs thus received "notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). Although Plaintiffs assert they lacked formal notice, Opp. 26, it is undisputed that they knew "the factual basis for the action,'" *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 40 (D.C. Cir. 2024) (quoting *Ralls Corp. v. Comm. On Foreign Inv. In U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014)); *see* 2AC ¶ 106. And Plaintiffs had a meaningful "opportunity . . . to tell [their] side of the story." *Gilbert v. Homar*, 520 U.S. 924, 929 (1997). Not only in their sworn statements and interviews, 2AC ¶¶ 107-08, but also during the prior investigation that formed part of the record before Director Patel, *see id.* ¶¶ 87-89, 115. Whether Plaintiffs had "an oral hearing" is immaterial, Opp. 28, because "[t]he opportunity to present reasons, either in person or in writing," satisfies due process, *Loudermill*, 470 U.S. at 546.

Plaintiffs nevertheless argue, based on a smattering of quotes from decades-old out-of-circuit opinions, that they were entitled to either "a fuller opportunity to mount a challenge . . . *after* . . . termination," Opp. 25, or a pre-termination hearing "akin to a trial, with each side calling

witnesses and presenting evidence, cross-examining opposing witnesses, arguing their respective cases, and so on," Opp. 26 (internal quotation marks and alterations omitted). That is incorrect. Plaintiffs received "notice and an opportunity to respond." *Loudermill*, 470 U.S. at 546. There is no requirement that they receive "a full adversarial evidentiary hearing prior to adverse governmental action." *Id.* at 545. "Due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Requiring full trial before dismissal would all but eliminate the Director's summary dismissal power. And because Plaintiffs have already had an adequate "opportunity to present [their] side of the story," *Loudermill*, 470 U.S. at 546, they are not entitled to additional post-termination procedures. As discussed above, such procedures would serve no purpose here.

As a last gasp, Plaintiffs assert that they were "deprived of a neutral adjudicator." Opp. 28. According to Plaintiffs, Director Patel didn't just need to jump through more hoops—he could not be the "decisionmaker" *at all*. *Id.* This theory would not only undermine accountability within the FBI—it would entirely eliminate it. In any termination, a supervisory official approves the personnel action. That does not mean there was any "prejudgment of the facts," which are not even seriously disputed, or "personal interest," which is not alleged. *E.g.*, *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973). And to the extent Plaintiffs object to the absence of post-termination review by a body like the Merit Systems Protection Board, that objection would negate Congress's deliberate choice to exclude FBI officials from that agency's review. *See* 5 U.S.C. § 7511(b)(8). If a decision to terminate itself created the sort of bias problem that gives rise to a due process violation, summary termination would (once again) be a dead letter.

## IV. <u>Plaintiffs Fail To State A Substantive Due Process Claim</u>

Plaintiffs argue that their substantive due process claim "warrant[s] discovery." Opp. 30. Not so.

To start, Plaintiffs misunderstand the applicable test. They recognize "this Court has described the 'shocks the conscience standard as 'antecedent to any question about the need for historical examples of enforcing a fundamental liberty interest.'" Opp. 29 n. 9 (quoting *L'Association des Americains Accidentels v. U.S. Dep't of State*, 633 F. Supp. 3d 74, 86 (D.D.C. 2022)). But Plaintiffs appear to believe this means a "fundamental liberty interest" need not "be alleged in the Complaint." *Id.* And they do not attempt to identify one in their opposition. *Id.*

Plaintiffs ignore that an "antecedent" requirement, by definition, is not a *sole* requirement. Whether Plaintiffs have satisfied the shocks-the-conscience standard is a "threshold issue"—that is, an *additional* gatekeeping requirement because Plaintiffs "challenge executive action on substantive due process grounds." *L'Association des Americains Accidentels*, 633 F. Supp. 3d at 86. "Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action, and only then might there be a debate about the sufficiency of historical examples of enforcement of the right claimed, or its recognition in other ways." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). At the second step, Plaintiffs do not and could not ground their substantive due process claim in any "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Dep't of State v. Munoz*, 602 U.S. 899, 910 (2024). That alone is dispositive.

To be clear, the claim fails at the threshold as well. "[C]onduct deliberately intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849. The FBI has a strong interest

in ensuring that agents do not carry out their duties in a manner that undermines law enforcement. *See, e.g.*, *Garcetti*, 547 U.S. at 422-23; *Breiterman*, 15 F.4th at 1177. Plaintiffs try to sidestep this obvious rationale based on their allegations that their terminations were "pretextual" and "unjustified," such that they should get discovery into Defendants' "motive[s]." Opp. 30. But the demanding substantive due process test asks whether government action was "unjustif*iable*," *Lewis*, 523 U.S. at 849 (emphasis added), not whether a plaintiff disagrees with the action or how the government has explained it. Plaintiffs can point to no authority suggesting that summary dismissal shocks the conscience just because a previous investigation occurred, time has passed, and (for example) some "Plaintiffs . . . could have been eligible for early retirement." Opp. 30. There is none.[3] New leadership having different views on how prior conduct should be evaluated in light of the agency's mission is hardly anomalous, let alone conscience-shocking.

## V. Linden Fails To State A Claim

Like the other Plaintiffs, Linden did not have a property interest in her position and received adequate process in any event. She also cannot satisfy the demanding standard for *ultra vires* claims—which in this context are entirely unreviewable.

---

[3] Plaintiffs rely solely on *McCabe v. Barr*, 490 F. Supp. 3d 198 (D.D.C. 2020). *See* Opp. 30. That non-binding decision is inapposite in multiple respects. For instance, it expressly declined to apply the shocks-the-conscience standard. *See McCabe*, 490 F. Supp. 3d at 225. Instead, the Court held that the plaintiff had plausibly alleged that the defendants "deliberately flouted" the law. *McCabe*, 490 F. Supp. at 225. Plaintiffs have not meaningfully argued that Defendants deliberately flouted the law here. Instead, they rely exclusively on the shocks-the-conscience standard. In any event, for all the reasons explained above and below, Plaintiffs do not plausibly allege that Defendants "flouted the law in a manner that trammeled significant personal or property rights," let alone did so "deliberately." *McCabe*, 490 F. Supp. 3d at 225. In *McCabe*, the plaintiff had already "retired from the FBI." *Id.* There is nothing like that here.

### A. Due Process

Even if they were valid, removal protections are not enough to give Linden a property interest in her position as an FBI agent. The "provision of procedural safeguards cannot in itself create a property interest for purposes of due process analysis." *Griffith v. FLRA*, 842 F.2d 487, 495 (D.C. Cir. 1988) (citing *Olim v. Wakinekona*, 461 U.S. 238, 250-251 (1983)). Linden acknowledges that "[t]he D.C. Circuit has previously held that two statutory provisions prohibiting the dismissal of an employee for certain specified reasons did not create property rights." Opp. 20 n.7 (citing *Hall*, 856 F.2d at 266; *Garrow v. Gramm*, 856 F.2d 203, 208 (D.C. Cir. 1988)). "It is not enough that a statute prohibits the dismissal of an employee for certain specified reasons. For that employee to have a constitutionally protected property interest in his job, the statute must provide the employee with an objectively reasonable expectation that he is entitled to retain it." *Hall*, 856 F.2d at 266. Even when an officer can be terminated "only for cause," the officer can expect to remain employed "*unless* they do something warranting their termination." *Id.* at 265 (emphasis in original). And given the Director's "expansive authority and discretion . . . to determine the circumstances where an FBI employee may be summarily dismissed," *Langeman*, 88 F.4th at 295 (internal quotation marks omitted), Linden had to know she served at the Director's pleasure. FBI SES agents generally understand they are "terminable at will by the director" and lack "any inherent entitlement to remain in [their] position[s]." *Strzok v. Garland*, Civ. A. No. 19-2367 (ABJ), Mem. Op., ECF No. 164, at 28 (D.D.C. Sept. 23, 2025). Linden notes that *Strzok* did not address the statutory provisions on which she relies. Opp. 32-33. But that is the point—the terminated FBI SES agent in that case did not even think to assert that he could expect to remain

in his position despite the Director's contrary judgment.[4]

At a minimum, for the same reasons, any property interest that Linden had in her position was limited and would require correspondingly limited process. But, as discussed above, Linden and her colleagues received more than enough process and have neither alleged nor persuasively explained what they would have done with more process.

**B. Ultra Vires**

Linden's *ultra vires* claim is not reviewable. She cites various cases providing that Congress must foreclose judicial review expressly. *See* Opp. 34. But as to the Civil Service Reform Act ("CSRA"), courts have been clear: "extrastatutory review is not available" for "a federal employee's challenge to an employment decision." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11 (2012) (internal quotation marks omitted). There is no "judicial review of personnel actions outside the bounds of the CSRA," regardless of whether a claim is styled *ultra vires*. *Graham*, 358 F.3d at 934. Otherwise, Plaintiffs—who were not granted any review rights under the CSRA—would enjoy "greater rights than [a]re available under the CSRA to employees who enjoy[] rights under that statute." *Id.*

Linden's contrary argument mischaracterizes *Griffith*. That decision arose in the distinct context of judicial review of a Federal Labor Relations Authority arbitration decision under 5 U.S.C. § 7123, where the question at issue "was the proper test to be applied where review uncovers a procedural error in the personnel decision under review." 842 F.2d at 493. Even then, the D.C. Circuit at most acknowledged the possibility of an "extremely limited scope" claim under *Leedom v. Kyne*, 358 U.S. 184 (1958), while holding that the "error asserted" in *Griffith* was

[4] As previously noted, *Esparraguera* did not address whether the distinct removal protections at issue there would interfere with the Article II removal power, or a scenario where Congress has precluded judicial review of statutory compliance.

"plainly not judicially correctable" under that standard, 842 F.2d at 493. "A series of opinions from the Supreme Court and [the D.C. Circuit]" in the decades since, and in the distinguishable context of a direct challenge to a removal, "make clear that [the CSRA's] remedial provisions are exclusive, and may not be supplemented by the recognition of additional rights to judicial review having their sources outside the CSRA." *Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005). The D.C. Circuit has applied this logic "in a variety of contexts," rejecting proposed "implied private right[s] of action," claims "under the APA," "*Bivens* remed[ies]," "*Vitarelli* actions," and beyond. *Id.* at 67. There is no basis to make an exception for *ultra vires* claims.

Linden could not come close to stating such a claim anyway. As *Griffith* itself makes clear (and Linden acknowledges), any *ultra vires* claim must allege an "error so extreme that one may view it as jurisdictional or nearly so." 842 F.2d at 493; Opp. 35. Such "a Hail Mary pass . . . rarely succeeds." *NRC v. Texas*, 605 U.S. 665, 681-82 (2025). Linden does not plausibly allege any error at all. Her allegations do not suffice to establish any violation of 5 U.S.C. § 7543(b)'s removal provisions. Those provisions would have afforded Linden "at least 30 days' advance written notice" and "a reasonable time . . . to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer," as well as a right to be represented by an attorney and "a written decision and specific reasons therefor." 5 U.S.C. § 7543(b). Linden had a chance to submit evidence. Nothing stopped her from enlisting an attorney. And she received a termination letter explaining the basis for her termination. 2AC ¶¶ 104, 106-108, 110, 113. The statute requires nothing more.

At a minimum, there was no *extreme* error. Linden faults the notice she received for not expressly articulating that she may be terminated. Opp. 36 (citing 2AC ¶ 106). But she acknowledges that the notice listed two "Offense Codes," *id.*, and the second amended complaint

points to internal guidelines showing that such violations could result in "dismissal," 2AC ¶ 106 n.53.[5] Linden thus understood the nature of the inquiry and what was at stake. And she had "a reasonable time . . . to answer . . . orally and in writing," Opp. 36, as evidenced by the fact that she *did* answer orally and in writing by providing a sworn statement and being interviewed. The termination letters gave "specific reasons" by explaining that Linden had "demonstrated unprofessional conduct and a lack of impartiality in carrying out duties, leading to the political weaponization of government." 2AC ¶ 113. Linden's conclusory assertion that the letters did not contain *enough* detail cannot demonstrate that Defendants acted "contrary to a specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022). The same is true for Linden's disagreement with the Director's discretionary judgment that Linden engaged in "misconduct or malfeasance." Opp. 36 (internal quotation marks omitted).

## VI. <u>Plaintiffs' Derivative Claims Should Be Dismissed</u>

Plaintiffs do not dispute that their declaratory judgment and mandamus claims rise or fall with their other claims. *See* Opp. 45. These derivative claims also fail.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Second Amended Complaint for failure to state a claim upon which relief can be granted. Because amendment would be futile, the Court should dismiss with prejudice.

---

[5] *Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process*, FBI (Jan. 1, 2017), https://vault.fbi.gov/offense-codes-and-penalty-guidelines-governing-fbis-internal-disciplinary-process/offense-codes-and-penalty-guidelines-governing-fbis-internal-disciplinary-process-final/. The policy states potential discipline for violations of Offense Code 2.12 at page 9 and for violations of Offense Code 5.22 at page 17.

Dated: November 13, 2026

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General

JEANINE FERRIS PIRRO
United States Attorney

MICHAEL WEISBUCH
Deputy Associate Attorney General

ANNA EDWARDS, Counsel
Office of the Associate Attorney General

By: *\/s/ Andrew J. Vaden*
ANDREW J. VADEN
Assistant United States Attorney
DC Bar No. 1044860
601 D Street, NW
Washington, DC 20530
(202) 252-2437

*Attorneys for the United States of America*